UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:23-CV-152

David John Hetzel, MD,

                              Plaintiff,

        vs.

ANC Healthcare, Inc.;
ANC Mission Hospital, Inc.;
HCA Healthcare, Inc.;
HCA Management Services, LP;
MH Master Holdings, LLLP;
MH Hospital Manager, LLC;
MH Mission Hospital, LLLP; and
HCA Healthcare Mission Fund, LLC,

                              Defendants.

**Mission's Brief in Support of
Motion to Dismiss**

This lawsuit is about a report that MH Mission Hospital, LLLP[1] made to the National Practitioner Data Bank. The Plaintiff, Dr. Hetzel, contends that the Report was false. He admits all of the underlying facts—most notably, that his clinical privileges were limited by a 72-day precautionary suspension—but takes issue with the Report's characterization of that suspension as a "professional review action." That statement, he says, was false, and actionably so.

He is wrong. Dr. Hetzel's own allegations show that the Report was accurate. And even if Dr. Hetzel were right that the Report was technically inaccurate, each of his claims would still fail. This action should be dismissed under Rule 12(b)(6).

---

[1] MH Mission Hospital, HCA Healthcare, HCA Management, MH Master, MH Hospital Manager, and HCA Healthcare Mission Fund are collectively referred to as "Mission" or the "Mission Defendants" in this brief.

## CONTENTS

Background ........................................................................................... 3

  I.   Dr. Hetzel and his Precautionary Suspension ............................. 3

 II.   The Health Care Quality Improvement Act and the  National
       Practitioner Data Bank ............................................................. 4

III.   The Report, Dr. Hetzel's Dispute, and this Lawsuit .................................... 5

Standard .............................................................................................. 7

Argument ............................................................................................ 8

  I.   The Report was truthful, so Mission has immunity under the
      Health Care Quality Improvement Act ........................................... 8

      A.   The Amended Complaint's allegations show that the Report
          was truthful. ....................................................................10

      B.   The Report ███████████████████████████████
          ██████████████. ....................................................13

 II.   Each of Dr. Hetzel's claims fails individually. ......................................... 14

      A.   Defamation (Counts 1 and 2) ................................................14

      B.   Good Faith and Fair Dealing (Count 3) ..................................17

      C.   Tortious Interference (Count 4) .............................................18

      D.   Infliction of Emotional Distress (Counts 5 and 6) .............................. 20

          1.   Intentional Infliction of Emotional Distress ................................ 20

          2.   Negligent Infliction of Emotional Distress .................................. 22

      E.   Punitive Damages (Count 7) .............................................. 23

Conclusion ........................................................................................ 23

## Background

### I.   DR. HETZEL AND HIS PRECAUTIONARY SUSPENSION

Dr. Hetzel is a gynecologic oncologist. In early 2020, he had clinical privileges at Mission Hospital, which meant that he could perform oncological surgeries there. (He was not, as he alleges, employed by Mission or any of its affiliates, but we will treat that allegation as true.)

On March 2, 2020, Dr. Hetzel performed a surgery that resulted in a serious "complication": the "remov[al]" of "the patient's colon and all of the small bowel." (Doc. 4 [Am. Compl.] ¶ 33.) The following day, Mission Hospital imposed a "precautionary suspension" of Dr. Hetzel's privileges due to concerns about that "complication and two other intraoperative organ injuries to patients in the six months prior." (Doc. 4 ¶ 34.) In other words, Mission Hospital told Dr. Hetzel he wasn't allowed to do any more surgeries until they were sure he could do so safely.

Dr. Hetzel goes into detail about who was involved in the ensuing investigation, when they met, why he thinks the investigation was inadequate, and so on, but none of that matters for our motion or any of his claims for relief. What does matter is the following timeline:

- On March 10 (the eighth day of precautionary suspension), Mission Hospital's Credentials Committee "modified [Dr. Hetzel's] precautionary suspension to a lesser sanction with conditions." (Doc. 4 ¶ 10.)

- On March 25, Mission reinstated the precautionary suspension, which would remain in effect until June. (Doc. 4 ¶¶ 42, 51.)

- On April 23, Mission restored Dr. Hetzel's privileges "subject to [his] satisfactory completion of a fitness for duty evaluation." (Doc. 4 ¶ 46.)

- On June 5, Mission finally "lift[ed] the precautionary suspension of Dr. Hetzel's privileges." (Doc. 4 ¶ 51.)

In total, Dr. Hetzel's privileges were suspended for well over thirty days, which meant that Mission Hospital had to submit a report to the National Practitioner Data Bank.

## II. THE HEALTH CARE QUALITY IMPROVEMENT ACT AND THE NATIONAL PRACTITIONER DATA BANK

When Congress passed the Health Care Quality Improvement Act of 1986, it sought to "remed[y]" the "nationwide problem" of dangerous physicians getting away with "damaging or incompetent performance." 42 U.S.C. § 11101(2), (3). Congress identified two facets of this problem: a need to encourage "effective professional peer review" and a need to "restrict" the ability of physicians "to move from State to State without disclosure" of their past performance. 42 U.S.C. § 11101 (2), (5). So Congress's solution was likewise multifaceted. It created a framework for "professional review actions," it created a national reporting system, and it made hospitals (and others) immune from resulting liability.

**Professional Review Actions.** To encourage "effective professional peer review," 42 U.S.C. § 11101(5), the HCQIA created a framework for hospitals to review physicians' performance without fear of being held liable for revoking or limiting clinical privileges. This framework has two relevant components: "professional review activities," 42 U.S.C. § 11151(10), and "professional review actions," 42 U.S.C. § 11151(9). "Professional review activities" are "investigative measures"—steps a hospital takes to help it decide whether to modify or revoke a physician's privileges. *Mathews v. Lancaster General Hosp.*, 87 F.3d 624, 634 (3d Cir. 1996). And "professional review actions" are the hospital's "decisions"—sanctions the hospital imposes that "curtail" or "affect" those privileges. *Id.*

Because Congress recognized that the "threat of ... liability" could

"unreasonably discourage[] ... effective professional peer review," it gave everyone involved in a professional review action a qualified immunity from civil liability "with respect to the action." 42 U.S.C. §§ 11101(4), 11111(a)(1).

**Data Bank Reports.** To "restrict" physicians from moving "from State to State" to escape the consequences of "damaging or incompetent performance," 42 U.S.C. § 11101(2), the HCQIA created the National Practitioner Data Bank, a federal database of information about health care providers. Hospitals, insurers, and state licensing boards are required to report certain information to the Data Bank, permitted to report other information, and required to query the Data Bank before hiring a physician or conferring privileges on him. (The reporting provision relevant to this case is 45 C.F.R. § 60.12(a)(1)(i), which requires hospitals to report any "professional review action that adversely affects the clinical privileges of a physician ... for a period longer than 30 days.")

As with peer review, Congress recognized that the threat of liability could frustrate the HCQIA's purpose. So it gave Data Bank reporters immunity from civil liability "with respect to any [Data Bank] report made ... without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c).

## III. The Report, Dr. Hetzel's Dispute, and this Lawsuit

With that background in mind, we turn to the Report at the heart of this case. Once Dr. Hetzel's privileges had been restricted for 30 days, Mission Hospital had a duty to report this under 45 C.F.R. § 60.12. So on May 4, 2020, Mission reported Dr. Hetzel's precautionary suspension to the Data Bank. (Doc. 4 ¶ 27; Ex. 1 [Report] at 1–2.)

The only thing that Dr. Hetzel says about the Report's contents is that it

"reflect[ed] that Dr. Hetzel had his privileges removed due to a professional review action under 45 C.F.R. § 60.12 and/or ... negative actions ... by peer review organizations."[2] (Doc. 4 ¶ 73.) That allegation—and the actual contents of the Report ███████████████████—will be discussed in Part I of the argument below. For now we will simply note that the Report consisted primarily of ████ ████████████████████████████████████████████ ████████████████████████████████.

Even though the Report was accurate, Dr. Hetzel filed a dispute under the provisions of 45 C.F.R. § 60.21. (Doc. 4 ¶ 25.) Dr. Hetzel does not expressly allege that DHHS determined that the Report was "accurate and reportable to the NPDB," 45 C.F.R. § 60.21(c)(2)(i), but he does allege that the Report is still in the Data Bank. (Doc. 4 ¶¶ 76, 86.)

Long after Dr. Hetzel's efforts to dispute the Report failed, and more than three years after the Report itself was submitted, he filed this lawsuit. The Amended Complaint states six claims for relief, or tries to: two defamation claims, a tortious-interference claim, a claim for breach of the covenant of good faith and fair dealing, and two infliction-of-emotional-distress claims. Each of these claims, however, is based on precisely the same theory: The Report falsely characterized Dr. Hetzel's precautionary suspension as a "professional review action." (Doc. 4 ¶¶ 36, 47, 73,

---

[2] Dr. Hetzel appears not to have reviewed the Report before filing suit—all of his allegations about the Report's contents include this "and/or" construction. (Doc. 4 ¶¶ 47, 73, 82.) Because Dr. Hetzel's precautionary suspension was a professional review action, Dr. Hetzel never squarely alleges that the Report was premised on "actions ... by peer review organizations," and in fact the Report ████████████████████████████████ ███████████ we will not address the peer-review-organization prong of those alternative allegations.

82, 92, 104, 112, 121.) As we will explain, each of these claims fails.

<h1 style="text-align:center">STANDARD</h1>

**Dismissal Generally.** "To survive a motion to dismiss" under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). Although factual assertions are accepted as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. So stating a plausible claim for relief "requires more than labels and conclusions," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007), or "naked assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 678 (cleaned up)—it requires well-pleaded factual allegations. If "there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679.

**Materials Considered.** In addition to the complaint itself, documents attached to it, and judicially noticeable materials, the Court may also "consider documents … attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *Secretary of State For Defence v. Trimble Navigation*, 484 F.3d 700, 705 (4th Cir. 2007). And the Court need not "accept as true allegations that contradict" materials properly considered by "judicial notice or by exhibit." *Veney v. Wyche*, 293 F.3d 726, 730 (4th Cir. 2002).

**Affirmative Defenses.** When an affirmative defense "clearly appear[s] on the face of the complaint"—for example, when the complaint shows that a claim is "barred by the applicable statute of limitations"—that defense is an appropriate basis for dismissal. *Farmer v. Campbell Soup*, 2014 WL 1608282, at *1 (M.D.N.C.

2014) (citing *Nasim v. Warden, Maryland House of Correction*, 64 F.3d 951, 955 (4th Cir. 1995)).

ARGUMENT

The Report lies at the core of each of Dr. Hetzel's claims for relief: Dr. Hetzel's contention that the Report was false is the basis for his defamation claims (¶¶ 73, 82), his contractual claim (¶ 92), his tortious-interference claim (¶ 104), and his emotional-distress claims (¶¶ 112, 121)—and, by extension, his punitive-damages claim, since there is no standalone cause of action for punitive damages.

But the Report was true. We know this both from the allegations in the complaint and from the Report itself. This means that Mission has immunity under 42 U.S.C. § 11137(c). And even if the Report were technically false, each of Dr. Hetzel's claims would still fail:

- The defamation claims are time-barred.

- The duty of good faith and fair dealing is not in play at all. It applies only when the defendant deprives the plaintiff of a contractual benefit; it is not a catch-all duty that can be invoked whenever something unfair happens.

- The tortious-interference claim fails because Dr. Hetzel doesn't allege that Mission knew of any specific contractual opportunity or purposefully interfered with it.

- The emotional-distress claims fail because the Report cannot support an IIED or NIED claim as a matter of law. Even if it could, the allegations of emotional distress are conclusory.

For all of these reasons, Mission is entitled to dismissal.

## I. THE REPORT WAS TRUTHFUL, SO MISSION HAS IMMUNITY UNDER THE HEALTH CARE QUALITY IMPROVEMENT ACT.

We begin with the near-absolute immunity for Data Bank reports:

> No person or entity … shall be held liable in any civil action with

respect to any [Data Bank] report made … without knowledge of the falsity of the information contained in the report.

42 U.S.C. § 11137(c). *See also* 45 C.F.R. § 60.22. This immunity presumptively applies in any lawsuit predicated on a Data Bank report. To overcome it, the plaintiff must show that "the report was false and the reporting party knew it was false." *Brown v. Presbyterian Healthcare*, 101 F.3d 1324, 1334 (10th Cir. 1996). At this stage, that means that Dr. Hetzel must plausibly allege that the Report was false and that Mission knew it was false.[3] He does the opposite: The Amended Complaint may assert that the Report was false, but it *shows* that the Report was true.

Dr. Hetzel offers no details about the contents of the Report. He says only that the Report "reflect[ed] that Dr. Hetzel had his privileges removed due to a professional review action under 45 C.F.R. § 60.12." (Doc. 4 ¶¶ 73, 82.) This was false, he says, because his "privileges [were] revoked as a precautionary measure and not as a result of a professional review action as that term is defined in 45 C.F.R. § 60.3." (Doc. 4 ¶ 48.)

This theory of falsity—the only one he has—fails for two reasons. First, the assertion that Dr. Hetzel's suspension was not a professional review action is a legal conclusion, not a factual allegation. In fact, the Amended Complaint's factual allegations show that the suspension *was* a professional review action. Second, the

---

[3] Although Dr. Hetzel hints that the underlying precautionary suspension was unjustified (Doc. 4 ¶¶ 35, 37–39), the suspension itself is not at issue in this case. Immunity for a Data Bank report does not depend on "whether the underlying merits of the reported action were properly determined": The "court's role" in any lawsuit predicated on a Data Bank report "is to evaluate whether the report itself accurately reflected the action taken." *Murphy v. Goss*, 103 F. Supp. 3d 1234, 1239 (D. Or. 2015). A Data Bank reporter has immunity as long as the report "accurately states what happened." *Moore v. Williamsburg Regional Hosp.*, 560 F.3d 166, 177 (4th Cir. 2009).

Report ███████████████████████████████████████████████
████████████████████████. So even if he were right that his suspension was not
a professional review action, it wouldn't matter.

**A.    The Amended Complaint's allegations show that the Report was truthful.**

"Professional review action" is a technical term with a statutory and reg-
ulatory definition. A professional review action is any "action or recommendation
of a [hospital]":

(1)   Taken in the course of professional review activity[4];

(2)   Based on the professional competence or professional
conduct of an individual health care practitioner which
affects or could affect adversely the health or welfare of a
patient or patients; and

(3)   Which adversely affects or may adversely affect[5] the clinical
privileges or membership in a professional society of the
health care practitioner.

45 C.F.R. § 60.3. Or, to summarize: A professional review action occurs whenever
a hospital limits or revokes a physician's clinical privileges in the course of invest-
igating whether he is dangerous to patients.

Dr. Hetzel admits that his clinical privileges were suspended and limited.
(Doc. 4 ¶¶ 34, 39, 42, 46.) He admits that this action was taken in the course of an
investigation into his competence and conduct. (Doc. 4 ¶¶ 34–51.) And he admits
that this action was based on three "intraoperative organ injuries" within six

---

[4] "Professional review activity" means any investigation or similar process that could
impact a specific physician's clinical privileges. *Mathews v. Lancaster General Hosp.*, 87
F.3d 624, 634 (3d Cir. 1996); 45 C.F.R. § 60.3.

[5] "Adversely affecting means reducing, restricting, suspending, revoking, or denying
clinical privileges or membership in a health care entity." 45 C.F.R. § 60.3.

months (Doc. 4 ¶ 34), which plainly involves "professional conduct ... that could affect adversely the health or welfare of a patient." So it is hard to see why he thinks his precautionary suspension was not a professional review action.

A generous reading of the Amended Complaint suggests two explanations.

**First,** Dr. Hetzel might believe that preliminary measures like a precautionary suspension are inherently non-reportable. But that rule appears nowhere in the statutory definition of "professional review action," nowhere in the implementing regulations, and nowhere in the subregulatory guidance. Just the opposite:

> [I]f a hospital ... imposes a suspension or restriction as immediate or precautionary, and the suspension remains in effect for more than 30 days, it must be reported to the NPDB.

(Ex. 2 [NPDB Guidebook] at E-39.[6]) *See also Leal v. Secretary*, 620 F.3d 1280, 1287 (11th Cir. 2010) ("A summary suspension is a 'professional review action.'"); *Bakare v. Pinnacle Health*, 469 F. Supp. 2d 272, 287 n.26 (M.D. Pa. 2006) (same).

**Second,** Dr. Hetzel may believe that Mission Hospital's medical staff bylaws establish that a precautionary suspension is not a professional review action. (Doc. 4 ¶ 36.) But there is "no reason to examine the Hospital's bylaws in order to determine if its action constituted a 'professional review action.'" *Azmat v. Shalala*, 186 F. Supp. 2d 744, 749 (W.D. Ky. 2001). The definition of "professional review

---

[6] The NPDB Guidebook is subregulatory guidance for health care providers that use the Data Bank. It is a proper subject of judicial notice and is persuasive authority on the meaning of the relevant statutes and regulations. *E.g.*, *Doe v. Leavitt*, 552 F.3d 75, 86 (1st Cir. 2009) (giving a prior version of the Guidebook *Skidmore* deference); *Sabatini v. Price*, 2018 WL 1638258, at *3 n.4 (S.D. Cal. 2018) (taking notice of the Guidebook). *See also Moore v. Williamsburg Regional Hosp.*, 560 F.3d 166, 170 n.1 (4th Cir. 2009). The version of the Guidebook attached as Exhibit 2, which has been in effect since 2018, is available at npdb.hrsa.gov/resources/NPDBGuidebook.pdf.

action" is set by statute and regulation, not hospital bylaws. *Id.* And the "existence of each of the[] elements" of that definition "can be determined solely by referencing the facts, the relevant … definitions, and the common meanings of words." *Id.* In other words, a credentialing "action must be reported to the NPDB based on whether it satisfies NPDB reporting requirements and not based on the name affixed to the action." (Ex. 2 at E-39.)

Anyway, the bylaws do not say what Dr. Hetzel wants them to. They say that a "precautionary suspension is not *in and of itself* a final professional review action *that is reportable,* but rather an interim step to protect patients." (Doc. 4 ¶ 36 (emphasis added).) This is true, because a precautionary suspension is not "in and of itself … reportable"—it is reportable only if it lasts longer than 30 days. As the Guidebook explains:

> Clinical privileges actions are reportable once they are made final by the health care entity. However, summary suspensions lasting more than 30 days are reportable *even if* they are not final.[7]

(Ex. 2 at E-32 (emphasis original).)

---

[7] The reason for making this distinction is that ordinarily, a hospital takes a professional review action at the conclusion of an investigation and after affording the physician the opportunity to be heard. So, for example, if a hospital investigates a surgeon, gives him a hearing, and then decides to suspend him for 31 days, that suspension is reportable as soon as it is imposed. By contrast, with a precautionary suspension, "the procedural rights of the practitioner are provided *following* the imposition of a suspension, rather than *preceding* it." (Ex. 2 at E-38 (emphasis original).) So precautionary suspensions rarely have a fixed length, and a suspension "expected to last more than 30 days" may in fact be lifted sooner. (*Id.*) Such a suspension "may be reported" when it is imposed, but is only *required* to be reported once it has "lasted more than 30 days." (*Id.*)

**B.** **The Report** █████████████████████████████████
██████

So far we have relied entirely on Dr. Hetzel's allegations. But this Court need not do so. The Report itself is properly before the Court, since it is "integral to the complaint." *Trimble*, 484 F.3d at 705. And where the Report contradicts the "bare allegations of the complaint," the Report "prevail[s]." *Travelers Indemnity Co. v. Schwarz Properties*, 2020 WL 564027, at *1 (W.D.N.C. 2020). *See also Veney*, 293 F.3d at 730.

The Report does not say that ████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████



There is not a single piece of information contained in the Report that █████████
██████████████████████████████

So Dr. Hetzel may say that the falsehood lies in making a Data Bank report at

all. He might argue that by making the Report, Mission implicitly claimed that the underlying action was reportable—in other words, that it was a professional review action. This false implication, he would say, is enough to overcome Mission's immunity. But this argument ignores the statutory and regulatory text.

Mission is immune unless it had "actual knowledge of the falsity of the information *contained in the report*." 45 C.F.R. § 60.22 (emphasis added); 42 U.S.C. § 11137(c). So if the report "accurately states what happened," Mission cannot be liable. *See Moore v. Williamsburg Regional Hosp.*, 560 F.3d 166, 177 (4th Cir. 2009). If Dr. Hetzel believes that the Report "accurately states what happened" but that the underlying events were non-reportable, his remedy was to dispute the Report under 45 C.F.R. § 60.21, not to sue Mission.

## II. EACH OF DR. HETZEL'S CLAIMS FAILS INDIVIDUALLY.

We turn from the flaws common to this entire lawsuit to the flaws specific to individual claims.

### A. Defamation (Counts 1[8] and 2)

Even if Dr. Hetzel were right that the Report was technically false, his defamation claims would fail for three reasons. The first two are straightforward: Dr. Hetzel failed to set out the defamatory statements "substantially ... verbatim," *Wolfe Financial v. Rodgers*, 2018 WL 1870464, at *13 (M.D.N.C. 2018),[9] and a

---

[8] The Amended Complaint labels Dr. Hetzel's first cause of action as "Libel *Per Se*: Title VII, 42 U.S.C. § 2000e-2(a)," which is a typo: Dr. Hetzel's counsel have confirmed that they do not intend to assert a federal cause of action. In any event, the Amended Complaint does not allege any elements of a Title VII claim.

[9] We've spotted him a point by attaching the Report to our motion to dismiss. But if Dr. Hetzel objects to considering the Report at this stage, his failure to specifically allege any defamatory statement is fatal to his defamation claims.

technical inaccuracy would not make "the sting" of the Report "materially false," *Robinson v. Williams*, 59 F.4th 113, 118 (4th Cir. 2023). The third issue, the statute of limitations, is a bit more complicated, but it ultimately comes down the same way.

The Report was submitted to the Data Bank on May 4, 2020. (Doc. 4 ¶¶ 47, 48, 72, 82.) Dr. Hetzel did not file suit until June 9, 2023. And defamation has a one-year limitations period. N.C.G.S. § 1-54(3). So the defamation claims are time-barred on their face.

To get around the time bar, Dr. Hetzel asserts that the defamation began with the Report but "is ongoing in nature." (Doc. 4 ¶¶ 76, 86.) By this he means that the Report is still in the Data Bank and "continues to be republished to p[ro]spective employers upon request." (*Id.*) But there is no such thing as "ongoing" defamation under North Carolina law—republication of a defamatory statement is a new tort, not an extension of the previous one. *Gibson v. Mutual Life Ins. Co.*, 121 N.C. App. 284, 287 (1996). So any claim arising out of the original Data Bank report is time-barred.

Nor can Dr. Hetzel state a claim related to republication by the Data Bank, for two reasons. **First,** he doesn't really try to. Rather than allege facts that would show the report was republished (for example, "Marshfield Clinic queried the Data Bank about Dr. Hetzel and reviewed the Report") he offers the conclusion that making the Report available in the Data Bank republishes it to "all entities with authorization to query the NPDB." (Doc. 4 ¶¶ 72, 81.) But the North Carolina Court of Appeals has rejected this precise theory.

In *Pressley v. Continental*, the Court of Appeals held that putting a defamatory report in an employee's personnel file, where it was "potentially available for others

to read," was not "continuous publication of the report." *Pressley v. Continental*, 39 N.C. App. 467, 469 (1979). Applying *Pressley*, federal courts have held that making information "passively available to others to read" is not publication. *Harrell v. City of Gastonia*, 392 F. App'x 197, 206 (4th Cir. 2010). For example, a plaintiff may have a defamation claim against a defendant who reports false information to a credit agency, but that claim would be premised on "the transmission of allegedly defamatory information to [the agency]," *not* on the "possibility that [the information] might be repeated through circulation of [the plaintiff's] credit report." *Branch v. Federal Home Loan*, 2005 WL 8159344, at *6 n.8 (E.D.N.C. 2005).

**Second,** the alleged republication is to "p[ro]spective employers upon [their] request." (Doc. 4 ¶¶ 76, 86.) In other words, Dr. Hetzel alleges that hospitals are querying the Data Bank about him, as 45 C.F.R. § 60.17 requires, so they can hire him. This matters because a "publication … procured or invited by the plaintiff[] is not sufficient to support an action for defamation." *Pressley*, 39 N.C. App. at 469.

Here again, *Branch* is instructive. The *Branch* plaintiff alleged that the defendants had made a false notation ("foreclosure proceeding started") on his Experian credit report. *Branch*, 2005 WL 8159344, at *2. When a lender checked the plaintiff's credit, they saw that false notation, which prevented the plaintiff from getting the loan he had wanted. *Id.* The *Branch* court explained that the Experian-to-lender publication was "not in this case"—Experian was not a party—but "[e]ven if it were, that publication was at the behest of Plaintiff," since he "needed the third party lender to review his credit report." *Id.* at *6 n.8 (citing *Pressley*).

*Branch* is on point. Just as a borrower needs lenders to review his credit report, a physician looking for work needs "p[ro]spective employers" to "query the

NPDB" about him. (Doc. 4 ¶ 72, 76, 81, 86.) *See also* 45 C.F.R. § 60.17 (hospitals must query the Data Bank before conferring medical staff positions). Just as one who applies for a loan "invite[s]" the publication of his credit report to the potential lender, *Pressley*, 39 N.C. App. at 469, a physician who applies for a job invites the publication of his NPDB file to the potential employer.

## B.     Good Faith and Fair Dealing (Count 3)

Dr. Hetzel believes that the Report was bad-faith and unfair. So he tries to state a claim for breach of the implied covenant of good faith and fair dealing, which makes some intuitive sense. But the covenant of good faith and fair dealing is not an all-purpose tool for forcing the parties to a contract to get along. It is the implied promise that "neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Authority v. Bell*, 314 N.C. 219, 228 (1985). So to state a good-faith claim, a plaintiff must allege facts that "plausibly show" that defendants "deprive[d] him of the benefits of a contract." *Ludlum v. United Food*, 2019 WL 1756524, at *5 (E.D.N.C. 2019). *See also Arnesen v. Rivers Edge*, 368 N.C. 440 (2015).

*Arnesen* involved a good-faith claim by a group of individual investors against a bank that had failed to "discover[] and disclose[]" that certain investment properties had been overvalued. *Arnesen*, 368 N.C. at 441. But because the bank "was not contractually obligated to produce" the information the investors were suing over, the plaintiffs hadn't been deprived "of *the benefits of the contract*," and their good-faith claim was properly dismissed. *Id.* at 451 (emphasis original). Reams of unreported cases from this Court and other North Carolina courts have followed the same logic, dismissing good-faith claims for failure to allege deprivation of a specific

contractual benefit. *E.g.*, *James B. Taylor Family v. Bank of Granite*, 2014 WL 2777492, at *8 (N.C. Ct. App. 2014); *Mato v. Window World*, 2011 WL 1500089, at *6 (W.D.N.C. 2011).

Dr. Hetzel does not even claim, let alone "plausibly show," that he was deprived of any contractual benefit. The Amended Complaint's only reference to any contract is its assertion that "the contractual employment relationship between Defendants and Dr. Hetzel" created an "implied duty of good faith and fair dealing." (Doc. 4 ¶ 91.) Nowhere does the complaint even gesture towards the benefits of that contract. Dr. Hetzel's good-faith claim must be dismissed.

### C. Tortious Interference (Count 4)

Tortious interference with prospective economic advantage occurs when a defendant intentionally and unjustifiably "induce[s] a third party to refrain from entering into a contract" with a plaintiff. *DaimlerChrysler v. Kirkhart*, 148 N.C. App. 572, 585 (2002). To state a claim for tortious interference, the plaintiff must adequately allege that the defendant (1) knew of a prospective contract and (2) purposefully prevented it from coming to fruition. Dr. Hetzel fails on both counts.

**First,** a tortious-interference plaintiff must show that the defendant "had knowledge of" the contract (or prospective contract) at issue. *Krawiec v. Manly*, 370 N.C. 602, 606 (2018).[10] Because a tortious-interference claim requires a "*specific*

---

[10] Note that *Krawiec* was an interference-with-contract case, and there are no prospective-economic-advantage cases addressing the requirement of knowledge. However, "interference with prospective economic advantage requires the same showings" as interference with contract, "except there need only be a contract that would have been entered" rather than a contract that actually existed. *Worley Claims Services v. Jefferies*, 429 F. Supp. 3d 146, 166 (W.D.N.C. 2019). *Accord Tucker Auto-Mation v. Russell Rutledge*, 2017 WL 2930926, at *2 (M.D.N.C. 2017); *National Welders v. Roberts Oxygen*, 2008 WL 1837251, at *1 (W.D.N.C. 2008). *See also Charah, LLC v. Sequoia Services*, 2019 NCBC 17, ¶ 40

contractual opportunity," *MarketPlace v. Vaughn*, 2023 NCBC 17, ¶ 84 (emphasis original), the plaintiff must allege that the defendant knew of that specific opportunity. *See Krawiec*, 370 N.C. at 607 (affirming dismissal because "the plaintiffs failed to allege that the … defendants had knowledge of" the specific contractual "provision" that was breached).

Dr. Hetzel does allege specific lost employment opportunities, but not that Mission knew of them. (Doc. 4 ¶¶ 65, 66.) Instead he alleges that Mission was generally "aware that Dr. Hetzel would or could seek employment with other health care providers." (Doc. 4 ¶ 103.) Knowledge that a plaintiff "would or could" look for a job is not the same thing as knowing of a specific job he is likely to get.

**Second,** tortious interference requires a showing of "purposeful" interference through "active persuasion, request, or petition." *Charah, LLC v. Sequoia Services*, 2019 NCBC 17, ¶ 40 (citing *Inland American v. Crockett*, 212 N.C. App. 349, 354 (2011)). This means that the defendant must have "actually sought" to influence the third party, *Esposito v. Talbert & Bright*, 181 N.C. App. 742, 745 (2007), and must have done so through "purposeful conduct … directed towards" that third party, *KRG v. Springs Investors*, 2015 NCBC 19, ¶ 29. Dr. Hetzel's allegations fall short for several reasons:

- Because he doesn't allege that Mission knew of any specific third party who was likely to employ him, he also can't allege that Mission "directed" any conduct "towards" such a party.

- The only conduct that Dr. Hetzel's claims are premised on, making the Report, is not "directed towards" anyone. As we note above, submitting

---

(applying rule from prospective-economic-advantage case to interference-with-contract case). The analysis in this section relies on both interference-with-contract and prospective-economic-advantage cases without noting the distinction.

the Report made it "passively available" to users of the Data Bank. *Harrell*, 392 F. App'x at 206.

- There are no allegations to support an inference that Mission had the "purpose[]" of preventing Dr. Hetzel from being hired. He offers only the conclusion that Mission "intentionally interfered." (Doc. 4 ¶ 104.)

Each of these failings requires dismissal of the tortious-interference claim.

### D. Infliction of Emotional Distress (Counts 5 and 6)

Dr. Hetzel tries to state claims for intentional and negligent infliction of emotional distress. He doesn't come close: His IIED claim fails because he doesn't adequately allege extreme or outrageous conduct; his NIED claim fails because he alleges intentional, not negligent, conduct; and both claims fail because he doesn't adequately allege severe emotional distress.

#### 1. Intentional Infliction of Emotional Distress

"To state a claim for intentional infliction of emotional distress, a plaintiff must allege: (1) extreme and outrageous conduct (2) which is intended to cause and does cause (3) severe emotional distress to another." *Moschos v. Moschos*, 2022-NCCOA-843, ¶ 10. Dr. Hetzel fails on elements (1) and (3).

Start with the requirement of "extreme and outrageous conduct," which "is defined as conduct that … go[es] beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community." *Moschos*, 2022-NCCOA-843, ¶ 10. This is a high standard, and "North Carolina courts have been extremely reluctant to find actionable IIED claims in an employment context." *Ortiz v. Big Bear Events*, 2013 WL 247444, at *4 (W.D.N.C. 2013) (dismissing complaint). For example:

- "[S]cream[ing] and shout[ing] at" an employee, "call[ing] her names," "interfer[ing]" with her duties, and "thr[owing] menus at her" isn't

enough for an IIED claim. *Hogan v. Forsyth Country Club*, 79 N.C. App. 483, 493 (1986).

- Neither is "inappropriate touching, offensive comments, exposure to pornography, and retaliation for seeking legal advice," even though this conduct is "abhorrent," "lewd," and "wholly inappropriate." *Ortiz*, 2013 WL 247444, at *4.

- Nor is revoking an employee's "approved leave of absence" and "terminat[ing] her in violation of federal law," even while knowing of her "poor medical condition[] and financial straits"—such conduct "might very well be objectionable" but is not "extreme and outrageous." *Buser v. Southern Food Service*, 73 F. Supp. 2d 556, 573 (M.D.N.C. 1999).

- Nor, finally, is "spreading falsehoods about [a physician's] professional ability," *Patel v. Scotland Memorial Hosp.*, 1995 WL 319213, at *9 (M.D.N.C. 1995), or otherwise "attempt[ing] to interfere with [a plaintiff]'s efforts to obtain a job," *Moody-Williams v. LipoScience*, 953 F. Supp. 2d 677, 691 (E.D.N.C. 2013).

Dr. Hetzel doesn't even allege that Mission "spread[] falsehoods about [his] professional ability," *Patel*, 1995 WL 319213, at *9. He alleges that Mission technically mischaracterized the precautionary suspension of his clinical privileges. This does not come close to alleging "extreme and outrageous" conduct.

That leaves "severe emotional distress." Some older cases suggest that it is enough for the plaintiff to say that he was "shocked" or "upset." *McKnight v. Simpson's Beauty Supply*, 86 N.C. App. 451, 454 (1987). But under current law, "severe emotional distress" means a "severe and disabling emotional or mental condition" like "neurosis, psychosis, chronic depression, [or] phobia." *Moschos*, 2022-NCCOA-843, ¶ 11. For example:

- It is not enough for a plaintiff to allege that he was "stunned, utterly distraught, and had to undertake psychological treatment." *Moschos*, 2022-NCCOA-843, ¶ 12 (cleaned up).

- Nor does it suffice to allege that the plaintiff was "devastated" and "afraid," had "panic attacks," and was "prescribed Xanax for anxiety." *Moody-Williams*, 953 F. Supp. 2d at 692.

- And a bare allegation of "severe emotional distress, including mental anguish, depression, [and] phobia" is "conclusory" and cannot support an emotional-distress claim. *Sanders v. Duke Energy*, 2021 WL 7185236, at *3 (W.D.N.C. 2021). *Accord Costin v. Ally Bank*, 2014 WL 130527, at *3 (E.D.N.C. 2014) (conclusory allegation of "sleepless nights, depression, and anxiety" insufficient).

Dr. Hetzel's emotional-distress allegations fall short even of the inadequate allegations in *Moschos* and *Moody-Williams*. He does not allege that he ever needed or sought psychological treatment, for example. In fact, his allegations are almost identical to those rejected in *Sanders* and *Costin*. As in those cases, he offers a laundry list of labels for his emotional distress (in this case, "anxiety, embarrassment, depression, loss of career, damage to reputation and career, feelings of helplessness and hopelessness, suffering, mental anguish and loss of enjoyment of life"), but no factual allegations whatsoever.

**2. Negligent Infliction of Emotional Distress**

A claim for negligent infliction of emotional distress is similar to an IIED claim. Both claims have "severe emotional distress" as an element, and the term means the same thing in both contexts. *See Johnson v. Ruark Obstetrics*, 327 N.C. 283, 304 (1990). So Dr. Hetzel's failure to adequately allege severe emotional distress is fatal to his NIED claim, too.

But the two claims differ in that NIED must, as the name suggests, be premised on negligent conduct. *Johnson*, 327 N.C. at 304. So if a complaint's "material factual allegations charge nothing but intentional acts," an NIED claim must be dismissed—even if the complaint includes conclusory allegations of

negligence. *Mitchell v. Lydall, Inc.*, 1994 WL 38703, at *3 (4th Cir. 1994) (per curiam). *See also Sheaffer v. County of Chatham*, 337 F. Supp. 2d 709, 734 (M.D.N.C. 2004) (dismissing NIED claim because the non-conclusory allegations "recount[ed] only intentional acts").

Dr. Hetzel's NIED claim rests on a single conclusory allegation of negligence: He claims that Mission "did not exercise reasonable care in the correct and truthful reporting of Dr. Hetzel to the NPDB and … improperly reported [him] prior to a full … professional review action that included due process." (Doc. 4 ¶ 121.) But every "factual allegation[] charges nothing but intentional acts." *Mitchell*, 1994 WL 38703, at *3. Dr. Hetzel alleges an intentional decision to make the Report before completing the investigation into the care he provided, he alleges that Defendants "had actual knowledge" that the Report was false, and so on. (Doc. 4 ¶¶ 47–51, 56.) As *Mitchell* and *Sheaffer* explain, he cannot convert these alleged intentional acts to negligent ones just by saying so.

## E.  Punitive Damages (Count 7[11])

That leaves Dr. Hetzel's claim for punitive damages. Punitive damages "are a remedy, not a cause of action." *Loyd v. Griffin*, 2022 NCBC 30, ¶ 104. *Accord Collier v. Bryant*, 216 N.C. App. 419, 434 (2011). Because Dr. Hetzel has failed to state any claim on which he could be awarded punitive damages, this claim must be dismissed as well.

### Conclusion

For these reasons, Mission is entitled to dismissal under Rule 12(b)(6).

---

[11] The Complaint erroneously labels the punitive-damages claim "Count VI."

This the 25th day of September, 2023.

ROBERTS & STEVENS, PA

/s/David Hawisher

Phillip Jackson (#21134)
 pjackson@roberts-stevens.com
David Hawisher (#55502)
 dhawisher@roberts-stevens.com
PO Box 7647
Asheville, NC 28802
(828) 252-6600
*Counsel for Mission Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document using the CM/ECF system, which automatically serves all counsel of record.

This the 25th day of September, 2023.

ROBERTS & STEVENS, PA

/s/David Hawisher
David Hawisher