IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
1:23-cv-00152-MR-WCM

| | | |
|---|---|---|
| DAVID JOHN HETZEL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **REVISED** |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| | ) | |
| ANC HEALTHCARE, INC.; | ) | |
| ANC MISSION HOSPITAL, INC.; | ) | |
| HCA HEALTHCARE, INC.; | ) | |
| HCA MANAGEMENT SERVICES, L.P.; | ) | |
| MH MASTER HOLDINGS, LLLP; | ) | |
| MH HOSPITAL MANAGER, LLC; | ) | |
| MH MISSION HOSPITAL, LLLP; | ) | |
| and HCA HEALTHCARE | ) | |
| MISSION FUND, LLC, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the Court on Defendants' Motion to Dismiss (the

"Motion to Dismiss," Doc. 22), which has been referred to the undersigned

pursuant to 28 U.S.C. § 636 for the entry of a recommendation.

I.    **Procedural Background**

On June 9, 2023, David John Hetzel, M.D. ("Plaintiff") filed a complaint

against ANC Healthcare, Inc., ANC Mission Hospital, Inc., HCA Healthcare,

Inc., HCA Management Services, L.P., MH Master Holdings, LLLP, MH

1

Hospital Manager, LLC, MH Mission Hospital, LLLP, and HCA Healthcare Mission Fund, LLC. Doc. 1 at 1.

Plaintiff filed an Amended Complaint on July 27, 2023. Doc. 4.

Plaintiff voluntarily dismissed his claims against ANC Healthcare, Inc. and ANC Mission Hospital, Inc. without prejudice on October 5, 2023. Doc. 28.

On September 25, 2023, the remaining defendants – HCA Healthcare, Inc., HCA Management Services, L.P., MH Master Holdings, LLLP, MH Hospital Manager, LLC, MH Mission Hospital, LLLP and HCA Healthcare Mission Fund, LLC (collectively, "Defendants") – filed the Motion to Dismiss. Doc. 22. Plaintiff has responded (Doc. 31), and Defendants have replied (Doc. 35).

## II.    The Amended Complaint

Plaintiff alleges that he was employed as a gynecologic oncologist at the Hope Women's Cancer Center at Mission Hospital in Asheville, North Carolina beginning in 2013. Doc. 4 at ¶¶ 1, 6.

In February 2019, Plaintiff gave notice that he was resigning from his position, effective July 2020. Id. at ¶ 28.

Plaintiff obtained prospective employment as the Chief of Gynecologic Oncology at Texas Tech El Paso Tenet Hospitals ("Tenet"). Id. at ¶ 29.

On March 2, 2020, Plaintiff performed a surgical procedure. During that procedure, Plaintiff called in a hepatobiliary surgeon and a surgical oncologist,

and a large portion of the patient's colon was removed (the "March 2 Surgery"). Id. at ¶¶ 32, 33.

On March 3, 2020, Plaintiff received a letter informing him that he was being placed on a "precautionary suspension" due to the March 2 Surgery and two previous intraoperative organ injuries. Id. at ¶ 34.

On March 10, 2020, the "Credentials Committee" modified the precautionary suspension to "a lesser sanction with conditions." Id. at ¶ 39.

By letter dated March 12, 2020, Plaintiff was informed that an investigative committee would review the March 2 Surgery further. Id. at ¶ 40.

On March 25, 2020, Plaintiff was informed that the Credentials Committee had "again imposed a precautionary suspension" of Plaintiff's privileges pending a full investigation. Id. at ¶ 42.[1]

On April 3, 2020, Plaintiff responded to the Credentials Committee by letter and, on April 10, 2020, Plaintiff met with an investigating subcommittee.[2] Plaintiff provided additional information to the subcommittee on April 17 and April 20, 2020. Id. at ¶ ¶ 43–44.

---

[1] The Amended Complaint does not provide additional details regarding the "lesser sanction" imposed on March 10, 2020; however, the allegation that on March 25, 2020, the precautionary suspension was "again imposed" suggests that the "lesser sanction" did not involve a suspension.

[2] The undersigned presumes that this investigating subcommittee is the same investigative committee referenced earlier in the Amended Complaint.

3

On April 23, 2020, the Credentials Committee modified Plaintiff's precautionary suspension and "fully restored his privileges, subject to [Plaintiff's] satisfactory completion of a fitness for duty evaluation." Id. at ¶ 46.

On May 4, 2020, Defendants filed a report (the "Report," Doc. 25-1) with the National Practitioner Data Bank (the "Data Bank").[3] The Report indicated that on March 3, 2020 Mission Hospital had taken adverse action against Plaintiff's clinical privileges, that the length of such action was "indefinite," and that the action was based on "concerns about preoperative planning and intraoperative care." Doc. 25-1. Additionally, the Report described the basis for this action as follows:

> Dr. Hetzel was the subject of a precautionary suspension beginning on 3/3/20. This precautionary suspension was modified with the most recent modification being on 4/23/20 when the precautionary suspension was removed subject to the practitioner's satisfactory completion of fitness for duty evaluations.

> Doc. 25-1.

On June 5, 2020, the Mission Hospital Medical Executive Committee "concluded that the clinical care that was the subject of the initial precautionary suspension did not warrant a limitation on Dr. Hetzel's clinical

---

[3] Defendants have submitted the Report and the Data Bank Guidebook as exhibits to the Motion to Dismiss. Docs. 24-1, 25-1, 24-1, 25-2. Plaintiff does not object to the Court's consideration of those materials. See Doc. 31 at 5, n. 3; Six v. Generations Fed. Credit Union, 891 F.3d 508, 512 (4th Cir. 2018) (quoting Sec'y of State for Defence v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007)).

privileges," lifted the precautionary suspension, and reinstated Plaintiff's clinical privileges.[4] Doc. 4 at ¶ 51. Plaintiff, though, elected not to return to work at Mission Hospital. Id. at ¶ 54.

The Amended Complaint further alleges that:

> On July 9, 2020, Defendants submitted a Revision to Action notice to [the Data Bank] regarding its initial filing related to precautionary suspension to indicate that Dr. Hetzel's [*omission in original*]. It did not, at any point, indicate the original filing of the report was made in error or request the revocation or removal of such improper report.
>
> Id. at ¶ 55.[5]

In December 2020, Plaintiff learned that Tenet "would not give him credentials due to" the Report and that its offer of employment was withdrawn. Id. at ¶ 65.

Thereafter, from March 2021 through April 2023, Plaintiff was denied other positions as a gynecologic oncologist which, he alleges upon information and belief, was due to the Report. Id. at ¶¶ 66–68.

Plaintiff brings claims for libel *per se*, libel, breach of the covenant of good faith and fair dealing, tortious interference with prospective economic

---

[4] It is unclear if Plaintiff ever completed a fitness for duty evaluation.

[5] A copy of the "Revision to Action" notice has not been provided to the Court, and the Amended Complaint does not contain further allegations regarding the contents of that notice.

advantage, intentional infliction of emotional distress, and negligent infliction of emotional distress. Plaintiff also seeks punitive damages.

## III. Legal Standard

When considering a motion made pursuant to Rule 12(b)(6), the Court, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff, determines "whether the complaint on its face states plausible claims upon which relief can be granted." Francis v. Giacomelli, 588 F.3d 186, 189, 192 (4th Cir. 2009); accord Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 253 (4th Cir. 2009).

The Court, however, is not required to accept "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Consumeraffairs.com, 591 F.3d at 255; see Giacomelli, 588 F.3d at 192. That is, while "detailed factual allegations" are not required, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007); accord Consumeraffairs.com, 591 F.3d at 255. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Consumeraffairs.com, 591 F.3d at 255. In short, the well-pled factual allegations must move a plaintiff's claim from

conceivable to plausible. <u>Twombly</u>, 550 U.S. at 570; <u>Consumeraffairs.com</u>, 591 F.3d at 256.

IV.  **Discussion**

   A.  **Defendants' Immunity**

The Healthcare Quality Improvement Act (the "Act") 42 U.S.C. § 11101 *et seq.*, requires the reporting of "a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days …." 42 U.S.C. § 11133(a)(1). The Act further provides that "[n]o person or entity … shall be held liable in any civil action with respect to any report made under this subchapter…without knowledge of the falsity of the information contained in the report." 42 U.S.C. § 11137(c); <u>see also</u> 45 C.F.R. § 60.22 ("Individuals, entities or their authorized agents, and the [the Data Bank] shall not be held liable in any civil action filed by the subject of a report unless the individual, entity, or authorized agent submitting the report has actual knowledge of the falsity of the information contained in the report.").

Defendants contend that the Report was accurate, that they are immune under the Act, and that all of Plaintiff's claims should be dismissed.

In response, Plaintiff argues that Defendants knew the Report was false because Plaintiff was not subject to a suspension that lasted more than 30 days, the precautionary suspension was not "indefinite," and Plaintiff did not

pose a concern for preoperative planning and intraoperative care. See Doc. 31 at 9-10.[6]

## 1. Falsity of the Report

When considering whether a report is false for the purposes of § 11137(c), "a general consensus has emerged that 'courts do not evaluate whether the underlying merits of the reported action were properly determined' but instead 'evaluate whether the report itself accurately reflected the action taken.'" Robinson v. E. Carolina Univ., 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018) (collecting cases).

Here, Plaintiff alleges that he was the subject of a precautionary suspension that began on March 3, 2020, that the suspension was "modified" on March 10, 2020 to "a lesser sanction with conditions," and that a

---

[6] Plaintiff also argues that the action against his privileges was not reportable. The Act defines a "professional review action" as including "an action … of a professional review body which is taken…in the conduct of professional review activity … and which affects (or may affect) adversely…clinical privileges …." 42 U.S.C. § 11151(9). The Act requires that a health care entity which "takes a professional review action that adversely affects the clinical privileges of a physician for a period longer than 30 days" report that action. 42 U.S.C. § 11133(a)(1)(A). Here, Plaintiff alleges that a specific provision of the Medical Staff Bylaws of MH Mission Hospital, LLP excluded the precautionary suspension from statutory reporting requirements and that, in any event, his precautionary suspension did not last for 30 consecutive days. See Doc. 4 at ¶ 36 (quoting § 8.4, Medical Staff Bylaws of MH Mission Hospital, LLP); Doc. 31 at 9. The undersigned does not reach a conclusion as to whether Plaintiff's precautionary suspension constituted a professional review action. Similarly, the undersigned expresses no opinion as to whether the Act does not require reporting of actions that cover 30 cumulative days in addition to actions that cover 30 consecutive days.

precautionary suspension was "again imposed" on March 25, 2020. Doc. 4 at ¶¶ 36, 39, 42. Plaintiff additionally alleges that his privileges were "fully restored" on April 23, 2020 subject to Plaintiff's "satisfactory completion of a fitness for duty evaluation." Id. at ¶ 46.

In other words, and viewing the allegations in the light most favorable to Plaintiff, Plaintiff's position appears to be that his privileges were suspended for two (2) distinct periods – one for 7 days (between March 3, 2020 and March 10, 2020) and a second for 29 days (between March 25, 2020 and April 23, 2020) – after which they were fully restored, provided that Plaintiff complete a single fitness for duty evaluation.

The Report, again taken in the light most favorable to Plaintiff, could be read to say that Plaintiff was subject to a single and continuous precautionary suspension which became effective on March 3, 2020 and that, as of April 23, 2020, would remain in place indefinitely unless Plaintiff satisfactorily completed multiple fitness for duty evaluations.

Based on these potentially divergent descriptions, the undersigned is persuaded that, at this stage of the proceedings, Plaintiff has sufficiently alleged that the Report was inaccurate.[7]

---

[7] As referenced above, courts generally do not consider the underlying merits of an action that forms the basis of a report to the Data Bank when considering immunity under 42 U.S.C. § 11137(c). Accordingly, the undersigned does not reach Plaintiff's

## 2. Defendants' Knowledge of the Falsity

Plaintiff alleges that because the Report was published (on May 4, 2020) after Plaintiff's clinical privileges were reinstated (on April 23, 2020), Defendants knew that the Report was incorrect. Specifically, Plaintiff alleges that Defendants had "actual knowledge that, prior to the [Report], the [Credentials Committee] had resolved to revoke the precautionary suspension and fully restore [Plaintiff's] clinical privileges." Doc. 4 at ¶ 50.

This allegation is somewhat inconsistent with Plaintiff's other allegations which do not indicate that the Credentials Committee "fully restored" Plaintiff's privileges on April 23, 2020. More precisely, Plaintiff alleges that his privileges were fully restored "subject to [Plaintiff's] satisfactory completion of a fitness for duty evaluation." Id. at ¶ 46.

Nonetheless, considering the possible different interpretations of the Report as discussed above, the undersigned is also persuaded that Plaintiff has alleged sufficiently that Defendants had knowledge, at the time they submitted the Report, that the Report was not completely accurate in describing the two alleged periods during which Plaintiff's clinical privileges were suspended (and, relatedly, the interim period during which Plaintiff's clinical privileges were subject to a "lesser sanction").

---

assertion that the Report was false because Plaintiff did not pose a concern for preoperative planning and intraoperative care.

Accordingly, the undersigned will recommend that, to the extent the Motion to Dismiss is based on Defendants' immunity pursuant to 42 U.S.C. § 11137(c), it be denied. See e.g., Montano v. Wash. State Dep't of Health, No. 1:23-23903, 2024 WL 3029155, at *19 (S.D. Fla. May 28, 2024) ("Because it is conceivable (albeit unlikely) that Plaintiff could allege facts in a properly pled amended complaint which would take his claims outside the reach of HCQIA immunity, the [u]ndersigned does not believe it is appropriate for this Court to rule, at this juncture, that Delta Dental is immune from liability under the HCQIA.") (citing Bonzani v. Goshen Health Sys. Inc., No. 3:19-CV-586 DRL-MGG, 2022 WL 715548, at *11 (N.D. Ind. Mar. 10, 2022), report and recommendation adopted, 2024 WL 3026528 (S.D. Fla. June 17, 2024)); Gudes v. Wilson Health, No. 3:22-cv-341, 2023 WL 5002053, at *4 (S.D. Ohio, Aug. 4, 2023) ("Importantly, Dr. Gudes alleges that the reasons stated in the First and Second [Date Bank] reports were inaccurate and pretextual, arguing that they contained false information in retaliation for his decision to move to Florida …. Thus, drawing all reasonable inferences in his favor, that calls into question whether the report itself accurately reflected the action taken …. ") (citation and internal quotation omitted).

### B. Plaintiff's Claims

#### 1. Libel and Libel *Per Se*

The Fourth Circuit has explained that "at base, defamation is a state-law tort claim." Cannon v. Peck, 36 F4th 547, 559 (4th Cir. 2022). "In North Carolina, 'to make out a prima facie case for defamation, [the] 'plaintiff must allege and prove that the defendant made false, defamatory statements of or concerning the plaintiff, which were published to a third person, causing injury to the plaintiff's reputation.'" Id. (quoting Griffin v. Holden, 180 N.C.App. 129 (2006) (quoting Smith–Price v. Charter Behav. Health Sys., 164 N.C.App. 349 (2004)).

Claims of libel and libel *per se* are governed by a one-year statute of limitations. See Oldham v. Univ. of N. Carolina, No. 1:22cv513, 2023 WL 3984031, at *17 (M.D.N.C. June 13, 2023) ("[D]efamation claims for libel and slander carry a one-year statute of limitations.") (citing N.C. Gen. Stat. § 1-54(3) and Horne v. Cumberland Cnty. Hosp. Sys., Inc., 228 N.C.App. 142, 150 (2013) (citations omitted)). This period begins to run on the date the allegedly defamatory material is published to a third party. Philips v. Pitt Cnty. Mem'l Hosp., Inc., 222 N.C.App. 511, 526 (2012) (noting that "the action accrues at the date of the publication of the defamatory words, regardless of the [date of discovery by the plaintiff].'") (quoting Gibson v. Mut. Life Ins. Co. of N.Y., 121 N.C.App. 284, 287 (1996) (modification in Philips)).

Here, Defendants contend that the Report was published for purposes of Plaintiff's defamation claims on May 4, 2020 when it was submitted to the Data Bank, and therefore the one-year limitations period expired prior to the filing of Plaintiff's Complaint on June 9, 2023.[8]

In response, Plaintiff argues that the Report was published each time a potential employer of his queried the Data Bank and the Data Bank provided the Report to that employer.

### a. General Principles

Generally, under North Carolina law, "each publication" of defamatory material is "a different tort" and therefore "the statute of limitations typically runs separately for each publication." Cannon, 36 F.4th at 576 (quoting Gibson, 121 N.C.App. at 287, Eng. Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc., 172 F.3d 862, No. 97-2397, 1999 WL 89125, at *3 (4th Cir. 1999) (unpublished table decision)); see also Branch v. Fed. Home Loan Mortg., No. 5:04-CV-859-BO, 2005 WL 8159344, at *7 n.8 (E.D.N.C. July 28, 2005) ("The act of republication is a separate instance of defamation—not a grounds for tolling of the original claim."); Restatement (Second) of Torts § 577A (1977) (the "Restatement")

---

[8] To the extent Defendants seek dismissal of Plaintiff's defamation claims based on the veracity of the Report, the alleged falsity of the Report is discussed above. To the extent Defendants seek dismissal of Plaintiff's defamation claims based on Plaintiff's failure to set out the allegedly defamatory statements from the Report verbatim in the Amended Complaint, the Report itself is in the record, as it was submitted by Defendants.

(generally, "each of several communications to a third person by the same defamer is a separate publication.").

The Restatement, though, sets out an exception, which is generally referred to as the "single publication rule," that pertains to certain aggregate communications. Specifically, the Restatement provides that "[a]ny one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication." Id. The Fourth Circuit has noted that the "great majority of states … now follow the single publication rule." Lokhova v. Halper, 995 F.3d 134, 142 (4th Cir. 2021) (quoting Morrissey v. William Morrow & Co., 739 F.2d 962, 967 (4th Cir. 1984)). In addition, a federal district court in North Carolina has applied the single publication rule to internet postings. Johnson v. City of Raleigh, No. 5:12-cv-210-BO, 2013 U.S. Dist. LEXIS 93947, at *19–20 (E.D.N.C. Mar. 29, 2013).

However, commentary in the Restatement indicates that the single publication rule does not apply to "separate aggregate publications on different occasions." Therefore:

> if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action. The same is true of a rebroadcast of the defamation over radio or television or a second run of a motion picture on the same evening. In these cases the publication reaches a new group and the

repetition justifies a new cause of action. The justification for this conclusion usually offered is that in these cases the second publication is intended to and does reach a new group.

Restatement (Second) of Torts § 577A (1977), comment (d).

### b. Analysis of Reports to the Data Bank

Here, to the extent Plaintiff is arguing that the original submission of the Report to the Data Bank on May 4, 2020 was defamatory, such a claim would be barred by the one year statute of limitation. The question, though, is whether the subsequent dissemination of the Report to Plaintiff's potential employers is actionable.

Some courts have found that the dissemination of a report found in the Data Bank is a distinct publication. In <u>Swafford v. Memphis Individual Prac. Ass'n</u>, No. 02A01-9612-CV-00311, 1998 WL 281935, at *9 (Tenn. Ct. App. June 2, 1998), the court found that each dissemination of material from the Data Bank was a separate publication and not part of an aggregate publication that would be covered by the single publication rule:

Unlike the mass publication of a book, magazine, or television commercial, it is unlikely that more than a handful of individuals or entities would gain access to information stored in the data base....In addition, the health care entities in this case, like the entities accessing credit information, requested information from the Data Bank on separate and distinct occasions. Therefore, there is no "aggregate publication" as contemplated in cases applying the single publication rule. While information in the Data

15

Bank may be accessed by several entities, the justification for the single publication rule, a vast multiplicity of lawsuits resulting from a mass publication, is simply not present here.

Id. at *8.

This reasoning has been followed by other courts. See Ashraf v. Adventist Health Sys./Sunbelt, Inc., 322 F. Supp. 3d 879 (W.D. Tenn. July 5, 2018) ("the republication doctrine applies in the context of information disseminated by the [Data Bank]"); Oja v. U.S. Army Corps of Eng'rs, 440 F.3d 1122 (9th Cir. 2006) ("[g]iven the exclusive and controlled access to the [Data Bank]…the release of the offending information could hardly be considered an 'aggregate communication' comparable to typical Internet publication[.]"); Stephan v. Baylor Med. Ctr. at Garland, 20 S.W.3d 880 (Tex. Ct. App. 2000) ("A physician may suffer a new and distinct injury with each republication of an allegedly defamatory report by the [Data Bank]. Accordingly, each transmission of the report is a new publication and a possible separate tort."); Williams v. Univ. Med. Ctr. of S. Nev., No. 2:09–cv–00554–PMP–PAL, 2010 WL 3001707, at *5–6 (D. Nev. July 28, 2010) ("A report to the [Data Bank] is not the same as a single edition of a newspaper. It can be accessed only by a select group of individuals and only upon their request. It is not widely and generally available and thus is not a single, aggregate publication. Each time the information is released to a requester, it is published anew.").

Other cases have taken a different approach. See Pierson v. Orlando Reg'l Healthcare Sys., Inc., No. 6:08–cv–466–Orl–28GJK, 2010 WL 1408391, at *12 (M.D. Fla. Apr. 6, 2010) (finding that "any defamation claim premised on the Adverse Action Report to the [Data Bank] accrued in 2004 when the report was made by [Defendant] to the [Data Bank]."), aff'd, 451 F. App'x 862 (11th Cir. 2012); see also Doe v. Thompson, 332 F. Supp. 2d 124 (D.D.C. Aug. 17, 2004) ("[T]he relevant factor for the Court to assess in deciding when the statute of limitations … has expired is to determine when the plaintiff knew or should have known of the alleged inaccuracy in the [Data Bank] revised Report" rather than when the Report was issued to requesting hospitals.).

Research has not disclosed cases in which North Carolina courts have directly considered the question of whether the dissemination of Data Bank reports should be analyzed as separate publications or as part of the original report (and therefore unactionable under the single publication rule).[9]

---

[9] Some North Carolina courts have reasoned, in other contexts, that the publication of a libelous statement when "invited by the plaintiff, is not sufficient to support an action for defamation." Pressley v. Cont'l Can Co., Inc., 39 N.C.App. 467, 469 (1979); see also Friel v. Angell, 113 N.C.App. 505, 509 (N.C. Ct. App. 1994) ("[a] communication … to a person acting at the plaintiff's request, cannot form the basis for a libel or slander claim.") (citing Pressley, 39 N.C.App. at 469); Branch, 2005 WL 8159344, at *7 n.8 ("Experian may have 'published' the credit report to Plaintiff's third party lender, but that issue is not in this case. Even if it were, that publication was at the behest of Plaintiff who needed the third party lender to review his credit report before agreeing to a construction loan."). To the extent Defendants assert that Plaintiff's defamation claim is foreclosed because Plaintiff caused the Report to be published to a potential employer each time he applied for a position, such a defense

Case 1:23-cv-00152-WCM    Document 38    Filed 08/07/24    Page 17 of 28

In the absence of such authority, the undersigned finds the reasoning of Swafford and similar cases to be persuasive and that the dissemination of the Report to new hospitals or medical entities constituted new publications of the Report.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████

As for the timing of these publications, Plaintiff alleges that for certain medical entities, a denial and/or revocation of an offer of employment occurred within the one-year period preceding the filing of Plaintiff's Complaint. See Doc. 4 at ¶¶ 77(j)–(o), 87 (j)–(o) (each alleging denials of employment or revocations of employment from August 22, 2022 through April 15, 2023). Although Plaintiff does not allege specific dates on which each of these entities queried the Data Bank, reading the allegations in the light most favorable to Plaintiff, the undersigned presumes that each entity obtained the Report on

---

would involve a fact-bound inquiry that should be taken up on a more complete record.

the same day it denied Plaintiff employment and will therefore recommend that Plaintiff's defamation claims be allowed to proceed.[10]

### 2. Breach of the Covenant of Good Faith and Fair Dealing

"In every contract there is an implied covenant of good faith and fair dealing that neither party will do anything that injures the right of the other to receive the benefits of the agreement." Hancock v. Americo Fin. Life & Annuity Ins. Co., 799 F. App'x 179, 181 (4th Cir. 2020) (citing Bicycle Transit Auth., Inc. v. Bell, 314 N.C. 219, 228 (1985) and Maglione v. Aegis Fam. Health Ctrs., 168 N.C.App. 49, 56–58 (N.C. Ct. App. 2005)). However, "[a] defendant cannot breach a covenant of good faith and fair dealing when a claimant fails to establish the defendant breached the underlying contract." McDonald v. Bank of N.Y. Mellon Trust Co., Nat'l Ass'n, 259 N.C.App. 582, 587 (2018) (citing Suntrust Bank v. Bryant/Sutphin Props., LLC, 222 N.C.App. 821, 833 (2012)).

Here, Plaintiff alleges that "[b]y virtue of the contractual employment relationship between" himself and Defendants, Defendants had an implied

---

[10] Even under this reading, some publications (and the related employment actions by Plaintiff's potential employers) occurred more than a year before Plaintiff initiated litigation. In addition, some employment actions that occurred during the year before Plaintiff filed suit could have been based on publications that were made outside of that one-year period. However, at least some publications may have occurred within the one-year period before suit was filed.

duty of good faith and fair dealing which Defendants breached "by falsely and improperly reporting Dr. Hetzel to the [Data Bank] prior to and without a proper peer review or professional review investigation," "refusing to provide adequate and/or legitimate explanations for their delays and failures to remedy the ongoing false and improper report to the [Data Bank] once they completed the peer review or professional review action," and engaging in unfair and deceptive practices. Doc. 4 at ¶¶ 91, 92, 93, 95.

Plaintiff, though, has not alleged with any particularity the terms of an underlying contract between himself and Defendants nor pleaded that Defendants breached that contract. See Suntrust Bank, 222 N.C.App. at 832 ("As the jury determined that plaintiff did not breach any of its contracts with defendants, it would be illogical for this Court to conclude that plaintiff somehow breached implied terms of the same contracts."); Sealy v. Fay Servicing, LLC, No. 3:16-cv-143-MOC-DCK, 2017 WL 4706909, at *2 (W.D.N.C. Oct. 19, 2017) ("if a party does not breach a contract, it is impossible to conclude that the party somehow did breach implied terms of the same contract.").

### 3. Tortious Interference with Prospective Economic Advantage

Defendants argue that to state a claim for tortious interference with prospective economic advantage, Plaintiff must allege that Defendants knew

of a prospective contract and purposefully prevented that contract from "coming to fruition." Doc. 25 at 18.

In response, Plaintiff asserts that a claim for tortious interference with prospective economic advantage is adequately pled when a plaintiff alleges "an 'unlawful interference with the freedom of contract' insofar as this involves 'preventing the making of a contract when this is done, not in the legitimate exercise of defendant's own right, but with design to injure the plaintiff, or gaining some advantage at his expense.'" Doc. 31 at 20 (quoting <u>Owens v. Pepsi Cola Bottling Co. of Hickory, N.C., Inc.</u>, 330 N.C. 666, 680 (1992)).

A court in this district recently explained that "[t]o plead an actionable claim for tortious interference with prospective economic advantage, Plaintiffs must plead (1) the existence of a business relationship between Plaintiffs and a third party", that "(2) [Defendants] interfered with that relationship; (3) by maliciously inducing the third party not to enter into a contract with Plaintiffs; (4) that the third party would have entered into but for [Defendants'] conduct; and (5) [Defendants'] conduct was not a legitimate exercise of its rights." <u>Church Ekklasia Sozo Inc. v. CVS Health Corp.</u>, No. 3:20-cv-00382-RJC-DSC, 2022 WL 1572732, at *10 (W.D.N.C. Feb. 25, 2022) (quoting <u>Beverage Sys. of the Carolinas, LLC v. Associated Beverage Repair, LLC</u>, 368 N.C. 693, 701 (2016)).

Case 1:23-cv-00152-WCM    Document 38    Filed 08/07/24    Page 21 of 28

Here, Plaintiff alleges that "Defendants were aware that Dr. Hetzel would or could seek employment with other health care providers." Doc. 4 at ¶ 103. He further alleges that he "obtained prospective employment" at Tenet, but that Tenet "would not give him credentials" due to the Report and withdrew its offer of employment, Doc. 4 at ¶¶ 29, 65 and that he then obtained a position with the University of Texas Health East Texas, but that the "job offer process stalled in March 2021, once the hospital learned" of the Report. Id. at ¶ 66. Additionally, Plaintiff alleges that in January 2022, he was hired at Ironwood Cancer and Research Center in Phoenix, Arizona, but that the offer of employment was withdrawn due to the Report and his precautionary suspension. Id. at ¶ 68. Such allegations fairly indicate the existence of business relationships between Plaintiff and these prospective employers, and that Defendants' submission of the Report to the Data Bank (and its subsequent dissemination to the employers) interfered with those business relationships.

What is less clear is whether Plaintiff has alleged sufficiently that Defendants' submission of the Report was "not a legitimate exercise of" Defendants' rights or that Defendants "maliciously induced" Plaintiff's prospective employers from withdrawing their offers of employment.

To the extent Defendants were obligated by the Act to submit the Report to the Data Bank, Defendants' submission of the Report could be considered a legitimate exercise of Defendants' rights.

On the other hand, Plaintiff has alleged, as discussed above, that Defendants had actual knowledge, at the time they submitted the Report, that the precautionary suspension had been "modified…to a lesser sanction with conditions," had determined that the "clinical care that was the subject of the initial precautionary suspension did not warrant a limitation" on Plaintiff's clinical privileges, that Plaintiff's privileges had been restored subject to "satisfactory completion of a fitness for duty evaluation," and that Plaintiff had not been subject to a continuous summary suspension lasting more than 30 days. See Doc. 4 at ¶¶ 39–50.

Under these circumstances, the undersigned is persuaded that Plaintiff's claim for tortious interference with prospective economic advantage should be allowed to proceed at this time.

### 4. Intentional Infliction of Emotional Distress

"The elements of intentional infliction of emotional distress are: '(1) extreme and outrageous conduct, (2) which is intended to cause and does cause (3) severe emotional distress.'" Cherry v. United Parcel Serv., Inc., No. 5:07–CV–403–D, 2009 WL 8641019, at *13 (E.D.N.C. Sept. 28, 2009) (quoting Hogan v. Forsyth Country Club Co., 79 N.C.App. 483, 487–88 (1986)). "Conduct is

23

extreme and outrageous when it is 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Id. (quoting Briggs v. Rosenthal, 73 N.C.App. 672, 677 (1985)).

Even when the evidence is viewed in the light most favorable to Plaintiff, Defendants' submission of the Report to the Data Bank was not extreme and outrageous conduct. See, e.g., Bratcher v. Pharma. Prod. Dev., Inc., 545 F. Supp. 2d 533, 544–45 (E.D.N.C. 2008) (collecting cases); Pardasani v. Rack Room Shoes Inc., 912 F. Supp. 187, 192 (M.D.N.C. 1996) ("Plaintiff has alleged that he was given poor performance evaluations, not given promotions which were given to others, excluded from training and finally terminated from his employment. Assuming these allegation[s] to be true, these actions do not rise to the level sufficient to exceed all bounds usually tolerated by decent society.").

### 5. Negligent Infliction of Emotional Distress

"In order to state a claim for [negligent infliction of emotional distress], a plaintiff must allege that (1) the defendant negligently engaged in conduct; (2) it was reasonably foreseeable that such conduct would cause the plaintiff to suffer severe emotional distress; and (3) the conduct did, in fact, cause the plaintiff to suffer severe emotional distress." Horne v. Cumberland Cnty. Hosp. Sys., 228 N.C.App. 142, 148 (N.C. Ct. App. July 2, 2013) (citing Johnson v. Ruark Obstetrics & Gynecology Assoc., P.A., 327 N.C. 283, 304 (1990)).

"A claim for *negligent* infliction of emotional distress is, therefore, subject to dismissal when 'the material factual allegations charge nothing but intentional acts ....'" <u>Fisher v. Frontline Nat'l</u>, No. 1:18-cv-00193-MOC-WCM, 2019 WL 1048848, at *4 (W.D.N.C. Mar. 5, 2019) (quoting <u>Mitchell v. Lydall, Inc.</u>, 16 F.3d 410, No. 93-1374, 1994 WL 38703, at *3 (4th Cir. Feb. 10, 1994) (emphasis in original)).

Here, Plaintiff relies solely on intentional acts to support his claim for negligent infliction of emotional distress, including that Defendants knew that the Report was false when they submitted it to the Data Bank. <u>See</u> <u>Sheaffer v. Cnty. of Chatham</u>, 337 F. Supp. 2d 709, 734 (M.D.N.C. 2004) (dismissing an NEID claim where the plaintiff had pleaded only intentional acts by the defendants).[11]

---

[11] Both a claim for intentional infliction of emotional distress and negligent infliction of emotional distress require factual allegations that the plaintiff suffered severe emotional distress. "While there are no magic words or phrases that a plaintiff must use to sufficiently plead emotional distress, bare allegations that the plaintiff has 'suffered severe emotional distress' without factual allegations describing what that emotional distress is or how it has manifested are insufficient to state a valid claim for negligent infliction of emotional distress." <u>Hudson v. Hudson</u>, 287 N.C.App. 217, at *5 (2022) (quoting <u>Cauley v. Bean</u>, 282 N.C.App. 443, 451 (2022), rev. denied, 876 S.E.2d 281 (2022)). Here, Plaintiff alleges generally that he suffered "severe emotional distress, including anxiety, embarrassment, depression, loss of career, damage to reputation and career, feelings of helplessness and hopelessness, suffering, mental anguish, and loss of enjoyment of life ...." Doc. 4 at ¶ 123. It is unnecessary to determine whether such allegations are sufficient here, in light of the conclusions set out above.

### 6. Punitive Damages

Under North Carolina law, "[p]unitive damages may be awarded only if the claimant proves that the defendant is liable for compensatory damages and that one of the following aggravating factors was present and was related to the injury for which compensatory damages were awarded: (1) Fraud, (2) Malice, (3) Willful or wanton conduct." N.C. Gen. Stat. § 1D-15. While "damages are not a separate cause of action," "if a complaint plausibly alleges the facts in support of an award of punitive damages under North Carolina law, a court should not dismiss a request for punitive damages." DeRose for Estate of DeRose v. DoorDash, Inc., 675 F. Supp. 3d 591, 605 (E.D.N.C. June 1, 2023) (citations omitted).

Here, Defendants argue that "punitive damages are a remedy, not a cause of action" and that "[b]ecause [Plaintiff] has failed to state any claim on which he could be awarded punitive damages, this claim must be dismissed as well." Doc. 24 at 23 (internal citations omitted).

As discussed above, however, the undersigned recommends that certain of Plaintiff's claims be allowed to proceed and punitive damages could be awarded for one or more of those claims if an appropriate showing is made. See e.g., Desmond v. News and Observer Publishing Company, 375 N.C. 21, (2020).

26

## V.   Recommendation

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that the Motion to Dismiss be **GRANTED IN PART** and **DENIED IN PART** as follows:

(1) That the following claims be allowed to proceed: libel, libel *per se*, and tortious interference with prospective economic advantage.

(2) That the following claims be **DISMISSED**: breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and negligent infliction of emotional distress.

W. Carleton Metcalf
United States Magistrate Judge

## Time for Objections

The parties are hereby advised that, pursuant to Title 28, United States Code, Section 636, and Federal Rule of Civil Procedure 72(b)(2), written objections to the findings of fact, conclusions of law, and recommendation contained herein must be filed within **fourteen (14)** days of service of same. **Responses to the objections must be filed within fourteen (14) days of service of the objections.** Failure to file objections to this Memorandum and Recommendation with the presiding District Judge will preclude the parties from raising such objections on appeal. See Thomas v. Arn, 474 U.S. 140, 140 (1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).