David John Hetzel, MD,

Plaintiff,

vs.

MH Mission Hospital, LLLP,

Defendant.

**Brief in Support of Summary Judgment on HCQIA Immunity**

This lawsuit is about a report that Mission Hospital made to the National Practitioner Data Bank. Dr. Hetzel contends that this report destroyed his career. So far discovery has not supported that contention. But even if it turns out to be true, there is a threshold problem: Dr. Hetzel concedes that all of the "information contained in the report," 42 U.S.C. § 11137(c), is true. So Mission Hospital has immunity.

Dr. Hetzel argues that although the report did not contain false information, it should not have been submitted and was therefore in some sense defamatory. As we will explain, this is wrong in two ways:

- The undisputed facts show that Dr. Hetzel's precautionary suspension was reportable.
- It does not matter, for the purpose of immunity, whether Dr. Hetzel's precautionary suspension was reportable.

And even if the precautionary suspension were not reportable, and even if that mattered for immunity, Mission Hospital believed that the precautionary suspension was reportable when it submitted the report. Therefore Mission Hospital is entitled to summary judgment on the issue of immunity.

## Scope of this Motion

We are moving for summary judgment now on a narrow, discrete issue: Whether Mission Hospital has immunity under the HCQIA, 42 U.S.C. § 11137(c). If this motion is denied, we anticipate moving for summary judgment at the close of discovery on several other issues that are not yet ripe, including:

- Defamation has a one-year limitations period, the allegedly defamatory report was replaced by a DHHS-dictated report in 2021, and this action was filed in 2023. This issue is not yet ripe because a key decision of this Court on the issue remains under seal.[1]

- Tortious interference requires a showing of "purposeful" interference through "active persuasion, request, or petition." *Charah, LLC v. Sequoia Services*, 2019 NCBC 17, ¶ 40. So far, Dr. Hetzel has forecast no evidence that Mission had the purpose of harming his career or that it actively persuaded other entities not to hire him.

- Dr. Hetzel cannot show that the report damaged his career. All of the information in the report, and then some, was contained in affiliation verification letters that Mission Hospital provided to prospective credentialing entities at Dr. Hetzel's request. Those letters are not the subject of this lawsuit because Dr. Hetzel signed a waiver related to them.

---

[1] The case is *Smith v. Cigna*, 3:09-cv-288, which this Court has cited for the proposition that the "last possible date for republication" of an NPDB report, for statute-of-limitation purposes, is the day before the allegedly defamatory report is replaced by a nondefamatory one. (Doc. 38 at 18.) We have moved to unseal the decision, or at least for the parties to this case to have access to it. That motion is still pending.

We believe that this early motion is appropriate, and will not waive our right to move for summary judgment on other issues at the close of discovery, based on the Court's remarks during the initial case-management conference.[2]

**BACKGROUND**

**1.      Dr. Hetzel's Privileges at Mission Hospital**

Dr. Hetzel is a gynecologic oncologist. From 1998 to 2020, he had clinical privileges at Mission Hospital, which meant that he could perform oncological surgeries there. Throughout that period, he was employed by Hope Women's Cancer Center, a physician-owned gynecologic oncology practice. He eventually became the owner of that practice. (Ex. 4 [Hetzel Dep.] at 10, 11.)

In 2019, some of Dr. Hetzel's breast surgical cases were the subject of a focused review by the Peer Review Committee. External reviewers had concerns about his surgical technique, and as a result he was placed on a performance improvement plan. He was directed to regularly attend the interdisciplinary breast conference and to present his breast surgical cases at that conference. He did not regularly attend or present at that conference, and as a result he was placed on "final warning" status in early 2020. (Ex. 4 at 85–88.)

---

[2] In response to our request for phased discovery that would allow us to resolve the immunity issue before proceeding to discovery on other issues, the Court suggested that we could instead bring an early motion for summary judgment on immunity while discovery on other issues was ongoing.

## 2.     Dr. Hetzel's Precautionary Suspension; Reports 1 and 2

Mission Hospital's bylaws and its policy on clinical privileges permit hospital leadership to impose a precautionary suspension of "all or any portion of [a physician's] clinical privileges" to protect patients. When a precautionary suspension is imposed, the Credentials Committee is notified and must meet within ten days. The Credentials Committee must then vote to recommend modification, continuance, or termination of the precautionary suspension. Its recommendation is subject to approval by the Medical Executive Committee but takes effect immediately. (Ex. 3 [Governance Document Excerpts] at 6–7.[3])

Mission Hospital followed that procedure after the index surgery in this case, which was a surgery that Dr. Hetzel performed on March 2, 2020.

**March 2: Index Surgery**. Dr. Hetzel performed an aggressive debulking surgery on a pelvic tumor. During this surgery, he encountered significant bleeding. He called Dr. Ramaswamy, a general surgeon, to help control the bleeding. Dr. Ramaswamy in turn requested the help of Dr. Buell, a transplant surgeon and the Mission Hospital chief of surgery. When Dr. Buell arrived, Dr. Hetzel "scrubbed out," leaving the OR. Dr. Buell and Dr. Ramaswamy then requested the assistance of Dr. Ahearne, a surgical oncologist. (Ex. 2 [Committee Documents] at 36.)

---

[3] The bylaws in Exhibit 3 took effect March 18, 2020 and was in effect for the . The prior version of the Bylaws has also been produced in discovery. It is relevantly identical but refers to Mission Hospital, Inc. instead of MH Mission Hospital, LLLP.

When Dr. Hetzel left the OR, his patient had lost about 1800 cc of blood and was still actively bleeding. By the time the procedure concluded, the patient had lost 5500 cc of blood, and her large and small bowels had been entirely removed. These were very serious complications and were not planned outcomes of the procedure. (Ex. 2 at 36.) After the surgery, the patient—who had been a "healthy, young 62 year old with no significant co-morbidities"—was discharged to hospice. (Ex. 2 at 37; Ex. 7 [Affiliation Verification Responses] at 5.)

**March 3: Suspension Imposed.** The day after the index surgery, the Mission Hospital Chief of Staff, CEO, and Women's Service Line Leader discussed the index surgery and two other intraoperative organ injuries that had occurred in the preceding six months. They determined that it was necessary to impose a total precautionary suspension of Dr. Hetzel's clinical privileges, and they notified Dr. Hetzel of that decision the same day. Dr. Hetzel's precautionary suspension began that day: March 3. (Ex. 2 at 1–3.)

**March 10: Suspension Modified.** On March 10, the Credentials Committee met to discuss Dr. Hetzel's precautionary suspension. The committee considered information from Dr. Hetzel, including his written explanation of the three surgeries that had led to the precautionary suspension. The committee voted to modify the precautionary suspension to restore some, but not all, of Dr. Hetzel's clinical privileges pending an investigation. Specifically:

1.     Dr. Hetzel could no longer order surgical cases on his own. He was

required to have another qualified surgeon render a "concurring consultation" agreeing that the surgery was appropriate.

2.   Dr. Hetzel could no longer perform surgical cases on his own. He was required to have another qualified surgeon scrub in with him for each surgery.

3.   Dr. Hetzel could no longer supervise residents.

(Ex. 2 at 7–14.)

Dr. Hetzel viewed this  modification as "minor at best"—"at this point," his privileges had not been returned. This sanction was "still a continuation of" the precautionary suspension that had been imposed on March 3. (Ex. 4 [Hetzel Dep.] at 42–43.)

**March 19–23: Investigative Committee.** The *ad hoc* investigative committee met on March 19 and 20 to discuss Dr. Hetzel's precautionary suspension.[4] The committee spoke with two of the surgeons who assisted with the March 3 surgery. They said that when they scrubbed in, the patient was actively bleeding from a large tumor that extensively involved the patient's small bowel. They said that the only way to save the patient's life was to remove the small and large bowels entirely. (Ex. 2 at 15–16.)

The committee also spoke with Dr. Hetzel's partners at Hope Women's

---

[4] Ordinarily the proceedings of the investigative committee would be absolutely privileged under N.C.G.S. § 131E-95. Dr. Hetzel would not be privy to their deliberations and we would not be able to discuss them. However, the chair of the committee gave Dr. Hetzel a copy of the committee's report so he could respond to the concerns it raised. Further proceedings of the investigative committee are privileged, except to the extent waived under our agreement with Dr. Hetzel.

Cancer Center, who discussed their concerns about his surgical practice:

- One partner reported "significant deviations from accepted breast cancer management guidelines" in Dr. Hetzel's breast cases. That partner also cited a case "where Dr. Hetzel left a resident to complete surgery when there was active bleeding."

- Another partner said that residents did "not feel comfortable with his supervision" or "wish to assist with his surgeries" because of "poor decision making and lack of engagement in patient care."

- One or more partners also disclosed reports of "a significant tremor which may affect surgical dexterity."

- All partners agreed that "Dr. Hetzel does not accept responsibility for poor outcomes and defers blame to others."

- All partners agreed that Dr. Hetzel exercised poor judgment and planning by performing the index surgery.

A member of the committee also disclosed "actively divert[ing] referrals from Dr. Hetzel due to concerns over his lack of engagement and decision-making." (Ex. 2 at 15–16.)

The investigative committee found that this information "indicated a concerning practice pattern." It recommended that the precautionary suspension be modified to totally suspend Dr. Hetzel's privileges, effective immediately; that a Code of Conduct violation be imposed for failure to speak with the family of the index patient; and that the Credentials Committee consider fitness-for-duty testing. (Ex. 2 at 15–16.)

**March 24: Suspension Modified.** The following day, the Credentials Committee considered the investigative committee's report and "modified the

precautionary suspension ... that was initially imposed on March 3, 2020" to suspend "all of [Dr. Hetzel's] clinical privileges." (Ex. 2 at 23. *See generally id.* at 22–24.)

**April 3: Suspension Upheld.** About a week later, the Medical Executive Committee considered and upheld the full precautionary suspension of Dr. Hetzel's privileges. (Ex. 2 at 28.) The same day, Dr. Hetzel submitted a statement from his lawyer, Steve Petersen, concerning the precautionary suspension that "was issued on March 3" and subsequently "modified" on March 10 and March 25. (Ex. 2 at 30.) That statement included a request for a hearing under Mission Hospital's governing documents, as well as a detailed explanation of Dr. Hetzel's role in the index surgery. (Ex. 2 at 29–34.)

**April 10–17: Investigation Continues.** Dr. Hetzel met with the investigative committee on April 10 to discuss the index surgery and the other concerns that had been raised. At this meeting, he was given a copy of the committee's earlier report and was asked to respond to it. He did so in writing on April 17. (Ex. 2 at 35–41.) Dr. Hetzel's response blamed Drs. Buell and Ahearne for being "overly "aggressive" during the index surgery (at 36), rejected the claim that he "d[id] not accept responsibility or ... blame[d] others" (at 40), and suggested that "turf disputes" with another oncology practice had led to "multiple anonymous submissions" "targeting" him for heightened scrutiny (at 40).

**April 23: Credentials Committee Recommendation.** After Dr. Hetzel responded to the investigative committee, another Credentials Committee

meeting was called. The Committee voted to recommend that the precautionary suspension be "lifted contingent on the findings of a fitness for duty evaluation which will include a Neuropsychologist's and a Neurologist's assessment." This action did not alter Dr. Hetzel's clinical privileges: The Committee planned to reconvene "once these evaluations are completed … in order to lift the precautionary suspension." (Ex. 2 at 43.)

**April 30–May 6: Evaluations.** The fitness-for-duty evaluations took place in late April and early May. (Ex. 5 [Fitness-for-Duty Evaluations].) The neurologist found that Dr. Hetzel had a "mild essential tremor" (at 5). The neuropsychologist found that he had some "troubling weaknesses" (at 9); his "fine motor control/speed was impaired using either hand" (at 9); and he had "illusions of invincibility," with a tendency to "transform failures into successes" and "construct lengthy and intricate rationalizations" (at 13). The neuropsychologist concluded that the "credentialing committee should consider whether Dr. Hetzel's profile of weaknesses preclude[d] his safe medical practice" (at 14).

**May 4: NPDB Report 1.** When a precautionary suspension lasts more than 30 days, it must be reported to the National Practitioner Data Bank. Dr. Hetzel's precautionary suspension passed the 30-day mark on April 3. That triggered a duty to report the suspension within a further 30 days. Mission Hospital submitted Report 1, which is the report this lawsuit is about, on May 4, 2020:

| C. INFORMATION REPORTED | | |
|---|---|---|
| Type of Adverse Action: | TITLE IV CLINICAL PRIVILEGES | |
| Basis for Action: | OTHER - NOT CLASSIFIED, SPECIFY (99) | |
| Other, as Specified: | CONCERNS ABOUT PREOPERATIVE PLANNING AND INTRAOPERATIVE CARE | |
| Adverse Action Classification Code(s): | SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES (1632) SUMMARY OR EMERGENCY LIMITATION, RESTRICTION, OR REDUCTION OF CLINICAL PRIVILEGES (1639) | |
| Date Action Was Taken: | 03/03/2020 | |
| Date Action Became Effective: | 03/03/2020 | |
| Length of Action: | INDEFINITE | |
| Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: | Dr. Hetzel was the subject of a precautionary suspension beginning on 3/3/20. This precautionary suspension was modified with the most recent modification being on 4/23/20 when the precautionary suspension was removed subject to the practitioner's satisfactory completion of fitness for duty evaluations. | |

(Ex. 6 [NPDB Documents] at 1–2; Ex. 8 [Shelton Declaration].)

Report 1 was as favorable to Dr. Hetzel as any truthful report about the suspension could be. It recited, in an abbreviated and anodyne way, the history of the suspension itself. It did not include any information about the serious complications that led to the suspension. It did not mention that the patient was discharged to hospice five days after the surgery. It did not use any of the standard basis-for-action codes that would imply fault by Dr. Hetzel.[5] It did not state that Dr. Hetzel's privileges had ever been totally suspended, and it used classification codes that could apply to a total or a partial suspension.

**May 11: Credentials Committee Recommendation.** The Credentials

---

[5] The code list, available at web.archive.org/web/20201017005747/https://www. npdb.hrsa.gov/software/CodeLists.pdf, contains a host of damning basis-for-action codes like "substandard or inadequate care," "malpractice," and "negligence" (at 19). Mission Hospital certainly would have been justified in using code F1, "immediate threat to health or safety." *See Moore v. Regional Hospital*, 560 F.3d 166, 177 (4th Cir. 2009) (hospital entitled to immunity for using "sexual misconduct" code "even though the hospital's action was based on mere allegations" because "this label came from the NPDB list of Basis for Action Codes"). But instead it used a custom description to emphasize that the precautionary suspension was based on "concerns" that had not yet been substantiated.

Committee met again shortly after the evaluations were completed. It recommended that the precautionary suspension be replaced with permanent and significant limitations on Dr. Hetzel's privileges—the same as the previous period of limited privileges (concurrent consultation, second surgeon, no residents). There was also to be a Focused Practice Performance Evaluation of future cases. This recommendation was referred to the Medical Executive Committee. (Ex. 2 at 50.)

**June 5: Suspension Lifted.** On June 5, the Medical Executive Committee met and voted to lift the precautionary suspension with conditions. It did not impose the conditions that the Credentials Committee had recommended. Instead it imposed lesser conditions that did not constitute a limitation on Dr. Hetzel's privileges:

- An FPPE of future surgical cases.
- Proctoring "as determined by the Women's Service Line Leader."
- A "letter of guidance and/or counsel to Dr. Hetzel related to the serious concerns that were identified … ."

Dr. Hetzel was notified of this action by letter dated June 9, which marked the end of his precautionary suspension. (Ex. 2 at 51–52.) His privileges had been limited continuously since March 3, and he had not exercised them since that date. For 83 of those 98 days, he had not had any clinical privileges at all. (Ex. 4 at 44–45, 65.)

**July 9: NPDB Report 2.** When Dr. Hetzel's privileges were restored, this too had to be reported to the NPDB. So on July 9, 2020, Mission Hospital

submitted a revision-to-action report that described the reinstatement. Report 2 stated that the Medical Executive Committee had determined that Dr. Hetzel's care "did not warrant a limitation on Dr. Hetzel's clinical privileges" and that his privileges had been fully restored. It did not state that the relevant committees had serious concerns about Dr. Hetzel's care, that he had been subjected to an FPPE, or that he had received a letter of guidance. (Ex. 6 at 4–5.)

### 3. Subsequent Events

Before the precautionary suspension was imposed, Dr. Hetzel had already resolved to leave his practice. He had sought employment at the Texas Tech University Health Sciences Center and hoped to start there later in 2020.

During the credentialing process, affiliates of Texas Tech University contacted Mission Hospital to verify the status of Dr. Hetzel's privileges. So did other entities, like the Texas Medical Board. The affiliation-verification responses (Ex. 7) included all of the information in Report 1 and then some. For example, they said (at 5–6) that:

- Dr. Hetzel was in "final warning status … due to serial code of conduct violations."

- His privileges had been suspended because the index surgery resulted in serious complications and hospice referral.

- That case occurred in the context of a pattern of injuries that might "represent Dr. Hetzel as an outlier relative to his peers."

These responses were "more … damaging to [Dr. Hetzel's] reputation than the substance of the Data Bank reports." (Ex. 4 at 155.) But they were provided

under a liability waiver, which is probably why they are not the subject of this lawsuit.

Dr. Hetzel ultimately did not complete his request for clinical privileges at Texas Tech's affiliated hospitals. He allowed those applications to lapse because he believed, or at least expressed a belief, that Report 1 was a barrier to obtaining credentials at those hospitals. He intended to use the NPDB's dispute-resolution process to have Report 1 removed. (Ex. 4 at 184.)

### 4. NPDB Dispute and Report 3

Dr. Hetzel submitted a dispute statement to the NPDB in early 2021. In this dispute statement, Dr. Hetzel did not argue that Report 1 was factually incorrect or should be modified. However, he did argue for the first time that Report 1 should be removed because, in relevant part, "Mission's Bylaws expressly [state] that a 'precautionary suspension is not in and of itself a final professional review action that is reportable, but rather an interim step to protect patients.'" (Ex. 6 at 7–8.)

The NPDB dispute-resolution process requires physicians to attempt to resolve their dispute with the reporting entity before obtaining a decision from DHHS. Dr. Hetzel asked Mission Hospital to void Report 1, and Mission responded that it would not do so because it believed Report 1 was submitted in accordance with the applicable law. Dr. Hetzel then asked DHHS to decide his dispute. (Ex. 6 at 9.)

After reviewing Dr. Hetzel's dispute and obtaining additional information from Mission Hospital, DHHS did not agree with Dr. Hetzel that

Report 1 should be removed from the NPDB. Instead it directed Mission to submit a correction report with additional information[6] and dictated what that report should include. (Ex. 6 at 10–11.)

Mission Hospital submitted Report 3 on October 27, 2021. Report 3 still said that Dr. Hetzel's precautionary suspension had begun March 3, that it subsequently was modified, and that it was based on concerns about his care. It differed in two ways, which did not "improve [Dr. Hetzel's] situation" at all (Ex. 4 at 140) but were required to adhere to NPDB requirements:

- Mission had coded the "date of action" as March 3, the date the precautionary suspension was imposed. DHHS instructed Mission to code that as March 25, the date of the most recent change to Dr. Hetzel's privileges, but to state in the body of the report that the suspension began March 3.

- DHHS instructed Mission to add the information that the precautionary suspension was total for most of its duration, and that even when it was not total, he was not permitted to post surgeries on his own, to perform surgeries unsupervised, or to supervise residents.

(Ex. 6 at 10–11, 15–16.)

Because these changes did not improve Dr. Hetzel's situation, he renew-

---

[6] A correction report does not imply that the original report was untrue:

> The NPDB reserves the right at any time after submission of a report to determine that a narrative description **does not provide sufficient detail** … . If the NPDB makes such a determination, the reporter is required to submit a Correction Report.

DHHS, *NPDB Guidebook* E-12 (2018) (emphasis added).

ed his dispute. He again contended that the report should be removed because his precautionary suspension was not reportable. This time, DHHS expressly disagreed:

> Based on the record and per the regulations, the Hospital was legally required to submit the Report. ... Regardless of the final decision, a precautionary suspension must be reported anytime it meets the NPDB requirement to report when the summary suspension is longer than 30 days. ... The Secretary is denying your dispute; the Report will remain in the NPDB.

(Ex. 6 at 22. *See generally id.* at 19–25; Ex. 9 [Hetzel RFA Responses] at 1.)

**5.      This Lawsuit**

Dr. Hetzel then filed suit for defamation and tortious interference, as well as other causes of action that have been dismissed. The operative complaint (Doc. 4) claims that Report 1 should not have been submitted to the NPDB, but it does not claim that the information contained in Report 1 is false. And that is how Dr. Hetzel testified. He said that Report 1 should not have been submitted, but none of the information in it was untrue:

> **It's not that there's an inaccuracy about the words on the page.** ... [T]here should be nothing on that page and it shouldn't exist. ... **I can't do any better than [Mission Hospital] did**, but, again, it shouldn't have been filed.

(Ex. 4 [Hetzel Dep.] at 126, 131.)

We responded by bringing this motion.

## STANDARD OF REVIEW

A party is entitled to summary judgment if it "shows that there is no

genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

**ARGUMENT**

Under 42 U.S.C. § 11137, Mission Hospital is immune from civil liability for any NPDB report "made … without knowledge of the falsity of the information contained in the report." This immunity presumptively applies in any lawsuit predicated on a report:

> Immunity for reporting exists as a matter of law unless there is sufficient evidence for a jury to conclude the report was false and the reporting party knew it was false.

*Brown v. Presbyterian Healthcare*, 101 F.3d 1324, 1134 (10th Cir. 1996) (cleaned up).

Based on Dr. Hetzel's testimony, his expert's report, and his recent submissions, we expect him to argue that Mission Hospital does not have immunity because his precautionary suspension was not reportable.[7] (Doc. 62

---

[7] But maybe not. After all, in the briefing on our motion to dismiss, Dr. Hetzel made several arguments that he knew were not true. For example, Dr. Hetzel said that his precautionary suspension did not "last[] a full 30 days" because his "privileges had been restored as of April 23, 2020." (Doc. 31 at 9–10.) That was false, and he knew it was false when he submitted his brief: His precautionary suspension lasted until June 9, well over 30 days. (Ex. 4 at 44–45, 65.) For similar reasons, he knew that his argument related to the suspension being reported as "indefinite" was also false. (Doc. 31 at 10.)

For another example, Dr. Hetzel argued that "the Report also falsely stated that Dr. Hetzel would be reinstated upon completion of multiple fitness-for-duty evaluations," when in fact only a single evaluation was required. (Doc. 42 at 9.) This, too, was untrue, and he knew it was untrue when he made that argument. (Ex. 4 at 96 ("Q: So, two evaluations, right? A: Yes.").) So even though Dr. Hetzel knows that the "words on the page" of Report 1 are accurate (Ex. 4 at 126), there is some possibility that he will now

at 6 (the "report's very creation is the false and defamatory act"); Doc. 60 at 2 ("the falsity is the report itself").)

That argument fails, and Mission Hospital is immune under section 11137, for three reasons:

1. Dr. Hetzel must show that "information contained in the report" was false. But Dr. Hetzel admits that the information contained in the report was true. He says only that his precautionary suspension was not reportable, which is irrelevant.

2. Even if reportability were relevant, the undisputed facts show that Dr. Hetzel's precautionary suspension was reportable.

3. Dr. Hetzel must also show that Mission Hospital knew that the report was false. He cannot do so, because Mission believed that the report was truthful and that it was required.

**1. None of the information contained in Report 1 was false, even if Dr. Hetzel's precautionary suspension was not reportable.**

Dr. Hetzel says that HCQIA immunity depends on whether Mission Hospital was required to submit Report 1. This argument fails for three reasons. First, the plain text of the Health Care Quality Improvement Act, its implementing regulations, and subregulatory guidance refute it. Second, binding precedent and persuasive authority from other circuits refute it. Third, it would make no sense as a policy matter.

**[1]** NPDB reporters are immune from liability unless they had "actual knowledge" that the "information contained in the report" was false when

---

argue that they aren't.

they made the report. 42 U.S.C. § 11137(c); 45 C.F.R. § 60.22. On its face this standard requires Dr. Hetzel to point to a false statement "contained in the report"—as he put it during his deposition, an inaccuracy in "the words on the page"—rather than an unnecessary submission of a factually accurate report.

Other regulations and subregulatory guidance confirm this reading. For example, the regulations governing the NPDB's dispute-resolution process distinguish between a case in which "the information contained in the report is inaccurate" and one in which "the adverse action was not reportable and therefore should be removed from the NPDB." 45 C.F.R. § 60.21(c)(2). And DHHS's guidance for physicians instructs them to submit "[d]ocumentation that shows that the information in the report is not accurate **or** that the action is not reportable." DHHS, *What If I Disagree with My Report*, npdb.hrsa.gov/pract/disputeProcess.jsp (emphasis added).

**[2]** Binding and persuasive precedents also confirm this reading. In *Moore v. Regional Hospital*, a physician sued a hospital for imposing a precautionary suspension based on allegations that he had molested a child. *Moore v. Regional Hospital*, 560 F.3d 166, 170 (4th Cir. 2009). In addition to suing for the precautionary suspension itself, he also sued for the ensuing NPDB report, which he felt was defamatory. He contended that his precautionary suspension was not a "professional review action" and therefore was not reportable.

The Fourth Circuit resolved that issue in the hospital's favor and therefore disposed of the entire case under a statute that is not relevant here.

*Id.* at 175. But it also held in the alternative[8] that the hospital was entitled to summary judgment under state law and under section 11137 because "the report accurately state[d] what happened." *Id.* at 177. It did not suggest that the dispute about whether the precautionary suspension was reportable could affect this holding. In fact, the relevant paragraph appears to assume, for argument's sake, that the precautionary suspension was not reportable. *See id.* ("Furthermore, we doubt South Carolina law would deny these defendants a defense of privilege when they could reasonably have believed that they were required by federal law to report plaintiff's suspension.").

Non-binding cases point the same way. Courts applying the section 11137 immunity "evaluate whether the report itself accurately reflected the action taken." *Murphy v. Goss*, 103 F. Supp. 3d 1234, 1239 (D. Or. 2015); *Kunajukr v. Lawrence & Memorial Hosp.*, 2009 WL 651984, at 23 (D. Conn. 2009). *See also Robinson v. East Carolina University*, 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018) (defendant entitled to immunity because "the report submitted to the NPDB accurately summarized" the events that led to the report). They do not investigate whether the report should have been submitted.[9]

---

[8] Alternative holdings are binding. *Pension Fund v. Four-C-Aire*, 42 F.4th 300, 309 n.10 (4th Cir. 2022).

[9] The only possible exception we know of is *Jackson v. Medical Board*, where the defendant moved to dismiss on the grounds that it had been required to submit the report at issue. *Jackson v. Medical Board*, 2008 WL 11378892, at *2 (C.D. Cal. 2008). The district court's order contains only a single passing reference to section 11137, it did not interpret or purport to interpret section 11137, and it did not cite any other cases

**[3]**   This approach makes perfect sense. A hospital knows which physicians it has granted privileges and what restrictions have been placed on those privileges. It knows what its committees have voted to do. When a precautionary suspension is imposed, the hospital knows the who, what, when, where, and why. But it may not know whether the precautionary suspension is reportable—that is a legal question, and sometimes a complicated one. Requiring hospitals to get that legal question right or lose their immunity would put them in an impossible position.

This case is a perfect example. If Dr. Hetzel is right, then the "falsity" that deprives Mission Hospital of HCQIA immunity is a legal mistake that two DHHS dispute-resolution officials, who specialize in resolving exactly this kind of question, also made. If the standard for immunity is that hospitals must be more accurate than DHHS, then hospitals will find any excuse not to submit reports, frustrating the purpose of the NPDB. That is not the law.

**2.    None of the information contained in Report 1 was false, because Dr. Hetzel's precautionary suspension was reportable.**

So far we have assumed, for argument's sake, that Dr. Hetzel's suspension was not reportable. We have assumed that not only Mission Hospital but also a DHHS dispute-resolution manager and the Chief of its Policy and Disputes Branch made an inexplicable legal error in determining that the

---

that had done so. Instead it jumped to the question of whether the report was required, apparently because that is how the defendant had framed the issue. We therefore do not believe that *Jackson* is relevant.

suspension was reportable.

That assumption is wrong. Dr. Hetzel's precautionary suspension was reportable, for three reasons. First, the NPDB Guidebook and regulations permit no other conclusion. Second, Dr. Hetzel's reliance on Mission Hospital's bylaws is misplaced because what matters is federal law. Third, the bylaws do not even say what he claims they say.

**[1]** A "professional review action" is an action by a hospital or its committees that is taken in connection with physician credentialing, is based on conduct that could adversely affect the welfare of patients, and adversely affects the physician's clinical privileges. 42 U.S.C. § 11151(9), (10). Hospitals are required to report any "professional review action that adversely affects the clinical privileges of a physician … for a period longer than 30 days." 45 C.F.R. § 60.12.

When a precautionary suspension is based on clinical care that could harm patients—for example, surgical complications—it is a professional review action. *Leal v. Secretary*, 620 F.3d 1280, 1287 (11th Cir. 2010) ("A summary suspension is a 'professional review action.'"); *Bakare v. Pinnacle Health*, 469 F. Supp. 2d 272, 287 n.26 (M.D. Pa. 2006) (same). It therefore must be reported if it lasts longer than 30 days:

> A suspension or restriction, whether called immediate, summary, emergency, or precautionary, typically means that a serious question has been raised and must be addressed quickly. Therefore, if a hospital or other health care entity … imposes a suspension ... as immediate or precautionary, and the suspension remains in effect for

more than 30 days, it must be reported to the NPDB.

DHHS, *NPDB Guidebook* E-39 (2018), *available at* npdb.hrsa.gov/resour ces/NPDBGuidebook.pdf.

Mission Hospital imposed a precautionary suspension of Dr. Hetzel's privileges based on complications that had occurred in three of his surgeries. That precautionary suspension lasted from March 3, 2020 to June 9, 2020. Even if we treat each modification to the precautionary suspension as a separate action, Dr. Hetzel's privileges were totally suspended for 76 consecutive days, from March 25, 2020 to June 9, 2020. That is well over the reporting threshold. In fact, Dr. Hetzel admitted as much during his deposition:

> Q. This is a determination by the NPDB that your precautionary suspension was reportable, right?
>
> A. According to [DHHS's] laws and [DHHS's] timeline, which they had set forth, you know, it meets their criteria. … Maybe they shouldn't have a rule, you know, like that. … [I]t just really ran out the clock on the 30 days and so it's reportable.

(Ex. 4 at 148.)

**[2]** Dr. Hetzel contends that his precautionary suspension was not a professional review action because of the following language from Section 8.4 of Mission Hospital's bylaws:

> A precautionary suspension is not in and of itself a final professional review action that is reportable, but rather an interim step to protect patients.

(Ex. 3 at 11.) In a moment we will discuss his reading of this language, but the more important point is that this language does not matter. The definition of "professional review action" is a question of federal law. Mission Hospital's bylaws are not a source of federal law. So there is "no reason to examine [Mission Hospital]'s bylaws in order to determine if its action constituted a professional review action." *Azmat v. Shalala*, 186 F. Supp. 2d 744, 749 (W.D. Ky. 2001) (cleaned up). Whether a professional review action has occurred "can be determined solely by referencing the facts, the relevant statutory definitions, and the common meanings of words." *Id.*[10]

Dr. Hetzel may see hospitals as akin to sovereign citizens, able to opt out of inconvenient laws merely by asserting that those laws do not apply, but that is not reality.

**[3]** Even if the bylaws were relevant, they would not help Dr. Hetzel. Section 8.4 of the bylaws does not say that a precautionary suspension is not a professional review action; it states that it is not a *final* professional review action. And section 8.4 does not say that a precautionary suspension is never reportable; it states that it is not "in and of itself" reportable. Both statements relate to the difference between a "final" professional review action, which becomes reportable as soon as it takes effect, and a nonfinal one, which becomes reportable only if it lasts more than 30 days:

---

[10] *Cf.* DHHS, *NPDB Guidebook* at E-36, E-39 ("[A]n investigation is not … limited to the manner in which the term 'investigation' is defined in a hospital's by-laws … . An action must be reported to the NPDB based on whether it satisfies NPDB reporting requirements and not based on the name affixed to the action.").

> Clinical privileges actions are reportable once they are made final by the health care entity. However, summary suspensions lasting more than 30 days are reportable even if they are not final.

DHHS, *NPDB Guidebook* at E-32.

### 3.    If any of the information contained in Report 1 was false, Mission Hospital did not know it.

Even if Dr. Hetzel could show that Report 1 contained false information, Mission Hospital still would be entitled to immunity. To overcome Mission Hospital's immunity, Dr. Hetzel would have to show that Mission had "actual knowledge of the falsity of the information contained in the report." 45 C.F.R. § 60.22. But there is no evidence that Mission knew of any falsity, and the individual who submitted the report believed it to be true:

> 6.    … When I submitted Report 1, I believed, and I still do believe, that all of the information in it was accurate.

(Ex. 8 at 2.) Ms. Shelton's declaration elaborates on how she determined that Report 1 was accurate, why she believed that Dr. Hetzel's precautionary suspension was reportable, and how she understands section 8.4 of Mission Hospital's bylaws.

*Murphy v. Goss* is instructive. In that case, the defendant conceded that the report was false but submitted a declaration from "the individual who claim[ed] to have filed the report with the NPDB" which "declare[d] that she had no actual knowledge that the report was false" when she submitted the report. *Murphy*, 103 F. Supp. 3d at 1239. Because the plaintiff could not "point to any evidence in the record suggesting that any defendant knew that

the NPDB report was false," this declaration established that the defendants were entitled to immunity. *Id.* at 1240 (cleaned up). Other than the fact that Report 1 was truthful, this case is no different.

## Conclusion

For these reasons, this Court should rule that Mission Hospital is entitled to judgment as a matter of law on the issue of HCQIA immunity and should therefore grant summary judgment.

Submitted October 28, 2025.

Roberts & Stevens, PA

/s/David Hawisher
Phillip Jackson (#21134)
    pjackson@roberts-stevens.com
David Hawisher(#55502)
    dhawisher@roberts-stevens.com
PO Box 7647
Asheville, NC 28802
(828) 252-6600
*Counsel for Defendants*

## Certificates

**Service.** I have served this document by ECF.

**AI Use.** The foregoing document complies with this Court's standing order at 3:24-mc-104 because its preparation did not involve the use of prohibited artificial intelligence tools and because an attorney has personally verified its accuracy as required by the standing order.

Certified October 28, 2025.

Roberts & Stevens, PA

/s/David Hawisher
David Hawisher