**MEMORANDUM FOR RECORD**

**To:** Medical Staff Office File

**From:** H. Michael Frisch, M.D. - Chief of Staff, Mission Hospital

**Date:** March 3, 2020

**Subject:** Conference Call, Precautionary Suspension of Dr. Hetzel Clinical Privileges

**Attendees:** H. Michael Frisch, M.D. - Chief of Staff, Mission Hospital

Dr. Anthony Spensieri, Chief Medical Officer, Mission Hospital

Dr. David Hetzel

The purpose of the conference call was to inform Dr. Hetzel that we were initiating a precautionary suspension of his clinical privileges at Mission Hospital in accordance with the Policy on Appointment, Reappointment, and Clinical Privileges of Mission Hospital.

The Obstetrics and Gynecology Service Line Leader, Dr. Arthur Ollendorff, was notified of a clinical event involving an intraoperative organ injury by Dr. Hetzel. Given that Dr. Hetzel had recently had two intraoperative organ injuries in the past 6 months and after further discussion with the Chief of General Surgery, Dr. Joseph Buell; the hospital Chief Medical Officer, Dr. Anthony Spensieri; the hospital Chief Executive Officer, Chad Patrick; and myself as Chief of Staff; we concurred that in the interest of patient's safety it was necessary to proceed with a precautionary suspension of Dr. Hetzel's clinical privileges at Mission Hospital.

We informed Dr. Hetzel that from this point his clinical privileges are under precautionary suspension and as such he does not have admitting, clinical, or surgical privileges at Mission Hospital. We informed him that any ongoing patient care would need to be transferred to his partners and any scheduled surgeries would need to be canceled until the precautionary suspension process is completed.

We will provide him with a written notice and a copy of the Policy on Appointment, Reappointment, and Clinical Privileges of Mission Hospital.



CERTIFIED MAIL, Return Receipt Requested, and EMAIL

PERSONAL AND CONFIDENTIAL

March 3, 2020

David Hetzel, MD
Hope Women's Cancer Center
100 Ridgefield Court
Asheville, NC 28806
David.Hetzel@HCAHealthcare.com

Dear Dr. Hetzel:

Consistent with the Policy on Appointment, Reappointment and Clinical Privileges of Mission Hospital, Article 4.6, (attached), your clinical privileges have been placed on precautionary suspension. The suspension of your clinical privileges is effective as of March 3, 2020 and remains in effect unless the suspension is terminated by the Medical Staff Credentials Committee, the Medical Executive Committee or the Board of Directors of Mission Hospital.

This suspension is imposed because of the reported complication of an organ injury that occurred during the gynecologic oncology surgery you performed on March 2, 2020 and the two intraoperative organ injuries to your patients within the past six months. Dr. Anthony Spensieri and I discussed the reasons for the precautionary suspension with you last night.

You will receive notice of a meeting of the Credentials Committee to review and consider this precautionary suspension. The Chair of the Credentials Committee will consult with you in setting the date of the meeting. You may address the Credentials Committee during the meeting, but you may not be represented by legal counsel at this meeting, and this meeting does not constitute a hearing.

The Service Line Leader will immediately assign responsibility for care of your inpatients at Mission Hospital to another medical staff member with appropriate clinical privileges. This assignment will be effective until the patients are discharged from the Hospital

If you have any questions regarding this notice, please contact us through the Medical Staff Services Office at 828-213-6116.

Sincerely,

H. Michael Frisch, MD
Chief of Staff
Mission Hospital

Chad Patrick
Chief Executive Officer
Mission Hospital

Arthur Ollendorff, MD by his designee, Brenda Shelton, CPMSM
Women's Service Line Leader
Mission Hospital

Enclosure: Policy on Appointment, Reappointment and Clinical Privileges; Article 4.6, 4.6.1 (a) (b)

cc: Joseph Buell, MD
Chief of General Surgery
Mission Hospital

John Garrett, MD
Chairman, Board of Trustees
Mission Hospital

Anthony Spensieri, MD
Chief Medical Officer
Mission Hospital

Rachel Coleman
Senior Operations Counsel
NC Division

4.6 PRECAUTIONARY SUSPENSION OF CLINICAL PRIVILEGES

4.6.1 Criteria for Initiation

(a) The Chief of Staff, the Service Line Leader, and the President of the Hospital (or in each case his/her respective designee) shall each, when acting with the concurrence of at least one of the others, have the authority to suspend all or any portion of the clinical privileges of a Medical Staff member whenever it is reasonably believed that the failure to take such action may result in an imminent danger to the health of any individual or class of individuals (e.g. present or future patients or Hospital staff).

(b) A precautionary suspension shall become effective immediately upon oral or written notice to the affected Medical Staff member from any one or more of the individuals listed above in section 4.6(a), which notice shall specify the general grounds for such suspension. If the notice is oral, the member shall promptly be given notice in written form. The member shall also promptly be given a copy of the member's rights, which shall include a meeting with the Credentials Committee pursuant to paragraph (c) below. A precautionary suspension is not in and of itself a final professional review action that is reportable, but rather an interim step to protect patients.

(c) The Credentials Committee shall be notified immediately of any precautionary suspension, and as soon as possible, but no later than ten (10) days after such precautionary suspension, a meeting of the Credentials Committee shall be convened to review and consider the action taken. The purpose of this meeting shall be to determine whether it is reasonable to believe that an imminent danger to the health of any individual or class of individuals (e.g. present or future patients or Hospital staff) actually exists so as to support the continuation of the precautionary suspension. The Chair of the Credentials Committee shall set the date for the meeting in consultation with the affected Medical Staff member. The affected Medical Staff member may address the Credentials Committee during the meeting, but the Medical Staff member may not be represented by legal counsel at this meeting, and in no event shall this meeting constitute a hearing (regardless of whether or not the affected Medical Staff member addresses the Credentials Committee).

(d) Within thirteen (13) days of the imposition of a precautionary suspension, or within such additional time period as the Credentials Committee in its discretion determines to be necessary and reasonable, the Credentials Committee shall recommend modification, continuance, or termination of the terms of the precautionary suspension, or recommend alternative corrective action. Until such time as the Credentials Committee has made a recommendation, the Chief of Staff, the Service Line Leader, and the President of the Hospital (or in each case his/her respective designee) shall, if acting unanimously, have the authority to terminate the precautionary suspension.

1) Unless the recommendation of the Credentials Committee is immediate termination or modification of the precautionary suspension to a lesser sanction (which sanction does not

entitle the Medical Staff member to hearing rights), the affected Medical Staff member shall be entitled to a hearing, as defined and described in Article V of this Policy; however, the terms of the precautionary suspension as sustained or as modified by the Credentials Committee shall remain in effect pending the outcome of any hearing, unless earlier terminated or modified by the Credentials Committee, the Medical Executive Committee, or the Board.

2) A Credentials Committee recommendation to terminate or modify the suspension to a lesser sanction not triggering hearing rights under Article V shall be referred with all supporting documentation or immediate access thereto to the MEC for recommendation to the Board. The terms of that recommendation by the Credentials Committee shall immediately take effect and shall remain in effect pending a final decision by the Board. The Board shall act within thirty (30) days of said referral from the Credentials Committee (or within such additional time as the Board in its discretion determines to be necessary and reasonable) to approve, modify, or terminate the suspension.

(e) Nothing in this section 4.6 shall prevent the initiation of an investigation pursuant to section 4.3 above regarding any events or matters related to any precautionary suspension.

(f) Immediately upon the imposition of a precautionary suspension, the appropriate Service Line Leader or, if unavailable, the Chief of Staff, shall assign to another Medical Staff member with appropriate clinical privileges responsibility for care of the suspended Medical Staff member's patients that are inpatients of the Hospital. The assignment shall be effective until the patients are discharged from the Hospital. The wishes of the patient shall be considered in choosing the substitute Medical Staff member.

(g) The procedures outlined above are deemed to be fair under the circumstances.

**CREDENTIALS COMMITTEE MINUTES**

**MISSION HOSPITAL**

**March 10, 2020**

**Call To Order:**



[redacted]

[redacted]

**CONCLUSION/ACTION**: At the conclusion of the discussion a motion was made, seconded, and unanimously approved by those present to modify the preliminary suspension to a lesser sanction – it was concluded the Dr. Hetzel be allowed to continue to see patients but that for all operative cases he be scrubbed in with a partner. The committee concluded that he not be involved in the supervision of residents until this matter is further deliberated on by the Medical Executive Committee and the Board of Trustees for a final determination.

[redacted]

**ADJOURNMENT**

There being no further business, the meeting adjourned.

Prepared by: ____________________________________
Christy Sutton, Medical Staff Coordinator

Reviewed by: ____________________________________
Scott Joslin, MD, Credentials Chair

  

Credentialing Committee Reviewed

Submitted by: David [illegible] 3/10/2020

S[redacted] W[redacted]

**Summary**

- Small enterotomy occurred in the small bowel
- Enterotomy was detected and closed with sutures with air and watertight result
- Post-surgery a sigmoid fistula developed and was appropriately handled
- Appropriate referral to colon-rectal surgeon for evaluation and schedule of surgery for take-down or repair

**Issues**

- Not unusual for enterotomy to occur with surgery for dense abdominal adhesions
- Small bowel enterotomy identified and appropriately closed during initial surgery
- Appropriate evaluation and treatment of subsequent fistula
- Appropriate referral to colon-rectal surgeon for evaluation and scheduling of repair
- Appropriate referral to colonrectal surgeon for colonoscopy to verify colon is normal and to schedule surgery to take down the colostomy

**Medical Records**

[redacted] surgery due to large abdominal mass

- Surgically observed dense widespread adhesions, particularly in area of the abdominal mass and the small bowel sigmoid bladder where there were two layers of adhesions.
- Small enterotomy occurred in the small bowel, which was detected and closed with sutures with air and watertight result.
- The abdominal mass was removed

Postoperatively

- Patient developed swelling, 5-7days fistula developed in lower sigmoid colon

Surgery 2

- Treatment options discussed and bypass transverse colostomy done to allow leaving the lower part of the bowel.
- Opted for prolonged interval for abscess to clear and fistula to heal.

Colonoscopy [redacted] – entire colon normal







**A[redacted] W[redacted]**

## Summary

- Breast cancer patient for removal of ovaries and fallopian tubes
- No enterotomy observed during initial surgery
- Patient discharged and had uneventful postop period for 4 days
- Then patient developed pain and returned to ER
- Second surgery five days post initial surgery found 5 mm perforation
- Path report indicates the area was attenuation thickening of bowel wall

## Issues

- Choice to use Ligature vs. sharp dissection alone
- Decision to use Ligature or sharp dissection based on anticipation of the amount of bleeding anticipated and fatty sigmoid epiploica looked like it buffered the interface between the left ovary and sigmoid.
- Possible that Ligature with electrical dissection caused heat damage to sigmoid wall that later resulted in development of postoperative perforation

## Medical Records

[redacted] Surgery

- Laparoscopic lysis of adhesions and bilateral salpingo-oophrectomy
- Left tube and ovary with dense adhesions to the sigmoid colon
- Observed bowel had significant areas of adipose tissue hanging down
- Considered diverticula, but concluded minimal risk (did not hit one)
- Ovary was very stuck to sigmoid colon
- Dissection of the ovary off of the sigmoid colon was very challenging
- Sigmoid colon inspected after dissection off of the ovary
- No enterotomy noticed
- Laparoscopic trocar sites and skin closed
- Patients postop recovery was unremarkable with good pain control and passing flatus

[redacted]

- Returned to ER with abdominal pain and swelling
- Developed fever of 103
- General Surgery was consulted
-

 Daniel 3/10/2020

**Summary**

- Knew preoperatively that the surgery involved a massive tumor.
- Goal was tumor debulking of what appeared to be an abdominal tumor and removal of ovaries and fallopian tubes.
- Upon opening the site, the tumor was massive
- Initiated the abdominal portion of the surgery and removed ovaries and fallopian tubes and portions of tumor.
- Observed an enterotomy and, due to its location and the extent of the tumor in the colon area, made the decision to include the general surgeons.
- When Dr. Buell began his portion of the surgery, he noted an initial enterotomy. As Buell progressed with trying to remove the rest of the massive tumor, other additional factors developed that compelled them to remove more small bowel and the colon.

**Issues**

- Initial decision to do the surgery– debulking of massive pelvic/abdominal tumor to increase effectiveness of chemotherapy and remove fallopian tubes and ovaries.
- Decision to include General & Hepato-biliary Surgeons – involvement of colon and observation of a very proximal enterotomy - a difficult to suture location.

**Review of Medical Records**

Preop Analysis

- Very bad cancer – plan was for tumor debulking
- Knew it looked very bad; patient unable to eat or have BMs
- Plan was to open, see how much tumor could be removed, restore some bowel function, surgically reduce the size of the tumor as much as possible, close, and send for chemo.

3/2/20 Surgery (Hetzel)

- Opened abdomen and saw the entire surface of abdomen was replaced by massive tumor
- Worked in the abdomen to remove omental tumor and to isolate and remove large uterine mass, fallopian tubes and ovaries.
- Could see large piece of the tumor involved the descending colon and sigmoid, Proximal 2/3 of colon acceptable. Decided to devide descending colon for diversion. Tumor underneath mesentery pulled in proximal jejunum

- With further dissection, an enterotomy was developing.
- Due to the size and spread of the tumor and the location of the developing enterotomy, decision made to call general /Hepato-biliary surgeons to help.
- Dr. Hetzel noted complications in the surgical notes.

3/2/20 Surgery (Buell)

- Stepped in and noted massive pelvis tumor with abdominal wall encasement throughout the small and large bowel due to extensive disease
- At the start, Dr. Buell noted a partial colectomy and a partial small bowel resection had been performed and there was "**a** enterotomy of the proximal small bowel at this juncture." Continued to dissect tumor
- They performed extensive unplanned enterectomy due to multiple bowel enterotomies and the extensive tumor.





CERTIFIED MAIL, Return Receipt Requested, and EMAIL

PERSONAL AND CONFIDENTIAL

March 12, 2020

David Hetzel, MD
Hope Women's Cancer Center
100 Ridgefield Court
Asheville, NC 28806
David.Hetzel@HCAhealthcare.com

Dear Dr. Hetzel:

As previously discussed, you were placed on precautionary suspension effective March 3, 2020.  The Credentials Committee (hereinafter "Committee") met on March 10, 2020 to review and consider this precautionary suspension.

Consistent with Articles IV and V of the Policy on Appointment, Reappointment and Clinical Privileges of Mission Hospital (hereinafter "Policy"), a copy of that Policy is enclosed for your careful review, you are informed that the Committee decided as follows:

1.  It will initiate further investigations into the preoperative, perioperative and postoperative care of the patients identified by the medical record numbers listed below. This will include the following aspects of your care: preoperative planning for each patient, surgical approach for each patient, intraoperative techniques for each patient, intraoperative decision making for each patient, post-operative care of each patient and, and post-operative communication with the patient and family.

2.  The precautionary suspension will be modified to the following lesser sanctions, which take immediate effect:

     a.  You may return to practice but you **must** at all times comply with the following conditions imposed by the Committee:

          i.  You are required to have a concurrent consultation for all of your operative cases. That concurrent consultation must be provided by a qualified surgeon employed by Hope Women's Cancer Center and in good standing with the medical staff;

    ii.   You are required to have another qualified surgeon scrub in with you for your operative cases. That qualified surgeon must employed by Hope Women's Cancer Center and in good standing with the medical staff;

    iii.   You may no longer supervise residents.

3.   These lesser sanctions described in paragraph (2) above shall remain in effect pending the outcome of any hearing, unless earlier terminated or modified by the Credentials Committee, the Medical Executive Committee, or the Board.

The Credentials Committee has appointed the following individuals to serve on the Ad Hoc Investigating Committee ("Investigating Committee"): Garth Davis, MD; William Harlan, MD; Lemuel Kirby, MD; and Stacy Travis, MD. The Investigating Committee will further investigate this matter.

Please be advised that the nature of the questions being investigated include the following: (1) Patient SW MR#722729 who underwent surgery on 10 June 2019; (2) Patient AW MR#1122181 who underwent surgery on 31 December 2019; (3) Patient VC MR#2363521 who underwent surgery on 2 March 2020, and (4) concerns about your lack of participation in multidisciplinary breast conferences and other such issues as outlined in your 13 January 2020 final warning issued in connection with our peer review process.

The Investigating Committee will be charged with further investigating the general nature of the concern, the existing evidence of concern, the preoperative planning of this case, your surgical technique, and your availability for postoperative communication with the family along with any other issues as encountered in the investigation. This incident occurred while in final warning status for Code of Conduct related concerns rather than clinical conduct but your behavior, response to feedback, failure to participate in tumor board and submit cases for review, very recent sit down meeting with the Chief of Staff, and demeanor may all be factors in placing this investigation into context for further recommendations.

The ad hoc committee at its discretion may seek an external review of this most recent operative case, and may interview the surgeons involved and your Service Line Leader for additional background and details.

The general nature of the evidence related to the questions being investigated includes the medical records for the above referenced questions, the recollections of the surgeons involved in those cases, concerns about your behavior, and the information related to your attendance and presentation to the tumor board reviews, your very recent sit down meeting with the Chief of Staff, and your clinical and professional judgment.

Please see the enclosed Policy and in particular Article IV of the Policy for additional discussion of the process and procedure regarding the investigation.

Please be advised that the modification of the precautionary suspension to the sanction(s) listed above with respect to the requirement of concurrent consultation entitles you to hearing rights under Article V of the Policy on Appointment. See Section 5.1(a).

You have the right to request a hearing within thirty (30) days of receipt of this notice. A request for a hearing must be made, in writing, to me as Chief Executive and President of Mission Hospital. If I have not received a request for a hearing within that thirty (30) days, you shall be deemed to have waived the right to a hearing and to have accepted the recommendation or action involved. Please see Policy on Appointment Article V for additional discussion regarding hearing and appeal procedures.

Note that the decisions and actions described herein are confidential professional review activities and intended to be covered by the provisions of N.C. Gen. Stat. 131E-95 and the corresponding provisions of any subsequent federal or State statute providing protection to peer review or related activities.

The Credentials Committee Chair, Dr. Scott Joslin, remains available to you on 828-280-4222 for any questions or need for additional clarifications that arise as this inquiry proceeds.

Sincerely,

Chad Patrick
Chief Executive Officer
Mission Hospital

**Ad hoc credentials committee report**

Members reviewing the case are Will Harlan, Lem Kirby, Garth Davis, and Stacy Travis. All were present for the called credentials meeting where Dr. Hetzel was present and met as a subgroup on March 19 and March 20, 2020.

Prior to the subgroup meeting, the case was discussed confidentially and informally amongst the members and operative reports from the index and two other cases were thoroughly reviewed.. I spoke to Dr. [redacted] to learn more about what transpired once he entered the operating room, and Dr. Davis discussed the case with Dr. [redacted]. Dr. [redacted] noted that when he entered the operative field, there was significant bleeding from the large pelvic tumor, and he and Dr. [redacted] determined the only way to control hemorrhage from this area was to remove the pelvic tumor en bloc. Once that was accomplished, attention was focused on numerous small bowel enterotomies present when they entered the operative field. The small bowel was massively involved with tumor, actively bleeding, and the only way forward to save the patient's life was evisceration with an end duodenostomy. It was the opinion of all Dr. Hetzel's partners that he exercised poor judgement and planning by proceeding with attempted debulking surgery on this patient.

The committee was made aware of two additional cases: one, a delay in diagnosis of breast cancer in a lactating female, and the second, a sigmoid perforation leading to an abscess. Regarding the second case, Dr Hetzel's partners told the committee he refused to see the patient on the night of admission. The resident took it upon his/herself to call general surgery to see the patient on the night of admission, and the general surgeon provided direction for the resident. Further, we are aware of the breast cases sent for outside review and other elements of his peer review file. . We did not feel the index or two other cases mentioned above warranted further outside review.

During the subcommittee meeting on March 19, we briefly reviewed the information presented above and felt it best to discuss his practice pattern with his partners to better understand if these cases represent isolated episodes or are a trend. The committee met Dr. Hetzel's practice partners, Drs. [redacted] on March 20..

The meeting on March 20 was illuminating and indicated a concerning practice pattern. For the past two years, Dr. Hetzel has demonstrated poor medical judgement and decision making similar to the index case.. Dr. [redacted] took over three of Dr. Hetzel's breast cancer patients in the office and found significant deviations from accepted breast cancer management guidelines. Dr. [redacted] indicated Dr. Hetzel does not accept responsibility for poor outcomes and defers blame to others. Other partners agreed there is a lack of accountability and ownership of adverse patient outcomes. Dr. [redacted] indicated the residents do not feel comfortable with his supervision, nor do they wish to assist with his surgeries due to poor decision making and lack of engagement in patient care. There are cases where a 24-hour history and physical update were not completed prior to surgery. Dr. [redacted] cited one case where Dr. Hetzel left a resident to complete surgery when there was active bleeding. Dr. [redacted] indicated she actively diverts referrals from Dr. Hetzel due to concerns over his lack of engagement and decision-making. The residents and his nurse have also observed a significant tremor which may affect surgical dexterity.

From these discussions the committee's findings and recommendations are:

1. A Code of Conduct violation for failure to discuss operative findings and surgical difficulty with the family/friend of the index case.
2. Reinstatement of the full precautionary suspension of privileges effective immediately.
3. Consider Fit for Duty testing to review if there are underlying medical conditions impairing his ability to use sound medical judgement and perform surgery.


Respectfully codified and submitted on behalf of the subcommittee,

Will Harlan, M.D.
Partner Digestive Health Partners Asheville
Member Credentials committee

**CREDENTIALS COMMITTEE MINUTES**

**MISSION HOSPITAL**

**March 24, 2020**

1.

R&S 2680714_1







MH# 001844

R&S 2680714_1

Fully redacted page with no readable body content.







**CONCLUSION/RECOMMENDATION:** At the conclusion of the discussion and review of Ad Hoc Committee report a motion was made, seconded, and unanimously approved by those present for reinstatement of the full precautionary suspension of privileges.

**FOR INFORMATION**

Next Credentials Committee meeting is scheduled for Tuesday, April 28, 2020.

**ADJOURNMENT**

There being no further business, the meeting adjourned at 8:00am.

Prepared by: ________________________________________
Sandra Turnau, Medical Staff Coordinator

Reviewed by: ________________________________________
Scott Joslin, MD, Credentials Committee Chair



MISSION
HOSPITAL

CERTIFIED MAIL, Return Receipt Requested, and EMAIL

PERSONAL AND CONFIDENTIAL

March 25, 2020

David Hetzel, MD
353 Midland Drive
Asheville, NC 28804
DavidJHetzel@gmail.com

Dear Dr. Hetzel:

On March 24, 2020, the Credentials Committee modified the precautionary suspension of your clinical privileges at Mission Hospital that was initially imposed on March 3, 2020. Pursuant to the modification by the Credentials committee, all of your clinical privileges at Mission Hospital are suspended. The modification is effective immediately. The Credentials Committee's authority for this modification is found in the Policy on Appointment, Reappointment, and Clinical Privileges ("Policy"), including but not limited to the authority contained in Section 4.6.1(d) of the Policy. A copy of the Policy was previously provided to you in the letter dated March 12, 2020 from Chad Patrick, CEO of Mission Hospital.

This letter is intended to provide you written notice of the modification of the precautionary suspension by the Credentials Committee and to further provide you written notice that under the terms of the modification of the precautionary suspension all of your clinical privileges at Mission Hospital have been suspended and that the modification is effectively immediately.

In addition, this letter informs you that the Investigative Committee which was appointed pursuant to Section 4.3 of the Policy and which was described in the March 12, 2020 letter from Mr. Patrick, will provide you the opportunity to meet with the Investigative Committee pursuant to Section 4.4(e) of the Policy. Please work with the Medical Staff office and the members of the Investigative Committee to schedule this meeting.

You have the right to request a hearing within thirty (30) days of receipt of this notice. A request for hearing must be made, in writing, to Chad Patrick, as Chief Executive and President of Mission Hospital. If a request for hearing has not been received within that thirty (30) days, you shall be deemed to have waived your right to a hearing and to have accepted the recommendation or action involved. Please see Article V of the Policy for information regarding requesting a hearing and the hearing process.

MH# 001849

David Hetzel, MD
Page 2
March 25, 2020

Sincerely,

Chad Patrick
Chief Executive Officer
Mission Hospital

Scott Joslin, M.D.
Credentials Committee Chair acting for the Credentials Committee

cc: Credentials Committee members
Investigative Committee members

Rachel Coleman
Senior Operations Counsel
NC Division

**Mission Hospital**
**MEETING RECORD**

| | | | | | |
|---|---|---|---|---|---|
| **MEETING:** | Medical Executive Committee – Executive Session | | | | |
| **DATE:** | 04-03-2020 | **TIME:** | 8:00am | **LOCATION:** | Stevens Board Room |
| **LEADER:** | [redacted] | | | **RECORDER:** | [redacted] |

**NEXT MEETING**

| | | | | | |
|---|---|---|---|---|---|
| **DATE:** | 05-01-2020 | **TIME:** | 7:30am | **LOCATION:** | Stevens Board Room |

| **TOPIC** | **DISCUSSION** | **ACTION/ FOLLOW-UP** |
|---|---|---|
| **Call to order** | [redacted] convened an Executive Session, calling the meeting to order at 7:30 am. The regular session of the MEC was not held this month. | |
| **Attendance** | **Members Present**: [redacted]<br><br>**Members Absent:** [redacted] | |
| [redacted] | [redacted] | |
| [redacted] | [redacted] | |

CREDENTIALS COMMITTEE REPORT

**CONSENT AGENDA:**





**PRECAUTIONARY SUSPENSION:**

**David Hetzel MD - GYN Oncology**



**CONCLUSION/RECOMMENDATION**: Following discussion, a motion was made, seconded and unanimously passed to not terminate or modify the full precautionary suspension of Dr. Hetzel's privileges, thus leaving the precautionary suspension in place.

**NEW BUSINESS**

Prepared by: Brenda Shelton, CPMSM
Director, Medical Staff & Credentialing

Approved by: Michael Frisch, MD
Chief of Staff



MH# 001854

Fox Rothschild LLP
ATTORNEYS AT LAW

434 Fayetteville Street
Suite 2800
Raleigh, NC 27601
Tel (919) 755-8700 Fax (919) 755-8800
www.foxrothschild.com

STEVE PETERSEN
Direct No: 919.755.8834
Email: SPetersen@Foxrothschild.com

April 3, 2020

VIA ELECTRONIC MAIL
Chad.Patrick@HCAHealthcare.com
Scott.Joslin@HCAHealthcare.com

Mr. Chad Patrick, Chief Executive Officer
Dr. Scott Joslin, M.D., Credentials Committee Chair
Acting for the Credentials Committee
Mission Hospital
509 Biltmore Avenue
Asheville, North Carolina 28801

**RE: Dr. David J. Hetzel**
**Response to Credentials Committee Letters of 3/12/20 and 3/25/20**

Dear Mr. Patrick and Dr. Joslin:

Dr. David J. Hetzel has retained me to assist him with this matter. Please accept this letter as Dr. Hetzel's request for a hearing in this matter and as an outline of his positions regarding the issues the Ad Hoc Investigative Committee has been tasked with reviewing.

**Hearing Request**

As outlined in your letter of March 25, 2020, Dr. Hetzel makes this written request for a hearing in this matter. This request is made within 30 days of Dr. Hetzel's receipt of the notice set out in your March 25, 2020 letter.

**Request for Documentation and Information Forming the Basis for Credentialing Committee's Decisions**

In order to prepare for the requested hearing, Dr. Hetzel requests all documentation and other information relied upon by any Committee or group at Mission Hospital in making the

A Pennsylvania Limited Liability Partnership

California Colorado Delaware District of Columbia Florida Georgia Illinois Minnesota Nevada
New Jersey New York North Carolina Pennsylvania South Carolina Texas Virginia Washington


MH# 001855

Mr. Chad Patrick, Chief Executive Officer
Dr. Scott Joslin, M.D., Credentials Committee Chair
Acting for the Credentials Committee
Mission Hospital
April 3, 2020
Page 2

decisions to initially put the precautionary suspension in place, to then modify the precautionary suspension and reinstate Dr. Hetzel's privileges with conditions, and then subsequently to again modify the decision and suspend Dr. Hetzel's privileges entirely.

**Summary of Recent History**

Following a surgery on March 2, 2020, (Patient VC MR#2363521), a Precautionary Suspension was issued on March 3, 2020. On March 10, 2020, the Credentialing Committee (Committee) met to consider the precautionary suspension and, based on what information it had at the time, modified the precautionary suspension to a lesser sanction with conditions that was to remain in effect pending a hearing or modification by the Committee, the MEC, or the Board.

Credentialing Committee – Letter of March 12, 2020

On March 12, 2020, the Committee sent Dr. Hetzel a letter informing him of these conditions, that the Committee had appointed an Ad Hoc Investigating Committee (Investigative Committee), and that the Investigative Committee would be conducting an investigation. The March 12, 2020 letter advised Dr. Hetzel that the issues that the Investigative Committee would review included: (i) the general nature and existing evidence related to "the concern," (ii) preoperative planning in "this case," (iii) Dr. Hetzel's surgical technique, (iv) availability for postoperative consultation with the patient's family, and (v) other issues as encountered in the investigation.

Credentialing Committee – Letter of March 25, 2020

By letter dated March 25, 2020, the Committee next notified Dr. Hetzel that on March 24, 2020, it had modified the precautionary suspension and that effective immediately all of Dr. Hetzel's privileges were suspended.

This letter also informed Dr. Hetzel that the Investigative Committee would provide Dr. Hetzel an opportunity to meet with the Investigative Committee. Dr. Hetzel notes that he had not heard anything from the Investigative Committee between the March 12, 2020 letter and the Committee's decision to modify the precautionary suspension and suspend his privileges. Dr. Hetzel has requested a meeting with the Investigative Committee in the upcoming week.



MH# 001856

Fox Rothschild LLP
ATTORNEYS AT LAW

Mr. Chad Patrick, Chief Executive Officer
Dr. Scott Joslin, M.D., Credentials Committee Chair
Acting for the Credentials Committee
Mission Hospital
April 3, 2020
Page 3

**Investigative Committee Issues**

A. The General Nature and Existing Evidence related to "the concern."

Although "the concern" is not specifically identified in the Committee's March 25, 2020 letter, it is assumed to be the March 2, 2020 surgery identified in the Committee's March 12, 2020 letter involving "Patient VC MR#2363521. Dr. Hetzel has been performing abdominal surgery on cancer patients for over 25 years.

B. Preoperative Planning

Preoperatively, Dr. Hetzel obtained a CT scan of the chest, abdomen, and pelvis, and he carefully studied the images. Pleural fluid below the right lung was aspirated and sent for cytology. The patient did not complain of any vaginal bleeding, so a uterine/endometrial biopsy was not called for. Dr. Hetzel was aware that this surgery involved a massive pelvic tumor with some extension of tumor to anterior upper abdomen – likely the omentum. His pre-surgery goals were: (1) debulking of what appeared to be a malignant ovarian or uterine tumor; and (2) removal of the uterus, ovaries, fallopian tubes, and omentum. These pre-surgery goals were designed to remove as much of the tumor as possible in order to prepare the patient for subsequent chemotherapy to try to shrink the remainder of the tumor. The patient was not eating much and had difficulty with bowel movements. Therefore, Dr. Hetzel felt she would not be able to endure 3-4 months of chemotherapy first (Neoadjuvant chemotherapy), but by performing surgery first they would consolidate a specific histologic subtype of cancer, could potentially allow better bowel function, and improve the efficacy of subsequent chemotherapy.

C. Dr. Hetzel's Surgical Technique

Upon entering the abdomen, Dr. Hetzel observed that the tumor was massive. He successfully removed the anterior abdominal tumor replacing the omentum with cancer and also removed tumor from the right and left colic gutter. The frozen section was most consistent with a Carcino-Sarcoma or Mixed mullarian tumor of the ovary or uterus. These tend to be very friable, fracture and bleed easily. The ascending and transverse colon were in good shape, but the mid-descending and sigmoid colon were heavily affected by the tumor and would need to be bypassed. Much of the small bowel and its mesentery were involved with metastatic cancer. One loop of small bowel was dark and necrotic from the carcino-sarcoma which involved its



MH# 001857

Fox Rothschild LLP
ATTORNEYS AT LAW

Mr. Chad Patrick, Chief Executive Officer
Dr. Scott Joslin, M.D., Credentials Committee Chair
Acting for the Credentials Committee
Mission Hospital
April 3, 2020
Page 4

mesentery. This section was about 18-20 cm and was resected and sent to pathology. With that Dr. Hetzel then turned his attention to the pelvis to the largest of the cancerous masses.

The uterus was enlarged with cancer to a point it occupied the entire pelvis. The ovaries and fallopian tubes were involved with cancer and amalgamated to the overall mass. Dr. Hetzel proceeded with resecting the uterus, the ovaries, the fallopian tubes and then dissecting over 80% of the tumor. The mass had become necrotic by out growing its blood supply. A rind of necrotic tumor along the pelvic sidewalls remained and cervical stump had fractured off due to poor blood supply. At this point Dr. Hetzel concluded that he had completed what debulking could be accomplished in the pelvis, and he then turned his attention back to the mid-abdomen to address the descending colon and small bowel.

The sigmoid colon was heavily involved with tumor and though it could be resected he felt that other areas of metastasis still existed throughout the small bowel and mesentery, instead he elected to be conservative and bypass the sigmoid colon by dividing the descending colon with plans for creating a colostomy.

Dr. Hetzel mobilized the descending colon by dividing the peritoneum in the left colic gutter. The mesentery on the upper and medial side of the colon was clear and the best potential place selected for dividing the descending colon with a GIA stapler. After it was divided and as the surgery progressed, Dr. Hetzel observed an enterotomy had occurred. Below the mesentery of divided colon from the deep retroperitoneum - a focus of tumor resided which involved a very proximal area of jejunum just below the ligament of Treitz. When the colon and mesentery was divided, this underlying focus of tumor at its base also fractured as well, leaving an opening very proximal in the small bowel.

Dr. Hetzel was keenly concerned that an enterotomy this proximal would be more dangerous if it leaked and more difficult to resect and anastomose. Because cancer was on both edges of the enterotomy one could not simply suture it closed, as the cancer would keep it from healing. Also to bypass the bowel via jejenostomy or duodenostomy would require mobilizing the duodenum and stomach, which would be better performed by a hepato-biliary surgeon rather than by himself or one of his partners. Based on its proximal, retroperitoneal location, and the need for further dissection near the duodenum to bypass or repair the enterotomy - Dr. Hetzel made the intraoperative decision to involve the general surgeons.


MH# 001858

Fox Rothschild LLP
ATTORNEYS AT LAW

Mr. Chad Patrick, Chief Executive Officer
Dr. Scott Joslin, M.D., Credentials Committee Chair
Acting for the Credentials Committee
Mission Hospital
April 3, 2020
Page 5

When Dr. Buell began his portion of the surgery, he noted a partial colectomy and a partial small bowel resection had been performed and there was a enterotomy of the proximal small bowel at this juncture. As Buell progressed with trying to remove the massive tumor in the colon area, it appears that the tumor was so massive and intertwined that it became necessary for him to remove the colon.

D. Availability for Postoperative Consultation with the patient's family

This patient was in the hospital for three days before the surgery. During that time, Dr. Hetzel is not aware that any family members ever came to visit her. Dr. Hetzel did speak preoperatively to a person the patient identified as "her sister." Dr. Hetzel now believes this person was merely a friend and was not the patient's actual sister.

During the surgery, Dr. Hetzel requested the Circulating Nurse attempt to contact any available family members. He was informed by the Circulating Nurse that she could not find any available family members. When Dr. Hetzel scrubbed out, he looked for and was not able to find or contact the patient's family.

E. Other Issues as encountered in the investigation

Following discussions with hospital agents about not going enough to the Breast Conferences, Dr. Hetzel has regularly attended the Wednesday morning Breast Conference meetings. There should be documented proof of his attendance at these meetings. Likewise, Dr. Hetzel has attended the Wednesday Noon "Breast Huddles." However, to Dr. Hetzel's knowledge, there is not a sign in process for those meetings.

**Conclusion**

In this letter, Dr. Hetzel has attempted to respond to the issues identified by the Committee that the Investigative Committee is tasked with investigating. Dr. Hetzel wished the Investigative Committee to have this material before his meeting with that Committee. If there are additional issues that the Investigative Committee would like for Dr. Hetzel to be prepared to discuss, please identify those issues in writing prior to the meeting with the Investigative Committee.



MH# 001859

Fox Rothschild LLP
ATTORNEYS AT LAW

Mr. Chad Patrick, Chief Executive Officer
Dr. Scott Joslin, M.D., Credentials Committee Chair
Acting for the Credentials Committee
Mission Hospital
April 3, 2020
Page 6

Thank you for your consideration.

Sincerely,

Stephen W. Petersen

SWP/cmm

Response to Ad hoc Credentials Committee Report

David Hetzel, April 17, 2020

I am writing this report at the request Dr. Will Harlan and the Ad hoc team after our meeting at 0830 on Friday April 10, 2020. At that meeting The Ad Hoc Investigative Committee provided me with a copy of its report, which was written prior to talking with me. During our meeting, the Committee members asked some good questions and asked about missing context that was not part of the previous narrative. At the end of the meeting, they requested that I respond in writing, specify, and elaborate on the current report for the greater Credentials Committee.

There are many comments in the report that were vague, were second hand information, or speculative such as "how the Residents feel" that makes these accusations difficult for me to address. I may have to make some assumptions and speculate myself to try to discern what others may be specifically referring to and explain why there may be better answers or less harmful conclusions than those that were made against me. I am fighting for my professional career and livelihood with this – so I will do my best.

Let me begin by saying I take full responsibility for my actions and accept any errors in communications or medical judgments I have made. I ask that the committee likewise look specifically at the exact medical judgments, skill and actions I have made in these cases to discern if there was poor decision making.

**Committee's Report of Dr. Ahearne's Comments**

In the second paragraph the Investigative Committee begins its discussion of the Index case with notes about conversations with Dr. [REDACTED]. The report notes that Dr. [REDACTED] has apparently reported:

- When he entered the operative field, there was significant bleeding from a large pelvic tumor
- [REDACTED] and [REDACTED] determined the only way to control hemorrhage was to remove the pelvic tumor en bloc.
- The small bowel was massively involved with tumor, actively bleeding, and the only way forward to save the patient's life was evisceration with an end duodenostomy,
- Once the pelvic tumor was removed, they focused on numerous small bowel enterotomies present when they entered the operative field.

My understanding is that Dr. Ahearne was the last surgeon to scrub into the case and arrived about 30-45 minutes after I had scrubbed out. The report indicates that Buell and Ahearne decided to do an en bloc resection of the large pelvic mass. As I discussed with the committee, I had already removed over 80% of the bulk of the tumor from the pelvis, the uterus tubes and ovaries included. There should be Pathology records about who sent what specimens and when. In the upper abdomen, I had also removed the omentum, tumor from the colic gutters, and an 18 cm area of affected, ischemic small bowel. Towards the end of my involvement with the surgery, I had divided the descending colon to bypass the heavily affected sigmoid colon. It was then that a deeper area of tumor in the retro peritoneum fractured opening an enterotomy in a very proximal area of jejunum. This was the specific reason I called them - to help either mobilize and repair this enterotomy or bypass it. At the conclusion of my portion of the surgery, what remained in the pelvis was a rind of tumor that was necrotic along the pelvic peritoneum, the cervical stump, and sigmoid colon with tumor. There was a slow ooze of venous bleeding along this rind of tumor, but at that point I felt it was not a concerning amount of bleeding and the patient's blood pressures were good.

Dr. Ramasuaumi was the first to arrive, and I showed him the location of the enterotomy, the pelvis and upper abdomen. He felt Dr. Buell should be called, and when Dr. Buell arrived I left to write an Op Note and look for the family. I was not present when Dr. Ahearne arrived, so I do not know what had transpired during the time after I left the operatory and Dr. Ahearne arrived, what decision making process he and Dr. Buell may have taken, or what further surgical procedures Dr. Buell may have conducted before Dr. Ahearne arrived.

Dr. Garth Davis asked me during this Ad hoc discussion whether I thought the General Surgeons were "overly aggressive with what they had done and removed after they took over?" I said absolutely. I feel it was reasonable to remove the remaining sigmoid colon since it had been isolated and due to how much tumor was on it. But, I also felt that it could also have been left in place. Once bypassed by the Duodenostomy (that they eventually did) the small bowel could also have been left in place. As I stated in our meeting, I was back in the OR 3 times and was trying to lobby for them to focus on and fix the proximal jejunum or bypass it. Instead they were focusing on removing more bowel and remaining tumor.

When I scrubbed out of the case (after 4 hours), the Anesthetist informed me that the EBL was about 1,800 cc. I note from the records that at the end of the case the EBL was about 5,500 cc and they had removed all of the small bowel and large bowel. Some of my concerns were that once the EBL gets to 3000 or more there can be dilutional coagulopathy and things start bleeding that had not been bleeding before which could explain what they were experiencing. Also, because Mixed Mullerian tumors or Carcinosarcomas of the Uterus or Ovaries are very aggressive and tend to metastasize to the liver and lung within 9-18 months - I did not feel that continuing to be that aggressive surgically was warranted.

**Committee's Report of Interviews of My Former Partners**

The Investigative Committee's Report indicates that on March 20, 2020, they met with Drs. [redacted]

1. Reports of Pattern of Poor Medical Judgment over the Past 2 Years,

As to the comment by my partners about whether the patient should have been taken to the OR at all and was that poor judgment or planning on my part: The patient was healthy, a young 62 year old with no significant co-morbidities. Many ovarian cancers have CT scans that look very similar to hers. The patient was unable to eat, said she had not had a bowel movement in nearly a month, and I felt she could not endure 4 months of neoadjuvant chemotherapy in her present condition. Given these factors, I felt that a debulking surgery was a treatment option that should have at least been offered to the patient. Hindsight is 20-20 and it is understandable that after the fact my partners could take a critical stance and comment that they would not have explored or attempted a debulking on this specific patient. However, the reality is that every week someone from our group takes a stage 3 ovarian cancer with a large pelvic mass and upper abdominal mets to the OR. In most of those cases, my partners and I are able to debulk optimally. However, some have less optimal results and, in a few cases each year, each of us has had to back out of the surgery. If in the future there is a new type of scan to delineate ahead of time or predict successful debulking cases from sub-optimal debulking surgeries or those few that are inoperable or dangerous mine-fields - that will be great. Many times you have to just carefully go there and be ready to back out. These were my thoughts, rational, and decisions regarding this index case.

2. Discussions with Partners about Two Additional Cases

In the third paragraph the Ad hoc committee referred to a suspicious breast mass in a lactating woman for delay in diagnoses. [Anonymous submission to MSO see ending] The patient had been breastfeeding for about a year and the lesion looked somewhat suspicious. The concern with doing a biopsy in a lactating breast is you can get a milk fistula, which makes the breast hard to wean and the fistula slow to heal. I counseled her to wean herself, to return in 3 weeks and I would biopsy it. When she returned she had not followed through weaning and I pleaded that she do so to avoid a milk fistula. When she returned the next time she had stopped breast-feeding and I proceeded with an US guided breast biopsy. Unfortunately it was a cancer, but had not changed much and the delay was only 6 - 8 weeks or so. I would preferred to biopsy it sooner, but the patient was noncompliant. We get a good number of consults for a palpable mass or suspicious lesion in a breast-feeding mother. If we biopsy all of these we are likely to create more problems than exist. I try my best to stratify the more concerning ones from the less concerning ones prior to biopsy.

Also in the third paragraph is a note me about a patient with a sigmoid fistula where my partners reported I refused to see the patient the night of admission. That patient had received a laparoscopic BSO (bilateral salpingo-oophorectomy) on December 31. The left tube and ovary had dense adhesions against the left pelvic sidewall and sigmoid colon. I used sharp dissection, but also some electro-dissection with the Ligature which is supposed to have less thermal effects than cautery. Unfortunately there was enough of a thermal effect that she returned 5-6 days later with a small 4 mm fistula. Again this was not an intra-op perforation or intra-op enterotomy, but a thermal effect from dissection. In regard to the communication: I was awoken just after midnight by a call from the ER where the Resident had seen the patient with fever and abdominal pain/tenderness. I asked about her status and was told she had a fever >103 F, she was tachy, with a systolic BP of about 58. She told me that General surgery had also been called and they were getting ready to see her. She asked whether I wanted to come in and see her instead. I told her to go ahead and have General Surgery see her as soon as possible since they had been alerted, knowing them waiting for me would only delay what the patient ultimately needed. I told her it was clear that the patient needed to go to the OR emergently and will need a laparotomy for a suspected bowel problem. The patient had had a previous hysterectomy and it was extremely unlikely to be a gynecologic problem.

I did not ever refuse to come in. That information - second-hand from my partners – it is completely false. Instead, I asked that she (the Resident) call me as soon as they finished seeing her to let me know how they would like to proceed. When she did call back she stated they wanted to take her for a laparotomy, exploration, and possible bowel repair. Since my surgery had been done laparoscopically with two 5mm Ports and one 10 mm Port I did not feel it would likely be a problem with my Port sites. I knew they would be making a mid-line laparotomy incision, I did not want to delay them, I knew they would not need my help to do that, so I did not feel that I needed to be there to open her.

Later I found out through one of my Partners that the Resident felt scared. I was reminded that the residents are used to having OB/GYN Staff In-house in Labor and Delivery in the middle of the night. From a psycho-social standpoint I now understand that I should have considered coming in any way to converse with any potentially available family and to reassure the third and one half year Resident. Had it not been 02:30 in the morning I hopefully would have thought of that - I know I would now.

Otherwise from a pure Medical and Surgical perspective, regarding my assessment, my judgment, and my decision making: I understood the patient was septic and needing emergent surgical exploration. I understood it was a bowel problem with associated abscess, I highly doubted it could be a gynecologic or Port site problem, I had the most qualified and closely available general surgeon Drs. see her immediately, I agreed with them to proceed with an emergent laparotomy surgery with bowel repair, a surgery they are well familiar with and used to doing without me, and I urged them through my resident to do it as soon as they could.

The fourth paragraph just introduces that they felt they should talk to my Hope WCC Partners, which they did on March 20, 2020. The Report then addresses their comments in the next or fifth paragraph.

The fifth paragraph starts with a statement alleging a concerning practice pattern. The Credentials Committee has been reviewing my cases for over a year to 18 months, and my notes and cases presented in conferences or those written up. None of the reviewers found fault except for the observation that my outpatient progress notes were too scant or not descriptive enough. I have tried over the last 3 months to improve that.

In the fifth paragraph there is also mention of "cases similar to the index case…" If there are such cases, you and I would easily know what it was. There was a [redacted] case (SW that the Committee knows about), which was similar to the December 31st case in that the patient returned with a fistula. This was the result of dissecting a large firm adherent mass out of the pelvis with some ischemia and bowel leakage a week later. I did correctly identify this circumstance, I took her back to surgery 7 days later, and I successfully completed a bypass colostomy. After I got her over the eventual pelvic abscess, I gave her time and the fistula eventually healed on its own. I then sent her to the colorectal surgeon for a colonoscopy and take down colostomy. I do not see how this case demonstrates poor clinical judgment or poor decision-making on my part.

I read that Dr. [redacted] reports that since I left he has had to take over some of my breast cancer patients and he mentioned "accepted breast cancer guidelines" and how he felt three cases of mine were outside of what he would consider standard. Since there are no specifics to this comment, it is difficult to defend myself. The surgical guidelines are quite distinct and I doubt he is specifically referring to those. He and I have the largest volume of breast cases in town so we are surgically quite aware and capable of what is required. There are a lot of differences of opinion regarding how much additional breast imaging patients should get preoperatively. I would not say there are accepted standards that everyone agrees with in this realm. Radiologists have a hand in crafting these recommendations and they have their own biases. Dr. [redacted], I feel, favors getting a lot of additional images, MRIs or Contrast enhanced breast images. I do not feel that even subspecialists agree on every detail in managing every case. I also know that some physicians can be very critical of others' styles even when data is lacking and outcomes are similar.

The fifth paragraph also reports that the Residents do not feel comfortable with me, my decision making and engagement. Rumors can be very damaging and who was there and what did they exactly see or experience – this is lacking. I know that the same Resident that was there for the Index case was also in on the laparoscopic BSO case that went to the ER and later was taken to the OR by General Surgery. Maybe she feels that way, I am not sure. What about the other 15 Residents? Is it fair to me to speculate on what they might feel? How much is based

on rumor versus fact and experience? How able are they, especially the junior Residents, to access or scrutinize my judgment?

Finally, one of my partners claimed I do not accept responsibility or that I blame others. Just because I do not act or say what he expects me to say after he confronts me after an event like this, does not mean that I do not accept responsibility. Am I not taking responsibility if I act to improve and fix the problem? I do accept the responsibility and I do care deeply about my patients. Please feel free to pull up Patient Evaluations and Satisfaction Surveys to see what my patients have said about me, and what they have said about the rest of team at Hope. I don't doubt what you will find.

**Additional Comments from the Investigative Committee Interview**

Near the end of the Ad hoc meeting, Dr. Garth Davis made a comment and asked me an insightful question. He said he has been on Credentials Committees before and never has it been a Senior Physician that started to have issues. He said that usually it is a new physician that is having problems. I told him I have been here 23 years and for the first 21 years I never had to go to the Medical Staff Office for anything but occasional paper work. He asked what happened and what has changed?! Later in our discussion Dr. Will Harlan asked me if I ever felt like I was being targeted?! You can decide…

You and the Credentials Committee are all well aware of how disruptive things have been in Oncology during the recent separation of CCWNC from Mission. Whether I, or anyone else, is being "targeted," we all must acknowledge that the hospital functions differently that it did two years ago. When Mission bought out many of the Practices including ours (Hope WCC), Regional Surgical, and Cancer Care of Western North Carolina (CCWNC), the differences in practice models were never resolved. On occasion, it seems this unfortunately has led to some turf disputes.

Whether it is coincidence or not, at the end of 2018, I started for the first time to have some cancer cases written up and submitted to the Medical Staff Office. In January and February I had more cases submitted and I was called to Medical Staff Office for reviews. Since the cases were always submitted anonymously, I have no way to know who the complainant(s) was/were All in all, at least a half dozen cases were submitted against me. Each was reviewed and cleared by the MS office. After 21 years of no encounters with the MS office, the events of the last two years begin to feel like some form of targeting.

Have I been targeted? Has my group or have I personally been targeted? Could what I have had to go through in 2019 during these multiple anonymous submissions had some effect on how I was viewed by other physicians, the Administration, or the Medical Staff Office? Did it bias people or prime the pump to react or read too much into the current situation?

I hope that the Ad hoc Committee and the Credentials Committee can take a fresh look at this. I am hopeful all of you can focus on the specific facts that are available in the cases reviewed, my rational, the specific judgments and decision making I made and see where exactly it was deficient – where, when and to what degree.

I appreciate the additional time and consideration
you are giving me, the facts, and the cases brought into question,


Sincerely,

DAVE

David J. Hetzel, MD, MBA

# CREDENTIALS COMMITTEE MINUTES

## MISSION HOSPITAL

**April 23, 2020**

**Call To Order:**





**CONCLUSION/ACTION**: At the conclusion of the discussion a motion was made, seconded, and unanimously approved and determined that Dr. Hetzel's precautionary suspension may be lifted contingent on the findings of a fitness for duty evaluation which will include a Neuropsychologist's and a Neurologist's assessment.

Dr. Joslin, Credential Chairman, will endeavor to coordinate this with local medical staff resources as a formal referral to Duff Rardin, MD, who has conducted neurological assessments on behalf of the Credentials Committee in the past, and to Mark Hill, PhD, who has been a resource for the Credentials Committee for neuropsychological evaluations. Once these evaluations are completed, the Credentials Committee will reconvene to review [REDACTED] in order to lift the precautionary suspension.

The next Credentials Committee meeting is scheduled for Tuesday, April 28, 2020 at 7:00 am.

**ADJOURNMENT**

There being no further business, the meeting adjourned.

Prepared by: ______________________________
Sandra Turnau, Medical Staff Coordinator

Reviewed by: ______________________________
Scott Joslin, MD, Credentials Chair

Memorandum To: David Hetzel MD

Subject: Review of Precautionary Suspension of Clinical Privileges by the Credentialing Committee

Date: 23 April 2020

From: Scott Joslin MD, Chair – Credentials Committee

David,

The Credentials Committee convened on April 23, 2020 at 7 AM to review the investigative findings of the appointed ad hoc committee regarding your precautionary suspension of clinical privileges initially imposed on March 3, 2020. As you know, on March 10 the Credentials Committee met and modified your precautionary suspension to allow you to operate scrubbed in with a partner, but determined that work with housestaff be suspended. Following initial review by the ad hoc committee the Credentials Committee met again on March 23 and re-imposed a full precautionary suspension of your clinical privileges. At this morning's meeting the Credentials Committee reviewed additional findings of the ad hoc committee which included their interview time with you and a review of your letter of response.

The Credentials Committee has determined that your precautionary suspension may be lifted contingent on the findings of a fitness for duty evaluation which will include a Neuropsychologist's and a Neurologist's assessment. I will endeavor to coordinate this with local medical staff resources as a formal referral, Duff Rardin MD has conducted neurological assessments on behalf of the Credentials Committee in the past, Mark Hill PhD has been a resource for the Credentials Committee for neuropsychological evaluations. Once these evaluations are completed the Credentials Committee will reconvene to review the results and make any additional recommendations.

I will reach out to Drs. Rardin and Hill to request their availability for these assessments and will forward you their contact information so that you can be promptly scheduled for these assessments. Please feel free to call me on 280–4222 should questions or the need for any clarifications regarding this required fitness for duty evaluation arise.

[May 6, 2020]

Peer Review Committee, Mission Hospital

RE: DJH_Physician Response Code of Conduct Allegation, May 6, 2020

Dear Ms. Brenda Shelton:

Please accept this as my response to the Credentialing Committee's request to write a response for the Peer Review Committee regarding my attempts to communicate post-surgery with the family of Ms. [redacted]

This particular matter was unusual in that Ms. [redacted] was not a regular patient who entered our Medical Group's patient family by first visiting our Outpatient Oncology clinic. Ms. [redacted] was instead a transfer patient to Mission Hospital from the Emergency Room in either Marion or Morganton, and I first saw her in her hospital room after she was transferred to the floor from the emergency room.

Although Ms. [redacted] had very significant symptoms (pelvic/abdominal pain, anorexia, nausea, severe constipation, weight loss) and a huge pelvic/abdominal mass – she did not seek medical advice for weeks and delayed an outpatient examination and referral. Instead she waited until her symptoms were intolerable and was then seen in the ER at another facility, which then transferred her to Mission Hospital on Friday, February 28, 2020. When she was accepted onto the Gynecologic Oncology Service at Mission, I was On-Call for that day and the weekend that followed. Although I obviously met and discussed treatment several times with Ms. [redacted] that weekend, I never met any of her family members prior to the surgery on Monday, March 2, 2020.

In contrast, the majority of our new patients we first meet and evaluate at our Outpatient office at Hope Women's Cancer Center. New patients and patients referred for consults at our clinic are almost always accompanied by family members, significant others, or a friend. With those patients who entered the system through our Outpatient office, we routinely talk first before the examination and also talk after. Usually the routine patient elects to have everyone she brought with her in on the discussion. If authorized by the patient, we discuss our findings, the radiology images and pathology if available, and then discuss a potential plan. The Plan would include what we have found, what is the cause, what can be done about it, and specifically what treatment or surgery we would recommend. We also answer any questions and concerns that they may have at that time and schedule any treatments/surgery if needed. I agree that good communication, before and in the several days after a treatment and surgery, is best. The relevant point here is that we meet and get to know the patient's family members during this regular process.

The Patient did not have an acute abdomen and was not septic or bleeding. She had a very large pelvic mass (8 month pregnant size) and had moderate tenderness to deep palpation. The patient stated she did not have a BM for three weeks, but was not vomiting. Her CT scans were reviewed several times and we tapped some pleural fluid off her right lung and sent it for cytology. I told her we were expecting that this was malignant and coming from the pelvis, either an ovarian or uterine type cancer. I told her that although sometimes chemotherapy can be done first (Neoadjuvant Chemo), I did not think she could endure 4 months of those chemotherapy treatments before going to surgery. I felt that our back was somewhat against the wall and I recommended doing a Laparotomy, Debulking of the massive tumor, Hysterectomy, BSO, Omentectomy and other Indicated Procedures. We told her we would get tissue for Pathology and Oncologic testing, and we expected she would need several months of chemotherapy afterward. Because Ms. [redacted] as an Inpatient at Mission Friday night, all day Saturday and Sunday, I was able to discuss these complex issues with her several times that weekend and answer any of her questions and concerns.

At no time during these discussions on Saturday or Sunday did I, or my Residents, ever meet or talk to any family member of Ms. [redacted] Nor did I ever receive any outside calls from any of her family members. I remember asking the Residents on duty that weekend, if anyone from Ms. [redacted] family had come by that weekend. None of the residents remembered seeing any family members. I realize it is possible that a family member could have come in at an odd hour without our knowing, but typically families try to inquire when the doctors are coming by so they can talk with us.

I have no evidence that Ms. [redacted] ever communicated with any of her family about her situation. I did ask her over the weekend if there was someone she wanted us to talk to. She responded that she was a very private person and that she had been divorced or separated. She did not forbid me to talk to anyone, but did not offer any names and she was at least very reluctant to do so. I did not want to add to her emotional suffering, so I did not push the questioning further. She said she might have a friend come in on Monday morning prior to her surgery. On Monday in her Preoperative Holding room around 1:00 PM or so, I did see and talk to the Patient and her friend, whom she referred to "as like a sister." However, I never did see or meet any actual family member (No: mother, father, children, Spouse/Ex, etc). In addition, I was under the impression that her friend might not be staying the whole time. My mind at the time was focused instead on the very big and difficult surgery that lay just ahead.

The surgery started sometime after 2:00 PM and was difficult from the start. By about 6 or 6:30 PM I had debulked about 80% of the tumor. During that time I had asked the circulating Nurse to update the family. She stated she had tried calling the number the Patient had provided, but had not gotten anyone to answer. By the

time I had scrubbed out, I was told they had tried that number unsuccessfully at least 3 times.

When I became concerned with issues that came up during the surgery, I called in the General Surgeons. The General surgeon was likewise concerned and he called in one of the Hepatobiliary Surgeons, and they then called in the Surgical Oncologist as well. Because there were now three of them there, I asked if I could scrub out to take a break and write a Note. When I did so, I called the number the Patient provided for the family contact and got no answer. I then wrote an Op Note.

I returned to the OR three times while the other surgeons finished the case. We all consented that Ms. ███ should be left asleep under General Anesthesia and sent to the ICU with plans of weaning her off the ventilator the following afternoon. On my last time in the OR the surgeons were mobilizing the Duodenum with plans for a duodenostomy and were taking out the ascending and transverse colon prior to closing the abdomen. Because there were plenty of them to close and the Patient would be under the Critical Care ICU Team once they finished, I decided to leave. On my way out of the hospital, I walked through the down stairs Hospital Entryway and waiting area where I looked for, but could not find, her friend or any family members.

Around 9:45 PM, I was called by what I presume was a Nurse from the OR saying that the Surgeons had finished and wanted to update me on the status of the patient. I told the Nurse I had left the hospital, but would return shortly to meet with them. When they heard that, the Nurse said they quickly left the room. The next day I called their office (Regional Surgical Associates) to thank them and talk with them. I left messages for Dr. Ahearne and Dr. Buell to call me back, but I did not get a call back from either of them.

Because I knew the Patient would still be asleep on the ventilator in the morning, I decided I would Round on the Patient late in the afternoon after completing outpatient visits in our Hope Women's Cancer Center office on Tuesday morning and afternoon. However, before that happened, I got a call late in the afternoon from Dr. Frisch from the Medical Staff Office who said he had talked with Dr. Buell the Chief of Surgery who was in on the case and informed me I was being placed on Emergency Temporary Suspension of Privileges. He said I was disallowed the ability to see, examine, or talk with patients. I was therefore unable to meet with Ms. ███ or any of her family members who might have been present in ICU after the surgery.

Normally we would have several discussions with the Patient and their family in the 5-7 days after a surgery while they are still in the hospital. By the time the suspension of privileges was eventually lifted, the Patient had been discharged from the hospital.

Because of the atypical circumstances of this case, I never met any of Ms. [redacted] family members. Since she was a transfer from another hospital, she did not come in as a regular patient through our practice. After meeting her in the hospital after her ER transfer and caring for her during the 3 days prior to surgery, I did not meet any family member during her pre-surgery discussions because, to my knowledge, no one ever visited her in the hospital. After I left the surgery room, I did look for her friend or any family members at the hospital, but I did not find anyone who responded that they were a family member. After my privileges were suspended, I was prohibited from visiting patients in the hospital.

My usual practice is to visit with a surgery patient's family at many points. I deeply regret the unusual circumstances of this case that resulted in me being unable to meet and converse with Ms. [redacted] family.

Sincerely,

Dave Hetzel, MD

MH# 001888

# CREDENTIALS COMMITTEE MINUTES

## MISSION HOSPITAL

## May 11, 2020

**Call To Order:**

1 of 2

May 12,, 2020 Special Called Credentials Committee meeting

Confidential – Medical Review Committee peer review per NCGS 131E-76, 131E-95, 90-21.22A

[redacted]

**CONCLUSION/ACTION**: At the conclusion of the discussion and review of the Fitness for Duty assessments, a motion was made to lift the precautionary suspension with the following stipulations:

- All surgical cases must include a prospective concurrent consultation by a qualified OB/GYN surgeon in good standing on the medical staff
- All pelvic surgeries must be paired with another operating Gyn Oncologist
- Work with interns and residents be discontinued
- Focused Practice Performance Evaluation to be implemented to capture operative volume and include indications, surgical performance and outcomes.

Consistent with Article V, Section 5.1(a), of the *Policy on Appointment, Reappointment, and Clinical Privileges* of Mission Hospital, the modification of the precautionary suspension to the sanction(s) listed above, with respect to the requirement for concurrent consultation, entitles Dr. Hetzel for fair hearing rights.

Consistent with the *Policy on Appointment, Reappointment, and Clinical Privileges* of Mission Hospital, Article 4.5, the committee discussed the investigative process and determined that the investigative review has been concluded.

**CONCLUSION/ACTION**: At the conclusion of the discussion and review, a motion was made, seconded and unanimously passed to dissolve the ad hoc Investigative Committee. No additional information is needed at this time.

[redacted]

**ADJOURNMENT**

There being no further business, the meeting adjourned.

Prepared by: ______________________________
Sandra Turnau, Medical Staff Coordinator

Reviewed by: ______________________________
Scott Joslin, MD, Credentials Chair

Confidential – Medical Review Committee peer review per NCGS 131E-76, 131E-95, 90-21.22A

**Medical Executive Committee**
**Executive Session**
**John S. Stevens Board Room**
**June 5, 2020**

**REVIEW/APPROVAL OF PREVIOUS MINUTES**

Dr. Joslin presented the minutes from the May 1, 2020 meeting.

      **ACTION:** A motion was made, seconded and passed to approve the minutes as written.



**CREDENTIALS COMMITTEE CONSENT AGENDA**

**NEW BUSINESS - FOR DISCUSSION:**

Following discussion, the committee resolved: (A) to modify the Credentials Committee's most recent action related to the precautionary suspension such that the precautionary suspension was lifted subject to the three (3) conditions described below and (B) to modify the Credentials Committee's recommendation following investigation such that the only conditions placed on Dr. Hetzel are those three (3) conditions described below.

    1) All surgical cases will be the subject of a Focused Professional Practice Evaluation (FPPE) until further

determined by the Medical Executive Committee. The Medical Executive Committee will delegate to the appropriate committee or service line leader the responsibility of carrying out the FPPE.

2) Proctoring will be required as determined by the Women's Service Line Leader.

3) A letter of guidance and/or counsel to Dr. Hetzel related to the serious concerns that were identified as part of the review of the precautionary suspension. That letter of guidance and/or counsel will be provided by the Chair of the Credentials Committee.

It was noted that the conditions outlined above do not provide Dr. Hetzel to a right to a hearing.



CERTIFIED MAIL, Return Receipt Requested, and EMAIL

PERSONAL AND CONFIDENTIAL

June 9, 2020

David Hetzel, MD
390 Windsor Road
Asheville, NC 28804
DavidJHetzel@gmail.com

Dear Dr. Hetzel:

This letter is written on behalf of MH Mission Hospital, LLLP ("Mission Hospital") and the Medical Executive Committee of the Hospital. The purpose of this letter is to inform you of certain action taken by the Medical Executive Committee on June 5, 2020 as it relates to your status as a member of the Active Medical Staff of the Hospital.

As you know, a precautionary suspension of your clinical privileges was initiated on March 3, 2020 pursuant to Section 4.6.1 of the Policy on Appointment, Reappointment, and Clinical Privileges of MH Mission Hospital, LLLP (hereinafter "Policy"). As you are also aware, the Credentials Committee has made modifications to the precautionary suspension since it was originally imposed. On June 5, 2020 the Medical Executive Committee reviewed the precautionary suspension and took action to lift the precautionary suspension as it relates to your clinical privileges. However, the Medical Executive Committee also made the decision to impose conditions upon your medical staff membership. The conditions imposed do not provide you a right to a hearing. The conditions imposed upon you by the Medical Executive Committee on June 5, 2020 were:

1.      All of your surgical cases will be the subject of a Focused Professional Practice Evaluation (FPPE) until you are given further notice by the Medical Executive Committee. The Medical Executive Committee will delegate to the appropriate committee or service line leader the responsibility of carrying out the FPPE.

2.      You will be subject to proctoring. The proctoring will be determined by the Women's Service Line Leader.

3.      You will receive a letter of guidance and/or counsel related to the serious concerns that were identified as part of the review of the precautionary suspension. That letter of

guidance and/or counsel will be provided by the Chair of the Credentials Committee. This letter will become part of your credentialing file with the Hospital.

As you are also aware, the Credentials Committee initiated an investigation into your practice, the scope of that investigation being described in the letter dated March 12, 2020 to you from Mr. Chad Patrick. The Credentials Committee made recommendations about the status of your clinical privileges following the completion of that investigation. On June 5, 2020 the Medical Executive Committee modified the recommendations of the Credentials Committee to impose only three (3) conditions. Those three (3) conditions being the same conditions stated above.

Please note that all members of the Medical Staff are required to have in place appropriate backup and call coverage. Before you may post any surgical cases you must demonstrate that you have in place appropriate backup and call coverage by a qualified surgeon.

Finally, the Medical Executive Committee reminds you that there is still pending a Code of Conduct Complaint related to the events of March 2, 2020. The Medical Executive Committee's action on June 5, 2020 did not address in any way that pending Code of Conduct Complaint.

Sincerely,

H. Michael Frisch, MD
Chief of Staff
Mission Hospital

Chad Patrick
Chief Executive Officer
Mission Hospital



CERTIFIED MAIL, Return Receipt Requested, and EMAIL

PERSONAL AND CONFIDENTIAL

June 17, 2020

David Hetzel, MD
390 Windsor Road
Asheville, NC 28804
DavidJHetzel@gmail.com

Subject: Letter of Guidance

Dear Dr. Hetzel:

As a component of the review of your precautionary suspension by the Medical Executive
Committee, it was resolved that a letter of guidance to you was to be drafted outlining the
concerns from the investigations conducted. It was further resolved that a copy of this letter be
included with your Credentials file at Mission.

The clinical concern investigated by the Credentials Committee was referred to me with the
implementation of your precautionary suspension in March of this year. The referral stemmed
from an operative case that culminated in the calling in of two additional surgeons who took over
operative care of the patient and ended with an enterectomy and an eventual hospice referral.
This case was on the backdrop of two other organ injury complications in the preceding six
months, as well as concerns and an improvement plan implemented regarding the management
of some of your breast surgery cases. A code of conduct investigation remains pending
stemming from the index operative case in March, a concern that was referred to the Peer
Review Committee and is in the process of being referred back to the Credentials Committee,
with you in a pre-existing final warning status from prior code of conduct concerns.

Credentials Committee guidance with the lifting of your precautionary suspension:
1. Additional diligence in preoperative planning and intraoperative decision making is
   recommended. In the index case, questions regarding the decision to proceed with
   aggressive debunking in light of the tumor type and highly vascular nature of the mass were
   raised by the surgeons on the Credentials Committee appointed to evaluate the case.
   Consultation with a colleague when the right decision may be uncertain is recommended.
2. Family communication in the immediate operative period and the day following the case did
   not meet expectations and should be much more robust with your operative cases, especially
   in circumstances when the operative course did not go as expected. Delegating such
   communication to a house officer, neglecting to have this communication in your role as the
   attending surgeon, and not personally rounding on the patient the morning after the case were

felt to represent a lapse of judgement and fell short of the professional expectations of our medical staff.

3. Guidance from the Peer Review Committee to be presenting your breast cases at Breast Conference should have been followed. If you came to believe that forces at the conference for any reason were aligned against you rather than working to improve decision making for your cases, this concern should have been brought back to the Peer Review Committee Chairman for intervention. Declining to present your cases and not attending the Breast Conference, after you were directed to do so, communicated a lack of interest in process improvement and patient safety inconsistent with our institutional values.

Events in the professional life of almost every physician unfold that mandate internal reflection and input from others for growth and for the well-being of our patients. I recommend that you take time to reflect on these events so that needed improvements to your surgical and interpersonal approach to patients and colleagues may occur.

Scott Joslin

Scott Joslin MD CHS
Associate Chief of Staff
Credentials Committee Chairman
Mission Hospital