1              UNITED STATES DISTRICT COURT

2          WESTERN DISTRICT OF NORTH CAROLINA

3                 ASHEVILLE DIVISION

4                    1:23-cv-152

5

   DAVID JOHN HETZEL, MD,      )

6                              )
   Plaintiff,           )

7                              )
   v.                 )

8                              )
   MH MISSION HOSPITAL, LLLP,  )

9                              )
   Defendant.             )

10

11

12

13

14       Video Deposition of DAVID J. HETZEL, MD

15       (Taken by the Defendant and Plaintiff)

16            Raleigh, North Carolina

17           Thursday, August 28, 2025

18

19

20

21

22

23   Reported by:    Marisa Munoz-Vourakis -
                 RMR, CRR and Notary Public

24

25

1   APPEARANCE OF COUNSEL:

2   For the Plaintiff:

3           KRISTEN L. BEIGHTOL, ESQ.

4           Edwards Beightol, LLC

5           1033 Oberlin Road, Suite 100

6           Raleigh, NC 27605

7           919-636-5100

8           klb@eblaw.com

9

10  Also Present:  CLARKE MUNFORD, Paralegal

11

12  For the Defendant:

13          DAVID C. HAWISHER, ESQ.

14          PHILLIP T. JACKSON, ESQ. (By Zoom)

15          Roberts & Stevens, P.A.

16          301 College Street, Suite 400

17          City Centre Building

18          Asheville, NC 28801

19          828-252-6600

20          dhawisher@roberts-stevens.com

21          pjackson@roberts-stevens.com

22

23  Also Present:  KERRI-ANN PISANO, Videographer

24

25

1

2

3

4

5                     o0o

6

7

8

9

10          Video Deposition of DAVID J. HETZEL, MD,

11   taken by the Defendant and Plaintiff, at Edwards Beightol,

12   LLC, 1033 Oberlin Road, Suite 100, Raleigh, North

13   Carolina, on the 28th day of August, 2025 at 10:04 a.m.,

14   before Marisa Munoz-Vourakis, Registered Merit Reporter,

15   Certified Realtime Reporter and Notary Public.

16

17

18

19

20

21

22

23

24

25

1              I N D E X

2    Examination of:                          Page

3      DAVID J. HETZEL, MD

4         EXAMINATION BY MR. HAWISHER . . . . . . . 6

5         EXAMINATION BY MS. BEIGHTOL . . . . . . 212

6         FURTHER EXAMINATION BY MR. . . . . . . . 217

7         HAWISHER

8              DEPOSITION EXHIBITS

9    EXHIBIT NUMBER        DESCRIPTION           PAGE

10   Exhibit 1   Professional Service Agreement     19

11   Exhibit 2   PDF Document 6                30

12   Exhibit 3   PDF Document 7                33

13   Exhibit 4   PDF Document 9                38

14   Exhibit 5   PDF Document 10               39

15   Exhibit 6   PDF Document 11               48

16   Exhibit 7   PDF Document 13               59

17   Exhibit 8   PDF Document 26               62

18   Exhibit 9   PDF Document 15               66

19   Exhibit 10  PDF Document 31 and 32           72

20   Exhibit 11  PDF Document 33               74

21   Exhibit 12  PDF Document 38               75

22   Exhibit 13  PDF Document 40               77

23   Exhibit 14  PDF Document 147              78

24   Exhibit 15  PDF Document 18               80

25   Exhibit 16  PDF Document 19               94

| | | |
|---|---|---|
| 1 | Exhibit 17  PDF Document 20 | 95 |
| 2 | Exhibit 18  PDF Document 21 | 96 |
| 3 | Exhibit 19  PDF Document 23 | 98 |
| 4 | Exhibit 20  PDF Document 148 | 120 |
| 5 | Exhibit 21  PDF Number 47 | 123 |
| 6 | Exhibit 22  PDF Documents 506 | 129 |
| 7 | Exhibit 23  PDF Document 43 | 133 |
| 8 | Exhibit 24  PDF Document 509 | 138 |
| 9 | Exhibit 25  PDF Document 54 | 140 |
| 10 | Exhibit 26  PDF Documents 55 to 58 | 149 |
| 11 | Exhibit 27  PDF Document 60 | 153 |
| 12 | Exhibit 28  PDF Document 274 | 169 |
| 13 | Exhibit 29  PDF Documents 289 and 290 | 180 |
| 14 | Exhibit 30  PDF Document 363 | 185 |
| 15 | Exhibit 31  PDF Document 384 | 186 |
| 16 | Exhibit 32  PDF Document 26 | 220 |
| 17 | Exhibit 33  PDF Document 27 | 223 |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

P R O C E E D I N G S

1                P R O C E E D I N G S

2         THE VIDEOGRAPHER:  On record at

3   10:04 a.m.  Today's date is August 28, 2025.

4         This is the deposition of David John

5   Hetzel, MD, in the matter of David John

6   Hetzel, MD versus MH Mission Hospital, LLLP,

7   taken in the United States District Court,

8   Western District of North Carolina,

9   Asheville Division.  File number

10  1:23-CV-152.

11        Will the court reporter please swear

12  in the witness.

13  Whereupon,  DAVID J. HETZEL, having

14  been first duly sworn, was examined

15  and testified as follows:

16        EXAMINATION BY COUNSEL FOR DEFENDANT

17        BY MR. HAWISHER:

18  Q.   Good morning, Dr. Hetzel.

19  **A.   Good morning.**

20  Q.   I am David Hawisher.  I introduced myself

21 before we started, but I represent the defendant MH

22 Mission Hospital, LLLP, which you probably just know as

23 Mission Hospital.

24        You understand why we're here today?

25  **A.   Yes.**

1     Q.    Have you ever done this before?

2     **A.    I've been through a deposition before.**

3     Q.    When was that?

4     **A.    I think Mission had a case regarding a**

5     **mistake in a pathology specimen that they switched, and**

6     **so I was deposed at my office, and I don't recall the**

7     **exact date.**

8     Q.    More than ten years ago?

9     **A.    Probably would have been about ten years**

10    **ago.**

11    Q.    Okay.  So you've had the opportunity to

12    consult with your counsel about how this works and to

13    prepare for the deposition?

14          MS. BEIGHTOL:  I'm just going to

15       object.  He's not going to answer any

16       questions that would be involving

17       attorney/client communications, and I

18       believe that question specifically is asking

19       that.  To the extent you can say whether

20       you've had an opportunity, but you cannot

21       discuss what was discussed with counsel.

22    **A.    I prepared.**

23    Q.    Okay.  What did you do, other than speaking

24    with your counsel to prepare for today?

25    **A.    Reviewed documents regarding my case, and**

1     **also the demand notes that were -- or I should say were**

2     **brought forth by Mission Hospital on things that we had**

3     **to answer, and some of the replies or all of the**

4     **replies that I could about those.**

5     Q.    What do you mean by demand notes?

6     **A.    So these were things that you requested of**

7   **us or me.**

8     Q.    You mean during this lawsuit?

9     **A.    Yes.**

10    Q.    Okay. Other than your counsel, did you

11   talk with anybody to prepare for your deposition?

12    **A.    No.**

13    Q.    You understand that a lot of what we're

14   here to talk about today happened more than five years

15   ago now, right?

16    **A.    Yes.**

17    Q.    Do you feel like you remember those events

18   pretty well?

19    **A.    There may be some details that I don't**

20   **recall exactly, but I remember the trauma of going**

21   **through what I was put through.**

22    Q.    Do you feel like there's any reason, as you

23   sit here today, that you can't testify accurately about

24   what happened?

25    **A.    No reason.**

1      Q.    We're also going to talk today about some

2  of your applications for employment and for clinical

3  privileges and for licensure by medical boards.  Do you

4  feel like you remember going through those processes

5  pretty well?

6      **A.    Yes.**

7      Q.    And specifically, I think we'll be talking

8  most about your applications for licensure in Arizona

9  and Texas.  Do you remember those applications?

10     **A.    Yes.**

11     Q.    Do you remember your employment

12 negotiations with Ironwood?

13     **A.    Yes.**

14     Q.    Do you remember what happened with Texas

15 Tech and Tenet Health and El Paso pretty well?

16     **A.    Yes.**

17     Q.    As you were preparing for today, did you

18 review documents related to those topics?

19     **A.    I don't recall reviewing anything from**

20 **Tenet Health, because Tenet Health had an algorithm**

21 **whereas any applicant, if there was any filing at all**

22 **in the National Physician(sic) Database, it was an**

23 **automatic refusal.  And we went around, tried to go**

24 **around that, but it was -- because there was this**

25 **inappropriate filing on my -- that was filed against**

1    me, it was just a quick no.  So I didn't have much to

2    review on that one.

3         University Hospital in El Paso, I do, or I

4    did go through that application and some of the

5    documents related to that.

6    Q.    What about documents related to your

7    employment with Ironwood?

8    A.    I don't recall reviewing those recently.

9    Q.    Okay.  So let's start in -- actually, let's

10   start in or around 1998 when you first applied for

11   privileges at Mission Hospital.  Do you remember that?

12   A.    Yes, it's a long time ago, but yes.

13   Q.    And that's totally fair.

14        To the best of your memory, what can you

15   tell me about why you decided to apply for privileges

16   at Mission?

17   A.    Well, I was really the first fellowship

18   trained, soon to be boarded soon.  I wasn't yet.  I was

19   in the process for GYN oncology.  I was the first one

20   really in western North Carolina to do that.  So I

21   guess everyone was, you know, looking forward, or I

22   hope that they were looking forward to doing that, I

23   was, and coming there to Asheville.

24   Q.    Why did you want to come to Asheville or to

25   Mission Hospital in particular?

1      **A.    Well, the need was there.  I had left a**
2   **place in -- around Allentown, Bethlehem, where I was**
3   **having to go to five different hospitals.  I think I**
4   **might have had privileges at six, at least, but -- and**
5   **so that, that was kind of hard to do.  And, you know,**
6   **Asheville seemed like a good opportunity to build a**
7   **program, and so that's why I came there.**
8      Q.    When you say build a program, are you
9   referring to Hope?
10     **A.    Right, Hope Womens Cancer Center.  I joined**
11  **someone at that time, he had a PA that was named Nathan**
12  **Williams, PA.  Eventually, you know, after I joined, we**
13  **ended up calling it Hope Womens Cancer Centers.**
14     Q.    So when you applied for privileges at
15  Mission Hospital, did you already have a position with
16  Dr. Williams' practice, or did it go the other way
17  around?
18     **A.    I don't understand the question.**
19     Q.    So you were employed by Dr. Williams'
20  practice, right?
21     **A.    Yes.**
22     Q.    Did you obtain the employment and then seek
23  privileges at Mission Hospital, or did you obtain
24  privileges at Mission Hospital and then seek employment
25  with Dr. Williams?

1      A.    I think employment agreement probably came

2   first.  I'm not positive about that, but I think it was

3   in March that I applied, I think, to Mission Hospital.

4      Q.    Okay.  This isn't particularly important,

5   but do you recall when the name became Hope Womens

6   Cancer Center?

7      A.    I don't exactly.  I think unofficially it

8   was, you know, the d/b/a, doing business as for a

9   while, and when officially it got changed, I don't

10  recall.

11     Q.    At some point, Dr. Williams left that

12  practice, right?

13     A.    He did.

14     Q.    When was that?

15     A.    That was around 2012, 2011.

16     Q.    Why did he leave?

17     A.    He really didn't want to sell, period, to

18  anybody, and specifically to Mission.  And so he had us

19  contractually constrained by an old employment

20  agreement that required a super majority vote, which is

21  a problem.  And so although we had talked to many

22  places, he -- we found later would go behind our backs

23  and say well, I'm not going to do that.  And so it

24  became difficult.

25          But to answer your question, he ended up

1   **giving me a buy/sell agreement, and he put the price on**
2   **that quite high, because he wanted me to take the money**
3   **and leave.**
4       Q.    Let's back up a little bit.
5             You said we didn't want to sell to Mission.
6   He didn't want to sell the practice to Mission?
7       **A.    Right.  I don't think he wanted to sell to**
8   **anybody, to be honest.  I think he wanted to stay in**
9   **control, but family, you know, we needed help.**
10      Q.    So this was around 2012?
11      **A.    2011.  I think there was a lot of back and**
12  **forth and 2012, I don't know exactly the date.**
13      Q.    At that time, were you just an employee of
14  the practice, or were you a partner in the practice?
15      **A.    I was a partner.**
16      Q.    And so you said effectively we need to
17  sell, we should sell Mission, because Mission will buy
18  it, and he said no, I don't want to do that?
19            MS. BEIGHTOL:  Just objection to
20       relevance.  You can answer.  You can answer
21       the question.
22      **A.    I don't think he was that forthcoming.  I**
23  **think it was at first it was, it was discussed, but yet**
24  **he would do things to kind of foil that transaction**
25  **from occurring.**

1     Q.    And so you said he gave you a buy/sell

2    agreement.  What was that?

3        **A.    What are you asking specifically?**

4     Q.    Well, you said a moment ago that you

5    thought, or he hoped you would take the money and

6    leave.  But it sounds like you wound up purchasing the

7    practice.  And can you elaborate on the details of the

8    buy/sell agreement?

9        **A.    Yes.  It was $2.5 million, where I had the**

10   **option to either take it or leave it.  But the total**

11   **value of the practice we weren't sure, which is based**

12   **on hard assets, which is a vast, vastly low number than**

13   **it should be, because it's Stark Law.  But it was clear**

14   **that that would have been close to the full value of**

15   **the practice, which I think eventually was valued at**

16   **around 3.1 million.**

17       **So I guess I'm hearing you infer why did**

18   **I -- why did I not take the money, and why did I choose**

19   **to purchase it?  If that's what you're asking --**

20    Q.    So are you saying the agreement or the

21   option that you were given was he would buy you out or

22   you would buy him out?

23       **A.    Right.  So once -- I believe you both**

24   **understand this better than I do, but this is a common**

25   **vehicle to get people out of a practice, usually it's**

1   not meant to be a hostile takeover, like this kind of

2   was.  But it was clear that to me, that there were two

3   major problems if I took the money and left.  I would

4   have been more than happy to do that.  One was that

5   the -- Tim Vanderkwaak was the other owner, as well as

6   Nathan Williams.  And so we had other younger

7   associates that were wanting to be part of the

8   practice, but it didn't make sense to sell it to them

9   until this was resolved.

10          So it was clear that they were -- would

11  have scattered, that they would have left, either left

12  Asheville altogether or went out on their own, so the

13  practice would have split up, unless I took it over,

14  because they -- when I say I took it over, I mean it

15  would have kept the group together.

16          And the second major thing was the building

17  itself, which was held in a separate LLC.  But if the

18  practice split up, then the three owners would have

19  this very large building, and if it became insolvent,

20  then it would have been, you know, a fire sale or

21  bankruptcy.

22          So, I mean, there was that pressure from

23  those two things.

24          So -- and Mission directly told me that

25  they would be disappointed if I took the money, and

1  **they wanted me to facilitate the sale, and that they**

2  **would try to help make that happen.**

3      Q.    So Dr. Williams got bought out, and you and

4  Dr. Vanderkwaak were in agreement that you wanted to

5  sell to Mission?

6      **A.**    **That's what -- that's what, and the**

7  **non-partners too, that was the consensus that they**

8  **wanted to sell to Mission.**

9      Q.    So what exactly was sold to Mission?

10      **A.**    **Well, specifically they'll say the hard**

11  **assets, which, you know, is like the furniture and, you**

12  **know, the things in the building, and the building**

13  **itself was also sold but is a separate LLC.  They**

14  **bought that.  But still it was short of covering the**

15  **full amount, because as you're likely aware, hard**

16  **assets are depreciated within one year, so basically,**

17  **you know, that $3.1 million has a large tax to it.**

18          **So the remaining $600,000 was far short of**

19  **being able to pay the taxes.  And so they also arranged**

20  **for a loan to Dr. Vanderkwaak and I to cover the**

21  **shortfall.**

22      Q.    And so you and Dr. Vanderkwaak remained

23  partners and owners of Hope Womens Cancer Center, but

24  the hard assets were sold to Mission?

25      **A.**    **The group stayed together, so it was still**

1    **a group, and we had a PSA agreement with the hospital.**

2        Q.    And under that PSA agreement, providers at

3    Hope Womens Cancer Center would provide care to

4    patients at Mission Hospital?

5        **A.    And within the confines of the clinic.**

6        Q.    Did you understand that your employer at

7    that point was Hope Womens Cancer Center or Mission

8    Hospital?

9            MS. BEIGHTOL:  Objection, to the

10            extent you're asking him a legal question,

11            which he's not qualified to answer.

12            You may answer, if you can.

13        **A.    I guess it depends on how you define**

14    **employer.  I mean, we were employed at Hope Womens**

15    **Cancer Center, yet billing functions, et cetera, ended**

16    **up, you know, obviously using the hospital's in ways I**

17    **don't completely understand.**

18        Q.    What other functions, if any, did Mission

19    Hospital perform for Hope Womens Cancer Center?

20        **A.    Besides the billing?**

21        Q.    Yeah.

22        **A.    I don't know if I can completely answer**

23    **that question.  I mean, there were certain**

24    **responsibilities we had to teach the residents at**

25    **MAHEC, which is a separate institution, which you're**

1  aware of, but they didn't necessarily help with any of

2  that.

3       I think at first there was a very limited

4  advertising, as we came over, but that was very short

5  lived.  You know, besides those things, I can't really

6  say there was much else.  But I may be overlooking some

7  things.

8  Q.   So if you could look to the tablet and open

9  document 45, please.  Top right side there's a button.

10  A.   45.  It's in order, I assume?

11  Q.   Yes.

12  A.   Okay.  It reads Professional Service

13  Agreement.

14  Q.   Okay.  Do you recognize this document?

15       MS. BEIGHTOL:  Take your time to look

16  at the whole document.

17       (Pause.)

18       MS. BEIGHTOL:  Are you marking this as

19  an exhibit?

20       MR. HAWISHER:  Yeah, I just wanted to

21  give him a chance to --

22       MS. BEIGHTOL:  I just wanted to make

23  sure it was attached or at least identified

24  in some way.

25       MR. HAWISHER:  While he's doing that,

1  I'll say for the record that I have marked

2  this PDF as Exhibit 1.

3           (The document referred to was marked

4  Defendant's Exhibit Number 1 for

5  identification.)

6  **A.    There's a lot of pages here.  Is there any**

7  **one page you want to focus on?**

8  Q.    It is.  I just want to be clear on the

9  identity of the document before we talk about the

10  contents.

11           Do you recognize it?  If it helps you, the

12  last page has your signature on it.

13  **A.    Oh, it does.**

14  Q.    So do you recognize the document?

15  **A.    Vaguely.**

16  Q.    Okay.  So first of all, when you said it

17  does, was that you confirming that that is your

18  signature on the document?

19           MS. BEIGHTOL:  Objection,

20  mischaracterizes what he did say, but you

21  can answer.

22  **A.    I recognize my signature as my own.**

23  Q.    Okay.  If you could go back just two pages

24  to page 45 of that document, can you read paragraph

25  10.10A?

1      **A.    10.10A, relationship.  The parties hereby**
2    **agree -- I assume you want me to read it?**
3      Q.    I'm sorry.  I should have said could you
4    read it to yourself, and then I'll ask you some
5    questions about it.
6      **A.    I see.**
7          **(Pause.)**
8      **A.    Okay.**
9      Q.    This document contains a provision where
10   you -- excuse me, Hope Womens Cancer Center and Mission
11   Hospital, Inc. agree that they are independent
12   contractors of each other, right?
13          MS. BEIGHTOL:  Objection to form, to
14      the extent it is seeking a legal conclusion
15      with regard to those terms.  You can answer.
16      **A.    I think it says what it says.  I mean, it**
17   **has entities distinct.  It talks a lot about vacation**
18   **time and some of these other things.**
19      Q.    Okay.  Can you then read into the record
20   the first sentence of that paragraph?
21      **A.    The parties hereby agree that the**
22   **relationship is that of independent contractors, and**
23   **that nothing in this agreement shall create or be**
24   **deemed to create a partnership, principal, agent or**
25   **employee relationship.**

1    Q.    And the parties are Hope Womens Cancer
2  Center and Mission Hospital, Inc.?
3    **A.    Yes.**
4    Q.    So can we agree that this says that those
5  parties are independent contractors of each other?
6         MS. BEIGHTOL:  Objection.  Again, I
7     object to the extent you're seeking a legal
8     conclusion from a nonlawyer and requesting
9     legal interpretation on employment terms
10    from a nonlawyer.
11        You can answer to the extent you
12    understand the question that is being posed
13    to you.
14   **A.    What is the question?**
15   Q.    Would you agree that this document says
16  that the relationship between Hope Womens Cancer Center
17  and Mission Hospital, Inc. is an independent contractor
18  relationship?
19        MR. HAWISHER:  Objection to form, same
20    objection.  Once again, seeking a legal
21    conclusion, interpretation of legal terms
22    from a nonlawyer.
23        You may answer, to the extent you can.
24   **A.    That's what it says.**
25   Q.    Did you ever sign an employment agreement

1    with Mission Hospital?

2          MS. BEIGHTOL:  Objection to form, to

3       the extent you mean employment in a legal

4       sense, and it's seeking that determination

5       from a nonlawyer.  You may answer.

6       **A.    I don't recall.**

7       Q.    While you were practicing in western North

8    Carolina, did you believe that Mission Hospital was

9    your employer?

10          MS. BEIGHTOL:  Once again, to the

11       extent you're using that in a legal fashion

12       and legal interpretation, objection, to the

13       extent Dr. Hetzel is not a lawyer.

14       **A.    I didn't consider myself an employee.**

15       Q.    So let's take a step back from the Hope

16    Womens Cancer Center stuff for a minute.

17          You had privileges at Mission Hospital from

18    1998 until mid-2020, right?

19       **A.    Yes.**

20       Q.    During part of that time, what we're

21    calling Mission Hospital was the entity Mission

22    Hospital, Inc., which we've just talked about a little

23    bit.  Did you understand that in 2020, there was a

24    transaction where HCA acquired -- or an HCA affiliate

25    acquired Mission Hospital?

1          MS. BEIGHTOL:  Objection, the

2     statement is answering the question and a

3     compound question.  You can answer.

4     **A.     I understand that Mission Hospital was**

5  **bought, although there was details about that because**

6  **it was a nonprofit or -- and I can't get into those**

7  **details.  But as far as HCA purchase of the hospital,**

8  **its assets and things, I can't speak to the structure**

9  **that they used to make that transition or transaction,**

10  **but I'm fully aware of it.**

11     Q.     And what did you know about it at the time

12  that it happened?

13     **A.     That it wasn't going to be good.**

14     Q.     Can you elaborate on that?

15     **A.     Things had gotten progressively worse from**

16  **an administration standpoint, and I did not feel that**

17  **this was going to make it better, and I don't think I**

18  **was wrong.  I wasn't there to witness it, but I heard**

19  **that a very large percentage of doctors left Mission**

20  **Hospital since HCA's acquiring of it.**

21     Q.     And I'm sorry, so I think I said this

22  happened in 2020 a minute ago.  It happened in 2019.

23          When this purchase occurred, what, if

24  anything, changed for your practice immediately?

25          MS. BEIGHTOL:  Objection to that

1     question and the introduction and in general

2     the compound, I guess, nature of the

3     statement.

4          You may answer, if you understand.

5     **A.    My -- I guess I'm kind of lost in what the**

6   **trigger was.  I mean, there were obvious discussions**

7   **happening before the actual transaction date, which I**

8   **think was the end of 2019, was it not?  The purchase?**

9   **You asked what changed in my practice, which is vague.**

10    Q.    That's fair.  So I will represent to you

11  that the transition took effect February 1, 2019.

12          So January 2019 versus March 2019, what, if

13  anything, is different about your day-to-day practice?

14    **A.    Well, of course I had a case in there that**

15  **probably, you know, was in my windshield mostly at the**

16  **time.  But in terms of hospital, I mean, most all of**

17  **the administration turned over, and so, you know,**

18  **nobody really knew who these people were or nor did**

19  **they know who the doctors were.**

20          **And so there was a turnover of the**

21  **administration, and then the HCA, I mean, I think this**

22  **was the biggest purchase HCA ever made.  So this was a**

23  **very big hospital with a lot of volume and a lot of**

24  **moving pieces.  And so that was a big change, and I'm**

25  **not sure that there was any continuity in the**

1    **leadership that we felt.**

2        Q.    Okay.  So let me ask you this, have you

3    ever worked with anybody at the medical staff office or

4    the medical staff services of Mission Hospital?

5        **A.    Well, I think the -- I don't know their**

6    **titles.  I don't want to call them secretaries, but I**

7    **don't know if -- but yeah, there was a medical staff**

8    **office that at least the people I saw there didn't turn**

9    **over.**

10       Q.    Did you have to do any re-credentialing as

11   a result of the HCA/Mission Hospital transaction?

12       **A.    Not specific to their purchase that I'm**

13   **aware of.**

14       Q.    You know, on February 2, 2019, if you

15   needed to post a case to take somebody to the OR, did

16   you do the same thing that you would have done in

17   January of 2019?

18       **A.    Yes.**

19       Q.    So on like a day-to-day, your practice of

20   medicine level, what, if anything, changed for you?

21       **A.    I think the procedures that we would do to**

22   **list a case and all of that was the same.  However, you**

23   **know, because I had other things up at that time, it**

24   **was apparent that -- and, you know, the people that you**

25   **used to know on the mezzanine, as they called it, or**

1    the administrative, all those people are different or

2    new, and they didn't know you, and I didn't know them.

3    So as I happened to be one of those people, there was a

4    disconnect for sure.  And as I were to later find out

5    that I think HCA did not totally understand the Mission

6    bylaws.

7        Q.    Maybe that's a good place to start talking

8    about getting into the rest of this lawsuit.

9            What do you mean by that?

10       A.    My understanding of the bylaws is that in a

11   case like mine, that if there's a precautionary

12   suspension, that that period of time is really meant to

13   just be a protective measure.  It's not a decision.

14   It's in order to, you know, investigate it thoroughly,

15   look into an issue to decide if there was fault or if

16   something wasn't the way it was hoped to be, you know,

17   what was the problem, where was the problem, who was to

18   blame, if there was, and, I mean, I could elaborate

19   more but I'll just pause there.

20       Q.    Please continue.

21       A.    Well, the fact that it took until the end

22   of May to actually show that, you know, I was at

23   fault -- that my -- was not at fault.  My clinical care

24   was not at fault, and to have my privilege returned,

25   that's a very long time.  And in the meantime, there

1    were many missteps that happened in investigating or

2    doing a poor job investigating this.  And during that

3    period also that there was an unnecessary reporting to

4    the National Physician(sic) Database, which should not

5    have been reported, because it wasn't a suspension.  It

6    was a precautionary thing, and the process was done

7    poorly and took way too long.

8        Q.    When you said there were missteps in

9    investigating, what missteps are you referring to?

10       A.    Well, in this particular case, which was a

11   very aggressive, very rare type of sarcoma called a

12   mixed müllerian tumor of the uterus, there was tumor in

13   the high upper abdomen in an area where I don't operate

14   in.  And this tumor was invading into the distal

15   duodenum, proximal ilium, and because of that and some

16   minor manipulation, you know, that tumor loss has a

17   very soft consistency, mushy, like mashed potatoes.

18   And so it had, you know, opened where that tumor was a

19   hole into the bowel that began to leak.

20           So this area of the bowel, it's not easy to

21   bypass, and I had to call in an hepatobiliary surgeon,

22   and his partner came in first, and then, you know, he

23   came in later.

24           And during, you know, up to that point

25   where he came in, I had only lost 1800ccs.  I had taken

1    out this large tumor in the pelvis, hysterectomy, the

2    omentum, about 18 centimeters of small bowel, and I

3    asked him specifically to mobilize the duodenum.  Why?

4    So we could bypass this area tumor, because even if you

5    sewed it shut, it wouldn't heal because there's cancer

6    there.

7            And so instead of doing that, he started to

8    take out bowel and eventually took out all of the small

9    bowel and all of the large bowel and lost over 5500

10   cc's of blood, much more than I did, and he just

11   happened to be the chief of surgery which Mission

12   Hospital hired.

13           And the next day, administration, having

14   heard about this, instead of calling the main surgeon,

15   which is me, to discuss what happened, they talked to

16   Dr. Buell, who is the one who had removed all of the

17   bowel, which is crazy, because it didn't have to be

18   done, and lost all this blood.  And that conversation I

19   wasn't there, but obviously I got thrown under the bus.

20   And early afternoon I get a call that I'm having this

21   precautionary suspension, and I, you know, couldn't

22   round in the hospital or really do anything.

23           So, I mean, from the very beginning, things

24   got off the track.

25           And then for many weeks no one talked to

1    me. And an ad hoc committee was assigned to find out,

2    you know, what went on, and they submitted a report,

3    and they still hadn't talked to me.

4          So even this committee that was supposed to

5    look into the details never talked to me, and they

6    submitted a report.

7          And so it just continues to snowball of

8    those big things, which continued, and I'll just pause

9    it there.

10    Q.    So let's -- you say nobody talked to you.

11    What do you mean by that?

12    A.    I mean, nobody talked to me from -- about

13    what happened. No one had any questions for me. You

14    know, I was in this precautionary suspension condition.

15    I don't recall when the first time I think that Scott

16    Joslin talked to me, but eventually it happened.

17    Q.    Okay. So the surgery happened on March 2

18    of 2020, right?

19    A.    As I recall.

20    Q.    And then you were placed on precautionary

21    suspension, March 3, 2020?

22    A.    Yes.

23    Q.    On the third, did you speak with anybody

24    about the precautionary suspension?

25    A.    I mean, I probably talked to my wife about

1    it.

2        Q.    Sorry.  Did you speak with anybody from the

3    hospital?

4        **A.    No, they called me.  I think -- I'm trying**

5    **to remember if it was Frisch that may have called me.**

6    **That's my recollection.**

7        Q.    Do you remember anything about the call?

8        **A.    I was shocked.  I mean, at the -- well, I**

9    **was shocked to hear it, first of all.  I was shocked**

10   **that they had jumped to a conclusion and still that**

11   **didn't -- they didn't say, you know, what's your**

12   **version?  What happened?  What's your view?  I mean, it**

13   **was clear a decision had been made, and they were just**

14   **there to tell me about it, and so that was probably as**

15   **shocking as just being surprised that my privileges for**

16   **the time being were gone.**

17       Q.    Could you look at document 6 on the tablet,

18   please.

19           MS. BEIGHTOL:  Are you marking this as

20       Exhibit 2?

21           MR. HAWISHER:  Yes.

22               (The document referred to was marked

23       Deposition Exhibit Number 2 for

24       identification.)

25           (Pause.)

1        **A.      Okay.**

2        Q.      Have you seen this before today?

3        **A.      Yes.**

4        Q.      When did you first see it?

5        **A.      I don't recall when I first saw it.**

6        Q.      Do you recall whether you first saw it

7    before this lawsuit?

8        **A.      I mean, I had seen it before the lawsuit.**

9    **Is that what you're asking?**

10       Q.      Yes.

11       **A.      Yes.**

12       Q.      So this document describes a phone

13   conversation with you, Dr. Frisch, Dr. Spensieri,

14   correct?

15       **A.      I believe Dr. Frisch was only on the call.**

16       Q.      The description of what was discussed on

17   the call, is there anything in that description that

18   you think is inaccurate?

19       **A.      In the second paragraph, they mentioned two**

20   **intraoperative organ injuries in the past six months.**

21   **That's inaccurate.  There was one, which was**

22   **presumably, you know, a thermal injury from resecting**

23   **an ovary that was stuck to the sigmoid colon.  And she,**

24   **you know, at that time maybe, so after several days,**

25   **she ended up having a leak and came into the, came into**

1    the emergency room.

2            The other case they're talking about is

3    like nine months previous, and that was not an

4    intraoperative injury either.  It was a large firm mass

5    in the pelvis that had pushed down on the bowel.  That

6    was resected and removed.  But there was probably

7    enough ischemia from that that, I don't know, five days

8    or so afterwards, she ended up getting a leak in her

9    sigmoid colon, which I ended up diverting, and then

10   later she didn't have to have any bowel resected or any

11   kind of repair.  But that was not in six months.  That

12   was nine months before, and it was totally reviewed,

13   the details of that and credentials committee,

14   Dr. Ollendorff, signed off on it.  He says, yeah, that

15   looks like a tough surgery.  I mean, that kind of goes

16   in the territory of doing the kind of work that we do.

17   These masses can get very stuck.  They can sometimes

18   invade into or create ischemia, and it's not because I

19   cut a hole in the bowel.

20           You know, so blaming me for that, but also

21   it's not accurate.  It was why they kept going back to

22   three thing -- three solid injury or -- and none of

23   these are solid organs either, but within six months.

24   So that's inaccurate.

25           As far as the phone call, I don't believe

1   they referred to those two previous cases in the phone

2   call.  It was mostly the top paragraph, and maybe the

3   last we inform.  You know, the second to last, I guess

4   there's another sentence there, but.

5       Q.    What did they tell you about why they were

6   imposing the precautionary suspension?

7       A.    They referred to the case the day before,

8   which Dr. Buell, who had done -- lost most of the blood

9   and took all of the small bowel out, which was crazy,

10  because there was no reason to do that if you're in a

11  lady that you're bypassing the bowel, and who is

12  probably going to die to metastatic disease to the

13  liver and the lung within 9 to 14 months, there was no

14  reason to be that aggressive.  But he was that

15  aggressive and wouldn't listen to me when I kept going

16  back and saying don't do it.  Let's just bypass this.

17  But he was the chief of staff, and so the next day when

18  people asked too many questions, I got blamed for it.

19      Q.    Can you turn to document 7, please, which

20  I'm going to label Exhibit 3.

21              (The document referred to was marked

22         Deposition Exhibit Number 3 for

23         identification.)

24      A.    Can you get this on?  I can't get it.  It's

25  not turning on.

1 Q. There is a button on the right-hand side.

2 **A. What was the number?**

3 Q. Document 7.

4 **A. Okay.**

5 Q. Do you recognize the document?

6 **A. I, I have seen it previously.**

7 Q. Do you remember receiving it on March 3 or

8 shortly thereafter?

9 **A. I remember receiving it.  I don't recall**

10 **the date.**

11 Q. One point to note about this.  If you will

12 look at the second paragraph of the letter, it says:

13 Dr. Anthony Spensieri and I discussed the reasons for

14 the precautionary suspension with you last night.

15 Are you confident that Dr. Spensieri was

16 not part of that call?

17 **A. I don't think I had ever met Dr. Spensieri**

18 **at this point.  So I wouldn't have recognized his**

19 **voice.  In fact, I'm quite sure I haven't met -- I**

20 **hadn't met Dr. Spensieri until after this.  But whether**

21 **they were on a conference call phone, and he was**

22 **sitting quietly and not talking, I just don't remember**

23 **someone else's voice.  I don't know.**

24 Q. Okay.  So after your conversation with

25 Dr. Frisch and Dr. Spensieri, and receiving this

1  letter, what did you understand the status of your

2  clinical privileges to be?

3          MS. BEIGHTOL:  Objection, just because

4      I may have missed it.  I'm not sure he said

5      he received this letter, but if he did, I

6      just was getting lunch orders, I apologize.

7          MR. HAWISHER:  Okay.  Let me withdraw

8      that question.

9      Q.    Dr. Hetzel, did you receive this letter?

10     **A.    I've seen the letter.  I don't recall when**

11  **I received the letter.**

12     Q.    Okay.  I'll ask this then.  As of March 4,

13  2020, what did you understand the status of your

14  clinical privileges at Mission Hospital would be?

15     **A.    They were on hold.**

16     Q.    Can you elaborate on that?

17     **A.    Well, on hold meaning that there wasn't**

18  **anything I could do at that point in time or the next**

19  **day, because my privileges, you know, were circling the**

20  **airport, waiting to land once some kind of decision was**

21  **made.**

22     Q.    So clinical privileges refers to the right

23  to perform procedures and see patients at the hospital,

24  right?

25     **A.    Yes.**

1      Q.    As of March 4, 2020, could you perform
2  procedures at Mission Hospital?
3      **A.    No, not at that time.**
4      Q.    Could you see patients at Mission Hospital?
5      **A.    No.**
6      Q.    And this suspension took effect March 3,
7  right?
8      **A.    Yes.**
9      Q.    What is the next thing you remember
10 happening with respect to the investigation or with
11 respect to your clinical privileges?
12     **A.    Well, I knew I needed professional advice,**
13 **legal advice.  I guess that was, that was the next**
14 **thing I needed.**
15         MS. BEIGHTOL:  And just to be clear,
16      do not testify about any attorney/client
17      communications with any lawyer regarding the
18      substance.
19         THE WITNESS:  Okay.
20     **A.    I'm -- so what are you asking then?  What's**
21 **the next thing that happened?  Are you saying what --**
22 **when was the next letter?  When was the next call?  I**
23 **don't recall that.  Probably without knowing exactly,**
24 **it was likely communication with the credential chair.**
25     Q.    It was likely a communication about what?

1      **A.    Well, you know, what was next.  But, but,**
2  **you know, unfortunately, I think they, you know, there**
3  **was, there was no like interview with the credentialing**
4  **committee.  And I'm sure they met, but I'm not privy to**
5  **their discussion or what was said.**
6            **You know, at some point I found out that**
7  **there was this ad hoc committee was going to be formed,**
8  **a subgroup of the doctors on the credential's committee**
9  **that were to look into the details of this case.**
10     Q.    Could you turn on the tablet to document 8,
11  which is I will label Exhibit 4.
12            (Pause.)
13     Q.    I think that's 7.
14     **A.    It's all black boxes, redacted.**
15            **You said 8?**
16     Q.    Yes, please.
17     **A.    It's all redacted.**
18            MS. BEIGHTOL:  Does anyone object if
19   we open this door?  It's like a hot box.
20     Q.    I apologize, I was looking at the wrong
21  document.  We actually need to look at document 9,
22  which I have labeled Exhibit 4.
23            (The document referred to was marked
24        Deposition Exhibit Number 4 for
25        identification.)

1    **A.    Okay.  What about it?**

2    Q.    First of all, do you recognize it?

3    **A.    Yeah, that was the one I was talking about,**

4    **6-3-19.  So, you know, remember where they said there**

5    **were two other cases within six months?  Well, that's**

6    **way more than six months ago.**

7    Q.    Right.  And so my question is, first of

8    all, is this a document that you prepared?

9    **A.    That I typed?**

10    Q.    Yes.

11    **A.    I didn't type this.  No, I don't --**

12    Q.    So do you see the handwritten --

13    **A.    I see submitted by, you know, I've**

14    **initialed it.**

15    Q.    Could you have had somebody else type that

16    up for you?

17    **A.    Well, what's your -- your question is how**

18    **did it get produced?**

19    Q.    Really my question is, is this a document

20    that you authored, regardless of whether you typed it

21    up yourself?

22    **A.    I believe, you know, yes, but there's some**

23    **things about it I will -- like, for instance, this**

24    **Active/1008482600, I wouldn't have done that.  So I**

25    **don't want to commit that I, you know, did the whole**

1    **thing, but I guess -- what's your question about --**

2    **you're talking about Stephanie White?**

3       Q.    So my question is just did you submit this

4    document to the credentials committee for its review?

5       **A.    What was the date on this?**

6       Q.    It's handwritten on the first page in the

7    top right.

8       **A.    2020, 3-10, okay.  It, it, it was -- yes, I**

9    **mean, I produced it, and, and considering the date, it**

10   **would have most likely been a response to perhaps some**

11   **questions that they had about these cases.**

12      Q.    Those questions, if that is how it

13   happened, those would have been posed to you by

14   Dr. Joslin?

15      **A.    Credentialing committee.  He would have**

16   **been the chair.  So he was really directly the only one**

17   **I communicated with from the credentialing committee.**

18   **So I assume that that is true.**

19      Q.    Could you please turn to document 10, which

20   I will label Exhibit 5.

21              (The document referred to was marked

22         Deposition Exhibit Number 5 for

23         identification.)

24           (Pause.)

25      **A.    Okay.**

1      Q.    Do you remember receiving that document

2   before?

3      **A.    Yes, I remember receiving it.**

4      Q.    After you received this letter, what did

5   you understand the status of your clinical privileges

6   to be?

7      **A.    I under -- I would interpret them as being**

8   **on hold but being monitored, and I won't say chaperone,**

9   **but what's the word?**

10     Q.    Proctor?

11     **A.    Proctor.  Proctor.**

12          **Now, to color in what was going on in March**

13   **of 2020 was that Covid hit.  And so everything had**

14   **slowed down significantly.  There weren't screenings**

15   **being done, only necessary surgeries were being done.**

16   **And consultations had -- were -- had been reduced.  And**

17   **so our entire practice slowed down.  And so even though**

18   **at this point, on paper, according to Mission, I could**

19   **return to what I was doing, it was -- you know, I had**

20   **previously turned in my notice that I was going to**

21   **leave with plans of leaving late summer.  But things**

22   **had slowed down a lot, and so my practice decided that**

23   **they would just step in the gap, rather than me**

24   **continue to practice at this point.**

25     Q.    So let's -- first let's talk about the

1  clinical privileges, and then I want to ask you some

2  questions about what your colleagues at your practice

3  took.

4       So as of March 1, 2020, if you had had a

5  patient who you said this patient needs to go to the

6  OR, you could have just posted the case and taken them

7  to the OR and done the surgery, right?

8     **A.**   **Correct.**

9     Q.   So as of March 12, could you have done

10  that?

11     **A.**   **With the cooperation of my -- I would have**

12  **had to have one of my partners join in the case.**

13     Q.   They would have to concur on the necessity

14  for the procedure, right?

15     **A.**   **Most likely, sure.**

16     Q.   What do you understand paragraph A.i, the

17  concurrent consultation requirement, to mean?

18     **A.**   **Concurrent consultation, yeah, that, that,**

19  **I was interpret that -- and -- so from a practical**

20  **standpoint, nobody is going to do that.  I mean,**

21  **because, you know, why would they have me doing that**

22  **when they would be doing it as well.**

23       **So, I mean, even from a financial**

24  **standpoint, you know, who's getting paid for that?**

25       **So, I mean, it's not a practical -- I mean,**

1    it's fine on paper, but anyway continue.

2        Q.    So in addition to having another surgeon

3    agree that the procedure is necessary, you had to have

4    another surgeon scrub in with you for the procedure?

5        A.    Yes.

6        Q.    And then there's this third restriction,

7    which is you may no longer supervise residents?

8        A.    Right, which based on what?

9        Q.    Well, I'll get into that in just a minute,

10   because I think our next topic of conversation will be

11   the investigative committee report.

12            Did you understand this to be a

13   modification of your precautionary suspension?

14       A.    I mean, as you -- before I answer that, as

15   you read on, you know, they began to, you know after

16   number three, they say:  As a point, the following

17   individuals will serve on an ad hoc investigative

18   committee.  You know, Garth Davis, Will Harland, et

19   cetera.  So I would, I would -- this modification is

20   minor at best, because obviously they haven't, they

21   haven't decided -- they haven't even really

22   investigated at this point as to whether my privileges

23   would be returned, which they eventually were after

24   months, but not at this point.

25            So I don't see the utility in trying to

1    **characterize what this is in terms of my privileges.**

2    Q.    Well, let me ask it this way.  As of

3    March 12, were you still on precautionary suspension of

4    some of your privileges?

5    **A.    Well, you know, I believe that this is**

6    **still a continuation of that.**

7    Q.    Okay.  Were you surprised that an

8    investigating committee had been appointed?

9    **A.    I didn't see that as a bad thing.  I mean,**

10   **unfortunately, I think there was only two, two people**

11   **in the credentialing committee that had any kind of**

12   **surgical training or ability.  But, you know, I**

13   **don't -- I guess Stacy Travis was an OBGYN, but.**

14   Q.    Did you recognize the names?

15   **A.    Her I knew, because she was an OBGYN who**

16   **actually delivered daughter number three of mine.  But,**

17   **you know, you know, I had to go and look, I think, on**

18   **what some of their names were.**

19        **Why do you ask am I surprised that there**

20   **was an ad hoc committee?**

21   Q.    Just curious.

22        The names you recognized, were you friendly

23   with them?

24        MS. BEIGHTOL:  Did he complete the

25        list of names?

1          MR. HAWISHER:  Oh, he may not have.
2     I'm sorry.
3          MS. BEIGHTOL:  I don't know if he
4     finished that question.
5          THE WITNESS:  I don't know if I have
6     the whole list in front of me.
7          MS. BEIGHTOL:  Do you have that for
8     him to answer?
9          BY MR. HAWISHER:
10    Q.    So it is on page two of the letter we're
11  talking about.  It is the first non-numbered paragraph
12  on that page.
13    **A.    You know, Stacy Travis is really the only**
14  **one I really knew.  I wouldn't say I was unfriendly.  I**
15  **guess as a subspecialist, we don't have a lot of, you**
16  **know, a wide network of people that we interact with,**
17  **just because of what we do, but.**
18    Q.    Before we move on to the investigative
19  committee's proceedings, at any point after you
20  received this letter, did you attempt to exercise your
21  clinical privileges at Mission Hospital?
22    **A.    You know, I think I talked to Tim**
23  **Vanderkwaak, my partner, as to, you know, being back on**
24  **call, et cetera.  And at that point, he said -- I mean,**
25  **there was a financial incentive for them not to,**

1   because they were all -- you know, referrals were way,

2   way down because of all the restrictions from Covid.

3   And so rather than just having one more person kind of

4   sitting around, he just said well, we've kind of

5   arranged to just, you know, cover your call.  So it was

6   kind of a, you know, not a --

7       Q.    Let me ask you about that.

8             What did call consist of for you?

9       A.    It means 24/7 for a week of, you know, in

10  case someone came in the emergency room that needed to

11  be admitted or operated on or -- they are not all

12  surgery, because we did chemotherapy.

13            So there would be people sometimes that

14  were getting sick that maybe who were running a fever,

15  that had to be admitted for a couple of days for a

16  reason or two.  I mean, that's, that's typically our

17  call requirements.

18      Q.    I mean, would it ever happen when you were

19  taking call, that a patient would need an emergent

20  oncologic surgery that you or someone else in your

21  practice would have to perform right then?

22      A.    There's not a lot of emergency type of when

23  you get down to it, like you have to be operated on

24  right then.  I mean, maybe they should be scheduled

25  within two days or three, but -- so not common.

1  **Sometimes we would get called to labor and delivery if**
2  **they had a lot of bleeding from, let's say, a Cesarean**
3  **section that ended up needing a hysterectomy.**
4  **Sometimes we get a call for that, but.**
5      Q.    Was it your understanding that you could
6  have taken call if your colleagues were open to that?
7          And the reason I'm asking is if there were
8  an emergent surgery that needed to be done, is it your
9  understanding that you would have been permitted to go
10  do that by yourself?
11      A.    **Well, not the way this talks.  I mean, so**
12  **you mean, if I was on call and could like talk on the**
13  **phone with people or go in to see somebody that's**
14  **already admitted, you know, I would have to have**
15  **someone riding shotgun with me or my partners, so they**
16  **were in some ways being also on call at the same time.**
17      Q.    Did you ever talk to Dr. Vanderkwaak or
18  anyone else at your practice about, for example,
19  there's this one patient who I think really needs X, I
20  would really like to do the procedure.  Will you scrub
21  in with me for it?
22      A.    **From the clinic?**
23      Q.    From Hope.
24      A.    **Well, you know, I think at that -- no, so**
25  **the answer is no.  But I, I, I think at this point,**

1    because of the way things were, yes, maybe I was seeing

2    some people back, you know, who were still getting

3    chemotherapy but weren't necessarily, you know, in

4    this -- usually surgery is done first and then other

5    things come after that.

6            So no, that didn't happen.

7        Q.    What about like as a general proposition,

8    did you ever ask any of your colleagues if they would

9    be willing to scrub in for you or scrub in with you if

10    you wanted to do an operative case?

11        A.    I mean, that did not happen.

12        Q.    Why not?

13        A.    Well, this, as I said from the beginning,

14    is kind of a dysfunctional Band-Aid on, you know, these

15    clinical privileges at, at an unusual time with Covid

16    where things were slow.  And so it was just easier for

17    them to cover the new patients.  And usually, again,

18    and the people who need surgery are usually the ones

19    who are new patients.  So there wouldn't be an occasion

20    where hey, someone just happens to need this.  And so

21    no, that didn't happen.

22        Q.    After -- while you were on precautionary

23    suspension, so either immediately after 3-3 or during

24    this period that you referred to as this sort of

25    Band-Aid period, did you see or attempt to see any

1  patients post surgery?

2      A.    Well, I may have seen some that I had

3  operated on before for a post op check.  I don't

4  specifically recall.

5      Q.    If you did see them, would that have been

6  in the hospital or --

7      A.    No.  No, it would have been at Hope in the

8  clinic.

9      Q.    Okay.  Fair to say that if there were any,

10  there probably were not very many?

11     A.    Probably, yes.  True.

12     Q.    Okay.  If you could turn to document 11,

13  which I will label Exhibit 6.

14          (The document referred to was marked

15      Deposition Exhibit Number 6 for

16      identification.)

17        (Pause.)

18     A.    Okay.

19     Q.    Have you received or seen this document

20  before today?

21     A.    Oh, yes.

22     Q.    You saw it before the lawsuit was filed,

23  right?

24     A.    Yes.

25     Q.    Who did you get it from?

1      A.   I don't recall who I got it from, but I --

2   oh, well, I think -- no, I met with the committee after

3   they published this.  And while I was at the committee,

4   I said I don't have it.  And they said well, I'll make

5   you a copy, and they hand it to me.

6           So they had not only, you know -- one, they

7   never talked to me about any of this stuff, but

8   obviously they talked to, and have call kinds of vague

9   rumors on here, and some of this is inaccurate.  And

10  then they did a report, and then met with me, and I

11  still hadn't seen this report.

12          So that's how -- that's how this, just

13  another sign of how badly this was investigated by

14  Mission Hospital.

15     Q.   So when you say they, meaning the people

16  you met with, the people who gave you the report, are

17  you talking about the investigating committee or the --

18     A.   The ad hoc committee, yes.

19     Q.   Okay.  So you were given this, and then you

20  subsequently responded to it in writing, right?

21     A.   Yes.

22     Q.   Okay.  So sticking for a moment just with

23  the text of this report, there's some discussion of the

24  March 2 procedure, which we've talked about a little

25  bit already.  And then there's also some discussion of

1  conversations that the committee had with your practice

2  partners, right?

3      **A.    Yes.**

4      Q.    Did the reports' description of those

5  conversations come as a surprise to you?

6      **A.    Did the reports --**

7      Q.    Did what the report said about what they

8  had to say, come as a surprise to you?

9          MS. BEIGHTOL:  Which they?

10          MR. HAWISHER:  The practice partners,

11      Harkness, Case and Vanderkwaak.

12      **A.    Yes.**

13      Q.    What were you surprised by?

14      **A.    Well, not to take it in any particular**

15  **order, but since most of it -- I don't know what to**

16  **call that.**

17          **So the paragraph that starts the committee**

18  **was made aware, I guess that's paragraph three, the**

19  **first paragraph is very short, delay in diagnosis in**

20  **cancer with a lactating female.  So this is a breast**

21  **feeding female.  And so the breast looks very different**

22  **on ultrasound during breast feeding.  It's very**

23  **difficult -- it's kind of a snowstorm of activity.  And**

24  **so there's a lot of blood flow.  And so it's difficult**

25  **to interpret.  And so they talk about delaying and**

1  biopsying it.  The problem is if you biopsy a breast,

2  or someone that's breast feeding, you can get what's

3  called a milk fistula.  In other words, you create an

4  abnormal track into a mass, and if it's -- let's say

5  it's negative, this one, you know, was cancer, but if

6  you jump in too fast and do that, you can have, you

7  know, milk leaking outside of the breast.  And because

8  it's, you know, just like a boat with a hole, and you

9  put it in the lake, it's going to, you know, it's going

10  to leak.

11          And so, you know, I guess once -- someone

12  complained that oh, I should have biopsied it last

13  time.  You know, I chose to watch it a little bit.  So

14  that starts it out.

15          As far as the sigmoid perforation --

16  Q.    Let me rephrase my question.

17          So I meant to be asking about paragraph

18  one, two, three, four, five, which I believe is the bit

19  that directly describes what your practice partners on

20  the committee.  Did anything in that, the paragraph

21  that begins the meeting on March 20, come as a surprise

22  to you?

23  A.    Well, first of all, it starts off with a

24  conclusion.  It starts off saying the meeting

25  illuminated and indicated a concerning practice

1   pattern.  Okay, so they're saying that there's a
2   pattern of something that's concerning.  In other
3   words, like a recurring event or something where, you
4   know, I was doing something wrong again and again, but
5   from there it goes Dr. Hetzel has demonstrated poor
6   medical judgment and decision making similar to the
7   index case.  I, I --
8          MR. HAWISHER:  I'm sorry, can we close
9     the door just for a minute?
10          MS. BEIGHTOL:  Yeah.
11    A.    Now, I don't agree that I had poor judgment
12  in the index case, you know.  They can say oh, I
13  shouldn't have taken to the operating room to begin
14  with, but I can say Dr. Buell had bad judgment, taking
15  out all of the bowel, losing most of the blood, and
16  then saying he had to do it.  I mean, that, that's poor
17  judgment.  You know, I -- when they talk higher up in
18  this report about he came in.  There was a massive
19  tumor -- the tumor, I have a picture of it, you know,
20  it was this big.  That was gone.  I had removed it.
21  Yes, there was a rind of tumor in the pelvis still,
22  but, you know, I was trying to back out, and then it
23  was this very proximal tumor by the very proximal
24  jejunum, which is the beginning out of the duodenum,
25  which is tethered to the back of the abdomen that you

1    can't bypass unless you mobilize the duodenum, and that

2    I got him in there to do that.  But instead of doing

3    that, he went on to take out all this and lose all this

4    blood.

5            That's not my bad judgment.  But they're

6    saying it, it, you know, that I had demonstrated poor

7    medical judgment decision making, similar to the index

8    case.  Okay.

9            And then there's -- what's the evidence of

10   that?  And then there's something about that Dr.--

11   significant deviations from accepted management

12   guidelines, but I don't see that -- you have to

13   understand, you know, this is what we do every day.

14   It's not like we occasionally do breast cancer work.

15   Q.   And if I could clarify my question again,

16   I'm sorry.

17          What I'm wondering is, were you surprised

18   that your partners said these things about you?  I

19   understand that you disagree with the criticisms.

20          MS. BEIGHTOL:  I'm just going to

21    object to the term as vague.

22          You can answer the question.

23   A.   I was surprised that they all had something

24   negative to say about me, but, you know, it's, you

25   know, it's like a family, you know.  Sometimes you

1    have, you know, something negative that sticks in your

2    mind.

3        Q.    Did you talk to any of them about their

4    concerns?

5        A.    You mean after this?

6        Q.    Yes.

7        A.    You know, I was pretty distracted just to

8    try to get through this.  I mean, it wasn't an easy

9    time going through this.  Plus I wasn't just hanging

10   out in the clinic, because pretty much they were taking

11   over the call and, you know, we usually would have our

12   own schedules.  And so I don't recall really any

13   specific discussion.

14       Q.    What about before?

15       A.    What about before?

16             Once or twice with Vanderkwaak.  He has --

17   for instance, you know, if I was doing a benign case

18   that I thought was going to be difficult and wanted to

19   use the robot, he felt that the robot shouldn't be used

20   in that case.  It should be done without the robot.  I

21   mean, it's just -- he has strong opinions about

22   practice styles.

23       Q.    Had any of your partners ever told you that

24   they felt you didn't accept responsibility for bad

25   outcomes?

1      A.     Well, I don't recall that many bad

2  outcomes.  You know, the ones that we're looking at

3  here, over that nine-month period.

4      Q.    So --

5      A.     I don't, I don't lament over them.  I mean,

6  it's kind of, it doesn't mean that I don't -- I'm not

7  accountable or that I don't have regret if something

8  goes wrong.  But I don't -- I don't see -- I mean, they

9  feel the way they feel.

10     Q.    So my question is whether you had ever

11  talked to any of your partners about that concern of

12  theirs?

13     A.     I don't know that they brought up specific

14  things like that to me.

15     Q.    What about concerns about supervision of

16  residents?  Had they ever brought that up with you?

17     A.     No.  And that was kind of surprising.  I

18  don't -- I mean, the residents are, you know, young,

19  and they gossip a fair amount.  And Vanderkwaak, for

20  instance, would have a very, you know, regimented, you

21  know, very, you know, detailed kind of tough way of

22  like managing rounds in the morning, and where I was

23  more relaxed about it.  And some -- a lot of residents

24  said oh, it's like a breath of fresh air having be on

25  call.  But still some of them, there's insecurities,

1    you know, like they bring up a case where -- well, it's

2    one of the illustrated cases about this lady that came

3    into the emergency room.  I mean, it was clear she had

4    to go to surgery, and the resident was afraid going

5    into this case, because she had an acute abdomen, and

6    they had a surgeon, who was -- they hire to kind of

7    cover the emergency room and evidently the resident had

8    kind of side-barred and talked to this person already,

9    and when I heard what was going on in terms of the

10   person's blood pressure was sagging, the pulse was

11   high, pain, rebound tenderness, knowing the surgery she

12   had, I can envision what it was and that she had to go

13   to the operating room.

14          And so since this person already saw them,

15   I said well, let's get this woman to surgery.  And, you

16   know, since this will be a bowel issue, this general

17   surgeon can handle it.

18          I was later criticized, because I didn't go

19   in in between, because if they would have waited for me

20   to do this, I would have just delayed it.  It was very

21   clear that this person had to go to the OR, but the

22   resident was scared about it, and so.

23          MS. BEIGHTOL:  Listen to the question.

24       I want to make sure that --

25       A.    So about the residents, no, I guess I was

1  surprised that that -- I guess I was surprised.

2      Q.    Who is Dr. Travis?

3      A.    She's an obstetrician/gynecologist.

4      Q.    Was she at Hope or --

5      A.    No.  She has a practice with a few other

6  OBGYNs.

7      Q.    Were you aware that she said she diverts

8  referrals -- I'm sorry, let me rephrase that.

9          Obviously you learned that she said that.

10          Were you aware that she diverted referrals

11  from you?

12     A.    They referred everything --

13          MS. BEIGHTOL:  Listen to the question.

14     I just want to make sure your answer is

15      meeting his question.

16     A.    Okay.  Say it again?

17     Q.    Were you aware that Dr. Travis diverted

18  referrals from you?

19     A.    I was not aware.

20     Q.    Were you aware that she had concerns about

21  what she perceived as a lack of engagement and decision

22  making?

23     A.    Is that on there?

24     Q.    It's at the bottom part.  If I may, so the

25  button to turn it on is this one here.

1      A.    Lack of engagement.  I don't know what she
2   means by lack of engagement.  I do know that they had a
3   tendency to refer stuff that they screwed up, including
4   cases where they had done a hysterectomy, and now, you
5   know, they had the top of the vaginal cup that was not
6   healed, and this is a very specific case that I
7   remember.
8          MS. BEIGHTOL:  Just be careful to
9       listen to his question.  Finish your answer,
10       but.
11          MR. HAWISHER:  It's fine.  I'm happy
12       for him to keep going.
13      A.    Yeah, so I mean, for instance, that was an
14   inappropriate referral, you know, because what they
15   were doing was they did the surgery, and they weren't
16   being accountable for managing the complications of
17   their surgery.  And then, you know, so I had a case
18   that I refused to see because of that.  Now, is that
19   what she's referring to by my lack of engagement?  I
20   don't know.
21      Q.    But before this investigative committee
22   report, had anybody told you they thought you had a
23   tremor?
24      A.    No one -- I don't think anyone told me
25   that.  I think I did.  I mean, I think it's -- you're a

1  **young man, but as you get a little bit older, you know,**

2  **all of us get a little more.  I think mine's**

3  **accentuated if I'm nervous or have too much caffeine.**

4  **But, I mean, that's --**

5      Q.    Had you ever sought medical treatment or

6  evaluation related to that?

7      **A.    Not, not prior to their request.**

8      Q.    So if you'll turn to document 15, please.

9  Actually, no, I'm sorry, if you would please turn to

10  document 13, which I will mark as Exhibit 6 -- 7, thank

11  you.

12      **A.    13?**

13      Q.    Yes.

14              (The document referred to was marked

15          Deposition Exhibit Number 7 for

16          identification.)

17          (Pause.)

18      **A.    Do you see what I see?**

19          MS. BEIGHTOL:  I have the same

20      documents as you.

21          THE WITNESS:  Oh, okay.

22      Q.    Do you remember receiving this?

23      **A.    I don't remember when I received it, but I**

24  **mean, it's kind of a back and forth thing, isn't it,**

25  **considering what they -- the previous document.**

1    Q.    Do you remember being notified in some way
2    on or around March 25, that your precautionary suspense
3    was being modified again?
4    **A.    Now, what's lacking -- yes, I guess, but**
5    **what's lacking is, you know, what changed that?  You**
6    **know, and so.**
7    Q.    And we can get into that in a minute.
8          Did you understand, as a result of this
9    second modification, that you could no longer exercise
10   any of your clinical privileges?
11   **A.    Yes, it says that.**
12   Q.    So when did that change?
13   **A.    When did that change?**
14   Q.    When did you again become able to exercise
15   clinical privileges at Mission Hospital?
16   **A.    On paper, I mean, you know, so here is when**
17   **it changed, but when you're asking going forward in**
18   **time --**
19   Q.    When were your privileges fully restored?
20   Yes.
21   **A.    Hang on, I have to look.  It's sometime in**
22   **May.**
23   Q.    You're saying sometime in May is when your
24   privileges were fully restored?
25   **A.    I have to look at the letter, the MEC**

1   letter.
2           MS. BEIGHTOL:  If there was something
3        you need to see, you're welcome to ask him
4        for it.
5       **A.     Whenever that date was.**
6       Q.    The date that you received the letter from
7   the MEC saying your precautionary suspension was?
8       **A.     Okay what questions do you have about this?**
9   **I mean, what --**
10      Q.    So my question is, when were your
11  privileges at Mission Hospital fully restored?  And if
12  you want to look --
13      **A.     Then we're on the wrong document then.**
14      Q.    My question is not about the document.
15  It's just a question.
16          MS. BEIGHTOL:  And if you need
17       something to refresh your recollection to
18       answer the question, you're welcome to ask
19       him for it, and if he has it available, he
20       can provide it to you.
21      **A.     It's --**
22      Q.    So if you feel better looking at a
23  document, there's document 26, which is the letter
24  describing an action taken by the Medical Executive
25  Committee.

1     **A.     June 9.  June 9.**

2     Q.     And I will mark that as Exhibit 8.

3            (The document referred to was marked

4       Deposition Exhibit Number 8 for

5       identification.)

6     Q.     From March 25 to June 9, you could not

7   exercise any clinical privileges at Mission Hospital?

8            MS. BEIGHTOL:  Objection, form.  You

9        can answer.

10    **A.     Well, we just covered over these documents,**

11   **one of which gave me some partial ability return, which**

12   **was dysfunctional Band-Aid that, you know, I would have**

13   **had to have someone hold my hand for everything, and**

14   **with Covid and everything, that didn't really happen.**

15   **So I don't know if your question is about that.**

16    Q.     My question is, putting -- so is it fair to

17   say that that was a practical problem that prevented

18   you from exercising privileges?

19    **A.     Yes.**

20    Q.     So putting aside the practical problems,

21   your privileges were actually fully suspended from

22   March 25 to June 9, is that accurate?

23            MS. BEIGHTOL:  Objection to the form

24        of the question, vague, confusing and

25        misleading.

1      Q.    I'm sorry, if you answered, I did not hear

2   it.

3      **A.    About the date?**

4      Q.    Yes.

5          MS. BEIGHTOL:  Well, let him ask the

6       question again, if you don't know what the

7       question --

8      **A.    I'm looking for -- he said March, what was**

9   **it?**

10      Q.    25th.

11      **A.    We were just on the previous document was**

12   **document?**

13          **MS. BEIGHTOL:  13.**

14      **A.    13.**

15          MS. BEIGHTOL:  Do you mind restating

16       the question for the record, just to make

17       sure that the question meets the answer, and

18       we're not going to --

19          MR. HAWISHER:  Sure.  I'll be happy

20       to, sure.

21      Q.    And Dr. Hetzel, I will do that whenever

22   you're ready to go.

23          (Pause.)

24      **A.    March 25.**

25          MS. BEIGHTOL:  Let him restate his

1    question.

2        A.    What's the --

3        Q.    So my question is, would you agree that

4    from March 25 to June 9, your privileges at Mission

5    Hospital were actually fully suspended?

6            MS. BEIGHTOL:  Objection to the form

7        of the question, vague, misleading.

8            You may answer the question.

9        A.    It's difficult to answer that, because

10   it's, again, a play on words, because it started with

11   the precautionary suspension.  And the role or the

12   function, as I understand from the bylaws, is that this

13   precautionary suspension is meant as a protective

14   measure until a final decision is made.  And under the

15   umbrella of this precautionary suspension, you can see

16   a back and forth craziness, I mean, to the dysfunction.

17   You know, a couple of weeks before they had something

18   returning some, but I had to be proctored, and now they

19   say it's suspended, but it's not really -- it's not

20   really suspended, because it's under this precautionary

21   thing, which they still hadn't really decided on.  And

22   so what do you want to call that?

23           Now, in this letter, they use that

24   terminology, but I understand -- you know, I don't

25   think that that's a very precise or accurate form of

1    **that, because really what did they decide?  And what**
2    **led them to change their mind from the previous**
3    **document?  I mean, it's kind of crazy.  What new**
4    **evidence came in?  I don't see any, you know, and I**
5    **mean, the ad hoc committee and all the things they**
6    **decided, but still hadn't talked to me, and, you know,**
7    **accused me of some things.**
8        Q.    Let me --
9        **A.    So I can't say yes according to this,**
10   **according to this document, I would not have been able**
11   **to go in and do a case by myself or even with somebody.**
12   **But still, you know, it's a play on words as far as I'm**
13   **concerned as to suspension versus precautionary**
14   **suspension, because they still had not decided.**
15       Q.    And I was not trying to imply that this was
16   a final suspension, and I apologize if I gave that
17   impression.  I am happy to use the phrase precautionary
18   suspension to refer to it.
19       **A.    Sure.**
20       Q.    So what I am trying to get out is whether
21   you had any clinical privileges that you could exercise
22   any point from March 25 to June 9?
23           MS. BEIGHTOL:  Objection to form,
24       asked and answered.  You can answer the
25       question in the same --

1          **A.     Not at the hospital.**

2                MR. HAWISHER:  That may be a good

3          breaking point.  We've been on the record

4          almost exactly for two hours.  I don't know

5          what time you all were thinking about lunch.

6                THE VIDEOGRAPHER:  Off record at

7          12 p.m.

8                (Recess.)

9                THE VIDEOGRAPHER:  On record at

10          12:17 p.m.

11                BY MR. HAWISHER:

12          Q.    All right, Dr. Hetzel.  We've taken about a

13          15-minute break.  Without telling me anything you

14          talked to your lawyer about during the break, is there

15          anything about your previous answers that you have

16          thought about and decided was incomplete or incorrect

17          or you would like to change in any way?

18          **A.    No.**

19          Q.    Okay.  So we had been looking at documents

20          13 and 26.  I want to turn to document 15, which I will

21          label Exhibit 9.

22                (The document referred to was marked

23                Deposition Exhibit Number 9 for

24                identification.)

25                (Pause.)

1    **A.    Questions?**

2    Q.    So have you seen this document before?

3    **A.    I don't recall, but it's been a while.**

4    Q.    Without telling me the substance of

5    anything you talked to Steve Peterson about, was Steve

6    Peterson your lawyer during March 2020 and your

7    precautionary suspension and investigation?

8    **A.    Yes, I contacted --**

9    MS. BEIGHTOL:  Don't talk about

10    communications.  Just answer his question

11    very specifically that he asked you.

12    **A.    Yes.**

13    Q.    When did he stop being your lawyer, if in

14    fact he is no longer your lawyer?

15    **A.    He's no longer my lawyer, and the exact**

16    **date I can't say.**

17    Q.    Was it in 2021?

18    **A.    I would have to look at the last thing I**

19    **had him do, but it's not recent.**

20    Q.    So do you remember what the last thing you

21    had to do was?

22    MS. BEIGHTOL:  Well, and to the extent

23    that gets -- just answer that yes or no and

24    not the substance of it, and he can ask the

25    question again.

1      **A.    Your question is, was it in 2021?**

2      Q.    So this question is yes or no.  Do you

3   remember what the last thing you had Mr. Peterson do

4   for you was?

5          MS. BEIGHTOL:  Just yes or no.

6      **A.    I think so, yes.**

7      Q.    Was that a submission of some kind to

8   somebody else, for example, the data bank, a medical

9   board, another hospital?

10          MS. BEIGHTOL:  Yes or no.

11     **A.    Yes.**

12          MR. HAWISHER:  And if you're going to

13      instruct him not to answer, I'm trying to

14      give you advance notice I think I can ask

15      him what that submission was.

16          MS. BEIGHTOL:  If the submission went

17      to someone other than just being between you

18      and Mr. Peterson, you may answer his

19      question.

20          To be clear, do not answer if it is

21      only an attorney/client communication

22      between you and Mr. Peterson, and he's not

23      asking you about any communications with you

24      and Mr. Peterson.

25     **A.    You're asking what the last thing he did**

1    **for me was?**

2        Q.    Yes.

3            MS. BEIGHTOL:  If it is to a third

4        party, you can answer.

5        **A.    It is to a third party.  I'm trying to**

6    **remember which.**

7        Q.    Do you remember if it was a hospital, a

8    medical board or something else?

9        **A.    I believe it was a medical board, probably**

10   **the Arizona Medical Board.**

11       Q.    Okay.  We can come back to that when we

12   talk about the medical boards then.

13           So this April 3, 2020 letter, document 15,

14   Exhibit 9, is this something that Mr. Peterson

15   submitted on your behalf?

16       **A.    Yes.**

17       Q.    Is it fair to say that it represents your

18   position?

19       **A.    Yes.**

20       Q.    Have you seen, either during the underlying

21   events or during this lawsuit, emails that were sent or

22   received by Mr. Peterson on your behalf?  And I'm not

23   asking about emails that you've had with him, but

24   emails, for example, that you had with Phillip Jackson,

25   have you seen emails like that?

1          MS. BEIGHTOL:  I mean, just objection,

2      overbroad, vague, confusing.

3      **A.    I don't recall emails between the two of**

4  **them being forwarded to me.**

5      Q.    Were you aware that he would be

6  communicating with Mission Hospital and Mission

7  Hospital's lawyers on your behalf?

8      **A.    Yes.**

9      Q.    Is it fair to say that what he said to

10  Mission Hospital, Mission Hospital's lawyers during

11  that time, he said on your behalf?

12      **A.    I hope so.**

13      Q.    Well, what do you mean by that?

14          MS. BEIGHTOL:  And just objection, to

15      the extent you're saying what was said

16      related to him or circumstances related to

17      him versus what may have been related to

18      some other individual that he was

19      representing for some other purpose or some

20      other communication socially or otherwise.

21          MR. HAWISHER:  Let me modify the

22      question, because that's fair.

23      Q.    If Mr. Peterson said to Mission Hospital's

24  lawyer or to somebody else:  Dr. Hetzel objects to

25  this, or Dr. Hetzel would like a hearing, or Dr. Hetzel

1    would no longer like a hearing or any of that, is it

2    fair to say that that was something he said on your

3    behalf?

4         MS. BEIGHTOL:  I'm just going to

5         object that you're not looking at specific

6         things, you're talking about -- you're

7         asking pie in the sky things.  He's not

8         looking at in the abstract.  I think it's

9         vague, it's confusing, and it's not able to

10        be -- his answer isn't able to meet the

11        question.

12        MR. HAWISHER:  So for the record, I

13        think that's an improper speaking objection.

14   Q.    And Dr. Hetzel, if you feel able, you can

15   answer.

16   **A.    So let me get the gist of your question.**

17        **Are you saying that all things that he said**

18   **to them were on my behalf?**

19   Q.    I'm asking you if you understand that to be

20   the case?

21        MS. BEIGHTOL:  And just objection to

22        the form and vagueness and confusing.

23   **A.    I guess without knowing what was said, it's**

24   **hard to be that global in saying everything he did**

25   **represented me.**

1      Q.   Okay.

2      **A.    So let's, if you could, look at document**

3  **31, which I will mark as Exhibit 10.**

4            **(The document referred to was marked**

5        **Deposition Exhibit Number 10 for**

6        **identification.)**

7         **(Pause.)**

8      **A.   Okay.**

9      Q.   Is this something he sent on your behalf?

10          MS. BEIGHTOL:  I just want to make

11  sure -- all right.

12     **A.    There's things in here I don't understand.**

13  **I don't know what 45 CFR 60.6 is.  He also refers to**

14  **new data bank and report regarding voluntary**

15  **relinquishment for the reasons discussed and outlined**

16  **in this draft, which I don't know what those are, but.**

17     Q.   The draft, if it would help you answer, is

18  document 32, and I will include that in Exhibit 10.

19     **A.    This says 31.**

20     Q.   You're currently looking at 31.  The

21  attached draft is 32.

22     **A.    Okay.  I looked at that.  So what's your**

23  **questions about 31?**

24     Q.   Mr. Peterson sent that on your behalf,

25  right?

1     **A.     What do you mean by on my behalf?  To**
2  **benefit me?**
3     Q.    Is this something you authorized him to
4  send, either specifically, like I approve this email;
5  or in general, like this is the kind of thing you
6  wanted him to send on your behalf?
7     **A.    I don't think I signed off on emails, I**
8  **mean.**
9     Q.    Did you know he would be communicating with
10 the hospital and the hospital's counsel on your behalf?
11    **A.    Yes.**
12    Q.    Did you want him to be communicating with
13 the hospital and the hospital's counsel on your behalf?
14    **A.    I did.**
15    Q.    Is this email within the authority you
16 conferred on him to represent you?
17    **A.    I think he was striving to resolve this the**
18 **best he could, and.**
19    Q.    Let me ask it another way.
20       Do you feel that Mr. Peterson did something
21 inappropriate by sending this document?
22    **A.    I don't see that it's inappropriate.**
23    Q.    It was not inappropriate for him to purport
24 to send this on your behalf?
25    **A.    It was not inappropriate.**

1      Q.    If you could turn, please, to document 33,
2    which I will mark as Exhibit 11.
3              (The document referred to was marked
4         Deposition Exhibit Number 11 for
5         identification.)
6         (Pause.)
7    **A.    Okay.**
8         MR. HAWISHER:  I'm sorry, before I ask
9    you about that, could we briefly go off the
10   record?
11        THE VIDEOGRAPHER:  Off record at
12   12:36 p.m.
13        (Recess.)
14        THE VIDEOGRAPHER:  On record at
15   12:40 p.m.
16        BY MR. HAWISHER:
17   Q.    Okay.  And Dr. Hetzel, now that we're back
18   on the record, the document you're reviewing, document
19   33, Exhibit 11, was this sent on your behalf?
20   **A.    I think this is the first time I've seen**
21   **this.  It's certainly about me.  Again, I'm kind of**
22   **tripping over on my behalf, but it has to do with**
23   **breast conferences.**
24   Q.    Do you feel it was inappropriate for
25   Mr. Peterson to send this?

1    **A.**    **No.**

2    Q.    Is there anything in this email from

3  Mr. Peterson that you disagree with?

4    **A.**    **No.**

5    Q.    If you could turn, please, to document 38,

6  which will be Exhibit 12.

7          (The document referred to was marked

8      Deposition Exhibit Number 12 for

9      identification.)

10    Q.    Do you feel it was inappropriate for

11  Mr. Peterson to send this?

12    **A.**    **I don't think it was inappropriate.  I**

13  **don't know whether it was the right decision or not,**

14  **but that's --**

15    Q.    Which part do you have reservations about?

16      MS. BEIGHTOL:  And do not talk about

17    any attorney/client communications.  So do

18    not talk about any discussion between you

19    and Mr. Peterson.

20       You can answer outside of that, you

21    can answer that question.  He is not asking

22    you about attorney/client communications, is

23    that correct, David?

24      MR. HAWISHER:  That's correct.

25    **A.**    **Well, you know, as we sit here almost**

1   beyond halfway into 2025, and having submitted

2   multiples and multiples of job applications, having all

3   been tripped up by a National Physician(sic) Database,

4   entry revision and all of that, I have the hindsight in

5   saying it could have been better to have a hearing and

6   clear this up, because it was an imperfect resolution

7   that has led to -- led me into, you know, five and a

8   half years of unemployment, loss of my profession, and

9   so that's what I mean.

10      Q.    What do you think would have been different

11  if you had had a hearing?

12          MS. BEIGHTOL:  Objection to the form.

13      Seeking speculation.  You can answer, if you

14      can.

15      A.    What's the date of this?  So your question

16  again was?

17      Q.    What do you think would have been different

18  if you had had a hearing on this?

19      A.    Well, there was a lot of inaccuracies.  It

20  mentioned the code of conduct, for instance.  And the

21  June letter, you know, refers to this heavily and

22  seriously.  But even at that time, they realized based

23  on my answer that, you know, the patient's family was

24  not there.  She did not want me to talk to the family.

25  It's all trumped up and sounds different.  It may have

1  been better, I believe, and hopefully instead of, you

2  know, I've gotten the National Physician(sic) Database

3  entry removed, and have that resolved instead of it

4  continue to snowball down the hill five and a half

5  years later.

6          So that was my hope or why I question if

7  that was the right move, but that's that.

8      Q.    If you could turn, please, to document 40,

9  which I will mark as Exhibit 13.

10            (The document referred to was marked

11        Deposition Exhibit Number 13 for

12        identification.)

13    A.    Okay.

14      Q.    Now, this one is an email addressed to

15  Mr. Peterson, and it was sent August 10, 2020.

16          At that time, did Mr. Peterson still

17  represent you?

18    A.    Yes.

19      Q.    It's going to take me a second to find the

20  next one.  Oh, here we go.

21          If you could turn, please, to document 147,

22  which I will mark as Exhibit 14.

23            (The document referred to was marked

24        Deposition Exhibit Number 14 for

25        identification.)

1      Q.    You there?

2            Do you remember submitting this document to

3      the Arizona Medical Board?

4      **A.    Yes.**

5      Q.    At the time you submitted it, was

6      Mr. Peterson still representing you?

7      **A.    Yes.**

8      Q.    Okay.  And I want you to pause before you

9      respond to this, because I think your counsel will

10     instruct you not to answer it.

11           On page three of this document, in the long

12     paragraph in the middle, there are several references

13     to things that your lawyer supposedly told you or

14     opined or believed.  Did you see those references?

15     **A.    I believe I see what your --**

16     Q.    This is the one where you need to pause.

17           Did Mr. Peterson tell you those things?

18           MS. BEIGHTOL:  I'm going to instruct

19        you not to answer, as to any communications

20        between you and your attorney with regard to

21        this.

22           We can have a discussion off the

23        record at lunch, if you can sort of tell me

24        where you're going with this, and then I can

25        confer with him about, and then we can

1    figure out if something more needs to be
2    done.
3        I'm not trying to -- I want to do this
4    correctly and not impede things you can get
5    into, but I just -- we need to be protective
6    of the attorney/client privilege.
7        MR. HAWISHER:  Right.  I totally
8    understand.  So for now, I'm going to ask a
9    handful of other questions just like that,
10    just to put on the record, and you put the
11    instruction for him not to answer.
12        MS. BEIGHTOL:  It may make more sense
13    to do the off-the-record thing, rather than
14    wasting time, because perhaps we can resolve
15    the issue.
16        I'm just trying to be efficient.
17    There's a time limit under the federal
18    rules, so I just figured you'd want to be
19    efficient with your time.
20        BY MR. HAWISHER:
21    Q.    So for now, Dr. Hetzel -- are we still on
22    the record -- for now, Dr. Hetzel, just to confirm, are
23    you following your counsel's instruction not to answer
24    that question?
25    A.    Yes.

1    Q.    Okay.  Then I will move on.

2         So let's go back to March -- excuse me, not

3    March, April and to May of 2020.  And I want you to

4    look at document 18, which I will mark as Exhibit 15.

5              (The document referred to was marked

6         Deposition Exhibit Number 15 for

7         identification.)

8    **A.    Okay.**

9    Q.    Do you remember receiving this memo from

10   Dr. Joslin?

11   **A.    I remember receiving, I believe, this,**

12   **unless there's another form of this, but I did receive.**

13   Q.    I will tell you it's very possible this was

14   put onto letterhead before it was sent to you, but if

15   so, we don't have the version that was on the

16   letterhead.

17   **A.    Okay.  All right.**

18   Q.    Do you remember discussing with Dr. Joslin

19   the subject matter of this memo?

20   **A.    I don't remember discussing that with him**

21   **specifically.  I thought it unusual though.**

22   Q.    The request for a fitness for video

23   evaluation?

24   **A.    Well, and -- well, they were very focused**

25   **on, you know, a neurologic exam and a neuropsych exam,**

1    **which is kind of what kids with learning disabilities**

2    **and things have, have to do.  So that was unusual, and**

3    **I've been in discussions.  I've heard that that's an**

4    **unusual request.**

5        Q.    When you spoke with Dr. Joslin about this,

6    can you share your views on it?

7        **A.    As I said, I don't recall discussing it at**

8    **all with Dr. Joslin.**

9        Q.    Okay.  I misunderstood you then.

10            So you under -- what did you understand

11   would happen after you obtained these evaluations by a

12   neuropsychologist and a neurologist?

13       **A.    What happened in -- from a --**

14       Q.    Prospectively, in the moment you're sitting

15   there, you received the memo.  What do you understand

16   will happen in the future once you are seen by

17   Dr. Rardin and Dr. Hill?

18       **A.    I assume that it was discussed at some time**

19   **during, you know, after, after those assessments were**

20   **done in committee, I assume credentials committee.**

21           **But I never did see a report by the**

22   **neuropsych person that was Mark Hill, Ph.D.  I mean, I**

23   **did, after I saw Duff Rardin, he gave me a copy of his**

24   **report, so that I had.**

25       Q.    Well, let me ask it this way.  Did you

1    think that Drs. Rardin and/or Hill would be deciding if

2    you could -- if your privileges would be restored, or

3    did you believe that the committee will decide if your

4    privileges will be restored?

5          MS. BEIGHTOL:  Just objection to

6      relevance.

7      **A.    Well, I -- of course they weren't going to**

8    **decide.  I mean, they were going to give the committee**

9    **information, but they were obviously hunting for**

10   **something, you know, looking for something to blame me.**

11   **The committee was -- I mean, it's not just them being**

12   **thorough.  They were looking -- they were looking for**

13   **things, reasons, and so they sent me there.  So I, you**

14   **know, I did it.**

15     Q.    You say that because of what they did, or

16   do you know from speaking with them that they felt that

17   way?

18     **A.    Speaking with who?**

19     Q.    The members of the committee.

20     **A.    They never spoke to me.  I mean, this is --**

21   **they were -- they would meet, you know, and that's the**

22   **dysfunction of these groups is they meet in private,**

23   **they get the information, but it's not vetted, it's not**

24   **edited, that I can tell.  I mean, they never like**

25   **interviewed me.  The ad hoc committee did, after they**

1    did a report.  But, you know, so there was never a

2    discussion, and you were never able to really face

3    your, you know, accusers.

4         You know they had their ideas, preconceived

5    ideas, and you can read them in there about oh, I

6    should have done more preoperative planning.  You know,

7    that's completely false, you know, all of those things.

8    I never had to discuss it with them.

9    Q.    So other than -- strike that.

10        Are you -- is your contention that the

11   credentials committee was looking for something to

12   blame on you based on the actions the committee took,

13   or is there any other basis for that belief?

14        MS. BEIGHTOL:  Objection to the form,

15        vague, confusing.  You can answer.

16   A.    Restate it again?

17   Q.    Sure.  What makes you say that the

18   credentials committee was looking for a reason to blame

19   you?

20   A.    Well, so this whole thing started kind of

21   backwards as to what the case would be as a, you know,

22   they came up with the conclusion, this precautionary

23   suspension, and they had their reasons, that there was,

24   you know, faulty planning, faulty judgment you know.

25   And so they were looking, you know.

1          And then the case itself where, you know,

2    the general surgeon, the hepatobiliary surgeon talks

3    about there being this huge pelvic mass, which by

4    document and pathology that had already been removed.

5          So there's no way that that's accurate, nor

6    was it accurate that there was multiple enterotomies.

7          I mean, there was a lot of misinformation,

8    and so, you know, they were kind of, to me, grasping at

9    straws to say oh, there's something wrong with Hetzel,

10   maybe it's physical, and, you know, and so I don't --

11   yes, I think it was rumor driven.  I mean, operating

12   with residents that, you know, sure.  I thought that

13   some of the senior guys that trained me were a little

14   shaky, which relative to me, would have been true, you

15   know, at the time.  But, you know, these aren't typical

16   cases.  I mean, these are stressful cases, sure.

17         But, you know, yeah, I think they were

18   anchored -- their thinking was anchored on these

19   initials conclusions that they had in their head, and

20   so they were trying to, you know, justify them.  But at

21   the end, you know -- and the North Carolina Medical

22   Board, you know, reviewed my cases, and they didn't,

23   you know, they didn't find anything.

24         So anyway, so.

25    Q.    So I want to make certain I understand

1   every reason you have for believing that the

2   credentials committee or the investigative committee

3   was out to get you.  And don't let me put words in your

4   mouth.  Please clarify your position, if I'm getting it

5   wrong.

6           It sounds like your position is the

7   committee actions and recommendations were unjustified,

8   based on the clinical care you delivered, and that

9   fact, that the committee actions were unjustified shows

10  that they were biased?

11          MS. BEIGHTOL:  Objection of the

12      restatement and recharacterization of his

13      testimony.  You can answer, if you can.

14  **A.    Well, if you go -- and I know we've been**

15  **talking about the meat of the matter in this case, but**

16  **if you were to go upstream, you know, in time, back in**

17  **time, back into early 2019, so why was I on this --**

18  **what's the word -- last resort status or something.**

19      Q.    Final warning?

20  **A.    File warning status, okay.**

21  **Also I have a final warning.  Well, what**

22  **was my first warning?  I'm not really sure.  What they**

23  **originally -- they had viewed a case regarding sentinel**

24  **nodes, and they sent it out, and it's maybe not**

25  **meaningful to you, but, you know, so the sentinel node,**

1    you know, you take less nodes, but sometimes to get to

2    it, you have to take some out.  And we would, or at

3    least I would, send the extra nodal tissue there.  And

4    so when it was reviewed, there were extra nodes there.

5    So they thought oh, well, he shouldn't have sent those,

6    or he shouldn't have removed those.

7            And so that reviewer said, well, what the

8    credentials committee decided was oh, Hetzel should

9    present, you know, more cases or percent at breast

10   conference.  Well, we already did a lot of br -- you

11   know, their decision was to present all new breast

12   cases.  But there wasn't enough time to do that.

13           So what did they do?  Well, since most of

14   them came through Hope, they said okay, we'll have a

15   Wednesday afternoon clinic or conference at Hope, so

16   you don't have to go anywhere.

17           So the other one was at the cancer center,

18   and there was the usual support staff there, and the

19   lady that takes attendance is there and all that.

20   Well, the one that happened in our office -- so, no, I

21   didn't have to go to both.  The one that happened in

22   our office, I was one of two people at that time doing

23   breast cancers for Hope.  So it was necessary for me to

24   present.

25           And what I'm getting to is that the

1    attendance that was being taken there, and I didn't

2    realize it at the time, was either not done or

3    unreliably done, because the person that normally does

4    that isn't there.

5         So looking back, the credential committee

6    was getting faulty, inaccurate attendance records, and

7    then they claim me that I have not been going to breast

8    conference, but I was going at my office, but nobody

9    was there to record them.  And such, because of that,

10   you know, they said well, he's ignoring our

11   recommendation to do this, and they put me on final

12   warning status for not attending a meeting regarding a

13   cancer that we did every day, more than the general

14   surgeons would do.

15        And so it was kind of crazy to be put on

16   that status, but that's what happened.

17        And so, you know, but I didn't realize that

18   they weren't doing that.  I later figured it out.  And,

19   you know, so we tried to calculate up what I could,

20   but -- and so, you know, all these things kind of

21   marched forward where, you know, the information was

22   bad, the processing of the case and how it was done and

23   not being talked to, not being open, and so maybe they

24   didn't think they were going after me, but it sure felt

25   from it from my standpoint, because, you know, after

1   this case from the ER, the one lady says do you want to

2   talk to a counselor or something?  I thought where did

3   that come from?  I'm like where are these credential

4   people coming, that they would say, like I'm being

5   crazy or something, you know, what -- I don't even know

6   what they're -- how they're coming up with this.

7          So, yeah, I felt I'm being pursued, I did,

8   and I think I was.

9      Q.    And, again, I'm not trying to change your

10  testimony.  I'm trying to make certain I understand it.

11         So the results or the results of the

12  credentials committee, investigative committee's

13  actions you felt unfair, that's one.

14         Two is you believe the final warning

15  status, which you don't think was appropriate, may have

16  biased the committee against you, is that fair?

17         MS. BEIGHTOL:  Objection to the

18         restatement of his testimony.  You can

19         answer.

20     A.    You know, I do believe it started me to be

21  more than just a person of interest, but a suspect.

22  And so that, you know, things -- people start finding

23  things, or at least looking for things, and then there

24  was -- it was just, you know, unfortunate timing that

25  this third sentinel case, you know, came, you know, not

1   long after this emergency room case that the general

2   surgeon did.

3           And then, of course, it was very unusual

4   for us to have to call in anybody, and then, you know

5   Dr. Buell and the general surgery group, they weren't

6   friendly to us, because general surgeons feel that they

7   own breast cancer, even though they don't, they don't

8   focus on it.  You know, they resented the fact that we

9   did most of the breast cancer in town.  I mean, they

10  weren't quiet about that.  And so there wasn't warm

11  feelings, even though it was just, you know, like

12  competing law firms or something.  I mean, there's just

13  bad feelings, and, I mean, I understand that, but

14  unfortunately, when I had to call him in, I was very

15  concerned that, you know, something more might be

16  coming, but I didn't expect something like this.

17      Q.    So you feel that Dr. Buell and maybe

18  Dr. Ramaswamy, is he included in that?

19      A.    Well, he was the first and most

20  available --

21          MS. BEIGHTOL:  Objection.

22      A.    Dr. Ahearne was the surgical oncologist

23  that I had known more for years.  But Buell was a very,

24  you know, intense person.  Mission Hospital hired him

25  to be the chief of surgery.  None of us ever

1    interviewed him, so he was just hired, and was, you

2    know, a personality.

3        Q.    Okay.  Are there any other reasons you have

4    for feeling that the credentials committee was biased

5    against you?

6        A.    Any other reasons?  Well, I mentioned the

7    anchoring and I mentioned the process.

8            I think when you have, you know, a roomful

9    of nonspecialists, you know, pediatricians, you know,

10   family doctors, et cetera, and they're judging on

11   complex surgical sarcomas and, you know, and it's a

12   closed door thing, and you don't have any mechanism to

13   really edit out or vet the people.  You know you're

14   having closed-door sessions, and I think, you know, it

15   starts getting down the road where, you know, in a

16   process like that, because in the legal profession you

17   have juries.  You have people that represent you.

18   You're being represented.  And as doctors, you're not

19   being represented at all.

20           And so I don't know that it was personal

21   against me, but I think the process does not help.

22       Q.    Did you say anchoring a minute ago?  I may

23   have misheard.

24       A.    Yeah, it's a psychological term that's been

25   studied.  I know we studied it in business school.  The

1    Challenger disaster, for instance, they blame a large

2    amount of that disaster on the fact they had the idea

3    it would be fine to launch this thing, even though the

4    temperatures were low, even though they had a lot of

5    scientific data that showed that it would have been

6    stressful.  But the decision makers on top had already

7    decided, and so once you have this anchoring effect,

8    it's like it biases how you process information.  So

9    anything that supports your presumptive conclusions,

10   your amplify, and all those things that are against it

11   you ignore.

12           And so just like you said, well, once

13   they're circling down the road, and I start being a

14   person not only of interest, but suspect, and they

15   start looking for things, it ends up, you know,

16   reverberating.  And so, yeah, anchoring is the correct

17   term.

18   Q.    What's your opinion of Dr. Johnson?

19          MS. BEIGHTOL:  Objection, relevance.

20    You can answer.

21   A.    I don't know him clinically.  I mean, I

22   only know him from my interactions with this.  I know

23   he serves an important function, and I think being an

24   employee of a hospital, they're obligated to be on some

25   committees, and, you know, I never served on any

1  **committee with him.  So I don't know him from a neutral**
2  **standpoint.**
3      Q.    Your perspective from having been under
4  investigation by the credentials committee, what's your
5  opinion of his character?
6          MS. BEIGHTOL:  Objection to the form,
7       again, relevance.
8      **A.    I don't know that I can comment on his**
9  **character.  You want to specify that somewhat?**
10     Q.    Sure.  Do you think he's honest?
11         MS. BEIGHTOL:  Objection to the form,
12      confusing, vague as to on what topic?  In
13      general?  Relevance.  You can answer.
14     **A.    You know, I wouldn't say he's dishonest.  I**
15  **mean, I don't.**
16     Q.    Do you think anybody on the credentials
17  committee was out to harm you?
18     **A.    Well, you know, I don't, I don't really**
19  **know any of them.  Again, we were never given an**
20  **opportunity to really discuss anything, you know, as a**
21  **group or individually, so.**
22     Q.    I mean, can you think of any reason they
23  would have to seek to harm you?
24         MS. BEIGHTOL:  Just objection to the
25      form in asking him what other people were

1          thinking.  You can answer.

2          A.     You know, again, not having talked to these

3     people, I can't under -- you know, I don't know what

4     their motivations were.  I don't -- personally, I

5     don't, I don't see why they would be, but I do know,

6     you know, that they had limited information.  They had

7     limited insight into what it's like to do a cancer case

8     like this surgically, and then there's probably a great

9     amount of group think where somebody has opinion, and

10    it just kind of resonates within the group, and that's

11    how the group decides.

12               I don't really know, but I just, you know,

13    I'm a victim of a process and a bad process where, you

14    know, I don't think that these things should be all

15    closed door without them doing some real digging and

16    talking to people that are directly affected and being

17    able to represent themselves or getting someone to

18    represent them.

19         Q.     What about your partners at Hope?  Do you

20    think they were motivated to harm you?

21               MS. BEIGHTOL:  Objection to what their

22          motives were and relevance, but you can

23          answer that, if you can.

24         A.     I think Blair Harkness is a jealous person

25    specifically.  You know, I'm senior to him.  In fact, I

1  **helped train him early on when he was in resident**

2  **there.  But, you know, he kind of always wanted to be**

3  **the main one for breast cancer, and he was always**

4  **somewhat resentful.  I think he's -- you know,**

5  **competitive, but like a lot of the doctors can be in a**

6  **group.**

7      **So, you know, I would kind of put him in a**

8  **different category than the others, but.**

9      Q.    So if you could turn, please, to document

10  19, which I will mark as Exhibit 16.

11              (The document referred to was marked

12      Deposition Exhibit Number 16 for

13      identification.)

14      **A.    Yeah, it -- isn't this like the coat rack**

15  **at restaurants where they say they can't be responsible**

16  **for lost and stolen items because it hasn't happened**

17  **yet?  Isn't this like I'm releasing you guys from being**

18  **fair and reasonable?**

19      Q.    To be clear, doctor, I don't have any

20  questions about the waiver portion of this.

21      **A.    Well, I have comments, obviously.**

22      Q.    I appreciate that.

23          My question was just going to be so this is

24  a document you signed for an evaluation by Dr. Hill,

25  right?

1      A.    Yeah, but it's also a document you sign if

2   you want your records sent out too.  I think so.

3      Q.    Pardon.

4      A.    This is from Mark Hill.  The --

5         MS. BEIGHTOL:  Just read it carefully

6      and -- before you answer the question, and

7      you can make them bigger, probably, by doing

8      that, if that helps you at all.

9      A.    Yeah, you're correct, from Mark Hill, yes,

10  okay.

11     Q.    And if you would look at document 20, which

12  will be Exhibit 17.

13         (The document referred to was marked

14      Deposition Exhibit Number 17 for

15      identification.)

16     Q.    And by the way, doctor, if it would help,

17  you can turn the tablet sideways and get a more

18  zoomed-in view of the whole horizontal slice.

19     A.    I have mostly blacked out redacted screens.

20     Q.    Document 20?

21         MS. BEIGHTOL:  We are on document 20.

22     A.    Duff Rardin, okay.

23     Q.    So this is around authorization you signed

24  for an evaluation by Dr. Rardin?

25     A.    Yes.

1          Q.    So two evaluations, right?

2          **A.    Yes.**

3          Q.    And then if you could turn to document 21,

4     which will be Exhibit 18.

5                     (The document referred to was marked

6            Deposition Exhibit Number 18 for

7            identification.)

8          **A.    Okay.**

9          Q.    This is the one that you said you did

10    receive from the evaluator at the time?

11         **A.    Yes.**

12         Q.    Okay.  Did you agree with the findings?

13         **A.    Did I agree with what?**

14         Q.    Did you agree with the findings of

15    Dr. Hill?

16             MS. BEIGHTOL:  You can take whatever

17          time you need to review them.

18         **A.    Well, I think his characterization was**

19    **good.  I probably would say that it's not number one,**

20    **it's number two.  If you go to the assessment plan, the**

21    **first one is like a baseline tumor, which is always the**

22    **same, and the other one is like enhanced physiologic.**

23    **Are you looking at the same thing?**

24         Q.    I was looking for a number, but I see now

25    what you're talking about.

1    A.    Yeah, so that means if you're stressed or
2    you had, you know, a little more caffeine or something,
3    that it's enhanced.  And I would say that's -- but he
4    said it's one or the other, and I'd say he favored
5    number one, but he just had me for a snapshot, so I
6    would say it's probably more number two.
7    Q.    As it relates to your practice of surgery,
8    what difference would that make?
9    A.    Not a lot.  I mean, if I was a microsurgeon
10   or something, I mean, one of the better plastic
11   surgeons in town did very good work.  He had a terrible
12   tremor, but he really did very good work, but, I mean,
13   obviously, he would prefer not having it, but.
14   Q.    I'm sorry, I mean the difference between an
15   essential tremor or a physiologic tremor.
16   A.    What's the difference?
17   Q.    Yes.
18   A.    Well, the physiologic one just is that it
19   could be more affected by stress, so that if I am like
20   this today.  But if you started really throwing the
21   flames at me, and the next time I might be a little
22   shakier, that's all.
23   Q.    If you could turn, please, to document 23,
24   which will be Exhibit 19.
25

1              (The document referred to was marked

2          Deposition Exhibit Number 19 for

3          identification.)

4       **A.    Yeah, so this is the one I've never seen.**

5       Q.    Okay.  Had you seen that document before

6   today?  I realize you had not seen it before this

7   lawsuit.

8       **A.    No, this is the first time.**

9       Q.    Okay.  If you could --

10      **A.    I believe anyway.**

11      Q.    If you could turn to the last page of this

12  document, please.  Just read those three-ish paragraphs

13  to yourself.

14          (Pause.)

15          MS. BEIGHTOL:  This is 23, did you

16      say?

17          MR. HAWISHER:  Yes.

18          MS. BEIGHTOL:  Just making sure.

19          (Pause.)

20      **A.    All right.  Okay.**

21      Q.    I noticed you laughed as you were reading.

22  What was it that you laughed at?

23      **A.    I have to find it.  He otherwise seems to**

24  **have unrealistic goals and expectations.**

25          **I don't know what -- I don't know what**

1    those unrealistic expectations are.  I don't really
2    know where he got that one from.  But, you know, he
3    does seem to editorialize a little bit on his review of
4    my, you know, I guess the credentials committee's
5    things.
6        Q.    So that paragraph you're looking at now,
7    which seems to be about Dr. Hill's assessment of your
8    personality, do you agree, disagree, mixture of both?
9        A.    No, I disagree.  I mean, I don't know
10   where -- you know, these -- I have never been to a
11   neuropsych person, but, I mean, they do interesting
12   tests about memory and recall and some performance
13   things.  I don't recall some of the personality
14   questions.  It probably plays a written part.  I don't
15   know what led him to conclude that I have unrealistic
16   goals and expectations.  I don't even know what those
17   things, you know, were really.  I mean, why he said
18   that.  I mean.
19       Q.    Do you agree or disagree that you had
20   "discounted recent criticisms of your performance"?
21           MS. BEIGHTOL:  Objection to the form
22       of the question.  It's vague and confusing
23       in terms, but you can answer.
24       A.    Discounted.  I discounted it to myself?  To
25   other people?  I don't know what -- when you say do I

1    **disagree that I have discounted it to myself?**

2        Q.    However you interpret that statement.

3            MS. BEIGHTOL:  And just for my

4        clarification, are you asking him to

5        interpret what this statement is in this

6        letter and then what?  I'm just

7        misunderstanding.  I'm not understanding

8        your question.

9            MR. HAWISHER:  As he reads it and

10       interprets it, I'm asking if he agrees or

11       disagrees with this statement.

12       **A.    Which one?**

13           MS. BEIGHTOL:  I'm just going to

14       object, that's vague and confusing, to the

15       extent he's being asked to interpret what

16       somebody else says and then agree or

17       disagree, but you can answer.

18           BY MR. HAWISHER:

19       Q.    The statement that you had "discounted

20   recent criticisms."

21           MS. BEIGHTOL:  Same objection.

22       **A.    Yeah, it's vague.  I mean, maybe there's --**

23   **as everyone tries their best, there's going to be some**

24   **things that don't quite go exactly the way you want.**

25   **Doesn't mean you should stop being optimistic or stop**

1    trying to be better.

2            But, I mean, some things that he just is

3    free wheeling.  You know, could be unwilling to

4    self-examine his role in difficult situation.

5    Illusions of invincibility?  I mean, there's no way

6    that I feel invincible.

7            I mean, he's just kind of -- I mean, he's

8    not a psychoanalyst.  These people, you know, they test

9    people who have been in car accidents if they have

10   neurologic deficits.  That's the kind of stuff.  I have

11   a brother-in-law, my youngest sister's husband that

12   does this.  So I kind of know some of it, but -- so I

13   don't agree with any of that.

14       Q.    Okay.  In the following paragraph, do you

15   see where the first sentence of this paragraph says:

16   The credentialing committee should consider whether

17   your "profile of weaknesses preclude your safe medical

18   practice"?

19       A.    Yeah, that's -- I see that.

20       Q.    I assume you disagree with that?

21       A.    Yeah.  I mean, that's -- wow, yeah, I

22   disagree with it.  I mean, it's -- I mean, as you read

23   it, preclude his safe medical practice, I don't -- I

24   just don't know where he gets to that point saying

25   that.

1      Q.    Right.  And I'm obviously not asking you to
2  agree that that is a fair assessment of your ability or
3  performance.  But my question for you now is, if you're
4  on the credentials committee, and you see a report that
5  concludes like that, how do you think you'll interpret
6  that?
7           MS. BEIGHTOL:  And just objection to
8        the form of the question, because it's
9        asking for an interpretation of someone
10       else's statement and then --
11          MR. HAWISHER:  I do think this is an
12       improper speaking objection.
13          MS. BEIGHTOL:  I think it's proper in
14       that it's vague, it's confusing, and it's
15       misleading, and it's asking him to interpret
16       something and then speculate about what
17       someone else thinks.
18          Those are my objections.  He can
19       certainly answer.
20     **A.    You're asking me to comment on how do I**
21  **expect the credentials committee to react to certain**
22  **comments like this?  And it just, you know, I agree**
23  **that -- it's similar to when you start as doctors, you**
24  **know, like well, they shouldn't order that CAT scan to**
25  **begin with, because, you know, sometimes you start**

1    looking for things or asking questions that you really
2    shouldn't be asking.  I mean, why did they have me do
3    this?  What led them to this?
4            I mean, basically when you get down to it,
5    it's the rumors of the resident doctors that said well,
6    Hetzel is a little bit shaky, and then that's why that
7    triggered this whole thing.  This kind of witch hunt of
8    looking for neurologic problem, and you start getting
9    someone who's not clinical at all, which is this
10   neuropsych person, starts speculating on, you know,
11   person -- you know, personalities, speculating on
12   safety profiles for clinical practice.
13           I mean, you know, I mean, I see where
14   you're going, but, I mean, that's -- they shouldn't
15   have ordered that to begin with.
16           And so, you know, it would have been better
17   to just sit down and talk with me.  I mean, that's the
18   logical thing to do.  But did that happen?  No, it
19   didn't happen.
20       Q.    Is there anything that you feel got missed
21   because you were only providing your input in writing,
22   as opposed to an in-person conversation?
23           MS. BEIGHTOL:  Just objection to the
24       mischaracterization of the past.  You can
25       answer.

1     A.     Oh, well, I mean, communication class at

2     business schools will tell you the answer to that is

3     which is, you know, that's written text and things.

4     You're always missing things.  And you said yourself,

5     wouldn't you rather have like the in-person, because

6     there's a lot of communications that happen just in

7     temperament and eye contact and other forms of

8     communications.

9          But, yeah, I think the whole process needs

10    to be more transparent, and, you know, they probably

11    wouldn't start going down this -- certain roads that

12    maybe they shouldn't be on.

13    Q.     You said you did speak in person with the

14    investigative committee, or am I misremembering?

15    A.     That ad hoc committee.

16    Q.     Um-hum.

17    A.     After they submitted their report, you

18    know, I talked with them.  And, you know, because, you

19    know, had it not -- this whole thing never would have

20    hit the radar screen until after Buell got in the room.

21    And the fact that he was too head strong to listen to a

22    junior oncologist.  He was the chief of surgery, and he

23    knew what to do, and so, you know, he didn't do it.

24    And so they resected all this bowel, lost all this

25    blood, so, you know, someone had to be blamed, and it

1  ended up being me.
2        And so I got -- kind of got cut out,
3  because he was -- you know, they went to him and he
4  made a -- you know, I don't have it in writing, but
5  obviously he was instrumental in my getting the
6  precautionary suspension.  And he was not looked at,
7  even though, you know, they questioned my judgment when
8  it should have been his judgment.  I mean, I was trying
9  to get out, but, you know, I.
10     Q.    So in addition to meeting with the
11  investigative committee, did you also attend the
12  March 10, 2020 credentials committee meeting?
13     A.    I don't -- do you have a document on that?
14     Q.    Not the minutes, but if you'll look at
15  document 11, which has already been marked as
16  Exhibit 6, there is a reference to it in the first
17  paragraph.
18     A.    11?
19     Q.    The investigative committee report.
20     A.    Ad hoc credentials committee report.  I
21  mean, that was.
22     Q.    And I will represent to you that that is a
23  misnomer for the ad hoc investigative committee.  I'm
24  saying this just to avoid confusion between the
25  credentials committee, which is what I'm asking you

1    about, and the investigative committee.

2           But the part of this document I was calling

3    your attention to was in the first paragraph, which

4    says:  All were present for the called credentials

5    committee meeting where Dr. Hetzel was present and met

6    on March 19 and March 20.

7       **A.     So is this from the 20th or the 19th, this**

8    **report?  It must have been the 20th, because I was**

9    **there.**

10      Q.    I think that's correct, but I do not know

11   and also can't testify.

12      **A.     Yeah, so.**

13      Q.    I'll repeat the question, if it will help.

14          Do you remember whether you attended the

15   March 10, 2020 called credentials meeting?

16      **A.     That's a different meeting.**

17      Q.    Yes.

18      **A.     I don't -- I remember being at, you know,**

19   **one of those.  I don't, I don't remember which.**

20      Q.    Okay.

21      **A.     Was Spensieri at that one?**

22      Q.    Off the top of my head, I could not tell

23   you.

24          So I'm going to jump around --

25          MR. HAWISHER:  We can go off the

1    record.

2         THE VIDEOGRAPHER:  Off the record at

3    1:39 p.m.

4         (Luncheon recess.)

5         (Recess.)

6         (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      A F T E R N O O N   S E S S I O N

2           THE VIDEOGRAPHER:  On record at

3      2:11 p.m.

4           BY MR. HAWISHER:

5      Q.    All right.  Dr. Hetzel, we've taken, I

6      don't know, roughly a half-hour break.

7           Is there anything about your previous

8      answers or testimony that you'd like to change, add to,

9      clarify?

10     **A.    Not at this time, no.**

11     Q.    I mean, is there something that has

12     occurred to you that you might want to change later?

13     **A.    Well, it's nothing I said, but I can't**

14     **really change the document.**

15     Q.    Okay.  What is it?

16     **A.    That note to the Arizona Medical Board.**

17     **There was just one part in there where it was really my**

18     **opinion, not my legal counsel's opinion about admission**

19     **of guilt.  That's all I probably kind of just should**

20     **have --**

21     Q.    That's fair.  And so I was actually just

22     about to turn to the Arizona Medical Board letter

23     again, because we have a chance to talk about it again.

24     **A.    What number was that?**

25          MS. BEIGHTOL:  143.  Sadly I know

1    that, only because you emailed it to me.
2        BY MR. HAWISHER:
3    Q.    And for the record's sake, this is numbered
4    as Exhibit 14.
5    **A.    Where is it on here?**
6    Q.    147.
7        (Pause.)
8    Q.    You there?  So first of all, give me a bit
9    of context, if you could.  Why are you submitting this
10   letter?
11   **A.    I was trying to get a medical license for**
12   **the State of Arizona.  I was given a contract by**
13   **Ironwood Cancer Centers, and it is, of course,**
14   **necessary to have an Arizona medical license to be able**
15   **to practice in the Phoenix -- greater Phoenix area.**
16   Q.    When did you apply for licensure with -- in
17   Arizona?
18   **A.    The exact date, it would have been -- you**
19   **know, it must be, you know, before this, but.**
20   Q.    Do you remember in relation to your
21   Ironwood contract when you applied?
22   **A.    Well, it would have been after in**
23   **relationship.  I'm sure I had at least a letter of**
24   **intent from Ironwood Cancer Center before I applied for**
25   **them, but I honestly don't recall the date exactly.**

1      Q.    If you had to estimate -- and the reason
2   I'm asking for an estimate instead of showing you a
3   document is I don't think we have a document that
4   establishes the date.  Maybe I'm wrong about that.  How
5   long after you got the offer for a contract for
6   Ironwood would you say you applied?
7      **A.    It's difficult to be accurate.  Just**
8   **relatively soon, I would think, yes.**
9      Q.    What did you under -- strike that.
10          Why did you have to submit the specific
11  letter that you have in front of you, document 147?
12  Did the Arizona Medical Board ask you to submit it, for
13  instance?
14     **A.    I'm fairly sure that they did in some**
15  **reason.  I wouldn't just carry on with a three-page**
16  **letter.**
17     Q.    Did you understand yourself to have any
18  responsibilities with respect to the information you
19  gave the Arizona Medical Board?
20          MS. BEIGHTOL:  Objection, confusing,
21   vague.
22     **A.    Responsibilities.**
23     Q.    Would it help if I asked it in a different
24  way?
25     **A.    Well, responsibilities to whom?**

1    Q.    So I mean, you understand today you are
2    under oath?
3    **A.    Right.**
4    Q.    You have a responsibility to the court and
5    to the jury to tell the truth?
6    **A.    Right.**
7    Q.    Did you understand yourself to be under any
8    similar responsibilities with respect to your medical
9    board application?
10    **A.    Relative to?**
11    Q.    To potential patients, to the medical
12    board, to anyone.
13    **A.    Well, I certainly want to be truthful to**
14    **relay a situation or the information, as I know it.**
15    Q.    Would you agree with me that honesty with a
16    licensing board, like the Arizona Medical Board, is
17    extremely important to protect patients?
18    **A.    Sure.**
19    Q.    Is there any reason that in your
20    communications to the Arizona Medical Board, you would
21    not have told the complete truth, as you understood it?
22    **A.    Complete truth about what?**
23    Q.    Anything you're telling them.
24        MS. BEIGHTOL:  I'm just going to
25     object, vague, overbroad, confusing, not

1          tied to his statement.

2          **A.     So say it again?**

3          Q.    Is there any reason that in your

4    communications with the Arizona Medical Board, you

5    would not have told them the complete truth?

6          MS. BEIGHTOL:  Objection to the form

7           of the question.  Again, vague, confusing,

8           overbroad.

9          **A.     Well, truth implies, you know, something**

10   **about something.  I mean, it's, you know, I guess, you**

11   **know, what is the subject?  How much does anyone need**

12   **to know?  So I have no motivation in that regard not to**

13   **be truthful or to edit out something.**

14         Q.    Okay.  Could you turn to the last page of

15   document 147, please.

16         **A.     All right.**

17         Q.    We spoke about this a little bit earlier.

18              There are three references in the largest

19   paragraph on that page to things your lawyer said or

20   believed or similar propositions.  Do you know the

21   passages I'm talking about?

22         **A.     The highlighted ones.**

23         Q.    May I see that just to confirm?

24         MS. BEIGHTOL:  I think you asked him

25          there are three highlighted passages that

1      you asked him about earlier, is that the

2      ones you're referring to?

3          MR. HAWISHER:  I did not realize that

4      one was highlighted.  My copy is fine.

5      Interesting.

6          MS. BEIGHTOL:  Oh, you literally asked

7      the question last time about looking at the

8      highlighted passages.

9          MR. HAWISHER:  That's concerning.

10     Okay.  Anyway.

11         Q.    So there's three highlighted passages.  Are

12     those based on things your lawyer told you, your

13     lawyer, Mr. Peterson?

14         MS. BEIGHTOL:  And just, if I may make

15     an instruction to you with regard to any --

16     listen very carefully to his question.

17     You're instructed not to answer anything

18     outside these passages, and the information

19     related to this regard to your

20     attorney/client communications.  But you may

21     answer them with regard to these three

22     highlighted.  With that instruction, go

23     ahead.

24     **A.    So the first two, the first two I heard**

25     **from Steve Peterson regarding his discussion about Phil**

1  **Jackson.  And the last one, as I left before, that**
2  **was -- I didn't mean to include that as this admission**
3  **of guilt.  That was my thought.  I didn't mean to say**
4  **that that was his conclusion.  That was my conclusion.**
5  **So that's my only edit on that.**
6      Q.    Okay.  One thing to clear up.  You referred
7  to HCA in that paragraph.  Are you talking about a
8  specific corporate entity when you refer to HCA in this
9  paragraph?
10      **A.    I don't know how HCA structures its work in**
11  **different hospitals that it owns.  I mean, that's.**
12      Q.    Okay.  And the reason I'm asking you that
13  is I will represent to you there is a company called
14  HCA, Inc.  There's another company called HCA, The
15  Hospital Company, or something like that.  There are
16  other companies with HCA in the name, and then there's
17  also MH Mission Hospital, LLLP, which owns and operates
18  Mission Hospital, and is the only defendant currently
19  in this action.  And am I understanding correctly that
20  you don't know which of those entities was the one that
21  made the report?
22      **A.    I don't know.**
23      Q.    So when you say HCA in that paragraph, is
24  that essentially equivalent to Mission Hospital?
25      **A.    No, because I, I believe that, you know,**

1    **this was -- you know, prior to February 2020, you know,**

2    **these, at least, you know, I didn't get specific, but**

3    **that these were previous events, from previous**

4    **hospitals that it owned, not from Mission, because this**

5    **was a brand new thing.**

6        Q.    That's fair.  Let me ask a slightly

7    different question.

8            If there's evidence in this case that MH

9    Mission Hospital, LLLP is the entity that made the NPDB

10   reports and declined to amend or void them, do you have

11   any reason to contradict that and to say no, it was

12   some other entity?

13       **A.    No.**

14       Q.    Okay.

15           MR. HAWISHER:  I'm sorry, could we go

16       off the record for just a minute.  My

17       computer froze up, and I have to reopen the

18       documents.

19           THE VIDEOGRAPHER:  Off record at

20       2:25 p.m.

21           (Recess.)

22           THE VIDEOGRAPHER:  On record at

23       2:25 p.m.

24           BY MR. HAWISHER:

25       Q.    So to take the statements in the paragraph

1    we're talking about in order, the first one:  According

2    to my lawyer, HCA was previously penalized for

3    underreporting cases to the NPDB, so they were

4    hypervigilant.

5           You said that is something Mr. Peterson

6    told you he believed?

7      **A.    Well, based on discussions he had had with**

8    **Phillip Jackson.  You know, that's the main person, I**

9    **believe, he had talked to, but I don't know**

10   **specifically who their --**

11     Q.    And then there's the statement:  HCA also

12   did not understand bylaws of Mission Hospital.

13   According to my lawyer, HCA also did not understand

14   that a temporary suspension, according to Mission

15   bylaws, was not a final decision but a holding pattern

16   until a final decision was made.

17          That is something your lawyer believed that

18   the decision makers who submitted the report did not

19   understand the bylaws?

20     **A.    They were pressuring us, because they felt**

21   **they had so many days to report this to the National**

22   **Physician(sic) Database.  And I don't have that**

23   **criteria, if they have like 60 weeks or 6 weeks or 8**

24   **weeks.  I don't recall the time schedule.  But it**

25   **was -- my understanding was that once a final decision**

1    was made that someone's privileges were revoked, that

2    they had that much time to have them -- a report had to

3    be filed for the National Physician(sic) Database.  And

4    so -- but they were feeling it had to be reported

5    before they were done.

6           And so, you know, this -- now this

7    misunderstanding was pushing them to get this report

8    in, and that's, from what I understand, why that first

9    report went in, because, you know, they weren't further

10   enough along, and they felt they had to put it in, and

11   then --

12          So that's -- kind of seeing it in real

13   time, it was, I think, a misinterpretation of that,

14   but, you know, I'm not an expert.

15   Q.    You said they were pressuring us.  Who is

16   the they, and who is the us in that statement?

17   A.    Well, us is -- I should say me, but.

18   Q.    And they is Mission Hospital?

19   A.    Yes.

20   Q.    How were they pressuring you, and to what

21   were they pressuring you?

22   A.    How and what?  I would say that

23   communication came from your firm to my representation

24   that there was this need to put something in by a

25   certain time based on the bylaws or whatever their -- I

1　don't know.  That that report had to be done, and it
2　had to get in, and that's -- so I don't know who the
3　they were either, because I wasn't part of the
4　discussion, but it was between the lawyers and my
5　counsel.
6　　Q.　So you say pressuring.  Was there anything
7　in particular --
8　　A.　Time pressure.
9　　Q.　Yes, but were you being asked to do
10　something because of this time pressure?
11　　A.　I personally was not being asked to do
12　something.
13　　Q.　I'm trying to figure out how to word this.
14　　　Was your lawyer being asked to submit
15　something on your behalf related to this time pressure?
16　　A.　I believe that discussions were ongoing as
17　to how the initial wording would be done for this
18　submission to the National Physician(sic) Database,
19　which they felt -- they, being Mission Hospital and its
20　new set of lawyers from HCA.  And so they, you know,
21　were working with your firm.  And, of course, I'm sure
22　they were a new client for your firm, because they were
23　based in Nashville, Tennessee.
24　　　But -- so there was -- there was pressure,
25　the way I understand it, time pressure through the

1    **lawyers.  That's what I heard.**

2         Q.    Okay.  This may be related, it may not.

3         Do you remember ever having a conversation

4    with Dr. Joslin about the timing of the investigation

5    concerning you, and specifically a 30-day threshold?

6         **A.    I don't recall such a conversation.  It may**

7    **have happened, but.**

8         Q.    Do you recall ever asking if a meeting

9    could be held on a particular date, and then they told

10   no, because we need to do this quickly?

11        **A.    From them?  That they --**

12        Q.    Do you recall ever asking if a credentials

13   committee or investigative committee meeting could be

14   held on a particular date because you were traveling

15   and being told that no, because it was necessary to

16   move quickly with the investigation?

17        **A.    I don't recall that.**

18        Q.    Okay.  On the topic of your submissions to

19   the Arizona Medical Board, can you turn, please, to

20   document 148, and this is going to be 20?

21             MS. BEIGHTOL:  Yes.

22             MR. HAWISHER:  I will mark this as

23        Exhibit 20 then.

24                  (The document referred to was marked

25             Deposition Exhibit Number 20 for

1           identification.)

2      **A.     Okay.**

3      Q.     Have you seen this document before?

4      **A.     Yes.**

5      Q.     This is the same Dr. Williams we were

6  talking about earlier who you used to practice with,

7  right?

8      **A.     Correct.**

9      Q.     In 2023, he was the CEO of New Horizon

10 Womens Cancer Center, is that right?

11     **A.     Well, he's the only -- you know, yes, he**

12 **is.  I mean, when he broke away, that's the entity that**

13 **he opened.  That's the name of it.**

14     Q.     How did he come to be writing you a letter,

15 sort of a recommendation to the Arizona Medical Board?

16     **A.     I'm sure I asked him to do it.**

17     Q.     Why did you ask him to do this?

18     **A.     They probably required a letter or two.**

19     Q.     Okay.  Is there anything in this letter

20 from Dr. Williams that you disagree with?

21     **A.     It goes far beyond discussing my**

22 **qualifications for a license in Arizona.  I mean, it**

23 **talks quite a bit about the hospital system and what**

24 **happened before HCA and his impressions about western**

25 **North Carolina and its medical care, but there's a**

1    total lack of focus there.

2        Q.    I mean, like do you agree with Dr. Williams

3    that Dr. Steven Hill and Dr. Paulus tried to "destroy

4    your practice"?

5        **A.    Where is that?**

6        Q.    About halfway down the page, beginning the

7    former credentials committee under Dr. Steven Hill.

8        **A.    I would not put it that strongly.  I mean,**

9    **at the end, he finally gets on top of Dr. Hetzel is one**

10   **of the physicians that was speaking up for, I would**

11   **say, you know, the integrity of practices and relative**

12   **to being absorbed into a hospital system.  But I can't**

13   **say that I disagree, but I do -- it's very strong about**

14   **Dr. Hill, and so I can't broadly say I disagree or**

15   **agree with all of it.**

16       Q.    I mean, is it fair to say that a lot of

17   what Dr. Williams is saying here is about his own

18   personal experience with --

19       **A.    Yeah, there's a lot of truth.  I mean,**

20   **there's a long list of things there.**

21       Q.    So I don't want to make this sound like an

22   accusation.  You did decide to forward this memo to the

23   Arizona Medical Board, right?

24       **A.    I don't know if he did it directly -- well,**

25   **it says to me.  So he may have just sent it, and then**

1    **sent this copy to me, because most of the time they**

2    **don't like, like a letter of reference to come through**

3    **somebody.  They prefer it to go directly, but he did**

4    **send this to me.**

5        Q.    I guess you think he may have sent it to

6    you and then also sent it to the board?

7        **A.    Correct.**

8        Q.    Okay.  We'll move on from that then.

9              I'm sorry to be jumping around like this.

10       **A.    It's okay.**

11       Q.    Do you remember where you were, even in

12   general terms, on March 8, 9 or 10 of 2020?  I realize

13   that's kind of out of the blue, but do you remember,

14   for instance, if you were traveling?

15       **A.    2020, March, I'm not sure.  I know I had --**

16   **I was returning from a second interview at Texas Tech**

17   **at sometime in early March, kind of as Covid was**

18   **hitting, but that may have been sooner than that date.**

19   **So I don't -- I don't recall.  I believe that was**

20   **sooner, that could have been.**

21       Q.    You believe that your travel was before

22   March 8, 9 and 10?

23       **A.    Yeah, it's hard to --**

24       Q.    Okay.

25       **A.    Why?**

1      Q.    Well, I will tell you the reason I'm asking

2   is that was related to my earlier questions about

3   whether you asked to meet on a particular date and were

4   told there was a need to move more quickly.  I believe

5   there will be evidence that you said you were

6   unavailable on March 8, 9 and 10 because you were

7   traveling.

8              So I want to turn to what I'm going to

9   refer to as report number one, which is the first

10  report that Mission Hospital submitted to the NPDB.

11             There's also a second report submitted in

12  2020, which was a revision to action report, and then

13  there's a third report, which was 2021, a correction

14  report.  Will you understand what I'm referring to if I

15  call those reports, one, two and three?

16     **A.    Which one are we on here?**

17     Q.    Document 47 is report number one, and

18  that's going to be Exhibit 21.

19             (The document referred to was marked

20         Defendant's Exhibit Number 21 for

21         identification.)

22         MS. BEIGHTOL:  Did you say -- what was

23     the document number?

24         MR. HAWISHER:  Document 47.

25         MS. BEIGHTOL:  How is it that I at

1    this point of the day can only hear one of

2    two numbers you give at a time?

3        MR. HAWISHER:  That's okay.  I'm the

4    one saying it, and I can only hear one.

5        MS. BEIGHTOL:  For some reason, I can

6    only retain one.

7    **A.    Okay.**

8    Q.    So this is -- report number one is the

9    report that you contend defamed, right?

10   **A.    That I --**

11   Q.    This document is how you contend Mission

12   Hospital defamed you and tortiously interfered with

13   your employment, right?

14   **A.    This was -- you know, the fact that it**

15   **shouldn't have been filed at all, I mean, because it**

16   **was not a final decision; and the fact that it was --**

17   **did not need to be filed and -- but was filed, was the**

18   **beginning of what continued to be after that a**

19   **reverberation, a snowballing, you know, once this is**

20   **here, then it has to be changed and then corrected, but**

21   **it's still, you know, it's still out there to this**

22   **moment as these words come out of my mouth, it's still**

23   **there, you know, echoing and continuing to get louder**

24   **and impact my career.  So, yeah it shouldn't have been**

25   **done.**

1      Q.    And in a little bit, I'm going to ask you

2  about report number three, which is the correction

3  report, and it is effectively a modified version of

4  this report.  We'll talk about what's still out there.

5  But right now I want to make sure I understand

6  everything you contend is wrong with this report.

7             So you said it shouldn't have been filed.

8  It was unnecessary.  Is there anything that you think

9  is untrue about what the report says?

10            MS. BEIGHTOL:  And I'll just object to

11      the terminology unnecessary, misleading,

12      confusing, and not consistent with the

13      totality of the testimony, but you can

14      answer the question pending.

15      **A.    So is your question is it not accurate or**

16  **is it --**

17      Q.    That is my question is, is it not accurate?

18      **A.    The fact that it exists -- the fact that it**

19  **exists at all is a huge part of, of, of my answer as to**

20  **why, you know, there is an expectation that this should**

21  **be a blank white board or a blank blackboard, that**

22  **nothing should be written on it, especially since it's**

23  **not that it's, you know, it's not accurate or those**

24  **things didn't happen, it's not a stock ticker of the**

25  **day-to-day of what goes on in a hospital.  You know,**

1  it's meant to be a sign board to say pay attention.

2  There's something here.  And when it's -- instead ends

3  up being oh, by the way -- and then the problem is once

4  it's there, it continues to be there, even when it's

5  changed and modified.  It continues to echo.  It

6  continues to grow on people, to say well there must be

7  something here.

8         And so it's -- it's a difficult answer.

9  It's not that there's an inaccuracy about the words on

10  the page.  It's not there should be nothing on that

11  page and it shouldn't exist.  So that's my answer.

12      Q.    And Dr. Hetzel, I am not trying to minimize

13  that when I say this.  I am trying to make sure I

14  understand everything that -- everything about this

15  report that's relevant in this case.

16         Is there anything -- in addition to what

17  you've said, is there anything in the words on the page

18  that is not accurate?

19         MS. BEIGHTOL:  Objection, asked and

20         answered.  You can answer.

21      A.    Nothing to add.

22      Q.    So I'm going to go through line by line,

23  because I spent far too much of my life this past year

24  staring at this one page of the report.  So if you will

25  turn to page two of this document.

1    **A.    Okay.  This is -- I'm sorry, I already went**
2    **back on that one.  What's the number on this?**

3    Q.    Page 2 of document 47.

4    **A.    Page 2 of document 47.**

5    Q.    And if you would look at the description of
6    subjects, acts or omissions or other reasons for
7    actions taken, which is a -- it's a short paragraph.

8    **A.    Is this at the very top?**

9    Q.    It's kind of in the middle.

10        The paragraph begins Dr. Hetzel is the
11    subject.

12    **A.    This is on page two?**

13    Q.    Yes.

14    **A.    Yes.**

15    Q.    So taking it sentence by sentence:
16    Dr. Hetzel was the subject of a cautionary suspension
17    on 3-3-20.  Do we agree that that is accurate?

18    **A.    Well, piece by piece, yeah.  Is that**
19    **accurate?  It's accurate.  Is that the right question?**
20    **No.**

21    Q.    And, again, I'm not trying to minimize the
22    contention of yours.  This is my one chance to talk to
23    you, so I need to make sure we cover this.

24    **A.    Sure.**

25    Q.    "This precautionary suspension was modified

1  with the most recent modification," because it's the

2  most recent modification as of May 5, 2020, "being on

3  4-23-20 when the precautionary suspension was removed,

4  subject to the practitioner's satisfactory completion

5  of fitness evaluations." I had sort of thought that

6  would be a smaller chunk. Is that accurate?

7       MS. BEIGHTOL: May I have a standing

8    objection, so I don't keep interrupting you

9    on taking this in pieces --

10      MR. HAWISHER: Yeah, sure.

11      MS. BEIGHTOL: -- versus the totality

12    that it actually is?

13      MR. HAWISHER: Yeah, absolutely.

14      MS. BEIGHTOL: Thank you.

15   **A.    Yes.**

16   Q.    And the adverse action classification codes

17  summary or emergency suspension summary or emergency

18  limitation, are those accurate?

19   **A.    Where are we now?**

20   Q.    A little bit above that paragraph but in

21  the same kind of block.

22   **A.    I don't know the classification systems,**

23  **you know, because they do site numbers, et cetera,**

24  **here, so I don't know. I assume that those are**

25  **standard categories that they have available to**

1  **themselves.  You know, and did they correctly do it or**
2  **not?  I don't really know.  I mean, I wouldn't word it**
3  **like that, you know, that it's an emergency.  But, you**
4  **know, it's -- to me, it's a yellow light, not, you**
5  **know, it's not a lock up the brakes kind of emergency.**
6      Q.    And, again, we can look at the code list,
7  if that will be helpful.  But if in fact there was no
8  precautionary suspension code, and the code was just
9  summary or emergency suspension or summary or emergency
10  limitation, and Mission Hospital did not choose that
11  wording, but just chose a code, can we agree that
12  that's accurate?
13          MS. BEIGHTOL:  Objection, to the form
14           of the question in that it's seeking to have
15           him guess.
16          MR. HAWISHER:  Honestly, fair.  That's
17           kind of a bad question.
18      Q.    Let's go to document number 506, and I'm
19  going to mark that Exhibit 22.
20              (The document referred to was marked
21           Deposition Exhibit Number 22 for
22           identification.)
23      **A.    Is there a particular page on here you want**
24  **me to?**
25      Q.    It may be faster if you just pass me the

1    tablet and I can get to the page.  It's a long

2    document.

3         And passing it back to you, and we are on

4    what's numbered page one of that document.

5    **A.    Table?**

6    Q.    So there's a table of basis for action

7    codes.  Do you see that?

8    **A.    Okay.**

9    Q.    Can you look through that table of basis --

10   excuse me, I'm sorry, not basis for action codes.  The

11   adverse action classification codes.  Can you look at

12   that table and just read it to yourself and let me know

13   when you're done.

14        (Pause.)

15   **A.    Okay, yes.**

16   Q.    Other than codes 1632 and 1639, which are

17   the ones that were used, is there any other code in

18   that list that you think Mission Hospital should have

19   used instead?

20        MS. BEIGHTOL:  Objection to the form

21        of the question in that it assumes that a

22        code should be used.

23        BY MR. HAWISHER:

24   Q.    I will amend the question to say, without

25   any prejudice to your position that no report should

1    have been filed, is there any other code that you think

2    is more appropriate than the codes that were used?

3            MS. BEIGHTOL:  Objection to the form

4            of the question for the same reason.  And

5            also to the extent that you're asking him to

6            interpret codes that he doesn't use and is

7            not expert in.

8        A.    I think the codes are inadequate, and I

9    just -- you know, for -- again, for something that has

10   not yet really been determined, you know, it's just

11   asking for a judgment before a judgment.  And it's

12   just -- it's fraught with problems, where you're trying

13   to come up with something to report.  But it just --

14   what do you report?  And how do you classify it?

15           So, I mean, I agree for me, I mean, it's

16   very clear after five and a half years of not being

17   able to get hired anywhere, including, you know,

18   getting -- continuing to get, including, you know, very

19   recently, you know, rejections.  And I'm a very rare

20   professional subtype.

21           So I don't -- I can't do any better than

22   they did, but, again, it shouldn't have been filed.

23   It's continued to be the problem.  That is the common

24   thread of disaster that runs through, you know,

25   everything professionally for me and financially.

1      Q.   Fair enough.  Let's move on from the
2   report.  While I'm looking for it, do you recall
3   submitting a dispute resolution statement about report
4   number one or telling your lawyer to submit a dispute
5   resolution statement about report number one?
6      **A.   I know what you're asking for, I just**
7   **don't -- you're looking for an email between my lawyer**
8   **and myself or?**
9      Q.   No.  No.  I'm sorry.  I'm asking you if you
10  remember the dispute resolution process?  If you
11  remember saying I want to dispute this report and then
12  a statement being drafted and being submitted to the
13  NPDB.  Do you know what I'm talking about when I refer
14  to that?
15     **A.   Yes.**
16     Q.   Okay.  And this happened in or around
17  February of 2021, right?
18          MS. BEIGHTOL:  Are you asking him to
19      look at something?
20          MR. HAWISHER:  No, I'm trying to find
21      it.
22          MS. BEIGHTOL:  I think you need him to
23      look at something.  I mean, you're talking
24      about four years ago.
25          MR. HAWISHER:  Right.

1          MR. JACKSON:  I think it's document

2     43, David.

3          MR. HAWISHER:  Thank you, Phillip.  I

4      skipped right over it.

5     Q.    So, yeah, if you could turn to document 43,

6   which I will mark as Exhibit 23.

7               (The document referred to was marked

8          Deposition Exhibit Number 23 for

9          identification.)

10    **A.    This is the process of disputing the**

11   **filing.**

12    Q.    Okay.  And I'm not going to ask you to read

13  through all of that, because it's kind of long, and the

14  formatting, I think, got messed up by the web form or

15  what have you.

16          But I do want to ask you, and you're

17  welcome to look at it for as long as you need to to

18  answer this question.  In general, what was the basis

19  for your dispute that you filed?

20          MS. BEIGHTOL:  Objection to the form

21       of the question and that it's just

22       confusing, misleading and that it's asking

23       to cherrypick, but you can answer, if you

24       can.

25    **A.    So restate your question again?**

1    Q.    What was the basis or what were the bases
2    for the dispute that you submitted to the NPDB?
3        A.    Well, you have to realize that really, you
4    know, anything reported to the National Physician(sic)
5    Database is a glaring thing.  You know, when you're
6    looking for a job, everyone wants to see, you know, has
7    there been previous issues, and they want a clean
8    report.  And so having anything there is an issue.
9            And if you ask me today, well, Dr. Hetzel,
10   Arizona Medical Board offered you, you know, a
11   probationary license, which they did, why did I decline
12   it?  And the answer is because it ends up as another
13   entry into the National Physician(sic) Database.
14           So I refused it, because anything on there
15   is just a glaring thing.
16           So it shouldn't have been reported.  It was
17   reporting.  And, you know, I wanted it removed, and now
18   enough time had gone by that my privileges have been
19   returned, they found no clinical concerns with my
20   judgment or performance.  The North Carolina Medical
21   Board had reviewed that case and two others, and they
22   had not a single issue with this case.
23           So, you know, they found no issue.  And so
24   why is this entry there?  What is its purpose?  And why
25   can't it be removed?  And it could have been removed,

1    but it wasn't removed.  Because Mission Hospital and,

2    you know, your firm, had decided that they weren't

3    going to have it removed.

4              And so that's continued to haunt me, and I,

5    you know, still am unemployed since that time, and so

6    why did I have -- I mean, I had plenty of reasons to

7    have it -- to dispute it --

8    Q.    And maybe --

9              MS. BEIGHTOL:  Let him finish.  Go

10   ahead.

11             MR. HAWISHER:  I'm sorry.

12   A.    You know, as I talked to them, the National

13   Physician(sic) Database is very clear with me.  They

14   said look, we are not the judge and jury on these

15   things.  That they are not going to determine, you

16   know, what should be, you know, accepted, what should

17   be filed, what should be not filed.  They said we

18   don't -- you know, we put you back.  We talk to the

19   hospital, but they don't, they don't, they don't make a

20   judgment on that.  They, they told me that.

21             So -- but, you know, a system like that

22   where, you know, at submission it already becomes part

23   of the record, they can say that they're not being the

24   judge and jury, but they're by default allowing

25   hospitals to put whatever they choose on there and then

1    only allowing them to edit out any things that they

2    agree to edit out.  And so it's an unfair system from a

3    physician standpoint, no doubt.

4        Q.    And what I wanted to clarify is I

5    understand your position on that.  I was trying to get

6    what were the reasons you gave to the NPDB for saying

7    this report should be removed from the data bank?

8    Because I understand why you felt it should be removed,

9    why you wanted it to be removed.  I'm asking you what

10   reasons you gave the data bank for the data bank

11   removing it?

12       A.    Well, you know, I had talked to Dr. Reddy,

13   for instance, who is the chairwoman at Texas Tech, and

14   she said look, there should be nothing in there about

15   precautionary suspensions.  That should only be real

16   suspensions where people, you know, had done something

17   wrong, you know, and they were suspended for good

18   cause, and that's supposed to be record for that.  She

19   said there should not be anything in there with

20   precautionary suspension, but there was.

21           So I had, you know, reasons, and that was

22   part of the argument.  And from my standpoint, I can

23   only take it so far.  I am not a lawyer.  I'm not an

24   expert on National Physician(sic) Data Bank.  I

25   understand what they wish it could or should be, but

1    **it's, you know, a corrupted system.  You -- they don't**

2    **independently decide.**

3        Q.    Was one of the arguments you raised in this

4    Mission data bank, that Mission Hospital's bylaws say

5    that a precautionary suspension is not reportable?

6        **A.    Was that one of mine?**

7        Q.    Was that one of your arguments?

8        **A.    That remains my argument too, yes.**

9        Q.    Okay.  And you had the opportunity to make

10   that argument?

11       **A.    Verbally?  No.**

12       Q.    In writing?

13       **A.    Anything I submitted there was also, you**

14   **know, you know, that was handled by my counsel, but we**

15   **talked about it.**

16           MS. BEIGHTOL:  Well, don't divulge

17       attorney/client communication.

18           THE WITNESS:  I said nothing specific.

19           MS. BEIGHTOL:  No attorney --

20           MR. HAWISHER:  I'm not --

21           MS. BEIGHTOL:  Thank you.  No

22       conversations about attorney/client

23       privilege, especially when no question is

24       being asked about it.  But also when a

25       question is asked about it.

1          BY MR. HAWISHER:

2      Q.    After you submitted that speed statement,

3   at some point there was a decision from the data bank,

4   right?

5      **A.    However you want to define decision.  I**

6   **don't -- I don't know at what point in time.  You know,**

7   **I think there was -- we submit something, then there's**

8   **so much time that Mission Hospital has to respond, and**

9   **then at the end of that, I can't really call that a**

10  **decision, but.**

11     Q.    Fair enough.  Can you turn to document 50,

12  please, I will mark that as Exhibit 24.

13             (The document referred to was marked

14         Deposition Exhibit Number 24 for

15         identification.)

16     **A.    50 what?**

17     Q.    50, 5-0?

18     **A.    50, I understand 50.**

19         **I'm there, yes.**

20     Q.    So this is a letter from Don Elick at the

21  NPDB to Brenda Shelton at Mission Hospital, and I'm

22  going to -- well, first of all, have you ever seen this

23  before?

24     **A.    I don't think so, but I might have, but I**

25  **don't recall, remember seeing it.  I don't think so.**

1    Q.    So were you aware that Mission Hospital was

2    directed to issue a correction report, which was --

3    which I've referred to as report number three?

4    **A.    Is that report number three?  Is that**

5    **what --**

6    Q.    That document is not report number three.

7         I'm just asking if you were aware that

8    Mission had been directed to make a correction report?

9    **A.    I don't specifically recall.**

10    Q.    Okay.  If you could read to yourself the

11    final paragraph on the first page of this document,

12    which continues on to the top of the next page.

13         (Pause.)

14    **A.    Okay.**

15    Q.    From your perspective, does the correction

16    that Mission Hospital is instructed to make fix

17    anything or improve your situation?

18         MS. BEIGHTOL:  We're still talking

19     about Exhibit 54?  I mean, exhibit or

20     document 50?

21         MR. HAWISHER:  Yes.

22    Q.    And if you would prefer, we can look at the

23    report that was then submitted?

24         MS. BEIGHTOL:  I think your question

25     is vague and confusing, if you're looking at

1      the letter and not the report.

2          MR. HAWISHER:  Let me revise the

3      question again.

4      Q.     So this letter directs Mission Hospital to

5  change the date of action to March 25 instead of

6  March 3, right?

7      **A.     That's what it says.**

8      Q.     And it also directs Mission Hospital to

9  include three numbered items, which include details on

10 March 3, March 10 and March 25, right?

11     **A.     That's what it says.**

12     Q.     Do those changes improve your situation?

13     **A.     No.**

14     Q.     If you could turn to exhibit -- or excuse

15 me, document 54, which I have numbered Exhibit 25.

16          (The document referred to was marked

17      Deposition Exhibit Number 25 for

18      identification.)

19     **A.     Okay, yeah.**

20     Q.     Do you remember seeing this letter before?

21     **A.     I don't -- you know, I'm sure it was sent**

22 **to me.  I don't specifically recall it, you know.  I**

23 **just don't, I don't have the memory of reading it**

24 **specifically.**

25     Q.     Do you have -- well, what do you remember

1    about learning that the National Practitioner Data Bank

2    had decided not to order Mission Hospital to void or

3    withdraw the report?

4        **A.    Say that again?**

5        Q.    So at some point you learned that the data

6    bank would not order Mission Hospital to withdraw or

7    void the report, right?

8        **A.    What do I remember it?  I remember, I**

9    **remember the short letter from Phil Jackson saying that**

10    **they, you know, the hospital declined the option to**

11    **have it removed.**

12        Q.    Do you remember anything after that?

13            And I will represent to you that letter

14    from the hospital was step one of the dispute

15    resolution process, and then step two was the data bank

16    letters, the letters from the data bank, if the

17    hospital and the practitioner are unable to agree,

18    which is what happened in this case.

19        **A.    Okay.  What about it?**

20        Q.    So do you remember learning at some point

21    that the National Practitioner Data Bank had decided

22    not to order Mission Hospital to withdraw the report?

23            MS. BEIGHTOL:  Objection.

24        **A.    I mean, I don't think they were ever in a**

25    **position of ordering the hospital to do what they want.**

1    I think they follow, you know, the lead of the

2    hospital, and by the fact that, you know, when a

3    hospital submits something and gets put into the data

4    bank, even if there's some clarification of category,

5    wording, whatever, that it's kind of there, you know,

6    unless the hospital agrees to remove it.  And if they

7    don't agree to remove it, then it stays there, which is

8    kind of what they told me at the beginning that they,

9    you know, they are not judge and jury in this thing,

10   but in the sense, they are in that they don't do it

11   unless there's agreement for it to be done.

12          So I don't think that's a shock, I don't.

13       Q.    Who told you that the NPDB was "not the

14   judge and jury"?

15       A.    I don't remember who I talked to there.  I

16   mean -- but I did talk to someone, and I don't know the

17   date, and I don't have any documentation.  You know, a

18   lot of this stuff they have a web application that you

19   plug stuff into and that type of thing.

20       Q.    Okay.  So can you please turn to page 5 of

21   that same document, document 54, Exhibit 25.

22       A.    Okay, yes.

23       Q.    Towards the bottom of the page, there's a

24   paragraph that begins in your seventh dispute.  Do you

25   see that paragraph?

1    **A.    Yes.**

2    Q.    Can you read that to yourself and tell me

3    when you're done reading it.

4         (Pause.)

5    **A.    Okay.**

6    Q.    Do you disagree with that paragraph?

7    **A.    On whether that this should be there?  Do I**

8    **disagree that this shouldn't be their criteria?**

9         MS. BEIGHTOL:  Objection to the form.

10    Seeking to --

11         MR. HAWISHER:  So let me --

12         MS. BEIGHTOL:  Outside of scope of the

13    witness, and also vague and confusing in the

14    question, in the context of what the

15    paragraph says, but you can answer, if you

16    can.

17         MR. HAWISHER:  And I think he said he

18    was.  So I'm happy to clarify.

19    Q.    The final sentence of that paragraph:

20    Regardless of the final decision, a precautionary

21    suspension must be reported any time it meets the NPDB

22    requirement to report, when the summary suspension is

23    longer than 30 days.

24         Do you disagree with that statement of what

25    the rules are?

1          MS. BEIGHTOL:  Objection to the form

2      of the question.

3      **A.    Well, whose fault was it that it took more**

4   **than 30 days?  It's not my fault, and it took way more**

5   **longer than 30 days.**

6          **So just because, you know, there's a whole**

7   **new administration, with a whole new set of lawyers,**

8   **and a whole incomplete understanding of bylaws and the**

9   **poorly -- poor handling of my case, and an**

10  **investigation of my case, and all the misinformation**

11  **involved in my case, it took, you know, months.  And so**

12  **I should get a report on my professional license**

13  **because of their incompetence?  Is that the way it**

14  **should be?  No, it shouldn't be that way, and it**

15  **shouldn't, again, have been made in the first place.**

16  **So I don't believe it should.**

17         **Now they may say, well, it should be there.**

18  **I mean, I can't decide what their rules are, but, you**

19  **know, that 30 days is just, yeah, I don't -- that may**

20  **be true that that's what their rules are, but, you**

21  **know, obviously I'm stuck with what I have, so.**

22     Q.    Could you turn to the previous page,

23  please, page four of the same document.

24     **A.    Okay.**

25     Q.    If you want to take a break?

1    **A.    No, that's all right.  Go ahead.**

2    Q.    So final paragraph that begins in your

3    second dispute point, if you could read that to

4    yourself, please?

5    **A.    Second from the end paragraph?**

6    Q.    The final paragraph it begins "in your

7    second dispute point"?

8    **A.    Oh, okay.**

9    **(Pause.)**

10   **A.    Yeah, what about it?**

11   Q.    Do you agree that the hospital's bylaws do

12   not determine whether a precautionary suspension is

13   reportable?

14        MS. BEIGHTOL:  Objection to the form

15        of the question.  Outside of his scope.

16        Also confusing and misleading, as it's

17        asking for interpretation of a letter and

18        assuming the facts, but you can answer if

19        you understand, feel like it's something you

20        can.

21   **A.    Your question was, again, does it -- do I**

22   **agree that the National Physician(sic) Data Bank rules**

23   **say that they don't want to look at or use the bylaws**

24   **to decide whether what's reportable?**

25   Q.    Let me rephrase the question.

1          If there's evidence that the National
2    Practitioner Data Bank -- strike that.
3          I'm trying to think of the best way to word
4    this.
5          Is it your position that the hospital's
6    bylaws determined whether your precautionary suspension
7    is reportable?
8          MS. BEIGHTOL:  Objection to the form
9       of the question, and to the extent this is
10      outside his scope, and the extent that
11      you're asking him to interpret bylaws and
12      board rules, and to the extent this will be
13      the subject of expert testimony, you can
14      answer, if you can.
15      **A.    You want to drive by that one one more**
16   **time, what your question is?**
17      Q.    My question is, is it your position that a
18   hospital's bylaws determine whether a precautionary
19   suspension was reportable?
20          MS. BEIGHTOL:  Same objections.
21      **A.    I think it -- or it maybe should be the**
22   **main guardrails in which, you know, something is**
23   **decided.  There's obviously a lot of, you know, people**
24   **in between that.  And, of course, unfortunately, timing**
25   **was bad.  Whole new cast of characters.  Whole new**

1  legal group.  Nobody knew each other from either side,

2  so that didn't help me.  But I think the data bank it's

3  very -- I mean, I understand why they want to do what

4  they do, but it kind of creates a situation where

5  there's a lot of unfairness, obviously, for me being an

6  example.

7      Q.    On the same page, if you could look at the

8  previous paragraph, which begins "in your first dispute

9  point."

10     A.    On page three?

11     Q.    Page four.

12         (Pause.)

13     A.    In your first dispute?

14     Q.    Yeah, if you could read that one to

15  yourself, please.

16     A.    Uh-huh.

17         (Pause.)

18     A.    Uh-huh.

19     Q.    So the final sentence of that paragraph I'm

20  going to read it:  "Your precautionary suspension

21  lasted from March 5, 2020 to June 9, 2020.  Therefore,

22  it lasted more than 30 days and is reportable to the

23  NPDB."

24         Did I read that correctly?

25     A.    That's what it says.

1      Q.    This is a determination by the NPDB that

2    your precautionary suspension was reportable, right?

3

4          MS. BEIGHTOL:  Objection to the form

5           of the question, vague, misleading

6           interpretation of the board statement, but

7           you can answer, if you can.

8      **A.    According to their laws and their timeline,**

9    **which they had set forth, you know, it meets their**

10   **report criteria.  However, it fails to meet any -- it**

11   **does not consider the situation where, you know, why is**

12   **the 30 days an issue?  You know, and in this case, it**

13   **took much longer to come to the correct answer.**

14         **And so, I mean, I'm kind of a living**

15   **example of why this isn't a good idea.**

16         **So you have this thing that's out there and**

17   **it's revised and it bounces along in perpetuity,**

18   **continue to create problems, you know.  Maybe they**

19   **shouldn't have a rule, you know, like that.  Why the 30**

20   **days?  It doesn't -- it's what they say.  But to say**

21   **it's a determination, again, you're kind of pushing in**

22   **that they've looked at it and decided something, when**

23   **it just really ran out the clock on the 30 days and so**

24   **it's reportable.**

25     Q.    If you could please turn to document number

 1    55, which I'm going to label Exhibit 26.

 2              (The document referred to was marked

 3         Deposition Exhibit Number 26 for

 4         identification.)

 5           (Pause.)

 6    Q.    On the last page of that document, do you

 7    see your signature?

 8    **A.    Yes, I see my signature.**

 9    Q.    Do you know what this document is?

10    **A.    Off the top of my head, I haven't figured**

11    **that out yet.**

12    Q.    Okay.  So if you go back to the first page,

13    there's a little box towards the top of the document.

14    Can you take a look at that?

15    **A.    Okay.**

16    Q.    So you see where it says:  Effectively,

17    Texas Tech and its affiliates?

18    **A.    Right.**

19    Q.    So does that refresh your memory about what

20    this document is?

21    **A.    No.**

22    Q.    So I will represent to you this is an

23    authorization for Mission Hospital and anyone else to

24    release information to Texas Tech and its affiliates

25    for use in credentialing.  Do you recall executing

1    authorization like that?

2        **A.    Well, you know, I signed it.  I mean, yes,**

3    **I mean, I signed it.**

4        Q.    Can you look at document 56, please, and

5    I'm going to include that in Exhibit 26.

6            (Pause.)

7        **A.    There it is, okay.**

8        Q.    This is the one you remember?

9        **A.    Yeah, that's the one I was joking about**

10    **before.**

11        Q.    And so that's your signature at the bottom?

12        **A.    That's my signature.**

13        Q.    Document 57, same question?

14            MS. BEIGHTOL:  Are you marking that as

15        an exhibit?

16            MR. HAWISHER:  So all of these

17        releases are going to be part of the

18        Exhibit 26.

19        **A.    Okay.  What's the next one?**

20        Q.    Document 57.

21        **A.    This thing goes back to the beginning every**

22    **time I shut it.  57?**

23        Q.    Yes.

24        **A.    Okay.**

25        Q.    Is that your signature on it?

1       **A.    Yes, it's my signature.**

2       Q.    To use your time efficiently, I'm not going

3    to go through all the rest, but do you remember signing

4    multiple authorizations to allow Mission Hospital to

5    give information to credentialing entities about the --

6    your privileges at Mission Hospital?

7       **A.    For this job?**

8       Q.    What do you mean by this job?

9       **A.    Well, they had several hospitals they went**

10   **to.  So there were -- so I did sign releases, but I**

11   **never liked the fact -- well, this is not an example of**

12   **one, but.**

13          MS. BEIGHTOL:  Are you just talking

14       about Texas Tech, which had multiple facets,

15       or are you talking about -- I'm just trying

16       to help speed things along.  Are you talking

17       about the gamut of different --

18          BY MR. HAWISHER:

19       Q.    I was trying to include both, because the

20   next document, which if you could turn to 58, this is

21   also going to be part of Exhibit 26, this is a

22   Gundersen Health System document.

23       **A.    Yeah, yes.**

24       Q.    Okay.  This one does not have your ink

25   signature on it, but it has what appears to be a

1  printed signature. Did you sign that?

2     **A.   You know, if this was part of an electronic**

3  **thing, I mean, I don't have a signature here to verify,**

4  **but what's the point?**

5     Q.   I'm just asking if you signed that

6  document?

7     **A.   I don't see my signature, but I don't know**

8  **if this was part of an electronic thing. That goes way**

9  **back, I mean, that's, well, 2021.**

10     Q.   Okay. Fair enough.

11       Do you remember Gundersen needing to get

12  information from Mission Hospital and asking you to

13  sign an authorization so they can do that?

14     **A.   I'm sure they asked for it, yes.**

15     Q.   Before we move on, so several entities

16  asking Mission Hospital for affiliation verifications.

17  What is your understanding of why they did that, why

18  they asked Mission Hospital for affiliation

19  verification?

20     **A.   What do you mean by affiliation**

21  **verification?**

22     Q.   Why they asked Mission Hospital for

23  information about you, your privileges and your

24  practice at Mission Hospital?

25     **A.   It's part of their due diligence to look**

1    **into new employees.**

2        Q.    Could you turn, please to document 60.  I

3    will mark this Exhibit 27.

4            (The document referred to was marked

5        Deposition Exhibit Number 27 for

6        identification.)

7    **A.    Okay.  Scott Joslin letter.**

8        Q.    Have you seen this letter before?

9            MS. BEIGHTOL:  What exhibit is this?

10   I'm sorry.

11           MR. HAWISHER:  Exhibit 27, document

12   60.

13           MR. HAWISHVER:  How long total have we

14   been on the record?

15           THE VIDEOGRAPHER:  4 hours, 38

16   minutes.

17           (Pause.)

18   **A.    Okay, yeah, what about that?**

19       Q.    So had you read that letter before?

20   **A.    Yes, I believe I have.**

21       Q.    In connection with this lawsuit or before

22   this lawsuit was filed?

23           MS. BEIGHTOL:  And just when you say

24   before this lawsuit was filed, there were

25   years between the letter and the lawsuit

1    being filed.  So I just want to understand
2    what you mean by before?  Do you mean
3    contemporaneous with the letter, or you see
4    what I mean?
5        MR. HAWISHER:  I'm really just
6    wondering if he somehow got this before
7    discovery in this case.
8        MS. BEIGHTOL:  Okay.  I just wanted to
9    make sure you weren't talking about before
10    being simultaneous with.  Got it, thank you.
11    **A.    Well, I don't know what you're going to ask**
12    **about it.  I mean, there's some inaccuracies in here.**
13    **The second paragraph, a short series of solid organ**
14    **injuries.  There was not one solid organ injured.  The**
15    **bowel is not a solid organ.**
16        **And so, you know, for any one of those**
17    **three, it's not a solid -- now they have it in their**
18    **bylaws as solid organ for a reason, you know, like**
19    **kidney or liver, but not the bowel.  And so -- and now**
20    **he is not a surgeon, but, you know, that goes in there.**
21        **You know, the precautionary -- I'm sorry,**
22    **the code of conduct thing is brought up, where, you**
23    **know, instead of just saying, you know, we accused him**
24    **of not talking to the family.  The truth was she**
25    **forbade me to talk to the family.  She said there would**

1    be no family there, and I didn't talk to the family.

2            So instead of weaving around, jumping

3    around and saying it was adjudicated by, well, you

4    know, they're kind of leading people into believing

5    there's something behind the curtain that they're

6    hiding.

7            So, I mean, that's more than I can say.

8    But, I mean, do I remember reading this before I talked

9    to --

10           MS. BEIGHTOL:  Don't talk about

11       talking to attorneys.

12       A.    Anything before I talked to someone, I

13    just -- do I remember reading this?  Maybe I didn't

14    see, see this actual letter.  But, again, what about

15    it?

16       Q.    Do you feel that it is -- the substance of

17    this letter is more or less damaging to your reputation

18    than the substance of the data bank reports?

19       A.    More.

20           MS. BEIGHTOL:  Objection to the form

21       of the question, to the extent it requires

22       it to be an either or.

23       A.    It is damaging, I think.  But to say it's

24    more or less, I mean, it's just, you know, you have

25    that with the internet, you know, you have scalability,

1    you know, where anybody at any time can look at it and

2    then it can echo, reverberate, perhaps get worse, where

3    this is an isolated case.

4          But, you know, this wasn't the, you know,

5    the first time, you know, even my return to

6    Proligus(sic), where, you know, instead of just

7    saying -- they knew at that time that I had answered a

8    concern with a code of conduct, that there wasn't any

9    family there, and then they're saying repeated failure

10   of going to the breast meeting when, when, you know,

11   they were doing a bad job of really, you know, covering

12   these conferences held in our office.

13         So, you know, but yet it comes up, and, you

14   know, it comes up here.  In this instance came up in

15   return.

16         So, you know, it's a -- it's damaging, but

17   it's all cumulative, and, you know, so it's hard to

18   tease them apart.

19   Q.    Okay.  So, I mean, let's talk about the

20   impact on Texas Tech specifically.

21         Texas Tech received both this affiliation

22   verification information and the NPDB report, report

23   number one, right?

24   A.    Yes.

25   Q.    Does the NPDB report tell them anything

1    that is not included in this letter?

2            MS. BEIGHTOL:  Objection to the form

3        of the question in that it's a separate

4        document and vague and confusing, but you

5        can answer.

6        **A.    Does this letter tell them anything that's**

7    **not in the --**

8        Q.    Other way around.  Does the report tell

9    them anything that's not in the letter?

10       **A.    No, I don't think so, but.**

11           MR. HAWISHER:  Could we go off the

12       record?  Take a brief break.

13           THE VIDEOGRAPHER:  Off record at

14       3:42 p.m.

15           (Recess.)

16           THE VIDEOGRAPHER:  On record at

17       3:53 p.m.

18           BY MR. HAWISHER:

19       Q.    So since we were just talking about it off

20   the record, this might be a good time to do some kind

21   of background questions that will be important if this

22   case goes to trial, because we'll need to pick a jury

23   and figure out who might know you, who might know about

24   the case.

25           Where do you and your family live?  I don't

1    need an address, but region, city, town, whatever?

2       **A.      So I lived in north Asheville for quite a**

3    **while.  I'm now divorced.  So my kids are now out, and**

4    **one of them's at NC State, and one of them's at Madison**

5    **as far as colleges go.**

6              **But my ex still lives in that house, which**

7    **is in north Asheville.  I'm presently renting a small**

8    **trailer in the rural area of Weaverville, which is**

9    **further north from Asheville.**

10      Q.    So I'm sorry, I hadn't realized that.  I

11   just sort of wandered into that pretty insensitively.

12            So you live in Weaverville.  For how long

13   have you lived in Weaverville, roughly?

14      **A.      I'll say a year and five months, a year and**

15   **a half.**

16      Q.    Okay.  At some point, you lived in Arizona

17   and in a few other states as you were looking for

18   employment, right?

19      **A.      Yeah, I went to Arizona on that contract**

20   **from Ironwood.  I then, when I couldn't get the**

21   **license, Dr. Reddy, who was at Texas Tech said, well,**

22   **why don't you put your application back through here,**

23   **and I kind of got led down the road of -- that we might**

24   **be able to hire you.  And I actually, you know, got**

25   **through several of the committees.  But at the end, the**

1    **final committee, which had the dean of the medical**

2    **schools they were on, decided no.  And, you know, part**

3    **of that was some documents that were included in**

4    **Mission, a letter allegedly that Dr. Reddy had**

5    **mentioned was very inappropriate, and that was part of**

6    **the file, and that also, you know, seemed to be one of**

7    **the deciding factors that kept them from hiring me,**

8    **along with what already they knew from the data bank**

9    **problem and, you know.**

10       Q.    And I don't want to forget to talk about

11   what Dr. Reddy said that you just mentioned, but I want

12   to make sure I understand the chronology of where

13   you've been living over the past five years.

14          So in 2020, in connection with your

15   application in Texas Tech, did you move to Texas?

16       **A.    So 2020, I wasn't in -- you said 2020, is**

17   **that what you just said?**

18       Q.    Yes.

19       **A.    So not right -- I mean, I didn't -- the**

20   **initial pass on Texas, you know, we were working**

21   **through the dispute to the National Physician(sic) Data**

22   **Bank, and it was still Covid, and a lot of those**

23   **hospitals had hiring freezes, and they didn't own their**

24   **own hospital.  I mean, they worked a lot out of**

25   **university but they did some at Tenet Hospital, and**

1    like I said, Tenet Hospital had this algorithm that

2    anything on the national database you weren't going to

3    get a Tenet Hospital job.  You know, that's the way it

4    is, and that's what I was told.

5           So not right away.  But then -- so summer

6    of '21, you know, I had that divorce thing.  I had to

7    kind of sell the house up north that we had on a lake,

8    and then get that fixed up.  And then I kind of moved

9    out with the idea that I was hopefully going to get,

10   you know, a medical license in Arizona.  I had applied,

11   and had a contract from Ironwood Cancer Center to go

12   there, and so that was the timing of that.

13          So that was '22, yeah, spring of '22, and

14   then I traveled a little bit, and then I came back to

15   move into Arizona, as I tried to pursue getting that

16   medical license, which I didn't get.

17          And then after I didn't get that, then I

18   temporarily moved to El Paso, and I was, you know,

19   supposed to start, but then in the end didn't get

20   hired.

21      Q.    And so when did you move back to North

22   Carolina?  And the reason I'm asking so, you know, what

23   to focus on is it is important in this case whether you

24   lived in North Carolina at the time this lawsuit was

25   filed.

1     **A.    I don't recall exact day.  I mean -- I**
2   **mean --**
3         MS. BEIGHTOL:  Don't guess.  I mean,
4      if you don't have an answer, you need to --
5     **A.    Living by, you mean paying rent somewhere?**
6   **I mean, I don't --**
7     Q.    I mean, like where physically were you?
8     **A.    Well, I kind of, you know, I moved around a**
9   **bit.  You know, I visited some people.  I remember**
10  **as -- I mean, in -- I was in the process of moving back**
11  **to western North Carolina, but all right.**
12    Q.    In 2023, you were in the process of moving
13  back to western North Carolina?
14    **A.    2023?**
15    Q.    Um-hum.
16          THE WITNESS:  Am I allowed to look at
17      my phone for pictures.
18          MS. BEIGHTOL:  We should not be
19      guessing here.  If it's something that needs
20      to be we can supplement.  It's not
21      appropriate to get.
22    **A.    Well, find out --**
23          MS. BEIGHTOL:  We're not going to look
24      at pictures.
25          MR. HAWISHER:  I actually think that

1    would be fine.  And I'm happy to caveat

2    whatever testimony with he doesn't remember

3    for sure.  But if he thinks he can refresh

4    his memory from looking at pictures, I'd

5    like him to look at the pictures.

6         MS. BEIGHTOL:  I think that's going

7    beyond the scope, and also concern that

8    pictures aren't going to give him a definite

9    date.

10         And so I think what we need to do is

11   we can have him supplement.  We can have him

12   write it in the record.  We can have him,

13   you know -- what I don't want to do is guess

14   or him to have an imperfect answer today

15   that becomes obsolete when he gets the real

16   information.

17         MR. HAWISHER:  To be clear, are you

18   instructing him not to look at his photos?

19         MS. BEIGHTOL:  I'm not instructing him

20   not to answer.  I'm objecting to you asking

21   him to physically go through pictures on his

22   cell phone that will not give him the

23   information that you're seeking in a form

24   that is reliable and more than a guess.

25         MR. HAWISHER:  Okay.

1      Q.    Dr. Hetzel, please try to refresh your

2  memory by looking through your phone.

3          MS. BEIGHTOL:  Objection to the form

4      of the question, and also objection to the

5      request to physically look through his phone

6      data.

7          Dr. Hetzel, just to move this along,

8      if you want to do that, and you think it

9      will give you some reliable answer, you can

10     do it.

11     **A.    Can I ask, you said it's going to impact**

12  **the case.  So if you have something very specific in**

13  **mind as to why and how it's going to impact the case,**

14  **so, you know, I'm interested to know what that is.**

15     Q.    Would that affect your answer?

16     **A.    As to where I was?  I mean, it wouldn't**

17  **affect my answer, but, I mean, I'm more than curious, I**

18  **guess.**

19     Q.    Are you willing to look through your phone

20  and see if that refreshes your memory?

21     **A.    You need a specific day?  Because I don't,**

22  **I don't know.  Like, for instance, okay, when I first**

23  **hit town, I know that I stayed with a woman that I used**

24  **to work with, with her young family.  They had room**

25  **down in the basement, and they had kind of, you know,**

1    mother-in-law suite.  It really wasn't a suite, but it

2    was a bedroom and, you know, a bathroom down there

3    that, you know, I've lived until I found a place to

4    rent.

5            So, I mean I don't know how you define

6    moved here, you know, because, I mean, there's also

7    stuff you have to move here, and so.

8        Q.    When was the first week that you think you

9    spent more than half of your time in North Carolina?

10       A.    I can look at my phone.

11       Q.    Please do.

12           MS. BEIGHTOL:  Same objection.

13       A.    As long as the clock keeps running, that's

14   the main thing.  It might take an hour to find it.  But

15   there's a little humor for you there.

16           (Pause.)

17       A.    April -- do you need a specific day?  Let's

18   see, I was in Chapel Hill April 26, 2024.

19       Q.    So you think the first -- you think you

20   moved back to North Carolina in 2024.

21           So throughout 2023, where were you living?

22       A.    Well, most of that just think of -- I'm

23   trying to kind of break out of the day.  But, I mean, I

24   was in Arizona the first part of 2023, and then.

25       Q.    When you said the first --

1      **A.     And so by the end of -- by August, I was in**
2   **El Paso of 2023.**
3      Q.     By August you were in El Paso?
4      **A.     Right.  And they had me down to be on call**
5   **the week of Thanksgiving, and, you know, Thanksgiving**
6   **week.  And then the Tuesday night before the Thursday**
7   **of Thanksgiving I got an email with an attached letter**
8   **saying, you know, we reject -- you know, we decided not**
9   **to hire you, basically, based on that letter, and the**
10  **National Physician(sic) Data Bank, and the other**
11  **communication from Mission Hospital.  So that was, you**
12  **know, so then, you know, then I had to make new plans**
13  **for getting back here.**
14          MR. HAWISHER:  We may serve some
15       discovery requests related to this, but I
16       don't think it sounds like a closed
17       question.
18      Q.     Going back to your application to Texas
19   Tech, you understand, right, the difference between
20   having credentials and obtaining employment?
21      **A.     I don't know that I have -- you're saying**
22   **between having credentials and being employed by**
23   **somebody?**
24      Q.     Yes.  So to give you an example, earlier
25   you testified that you did not understand Mission

1    Hospital to be your employer, but, of course, you had

2    credentials at Mission Hospital or privileges, right?

3        **A.    Yes.**

4            MS. BEIGHTOL:  Just objection to the

5        restatement of testimony as inaccurate, but

6        go ahead.

7            BY MR. HAWISHER:

8        Q.    So kind of similarly, you were seeking

9    employment when -- you were seeking employment with

10   Texas Tech or an affiliate, but you were also seeking

11   clinical privileges at institutions connected to it,

12   right?

13       **A.    Correct.**

14       Q.    Which entity was going to be the employer?

15       **A.    Both.**

16           MS. BEIGHTOL:  And just objection, to

17       the extent that you're using a legal term

18       employer/employee as a legal term, that

19       would be outside of his scope, you can

20       answer.

21       **A.    I am not an expert on the legal definition**

22   **of employer/employee versus contract employee.  I'm not**

23   **an expert.  So I do not know.  But to attempt to answer**

24   **your question, so Texas Tech University Health Sciences**

25   **Center is a physician-led -- you know, it's a**

1 university entity that has clinics, but do not -- does

2 not have a hospital. So in terms of privileging, that

3 would be at the separate hospitals, including the one

4 document we looked at before, which was University

5 Health System of El Paso, or whatever it's called, is

6 one of them.

7     Q.   Okay. So the -- so one entity is

8 University Health Science Center of El Paso. Another

9 is the El Paso Children's Hospital, is that right?

10     A.   Yeah, it's one of those goofy things where

11 the children's hospital, I think, is part of that

12 hospital, but it's like two floors or something like

13 that of that. So, you know, what's the difference

14 between a children's hospital part? I don't know, but

15 it is separate.

16     Q.   Why, why did you need privileges at a

17 children's hospital?

18     A.   Well, the thing is that they usually have

19 women's and children, see and when you have women's and

20 children, because sometimes we would get called in for

21 let's say if an obstetrician is delivering somebody,

22 and it's very bad bleeding and they need a

23 hysterectomy, and then we'd be called in. But as to

24 what the dividing line between how is that different

25 than the rest of the University Hospital, I don't know.

1    They had a similar thing at Penn State where it was
2    like a floor of the hospital.  I don't know, but.
3        Q.    And so in order for your employment with
4    Texas Tech University Health Sciences Center to go
5    forward, which institutions did you need privileges at?
6        A.    Well, for sure that one.  But I think where
7    the decision that Tuesday night before Thanksgiving,
8    that one, you know, was, you know, the Texas Tech
9    University Health Sciences Center, that was the
10   clinical university part, but that, again, was not a
11   hospital.  They had a clinic, but it was not a
12   hospital.
13           So I'm not sure that they were necessarily,
14   besides minor procedures, there wasn't probably much
15   for credentialing of that, but they probably had some.
16       Q.    So were you required to have privileges at
17   El Paso Children's Hospital in order for your
18   employment with Texas Tech to go forward?
19       A.    Well, I don't know.  You know, I don't --
20   it's -- I don't recall -- I mean, it was university
21   health sciences, I'm sorry, I'm looking at the wrong
22   thing.  We looked at one of the documents before that
23   had --
24       Q.    So the best document for this is probably
25   one I've not yet labeled.  So if you could go to

1    document 274, which I will mark as Exhibit 28.

2                    (The document referred to was marked

3            Deposition Exhibit Number 28 for

4            identification.)

5        **A.    Yeah, that's not the hospital, that's Texas**

6    **Tech.**

7        Q.    I'm sorry?

8        **A.    Yeah, I was kind of grappling back to**

9    **something we looked at before that had the university**

10   **hospital.**

11       Q.    Oh, I see what you're saying.

12       **A.    It was associated with the Scott Joslin**

13   **letter.**

14       Q.    So it's document 57, which is part of

15   Exhibit 26, lists several requesting entities; one is

16   the Texas Medical Board, another is Texas Tech

17   University Health Sciences Center, El Paso, and then

18   there's the University Center at El Paso?

19       **A.    Yeah, that's the one.  And I don't know if**

20   **that is distinct from the children's hospital, that is**

21   **separate credentialing or not.  I mean, it's a certain**

22   **space within the hospital, but I don't know that that's**

23   **separate from credentialing or -- I don't know.**

24       Q.    And then also in document 57, the only

25   other entity that's referenced is Tenet Health/Tenet

1    Hospitals?

2        A.    **Right.**

3        Q.    What is the connection between Tenet Health

4    and those others?

5        A.    **Well, there's a separate hospital system,**

6    **and, again, we tried several times, but it was just an**

7    **automatic refusal.  If you had anything in the data**

8    **bank, period, it would just spit it out and they**

9    **wouldn't go to the next step.  But if it was a separate**

10    **hospital within the City of El Paso, that they had**

11    **some -- they had consulting privileges as well as I**

12    **think or hoped to have full privileges there.**

13        Q.    Were you seeking employment at Tenet

14    Health, or was this in connection with Texas Tech?

15        A.    **This was in connection with Texas Tech.**

16        Q.    Were you required to obtain privileges at

17    Tenet Health as a condition of employment with Texas

18    Tech?

19        A.    **I think initially at the beginning of**

20    **Covid, when I was offered the job at 2020 -- in 2020,**

21    **you know, Tenet had a freeze in the hospital, I think**

22    **the university.  I think the intent at that time it was**

23    **I would, but I think Dr. Reddy wanted to just proceed,**

24    **if necessary, as long as everything else went forward**

25    **with the hopes of getting, you know, privileges at**

1    Tenet later.

2        Q.    You mentioned earlier that Dr. Reddy had

3    said, and I wrote down two words as a quote, which was

4    very inappropriate.  Something to the effect that there

5    was something very inappropriate in your file or in the

6    affiliation verification.  I don't recall your exact

7    words.  Do you know what I'm talking about?

8        A.    Yes.  I only heard about it from her.  I

9    requested that she send it to me.  She said well, I

10   can't really do that.  You're going to have to -- you

11   know, you really should get a lawyer because of -- her

12   feelings was that these filings in the database should

13   not be there at all, that that's a problem.  But also

14   that there was this letter that was kind of

15   inappropriately written, and that it was defaming, you

16   know, libelous, you know, I don't know the right legal

17   term.  But I haven't personally read it, and she said

18   that I would have to get this, you know, another way,

19   that she wasn't willing to give me a copy.  But she

20   said that it's an issue, and in the end, I wasn't

21   hired.  So it was obviously sent as part of my file

22   from Mission.  I assume it was not, based on a letter

23   of recommendation that I asked for.

24            I had someone that worked -- well,

25   previously she worked at Hope with me.  She was kind of

1    a second lieutenant to our office manager.  And when

2    Dr. Williams gave me the buy/sell and he set up New

3    Horizons Medical Center, Karen Turner was his office

4    manager.  And, you know, she'd been a friend, and, you

5    know, I brought up this issue.  And she had heard or

6    that it was she believes Blair Harkness, which is one

7    of my ex-partners, had written something, first name is

8    Cameron, but he goes by Blair, which is his middle

9    name.  So it's C. Blair Harkness.

10        Q.    You heard from whom that Blair Harkness had

11   heard something?

12        A.    Yeah, this is from Karen Turner.  She's on

13   the list of people that we sent to you, but I don't

14   think she's seen it, but I mean, she had heard that.

15        Q.    So when you say had written something, you

16   mean something --

17        A.    Like a letter.  Like that --

18        Q.    I mean, are you saying that that was

19   defamatory?  Or are you saying that was -- it's not

20   clear to me what you're saying this letter contained or

21   consisted of.

22        A.    Well, I haven't read it.  But Dr. Reddy

23   felt that the way it was written was very

24   unprofessional and inappropriate.  And yes, it was --

25   you know, defamed me, and my reputation and apparently

1    was one of the factors, which, you know, kept them from

2    hiring me.

3        Q.    And so I understand, Dr. Harkness is not an

4    employee of Mission Hospital, right?

5        A.    I don't know that.  I mean, is he?

6            MS. BEIGHTOL:  Again, same objection

7        as to employee and the legal term and all

8        the things.

9            BY MR. HAWISHER:

10       Q.    Do you have any reason to think that

11   Dr. Harkness is an employee of Mission Hospital?

12           MS. BEIGHTOL:  Same objection.

13       A.    I don't know it at this point.  I don't

14   know.  I'm out of the loop as to if they've hired -- if

15   anyone has moved on or left.  I would bet that he is

16   part of it.  What I generally know is at some point,

17   there was difficulty with the PSA agreement in that we

18   couldn't be -- or the group could no longer be

19   adequately reimbursed, and I believe Hope Womens Cancer

20   Center physicians are now all employees of Mission

21   Hospital.  That's what I heard, and I don't know

22   anything more about it or if anyone has moved on.

23       Q.    And when was it your understanding that

24   that had happened?  Ballpark?  I'm not going to hold

25   you to a date.  I just --

1     A.    I'm going to say like maybe after 2021, or
2    I don't really know exactly.
3     Q.    Okay.  Do you hold Mission Hospital
4    responsible for what Blair Harkness wrote, assuming
5    Blair Harkness did write something?
6          MS. BEIGHTOL:  Objection to the many
7          pieces of that, that are seeking guesses and
8          hypotheticals, but you can answer.
9     A.    Your question is do I hold them
10   responsible?
11    Q.    Um-hum.
12    A.    I mean, I didn't send it to Texas Tech,
13   and, you know, I'm quite sure if it was him, or if it
14   was someone else, that they didn't directly send it to
15   Texas Tech, or even knew that it was being forwarded to
16   an application that I applied for a job for.  But yet,
17   you know, the handling of my records as PSA holder, I
18   guess, and my professional reputation was on the line.
19   And should Mission Hospital NAC be responsible for
20   that?  Absolutely.
21    Q.    Okay.  So I'll represent to you I do not
22   know the letter you're talking about.  I will certainly
23   try to find out about it, but your best understanding,
24   as we sit here today, is it was written by Blair
25   Harkness at some point?

1      **A.    It's very shady as to, you know, Dr. Reddy**

2   **did not tell me.  She's the one who had direct**

3   **knowledge.  I think we would like to see it ourselves.**

4          MS. BEIGHTOL:  And to the extent you

5      do okay that, it would be responsive to

6      discovery, obviously, and if it's one of the

7      redacted materials that have not been

8      provided we would want that.

9          MR. HAWISHER:  It's not.

10          MS. BEIGHTOL:  Either way, it's easily

11      supplemented upon receipt.

12          MR. HAWISHER:  I have never seen this

13      letter.  It has not been redacted.  I

14      certainly agree it would be responsive if we

15      have it.

16          How long have we been on the record total?

17          THE VIDEOGRAPHER:  5 hours and 18

18      minutes.

19          THE WITNESS:  It seems longer than

20      that.  Your clock is slow over there.

21          BY MR. HAWISHER:

22      Q.    So you went through two application cycles

23   with Texas Tech, right?  One in 2020, and then one in

24   2023?

25      **A.    Right.  So that was fall of 2023, correct.**

1     Q.    When did you hear about this letter that

2   was possibly from Blair Harkness, in the first cycle or

3   the second cycle?

4     **A.    Second cycle.**

5     Q.    Okay.

6     **A.    I don't think we got that far on the first**

7   **one because of the hospital freezes, and the database**

8   **thing was still -- we were hoping to get it removed,**

9   **but.**

10     Q.    Okay.  So in 2020, during that first

11  application cycle, what was the resolution, I guess, of

12  your application for employment there?  How did things

13  end?

14     **A.    I think conversations with Dr. Reddy over**

15  **the phone, you know, probably timing of that I'm going**

16  **to say, you know, November or so of 2021, somewhere in**

17  **there, that it didn't seem like we were going to be**

18  **able to connect the dots at that point.**

19     Q.    You said November of 2021?

20     **A.    Yeah, I'm sorry, let me think.  Well, the**

21  **timing, when was the timing?  That was 2020.**

22     MS. BEIGHTOL:  If it helps, there's

23   emails about it.  I can probably find them.

24     **A.    I'm sorry, you know, it's just a gauntlet**

25  **of pain.  So the lines are kind of hard to see looking**

1  **back, but.**
2          MS. BEIGHTOL:  I can probably get you
3  to it, I mean, if you need it.
4          MR. HAWISHER:  That would be helpful.
5  I mean, I have emails that end around the
6  end of 2020 and then emails in 2023.
7          MS. BEIGHTOL:  I think my table of
8  contents should get you there.
9          You're referring to the second cycle,
10  right?
11          THE WITNESS:  No, I think he was
12  asking about the end of the first one.
13          MR. HAWISHER:  Right.
14          THE WITNESS:  And that I don't quite
15  recall, because at some point we start
16  moving into the Ironwood Cancer time frame,
17  which is.
18          MS. BEIGHTOL:  Okay.  If you want to
19  start looking around 821 to 822, as far as
20  Bates stamp numbers that we've produced, it
21  should be in the July 9 production.  It
22  seems like there's a chain, December 21,
23  2020.
24          MR. HAWISHER:  Okay.  And that's what
25  I thought.  It was the suggestion that it

1    was in 2021.

2         MS. BEIGHTOL:  Wait, let's see.

3    There's another communication February 15,

4    '21, but I think that's not what we're

5    talking about.

6         I think your recollection is correct.

7    But that's just by what we have, and I'm

8    sure there are communications that may be in

9    this.

10        MR. HAWISHVER:  Right.

11    Q.    Dr. Hetzel, you said you think there were

12   some phone calls with Dr. Reddy about not being able to

13   make the employment arrangement work during the first

14   cycle.  What do you remember about those calls?

15   **A.    Well, I think the fact -- I think she**

16   **was -- there was a gap in town, and I believe that she**

17   **felt, for instance, Tenet Hospital at that time to her**

18   **was more of an important factor, and the difficulties**

19   **with the database, you know, entry, and, you know, at,**

20   **at, you know, at the time, for instance, I still had**

21   **that North Carolina Medical Board was reviewing this**

22   **separately, which their review was very, very good, and**

23   **they found no inconsistencies in that.**

24        **So some of those things were kind of**

25   **unresolved in the fall of, you know, late fall of 2020,**

1    and then you were just talking about the chain of
2    emails were February of '21?
3            MS. BEIGHTOL:  Well, there's -- I just
4        closed that.
5            BY MR. HAWISHER:
6        Q.    That's all right.  I just wanted to make
7    sure I understood roughly the timeline.
8        A.    There was -- so, yeah, so I was back, you
9    know, at some point here looking again for another job.
10           And another big crumb, in the -- you know,
11   I had applied to a bunch of different places, and I had
12   gone to East Texas, since I had a Texas license, and,
13   you know, they were looking for someone.  And the
14   person interviewing me was kind of like, he was the
15   chief of surgery, but he had also administrative role
16   that was greater than that.  And so, you know, I
17   thought our interview went very well, and then he said
18   well, he intended on talking to the chief of surgery at
19   Mission to get his view on me.  And I thought to
20   myself, you know, I said oh, that's, you know, that's
21   Dr. Buell.  So, you know, after that it kind of, it
22   just, they weren't interested.
23           So I don't know what kind of conversation,
24   you know, went on there.  But obviously their interest
25   in me fell off the cliff at that point, so.  But,

1   again, that's over the phone, so I have no documents

2   regarding that East Texas University discussion.  And

3   then eventually then, you know, I had the Ironwood

4   contract that I sold, that kind of got me to move out

5   to the southwest.

6       Q.    If you could turn, please, to document 289

7   that's on the tablet.  I will mark this Exhibit 29.

8               (The document referred to was marked

9           Deposition Exhibit Number 29 for

10          identification.)

11          MS. BEIGHTOL:  They are both 29?

12          MR. HAWISHER:  No, 289.  I'm really

13   hopeful we don't have any overlap.

14      A.    289 you're saying?

15      Q.    Yes.

16      A.    Tenet Health.

17      Q.    Are you there?

18      A.    Yes.

19      Q.    So I think this is one of the

20   communications we've been talking about.  Can you read

21   through it, take however much time you need, and see if

22   you remember that.

23          (Pause.)

24      A.    Okay.

25      Q.    Do you recognize the email chain?

1      **A.     Do I recognize what?**

2      Q.     The email chain.

3      **A.     I'm just looking at the other documents**

4      **going backwards on the chain.  Okay.  What --**

5      Q.     Do you remember that email conversation?

6      **A.     Not specifically.  Plus it's kind of late,**

7      **it's December 2020, and I'm trying to remember where I**

8      **was with my discussions with Dr. Reddy at that point,**

9      **if we were kind of already pulled the plug or what.**

10     Q.     So if you look at the second email in that

11     chain, second from the top, it's an email from

12     Dr. Reddy, dated December 22, 2020, and it says --

13     **A.     I'm not seeing that.  I have mostly**

14     **attachments.  I don't see any emails.**

15     Q.     I apologize.  So this is document 290.

16     Sorry about that.

17     **A.     Okay.**

18          MS. BEIGHTOL:  Are you including that

19      in Exhibit 29?

20          MR. HAWISHER:  Yes.

21     **A.     290?**

22     Q.     Yes.

23     **A.     Oh, there we go, okay.  That makes more**

24     **sense.  Yeah, that I remember.**

25     Q.     Okay.  So Dr. Reddy tells you to wait or

1  pause your application for privileges at Tenet.  Do you

2  remember the discussion she references in that email?

3      **A.    Well, I think she was hoping, as was I,**

4  **that the National Physician Database entry would be**

5  **retracted, because that -- she said in her words that**

6  **they were -- they had a very algorithmic approach to**

7  **their applications, where, you know, if there was a**

8  **database entry, it would just automatically be dropped**

9  **out.  And so, you know rather than, you know, continue**

10  **to trip the system, wait for the National**

11  **Physician(sic) Data Bank, hoping that that would be**

12  **retracted before following through on this Tenet**

13  **application for privileges.**

14      Q.    So you withdrew your application for

15  privileges at Tenet?

16      **A.    Well, I didn't pursue anymore, I guess if**

17  **you call it reviewing, but I didn't, you know, initiate**

18  **the CBO.**

19      Q.    Did Tenet deny your request for privileges?

20      **A.    Well, it had kind of gotten kicked out**

21  **because of the data bank entries.  If you're asking**

22  **whether I have a letter stating that, I don't recall.**

23      Q.    So let's go down to the last email in the

24  chain that we're currently looking at.  We're still in

25  document 290 of Exhibit 29.  And it appears to be an

1   automated message from Tenet Health.  Do you see the

2   one I'm looking at?

3       **A.      Non-receipt of Tenet CBO determination of**

4   **eligibility application.  Is that it?**

5       Q.      Yes.

6       **A.      Okay.**

7       Q.      So it looks to me, and please tell me if

8   you've got a reason to disagree with this.  It looks to

9   me like they're waiting on information from you before

10   the application will proceed.

11      **A.      Well, that's what their automatic system**

12   **implies, and Dr. Reddy was saying hold off on doing**

13   **anything more with this.**

14      Q.      Okay.  And so you did not submit the

15   "determination of eligibility application"?

16      **A.      I didn't do anything more with that,**

17   **because she asked me not to until the database was**

18   **fixed, which it hasn't been fixed.**

19      Q.      Have you ever completed an application for

20   privileges to Tenet Health?

21      **A.      Not since this time.  I mean, this was --**

22      Q.      Well, I mean, you didn't get a

23   determination this time, right?

24          MS. BEIGHTOL:  Well, objection,

25       because you asked if he did an application,

1         and then you're talking about whether there

2         was a determination.  I think that's

3         misleading.

4             MR. HAWISHER:  Fair enough.  Let me

5         ask the question a different way.

6         Q.    So during this period of time we're talking

7    about, which is late 2020, you began an application for

8    privileges at Tenet Health, right?

9         **A.    I initiated it.**

10        Q.    You didn't complete it, right?

11            MS. BEIGHTOL:  Objection,

12        mischaracterization of his testimony.

13        **A.    I did nothing more with it, so.**

14        Q.    Okay.  Have you ever completed an

15   application to Tenet Health?  And by completed, I mean

16   provide them all of the information that they say they

17   need in order to proceed?

18        **A.    I have never --**

19            MS. BEIGHTOL:  Objection, again.

20        **A.    I have not applied to any Tenet Hospital**

21   **since then.  There's a job up there right now.**

22        Q.    So you do not know what they would have

23   done if you had completed your application?

24            MS. BEIGHTOL:  Objection to the form,

25        mischaracterizes testimony he's already

1      given about that.

2      **A.      But also, I mean, how do I know what they**

3   **would have done?  I mean, I wouldn't know.  I mean.**

4      Q.    While this was going on, you were also

5   applying for a Texas medical license, right?

6      **A.    I had already applied.**

7      Q.    When did you apply for the medical license?

8      **A.    Spring.**

9      Q.    And while this was going on, the medical

10  board was reviewing your application, and it was at one

11  point considering additional information, right?

12     **A.    Yes.  I mean, I applied kind of early.  I**

13  **don't know if it was April, May, but, I mean, it was**

14  **still, you know, I applied pretty early on.**

15     Q.    So if you could turn, please, to document

16  363, which will be Exhibit 30.

17              (The document referred to was marked

18        Deposition Exhibit Number 30 for

19        identification.)

20     **A.    Okay.**

21     Q.    And do you recognize this document?

22     **A.    I recognize it.  I'm trying to remember if**

23  **that's from the Texas Medical Board or not.  Probably.**

24     Q.    I will tell you it is, and if you read the

25  narrative of the written response, it's pretty clear

1    from the context that it is.

2        **A.    Okay.  All right.**

3        Q.    What I wanted to ask you about this is if

4    you look at one, two, three, the third paragraph of

5    your written response, it's about three-quarters of the

6    way down the page, it starts:  "I had turned in my

7    notice to Mission Hospital."

8            Do you see that?

9        **A.    Yeah.  Yes.**

10       Q.    Do you know why you told the Texas Medical

11   Board on May 15, 2020 that you had your privileges at

12   Mission back?

13       **A.    Boy, you know I had this -- I can't answer**

14   **that.  I mean, I know that as we marched through before**

15   **there was a precautionary suspension, and then I was**

16   **given privileges back with proctoring, you know, and**

17   **then they were limited again until that note of June.**

18       Q.    If you could look at document 383 -- I'm

19   sorry, 384, which I will mark as Exhibit 31.

20               (The document referred to was marked

21          Deposition Exhibit Number 31 for

22          identification.)

23       **A.    Okay.  Is this the --**

24       Q.    This is the disclosure history.  It was

25   something that you all produced.

1      **A.    Right.  Okay.**

2      Q.    So if you'll go down to, let's see here --

3  actually, if you'll just start at the top and just kind

4  of read through and let me know if you see any entity

5  names in there that you don't recognize, or it's not

6  clear to you why they will be listed here.

7          (Pause.)

8      **A.    I don't remember United Healthcare National**

9  **Credentialing, Dublin, Ohio, unless they represent some**

10 **other health.  I don't recall that.**

11         **Margaret Pardee Hospital, it could be that**

12 **we had some privileges there, and it could be that it**

13 **was just time to renew it and they were unaware that --**

14 **you know, they were in Hendersonville, which you**

15 **probably know where that is.**

16     Q.    You had privileges at Pardee, right?

17     **A.    Correct.  I'm sure that they renew every so**

18 **often.**

19     Q.    What is the status now of your privileges

20 with Pardee?

21     **A.    Well, I hadn't, you know, those time out**

22 **after a while unless you're filling them in.  So I'm**

23 **sure I don't have them anymore.**

24     Q.    So do you remember ever affirmatively

25 resigning or terminating your privileges at Pardee?

1       **A.    I didn't take action to do that, so I just**
2   **don't -- I don't know.  I did not.**
3       Q.    But you assume they non-renewed at some
4   point?
5       **A.    Correct.**
6       Q.    Okay.  So if you scroll down to the bolded
7   text on page three of this document, it says:  The
8   current version of report -- and I'm not going to read
9   the long number -- replaced one or more of the earlier
10  versions.  Do you see that?
11      **A.    I see something that says recipients of an**
12  **earlier version.  Is that what you have?**
13      Q.    I think you went one page too far.  Go back
14  one.
15      **A.    Okay.  I see what you're saying.  Yes,**
16  **what --**
17      Q.    Okay.  So you see how these dates start
18  October 27, 2021?
19      **A.    Okay.**
20      Q.    This is the disclosure history of report
21  number three, the correction report, right?
22          MS. BEIGHTOL:  If you know.
23      **A.    I don't know whether that's true, but I**
24  **don't know.**
25      Q.    Okay.  Let me ask it this way then.  Do you

1  know which entities have received report number one and

2  which entities have received report number three?

3         MS. BEIGHTOL:  Objection to the form

4      of the question, and to the extent that it's

5      something that would be within his knowledge

6       from this earlier --

7      **A.    So I don't know.**

8      Q.    Okay.  Let's talk about Ironwood for a

9  little bit.

10     **A.    Where?**

11     Q.    Ironwood.

12     **A.    Okay.**

13     Q.    So Ironwood you actually had an executed

14 employment agreement with, right?  You were employed by

15 them?

16     **A.    Yes.**

17     Q.    How did that happen, first of all, that you

18 became employed before you had an Arizona license?

19     **A.    I don't know how they usually do things,**

20 **but it -- I don't think that's unusual.**

21     Q.    Okay.  So if you look at document 143,

22 please -- well, actually, I'm sorry, before you turn to

23 that, let me ask you this.  The reason your employment

24 at Ironwood terminated was you could not obtain an

25 Arizona license by the date that they gave you as a

1    deadline?

2        **A.    As I recall, it was like somewhere in**

3    **October.**

4        Q.    October of '22?

5        **A.    Yeah, that I had to have, you know,**

6    **unrestricted privileges.  And so they just, you know,**

7    **did not -- it kind of ran out at that point.**

8        Q.    So Ironwood did not decide to fire you

9    because they received the report and thought wow, this

10   is really bad.  We don't want to employ him.  They

11   fired you because you couldn't get an Arizona license?

12       MS. BEIGHTOL:  Objection to the form

13           of the question, to the extent he knows all

14           the reasons and what prompted them, and to

15           the extent the two are mutually exclusive.

16           You can answer if --

17       **A.    I think it was a combination, you know.  I**

18   **mean, that was a major factor, but also, the, you know,**

19   **potential uphill battle of getting credentialed, you**

20   **know, at the hospital, considering what they saw,**

21   **either in my file, on the National Physician Database**

22   **you know, those kind of things existed.  And they felt**

23   **that that too would be a problem even if I got, you**

24   **know, you know -- they didn't specify, but, you know,**

25   **even at a restricted license, which I didn't want to**

1  do, they didn't specify that I had to be an

2  unrestricted license, but I think it was a bit of both.

3      Q.    Did anyone at Ironwood ever tell you that

4  the reason for terminating your employment was anything

5  other than your lack of an Arizona license?

6          MS. BEIGHTOL:  Objection to the form

7      of the question.  That assumes that they

8      would tell him that reason and all of that.

9          MR. HAWISHER:  I do not think that is

10     a proper deposition objection.

11         MS. BEIGHTOL:  You can answer.

12     A.    Well, I gave my impression of what I

13  thought, but, I mean, you know, the delay -- but, I

14  mean, if you saw -- I mean, it was Covid.  And if you

15  saw the previous elections in Arizona, how long it took

16  for them to get all their votes in.  I mean, they're

17  very, very slow.  Why?  I don't understand.  But, you

18  know, they -- I don't recall that they specified, you

19  know, all of it.  But, you know, obviously for them,

20  you know, if I'm not able to have a license, and then

21  if I'm not able to get privileged, they're going to

22  terminate my contract, so.

23     Q.    How did the data bank report, either report

24  number one or report number three, affect your Arizona

25  medical license application?

1    MS. BEIGHTOL:  Objection to the form

2    of the question, to the extent you may not

3    have the full breadth.  You can answer what

4    you know.

5    A.    Well, I did go on to, you know -- I had to

6    find someone to represent me in the State of Arizona,

7    which I did, to contest, and I say contest, but argue

8    in front of the Arizona Medical Board or make my case

9    of why I should be accepted.  And, you know, so I could

10    hear what the board said.  And so some of the board

11    members were not, you know, were, you know, on my side,

12    but the chair and everything kind of had in his head

13    that, you know, he mentioned the wording of when I had

14    this June letter from Mission Hospital giving my

15    privileges back, it wasn't -- you know, instead of it

16    just being okay, we've looked into this.  We found

17    nothing significant, you know, in terms of your care of

18    this patient or your preoperative judgment or testing,

19    it didn't say any of that.  What it did was it kind of

20    went back to -- you know, it went back to, okay, you

21    had to be proctored for this amount of time, you know,

22    you had to have a case reviewed.  I mean, it was very

23    strongly written.  It was very edgy.  And when I asked

24    Dr. Joslin about it, I go why is this in there?  He

25    goes well, that's just standard practice.  Well, if

1    it's standard practice, then why put that in there?

2         And then they went back to -- by June 7,

3    they had already read my response to their code of

4    conduct issues.  And although at that time I hadn't

5    figured out that they lacked adequate counting of my

6    attendance to the breast conference, which they did,

7    but I didn't realize that, but, I mean, that's what put

8    me on the last warning status, which was part of this

9    code of conduct they said repeated serious attempts.

10        I mean, all this wording is very edgy and

11   predatory from a professional standpoint for me to get

12   privileges somewhere else.

13        And they went back to this claim of well, I

14   didn't talk to the family.  Well, I had already told

15   them the woman was very -- she didn't want me talking

16   to her ex-husband.  She was estranged from other

17   family.  She told me no one was going to be there, and

18   she didn't want me to talk to anybody.  And I had

19   admitted her that weekend, and so I had plenty of time

20   to talk beforehand.  She did have a friend come in

21   before surgery, who I met and talked to.  But she said

22   no one was going to be here.

23        But yet even though they knew what my

24   responses were, that still was in my return of

25   privileges.

1           **So they read that, and to them it scared**
2    **them off, and the chair of the committee said -- didn't**
3    **want me going to some remote town in Arizona and**
4    **practicing oncology, you know, which was ludicrous,**
5    **because you need a big pop -- you know, you need at**
6    **least a million people to establish a GYN oncology**
7    **practice.**
8           **So, you know, he wanted to offer, you know,**
9    **a restrictive license. And after talking to my lawyer**
10   **afterwards, we -- you know, I elected not to accept**
11   **that and just turned it down, so I wouldn't be part of**
12   **yet another database entry into the National Physician**
13   **Database. So --**
14       Q.    So specifically, as it relates to the data
15   bank report, as distinct from the letters and the
16   suspension itself, and the affiliation verification
17   response, and anything other than the report that was
18   made to the data bank, how did the report itself affect
19   your application for an Arizona medical license?
20          MS. BEIGHTOL: Objection to the form
21       of the question, to the use of the term
22       distinct, and also confusing, vague and
23       misleading, and the terminology is that they
24       are not connected, but you can answer.
25       **A.    Well, it's like tearing out a page in a**

1    novel and say how does this one page affect the whole

2    thing?  You know, I mean, it's, it's, out of, out of

3    context.  No letter or document is an island to itself.

4    And, you know, I have no idea as the, as the Arizona

5    Medical Board was looking at me, how heavily did they

6    weight that one piece of information, you know, because

7    the entry was the entry.  But yet, you know, there was

8    the June letter that I spent, and how it was worded,

9    and, you know, all that collectively, you know, was an

10   issue.

11         And then of course the time gap that had

12   been caused by the National Physician Database

13   inappropriately listing this.  Although you'd like to

14   argue that it is appropriate.  I just feel that it's,

15   you know, preliminary decisions are a dangerous thing

16   and have been for me.

17   Q.    You told the Arizona Medical Board in your

18   application that you had had your privileges suspended

19   by Mission Hospital temporarily, right?

20   A.    Precautionary suspension.

21   Q.    And then they needed to investigate that

22   precautionary suspension, they being the Arizona

23   Medical Board, right?

24   A.    Yes.

25   Q.    As part of that investigation, they

1 uncovered all of the information that was in the report

2 and then some, right?

3     **A.   Yes.**

4     Q.   So what difference does the report make to

5 the Arizona Medical Board?

6       MS. BEIGHTOL:  Same objection, asked

7    and answered, and to the extent he's being

8    asked knowledge of something he is not.

9     **A.   Well, you know, it's a chain reaction too.**

10 **I mean, it's just going back to the first thing and**

11 **saying well, you know, how much does this thing really**

12 **matter, considering all the rest of this?  But, you**

13 **know, yet, you know, that was the first event that was**

14 **filed, and it was filed, you know, on an**

15 **internationally accessible database that remains today.**

16       **And so as to how they weighted it, I cannot**

17 **say.  But it's --**

18     Q.   If the National Practitioner Data Bank

19 report had not been filed, but the precautionary

20 suspension had still occurred, and so on, would you

21 have reported that precautionary suspension to the

22 Arizona Medical Board as part of your application?

23       MS. BEIGHTOL:  Objection to the form

24    of the question.  You can answer, if you

25    know.

1    **A.    Well, I wouldn't have needed to.  I mean,**

2    **they would have wanted me to, I assume, you know, but**

3    **that wasn't the case, but.**

4        MR. HAWISHER:  If we could go off the

5        record, take a quick break.  I think I'm

6        nearly done.

7        THE VIDEOGRAPHER:  Off record at

8        5:06 p.m.

9        (Recess.)

10       THE VIDEOGRAPHER:  On record at

11       5:12 p.m.

12       BY MR. HAWISHER:

13   Q.    Dr. Hetzel, I am very nearly done with my

14   questions.  I appreciate your patience so far, and I

15   know this hasn't been easy to talk about.

16       Texas Tech you had a written binding offer

17   from on two occasions, I think, right?

18   **A.    A letter of intent at first and, you know,**

19   **I don't know the binding offer, because obviously they**

20   **had my, you know, that week of Thanksgiving, you know,**

21   **they said no, we're not going to hire you.  So I don't**

22   **know how binding that was, but.**

23   Q.    A written commitment that they were

24   interested in you?

25   **A.    Yes.  Okay.**

1    Q.    Ironwood you had an actual contract with?

2    **A.    Yes.**

3    Q.    Were there any other employers or

4    prospective employers like that that you had like a

5    firm commitment from at some point?

6    **A.    No.  The closest one was Gundersen Clinic**

7    **in western Wisconsin, and that was around La Crosse, if**

8    **you know where that is, near the Mississippi.  But**

9    **anyway, but that was probably the next closest, but**

10   **none since really Texas Tech, number two.**

11   Q.    So very briefly, what happened with

12   Gundersen?

13   **A.    You know, I don't know.  I don't know if**

14   **they came across a specific piece of information that**

15   **kind of turned the tables on that.  I don't know.  I**

16   **mean, I had -- there's another clinic called Marshfield**

17   **Clinic that was a little more clear.  There was one**

18   **person they were looking to go to two, and that**

19   **person's contract was up or coming up, and he didn't**

20   **want to go into that having another person, and he kind**

21   **of pressured them to drop my application.  So that one**

22   **was clear.**

23        **What really happened at Gundersen, I'm not**

24   **really sure.**

25   Q.    So Gundersen received the NPDP report,

1  right?

2       A.    That's going back.  Yes, I assume they did.

3  I'm sure they did.

4       Q.    They also received an affiliation

5  verification letter, am I right?

6       A.    Yes.

7       Q.    Do you have any way of saying whether one

8  or the other or a combination is what caused you to not

9  get employment at Gundersen?

10           MS. BEIGHTOL:  Objection to the form

11            of the question, to the extent you're asking

12            him what they did and why.

13       A.    I can't sort that out.  I think for any of

14  these other applications too, it's -- in most cases,

15  it's just easier for them to say well, we don't think

16  it's a fit or, you know, we've decided to pursue it or

17  candidates, and, you know, including AdventHealth,

18  which, you know, they seemed very interested, you know,

19  but then as they got more information, and then I got a

20  letter that said -- this is in Orlando, that we're

21  sorry.  We've, you know, we're not going to pursue your

22  application, at least at this time.

23       Q.    AdventHealth in Orlando?

24       A.    I just got the notification this morning.

25       Q.    Sorry to hear that?

1      **A.     At 6:30.**

2      Q.     What position did you apply for at Advent?

3      **A.     Division director of GYN oncology for --**

4      **they have, I think, three others, and so the person was**

5      **kind of cutting back, half time or planned to cut back**

6      **half time and then probably be, you know, retire, you**

7      **know, next summer or.**

8      Q.     And you said they didn't say why they were

9      not going to proceed with the application?

10     **A.     They didn't specify.**

11     Q.     You said Marshfield.  Tell me a little bit

12     more about what you know about why Marshfield didn't

13     work out?

14     **A.     Again, Marshfield Clinic had a -- I mean,**

15     **not to go into the weeds, but Marshfield was an**

16     **original train line, and it's actually an old**

17     **institution, pretty, you know, not as old as the Mayo**

18     **Clinic where I trained, but, you know, they had been**

19     **around, but in a very rural setting.  And in today's**

20     **world of cars and highways and interstates, Marshfield**

21     **is kind of in the middle of nowhere.  But they do take**

22     **care of a lot of the northern, northern Wisconsin and**

23     **even some of, you know, central Wisconsin.  Wausau is**

24     **probably the biggest town.  So, you know, my**

25     **mother-in-law, you know, for instance, lived there, and**

1    so, you know, they had some interest in having someone

2    outside of Marshfield or north of Marshfield.

3            And so, you know, I had a lake house at

4    that time, you know, north of there in Minocqua, but I

5    added that application, and I talked with several

6    people.  I had someone I knew from medical school that

7    was there.  So I had an insider, which kind of helped

8    from several discussions, but, you know, they didn't

9    pursue me.  And how much of that was this other

10   doctor's whose contract was up and how much it had to

11   do with what was in the National Physician(sic) Data

12   Bank, I really don't know.

13   Q.    Do you know what entity would be listed on

14   the disclosure history if Marshfield had received the

15   National Practitioner Data Bank report?

16   A.    Well, it should say Marshfield Clinic.

17           MS. BEIGHTOL:  It's probably in the

18        emails in the production.  I think

19        Marshfield responded.  I think there's

20        another name, if I'm remembering correctly,

21        I'm going off memory, but it should be in

22        the materials from the third party or from

23        his emails, if there is one.  I'm just

24        saying.

25           MR. HAWISHER:  Okay.  Either way,

1    that's not something we need to cover right

2    now.

3    Q.    So as you were applying to these potential

4    employers, you knew you'd have to get privileges

5    somewhere in order to work anywhere as a surgeon?

6    **A.    Correct.**

7    Q.    So you knew that part of the process would

8    involve a National Practitioner Data Bank query being

9    run on you?

10    **A.    Yes.**

11    Q.    And you knew that as a result of that,

12    someone affiliated with your prospective employer would

13    review the report that was in the database about you,

14    right?

15    **A.    Right.**

16    Q.    Okay.

17    **A.    So West Virginia University, for instance,**

18    **you know, I had a good discussion with the recruiter.**

19    **And he said well, can you send me a National**

20    **Physician(sic) Data Bank thing?  He said, I will have**

21    **my lawyers look at this report of the National**

22    **Physician(sic) Data Bank, and a week later, you know, I**

23    **said do you have any feedback?  And the feedback was**

24    **no, we're not going to pursue this.**

25    **So that's -- and that's just with them**

1    seeing only that, you know, nothing else.

2        Q.    There was something I was about to say, and

3    then I lost it.  I guess it can't be that important.

4            I want to briefly talk about potential

5    damages in this case.

6            We've received some tax records in

7    discovery in this case, and it looks like, depending on

8    the year while you were practicing at Hope, you were

9    making anywhere from 350 to $500,000 a year, is that

10   roughly correct?

11           MS. BEIGHTOL:  Objection to the word

12            potential, and also the request for a guess,

13            but you can answer, to the extent you know.

14       A.    I think that's on the low side, you know,

15   because 500,000 when I was a partner was kind of our

16   base pay, and then anything above that you would get

17   additionally.  But, you know, even that was somehow

18   skewed because there was Blair Harkness and myself

19   doing more breast cases, which was less lucrative.

20           So, but in general, 500,000.  Now, the last

21   year, of course, is an incomplete year.  You know,

22   you've only got maybe a quarter or a third of 2020 that

23   I was really earning, you know, anything.  But what

24   else?

25       Q.    Understanding that we're talking about a

1    whole lot of different potential employers, what do you

2    think a fair market value for your full-time employment

3    would have been if you were able to secure employment

4    in your specialty?

5         MS. BEIGHTOL:  Objection to the form

6         of the question, given the varied jobs and

7         speculation.  But answer if you can.

8    **A.    Well, I mean, you know, the impact of this**

9    **event and on my profession and on my career has been,**

10   **you know, certainly more than just the finances,**

11   **although that's been horrible.  But as we sit here**

12   **today, you know, I've had to live on something, so, you**

13   **know, it's pretty much I've drained out my retirement**

14   **account, most of it.  I have a small one that has some**

15   **atypical assets, but I've pretty much burned through**

16   **all of that.  And I've had to live, you know, in a**

17   **difficult, in a difficult way, with -- thankfully, I**

18   **have a nice landlord.  I was three months behind on my**

19   **rent at this old trailer I rent, and she let me go.**

20   **And my phone got cut off.  And, you know, it was the**

21   **end of winter, and I had lived for almost two months --**

22   **Duke Power cut my power off.  So I had to get candles,**

23   **and I had to sleep in a winter sleeping bag.  I mean,**

24   **that was caused by a lack of finances, and, you know, I**

25   **tried -- I had something temporary for the hurricane**

1    that I did for a little bit, but that was short-term.

2          But, you know, fair market value, of

3    course, accumulates all your forward cash flows to the

4    present.  And -- but also the fact that during this

5    last five and a half years, I would have been adding to

6    my retirement account instead of exhausting mine, which

7    is what really happened.

8          So now I'm trying to start over, but, you

9    know, as this ball continues to roll, you know, the

10   blasted cap of the first National Physician(sic) Data

11   Bank and the impact of that sequence of events has, you

12   know, projected forward such that, you know, I might

13   never be able to be hired.  You know, maybe I'll get a

14   job, but, you know, as it's added to the time gap, now

15   I look less and less attractive, not only because I'm

16   older, but because I haven't been working.  And so, you

17   know, you add that to the fact of, you know, all these

18   other things and all of the, you know, finances, which

19   I won't be able to see.  So it's significant.  I can't,

20   you know, hand you a number.

21       Q.    Specifically, an annual salary, if you had

22   managed to obtain a full-time employment in your

23   subspecialty, what would a fair market value for that,

24   I'm talking about per year, not in total, across this

25   entire lawsuit, what do you think a fair market value

1    for your salary would be?

2        A.    A one, a one year?

3        Q.    Per year.

4            MS. BEIGHTOL:  Objection to the form

5        of the question, to the extent there are

6        varied jobs and opportunities in different

7        locations.  You can answer, if you can.

8        A.    Well, just to be -- I mean, you know, from

9    an economist standpoint, fair market value is a

10   specific -- has a specific formula that represents, you

11   know, forward cash flows outward to some period of

12   time.  So I don't know that I would call that fair

13   market value.

14           I guess I would say what you're asking for

15   is what would be an average salary now in most places,

16   which, you know, if it's not -- a university job is

17   usually less, but has more perks, at least in the long

18   term it does.

19           For someone of my age, getting a university

20   job, not -- it doesn't have those long-term perks as

21   much, but, you know, as far as the average kind of jobs

22   are probably around 600,000.  But I've seen a Baton

23   Rouge job was pushing it was like 800,000.  But, I

24   mean, those are a little bit high.  It depends in the

25   area as to what an average or what a salary might be

1    for a full-time GYN oncology surgeon.

2         Q.    The Texas Tech position was a salary of

3    350,000, right?

4              MS. BEIGHTOL:  If you recall.

5         A.    I don't recall there were ways -- there

6    were other things that she felt she could get it closer

7    to 500,000, which, of course, you know, didn't happen.

8              So, you know, they were going to other

9    hospitals, which did involve some type of

10   reimbursement, but that would have been sort of the

11   base salary from the Texas Tech University Health

12   Sciences Center.

13             And then these other things would have been

14   supplemental to that.  But, again, that's, you know,

15   just her talking, that didn't happen.

16        Q.    Have you been exclusively looking for

17   leadership type positions, director of a program, that

18   kind of thing?

19        A.    I was initially more focused on that until

20   I got sensitized to the area of this two-year gap,

21   where things get more difficult, in which case I kind

22   of opened it up to looking at any kind of job.  I mean,

23   Ironwood was not a leadership position, and the Texas

24   Tech 2.0 where I applied the second time, that was not

25   going to be a leadership position either, because they

1    had hired someone else to be the division director.

2        Q.    Have you considered or looked into locums

3    work or anything like that?

4        A.    Yeah, I have.  They're extremely sensitive

5    to the -- well, to the time gap, because they

6    self-insure.  So they really absolutely need someone

7    who has, you know, two years of cases the last two

8    years, and if you don't have it, you're not, you know,

9    you're not, you're not eligible to work for them.

10            In addition, because of this long stretch

11   of time, and, you know, of not being clinically active,

12   is that my board status has kind of lapsed.  So for me

13   to resurrect that, you know, clinically I could apply

14   next year, take a test and then do the year full of

15   journal article and their questions to resurrect that.

16   But, you know, so my -- I was boarded both in

17   obstetrics and gynecology and in gynecologic oncology,

18   and so those have lapsed.  They would absolutely

19   require that that be rectified.

20       Q.    And have you looked into reentry programs

21   to help address the gap?

22       A.    You know, I've looked.  You know, every

23   time I've Googled that, and maybe, you know, what I

24   found was mostly for people coming out of prison.  And

25   so I felt like I had just come out of prison, but I'm

1   not quite out yet, but I didn't really see anything

2   appropriate.  There needs to be more of those,

3   honestly.  There are -- I mean, my connections at Mayo

4   when I was in Scottsdale, I mean, I knew the guy there

5   and said, yeah, can you help me out here, because

6   really, you know, even just having four months of

7   something I'm told can kind of get the ball rolling,

8   and but there officially isn't any of those things that

9   I know of.

10          I know from a resident of mine that was

11  trying to get a fellowship, she did a program, but she

12  was there for -- she was down in Columbia --

13  Columbia -- not Columbia, South Carolina, Charleston at

14  the university there, and she did research with them,

15  but it was a longer commitment.  It was like a two-year

16  commitment.  So it wasn't a, you know, two to six-month

17  program, but I'm unaware of that, so.

18      Q.    I know -- well, I shouldn't assume.

19          When was the last time you talked to Nathan

20  Williams, Dr. Williams?

21      A.    Well, I'll say it's been a year maybe.

22      Q.    Is he still at New Horizons, as far as you

23  know?

24      A.    He is.

25      Q.    Did you ever consider asking him for a job,

1    even just a temporary thing to address the gap?

2         A.    That's initially one thing he wanted, and

3    then I think, according to him, he was hit pretty hard

4    by Covid, and they didn't lay maybe enough people off.

5    And so he had, you know, a significant period of time,

6    a couple of years, you know, that he's been trying to

7    pay back.  And right now, I mean -- I don't know that

8    financially it would work for him, at least that was

9    the impression.

10        Q.    Have you considered working for a brief

11   period of time for less compensation or even no

12   compensation just to repair the gap in your practice?

13        A.    I would.  Like I, for instance, I contacted

14   the VA Hospital, because they're self-insured, but they

15   have a no -- you know, they have a hiring freeze, and

16   they weren't, you know, willing to expand.  I didn't

17   get anything there.  But, you know, I think from a

18   surgical standpoint, I don't know of many places that

19   they want you to just come and operate for free.  We've

20   gone -- I've been down to Honduras twice during this

21   time period and did surgeries down there at a place

22   that we previously have done that at, but you kind of

23   have to pay your way, pay to get down there, pay for

24   costs while you're down there.

25        Q.    That surprises me.  I would have assumed

1    that the charity that organizes it is done.

2            When was the last time you went to Honduras

3    for that?

4        **A.    I would say it's about two years.**

5        Q.    When you were doing procedures abroad

6    through that charitable program, what kind of records

7    were they keeping of the cases you did?

8        **A.    Well, it's kind of what you decided to**

9    **write down, and you could be as brief, you know, as you**

10   **wanted to be.  I mean, because I was in this thing.  I**

11   **actually try to -- I was a little proactive in actually**

12   **getting, you know, writing out the cases that I had**

13   **done.  But as far as -- you know, it's very rural, and,**

14   **you know, it's very minimalistic records.**

15       Q.    Okay.  And what I'm wondering is, I mean,

16   if you wanted to get a case log from them, would you be

17   able to?

18       **A.    Well, just what I've kind of put together**

19   **from what I had.**

20           MR. HAWISHER:  I believe those are all

21       my questions.

22           MS. BEIGHTOL:  I'm going to have just

23       a few.  Can we take a quick, and I mean

24       super quick break?  I want to check with my

25       boss real quick.

1          THE VIDEOGRAPHER:  Off record at

2      5:37 p.m.

3          (Recess.)

4          THE VIDEOGRAPHER:  On record at

5      5:44 p.m.

6          EXAMINATION BY COUNSEL FOR PLAINTIFF

7          BY MS. BEIGHTOL:

8      Q.    I think we covered a little bit of this,

9  but I'm going to jump around, I apologize.

10          Have you gone to law school or trained to

11  be an attorney?

12      **A.    No, I have not; and after today, I don't**

13  **think I will.**

14      Q.    Well, you're the smartest person in this

15  room.

16          And are you in any way an expert in

17  contract interpretation?

18      **A.    Not at all.**

19      Q.    Hospital practices, entity's names can be

20  confusing.  We talked about University Health Tenet,

21  Health Children's, who employs who, who is the practice

22  versus the credentialer(sic) versus the employer.  Do

23  you remember that sort of line of questioning?

24      **A.    Yes.**

25      Q.    And is that different in different places

1    and something that is confusing even to the physicians

2    that practice in each location?

3         **A.    I don't think that I, or probably most**

4    **physicians appreciate that there is a legal definition**

5    **as to what an employee is versus a contract employee**

6    **versus an employed employee.  I don't really know the**

7    **details of that.**

8         Q.    So should any of your testimony today be

9    meant to be an admission by you as to the legal

10   definition of any employment or employment-related

11   term, such as employee, independent contractor, agent,

12   anything like that?

13        **A.    No, I don't -- I didn't mean to imply that**

14   **I understood that definition or depth of those terms.**

15        Q.    When you were practicing during this period

16   that we talked about a lot earlier, the 2012 to 2020

17   period, were you required to follow Mission Hospital

18   rules, guidelines regulations, bylaws, things like

19   that?

20        **A.    Yes.**

21        Q.    Okay.  Are you, sir, an expert in NPDB

22   reporting, and what should be reported, what should not

23   be reported, what the rules are, all those sorts of

24   things?

25        **A.    No.**

1      Q.    What about bylaw interpretation, what that

2    means, and how that impacts the day-to-day of

3    hospitals?

4      **A.    I'm not an expert in that either.**

5      Q.    Would you defer to an expert you hire in

6    this case who may be familiar with an expert in those

7    fields and topics?

8      **A.    I would defer to those people.**

9      Q.    Between March 25 and June 9, 2020, do you

10   remember that time frame we talked about a long time

11   ago in your deposition?

12     **A.    Say it again?**

13     Q.    March 25 and June 9, 2020, that window we

14   talked about earlier today?

15     **A.    Okay.  We're in 2020, and it's from**

16   **March 5?**

17     Q.    25 to June 9, 2020.

18     **A.    Yes, okay.**

19     Q.    During that window, was it your

20   understanding, and do you in fact know that Mission was

21   still investigating whether there were issues with your

22   clinical care?

23     **A.    That had not been resolved.  That was my**

24   **understanding.**

25     Q.    And by not resolved, do you mean that they

1    were still investigating?

2        A.    That they had not completed their

3    investigation or come to a conclusion as to the events

4    in question.  But also my, you know, care of the

5    patient during this time.

6        Q.    And what was the ultimate determination by

7    Mission, to your understanding?  Was there any concern

8    in the end about your clinical care of any patient?

9        A.    Despite the bad way that it's written, no,

10   there was not.  And there was no concern as to the

11   preop planning or the intraoperative management, you

12   know, of my care during this particular case, and which

13   was also, as I mentioned, reviewed by the North

14   Carolina Medical Board, who reviewed that case and the

15   other three, and they had no comment about this as

16   anything being wrong.  And the first case they thought

17   well, I maybe should have gone to the OR a couple of,

18   you know, hours or a day sooner, but there was no

19   concern overall about any of that.

20       Q.    But despite that, has Mission ever made an

21   attempt to put that information out on the NPDB?

22       A.    It's certainly not even stated, which is a

23   good point.  I think it should have been stated that

24   nothing was found, and a lot of the initial language of

25   what they were at first alleging kind of, you know,

1  existed as to why -- you know, that language, that

2  lexicon kind of lives on in this National

3  Physician(sic) Data Bank, which, you know, I believe

4  was the trigger and then continued to roll forward, and

5  that language, you know, is still, still in there,

6  although revised.

7      Q.    Sitting here today, doctor, do you have any

8  doubt that the NPDB report was a factor and/or the

9  factor in your inability to achieve each of the jobs

10  and/or credentialing opportunities at the different

11  locations in which you applied in the time frame since

12  that report?

13      MR. HAWISHER:  Object to the form.

14      A.    Well, what I've learned, you know, in the

15  process, and, you know, that anybody -- all the doctors

16  I know would do anything to keep anything off of the

17  National Physician(sic) Data Bank, because really any

18  kind of report in there is looked on as negative,

19  regardless of what the words say.  It's a negative

20  thing and casts a long shadow.  And, yes, I believe it

21  is the major factor, and the fact that I believe it

22  shouldn't have been reported regardless.

23          I think the spirit of the National

24  Physician(sic) Data Bank is to develop clarity and

25  truthfulness as to a doctor's ability.  And when you

1    have someone who went through what I did, even though

2    it took longer than it should have, and because it took

3    so long, I'm being penalized for that as justifying it

4    being in the data bank, is that it doesn't create

5    clarity, and it's confusing and hints towards there was

6    an issue, and that people should look closer.

7            So I do think it's, you know, the major

8    factor, as I also feel the return of my privileges

9    suffered the same problems of sharp wording that was,

10   you know, continued to, you know, echo previous

11   allegations, which they knew had been proven to be not

12   true at that point, but still they put it in that, you

13   know, June letter, MEC committee return of privileges.

14           MS. BEIGHTOL:  I don't have other

15       questions.

16           FURTHER EXAMINATION BY COUNSEL FOR DEFENDANT

17           BY MR. HAWISHER:

18   Q.    I have just a couple to follow up on two

19   points that were raised.

20           Dr. Hetzel, you were asked a question about

21   2012 to 2020 you being obligated to follow the bylaws

22   and policies and so on at Mission Hospital.  Do you

23   know which corporate entity we are talking about when

24   we say Mission Hospital during that period?

25   A.    It was still the nonprofit.  You know, I

1  **think we were going to, what was our end date on that,**
2  **March?**
3      Q.    February of 2019, February 1 is when the
4  transition happened.
5      **A.**    **So anything prior to that was Mission**
6  **Hospital and Mission Health, whatever it was, a**
7  **nonprofit at that point in time.**
8      Q.    And then after that, it was an HCA
9  affiliate or subsidiary, but it's still the same
10  hospital?
11      **A.**    **It is.**
12      Q.    As far as you are concerned with your
13  relationship to the bylaws or your privileges or
14  medical staff membership, was that continuous between
15  the nonprofit and the HCA affiliate?
16      **A.**    **My privileges, my ability to -- what did**
17  **you say?**
18      Q.    Your clinical privileges, your medical
19  staff membership.
20      **A.**    **That was continuous.  What was missing was**
21  **a whole new cast of characters on administrative side,**
22  **which for someone who is just having an average day or**
23  **an average few months may not been(sic) very important**
24  **to them.  But to me that was going through this is that**
25  **you would rather have a friend that you've worked with**

1   **or have been under or part of as a relationship.  And**

2   **instead, you know, we had Spensieri, who I had never**

3   **met, you know, and a whole bunch of other -- Chad**

4   **Patrick, and a lot of new people, and so there was a**

5   **definite disconnect, which added to the problems of**

6   **handling my situation in this case.**

7       Q.    The other thing I wanted to follow up on,

8   did you testify that at the conclusion of Mission

9   Hospital's investigation in June of 2020, there were no

10  concerns about your care?

11      **A.    My?  So my impression by the letter, is**

12  **that what you're saying?**

13          MS. BEIGHTOL:  Object, well --

14          BY MR. HAWISHER:

15      Q.    My question was, did you testify that there

16  were no concerns?

17      **A.    As part of this deposition?**

18      Q.    Just now, yeah.

19      **A.    From a clinical standpoint, is that what**

20  **you're saying?**

21          MS. BEIGHTOL:  I guess I'll object to

22          the question being vague based on also

23          earlier.

24          BY MR. HAWISHER:

25      Q.    If I can figure out how to work this real

 1    time thing, I'm going to figure out and see exactly.

 2

 3         MR. HAWISHER:  Madam, court reporter,

 4    can you read back 20407 to 20420?

 5         (Record read.)

 6    Q.    Dr. Hetzel, is that still your testimony?

 7    **A.    It is.**

 8    Q.    If I could refer you, I'm going to have to

 9    give you back the tablet, I'm afraid.  If I could refer

10    you to document 26, with I will mark Exhibit 33.

11         Document 26 will be Exhibit 32.

12              (The document referred to was marked

13         Deposition Exhibit Number 32 for

14         identification.)

15         MS. BEIGHTOL:  You're referring to a

16    redline document?

17         MR. HAWISHER:  Gosh, I sure hope not.

18    Document 26.

19         MS. BEIGHTOL:  Oh, document 26.  I'm

20    on the wrong one.  Sorry, it's been a long

21    day.

22         MR. HAWISHER:  No kidding.

23         MS. BEIGHTOL:  I went to 32.  Remember

24    I only hear one of the numbers for some

25    reason.

1      **A.    Okay.**

2      Q.    So do you see at the bottom of the first

3   page the numbered paragraph beginning with number

4   three?

5      **A.    Yes.**

6      Q.    So first of all, this is a letter written

7   on behalf of the Medical Executive Committee of the

8   hospital to you?

9      **A.    The overall letter?**

10     Q.    Yes.

11     **A.    Yes, it is.**

12     Q.    And so then can you just read out loud into

13   the record numbered paragraph three of that letter?

14     **A.    You're saying the sentence that starts with**

15   **number three at the bottom?**

16     Q.    That whole paragraph, but yes, you're in

17   the right place.

18     **A.    You will receive a letter of guidance.  Is**

19   **that where you're referring to?**

20     Q.    Yes.

21     **A.    And/or counsel related to the serious**

22   **concerns that were identified as part of the review of**

23   **precautionary suspension.  That letter of guidance**

24   **and/or counsel will be provided by the chair of the**

25   **credentials committee.  This letter will become part of**

1    the credentialing file with the hospital.

2        Q.    This letter also states that your surgical

3    cases will be subject of a focused professional

4    practice evaluation, right?

5        A.    It does.

6        Q.    What is a focused professional practice

7    evaluation?

8        A.    I am not an expert in saying what that is.

9    I did have questions for Dr. Joslin, who said that this

10   type of thing is routine with new hires, maybe.

11       Q.    Is it routine with senior physicians?

12       A.    I would think not.

13       Q.    What about proctoring?  Is that routine for

14   senior physicians?

15       A.    He will be subject to proctoring.  The

16   proctoring will be determined by the women's service

17   line later.

18       Q.    Is that routine for senior physicians?

19       A.    Maybe new ones that are coming in, but not

20   for ones that have been there.

21       Q.    Okay.  If you could turn to document 27,

22   please, which I will label Exhibit 33.

23            (The document referred to was marked

24       Deposition Exhibit Number 33 for

25       identification.)

1    A.    Since you brought up number three, you

2    know, I would like to comment, and I have already that

3    these -- this letter of guidance, and it says it's

4    serious.  Serious, okay.  So what exactly are they

5    referring to?

6            Well, one, they're referring to the fact

7    that I didn't talk to the patient's family, who she

8    told me not to talk to, and who she said weren't going

9    to be there, and I had checked with the circulating

10   nurse to check if there was anyone there.  So I didn't

11   talk to someone, and they're saying that that's

12   serious.  But she told me not to.  And as far as I

13   know, no one was there.

14           And then the other serious concern was that

15   I had not attended as many of the breast conferences,

16   according to their records, which I didn't realize you

17   were not being sufficiently counted, because nearly all

18   of my attendance was at my office where someone wasn't

19   reliably there.

20           So, I mean, how do you call those things

21   serious?

22           And I also want to say that they knew this

23   at the time of this letter.  I had already, you know,

24   had commented, on these, you know, letter of -- you

25   know, you know, this guidance letter, and so they knew

1    this, but yet they put it in here anyway.

2        Q.    Okay.  Could you turn to document 27,

3    please, which I will label Exhibit 33.

4        **A.    Okay.**

5        Q.    This is the letter of guidance that was

6    referenced in the previous letter?

7        **A.    Yes.**

8        Q.    It's from Dr. Joslin, Chair of the

9    Credentials Committee?

10       **A.    Yes.**

11       Q.    Okay.  Do you see the beginning of numbered

12   paragraph one that says:  "Additional diligence and

13   preoperative planning and intraoperative decision

14   making is recommended?"

15       **A.    I see that.  And what, what did they find**

16   **in my case could have changed that?  I mean, what bad**

17   **decisions did I make during their case?  I called**

18   **Dr. -- you know, the hepatobiliary surgeon in, which**

19   **was the right thing to do.  I told him to bypass this**

20   **so we could get out, which is the right thing to do,**

21   **which he didn't do.**

22           **Preoperative planning.  I don't know what**

23   **else I could have done.  I tapped cytology from around**

24   **the lung.  We had done CAT scans.**

25           **You know, this is using -- remember I**

1    talked about anchoring and how they had this idea at
2    the beginning of this, and that's, you know, it's
3    resurfacing here, because they're going back to that.
4          And so he's saying this, but I don't see
5    any evidence in what I did in those cases.  Had I known
6    it was going to go to this, you know, sure, you would
7    opt not to take someone to surgery, but she had no
8    choice.  She wouldn't have been able to withstand four
9    months of chemo to try to shrink this, and so we were
10    trying to help her.
11          But okay, so yes, that's the index case
12    they refer to.
13    Q.   Right.  So after the portion I read, could
14    you just read out loud the remainder of that paragraph,
15    beginning with "in the index case"?
16    A.   The index case question regarding the
17    decision to proceed with aggressive debulking in light
18    of the tumor type.  And -- okay, so that's what
19    Dr. Buell did.  I mean, I was at a point where I could
20    back out and I did with 1800 cc's of blood loss.
21          He came in and I asked him to mobilize the
22    duodenum so we can bypass this and get out.  Had he
23    done that, and we would have still been at 1800 EBL,
24    and all of that bowel wouldn't have been removed, this
25    wouldn't have been a case.  But he didn't do that.

1    **But, you know, I'm being blamed for him pushing on.**

2           **You know, so I don't know at what point me**

3    **starting this case was the place that I, you know,**

4    **should have pulled back, but he's implying that.**

5    Q.    So I understand that you disagree with the

6    credentials' committees concerns on this point, but is

7    it fair to say that they did raise concerns in this

8    letter?

9           MS. BEIGHTOL:  Objection to the form

10          of the question.  Misstates letter, but also

11          his testimony.

12          You can answer, if you understand or

13          feel you haven't already.

14   **A.    So I don't know where we're leaving that.**

15   **I mean, they mentioned this.  Are we still talking**

16   **about number one?**

17   Q.    Yeah, I mean, it seems to me that that is a

18   concern, as articulated by Dr. Joslin.  Do you

19   disagree?

20          MS. BEIGHTOL:  Objection to what it

21          seems to you, as an inappropriate way to ask

22          that question.

23   **A.    It may remain a concern, but I don't know**

24   **what evidence he has to maintain his concern, despite**

25   **what he knows at the time of the writing of this**

1    **letter, because had they really looked at the facts of**
2    **how much bowel did I remove, 18 centimeters.  How much**
3    **did he remove?  All of it.  Did he have to do that, no?**
4    **Should he have done that?  Absolutely not.**
5              **So, you know, I'm being whipped for, you**
6    **know, what I did, and, you know, and when really he**
7    **contributed heavily to that.**
8        Q.    The following page, final paragraph of the
9    letter, beginning events in the professional life, can
10   you please read that into the record?
11       **A.    Events in the professional life of almost**
12   **every physician should unfold a mandate internal**
13   **reflection and input from others for growth and for**
14   **well-being of our patients.  I recommend that you take**
15   **time to reflect on the events so that I(sic) needed**
16   **improvements to your surgical and interpersonal**
17   **approach to patients and colleagues may occur.**
18             **So do you think when he says I should take**
19   **time that it should be five and a half years?  Six**
20   **years?  I mean, how much longer do I have to go?**
21       Q.    My only question for you, doctor, is is
22   that something you would say to somebody whose care you
23   had no concerns about?
24             MS. BEIGHTOL:  Objection to the form
25       of the question.  Now you're asking him to

1    make assumptions from statements.

2    **A.    Restate the question?**

3    Q.    That final paragraph that you just read

4    into the record, is that something you would say to

5    somebody whose care you had no concerns about?

6    MS. BEIGHTOL:  Objection to the form

7    of the question.  Same objection.

8    **A.    You know, it's one of those types of advice**

9    **you could give to anybody at any stage of their life.**

10   **It wouldn't even have to be professionally, the case,**

11   **that things are going to come up that, you know,**

12   **should -- you should allow to pause.**

13   **You know, as to me speculating why that**

14   **they continued on this, you know, I've already stated**

15   **that in some of the -- you know, they came to a lot of**

16   **conclusions based on some things that weren't factual,**

17   **and they didn't investigate, and, but refused to let go**

18   **of, you know, I've -- talking to the family part, and**

19   **the fact of seeing the patient in the morning.**

20   **You see, what he doesn't realize is that**

21   **when you have a case this big, the intensivist in the**

22   **ICU is going to keep this person on the machine under**

23   **propofol asleep all night and all morning, and would**

24   **start trying to wean that person off of the ventilator**

25   **late morning, like 11 o'clock.**

1          So for me to go in after a very long day,

2    again, you know, trying to operate on her all day and

3    then getting home at 9 o'clock at night, for me to go

4    in and round on her, knowing she's going to be

5    intubated on a ventilator and I'm unable to talk to

6    her, it doesn't make a lot of sense.

7          So my plan was to, you know, get through my

8    morning in the clinic and then in the afternoon go and

9    round on her after she was extubated.  But that didn't

10   happen, because by then, they pulled my privileges.

11         So, you know, it's not that I didn't care.

12   I mean, there -- anyone that did this kind of surgery

13   understands that a case like this is going to be -- you

14   know, that patient is going to be wide awake and

15   looking at you in the morning when you come in at seven

16   o'clock or eight o'clock in the morning, so.

17         MR. HAWISHER:  Those are all of my

18   questions.  Thank you, doctor.

19         THE WITNESS:  Thank you, David.  Thank

20   you Phil, if you're still awake.

21         MR. HAWISHER:  I think he had to step

22   away.

23         MR. JACKSON:  I'm still here.  Thank

24   you.

25         THE VIDEOGRAPHER:  This concludes

1    today's deposition.  The time is 6:11 p.m.

2    We're now off the record.

3        THE COURT REPORTER:  David, I need

4    your transcript order.

5        MR. HAWISHER:  So we've already talked

6    about the rough draft, realtime, E-Tran with

7    exhibits is all we need.

8        THE COURT REPORTER:  Kristen, your

9    transcript order?

10       MS. BEIGHTOL:  E-Trans with exhibits

11   will be great.

12       THE VIDEOGRAPHER:  And if I can get

13   your video orders?  Do you want a copy of

14   your video?

15       MS. BEIGHTOL:  Can you give me a card.

16   We usually do that closer to the time of

17   trial.  So I may very well want one, just

18   not today.

19       THE VIDEOGRAPHER:  I'll notify

20   Esquire.

21       MS. BEIGHTOL:  Will somebody send us

22   your contact information?

23       MR. HAWISHER:  We will be ordering

24   one.

25       THE VIDEOGRAPHER:  You want a copy of

1    the video?

2        MR. HAWISHER:  Yes.

3        THE VIDEOGRAPHER:  Would you like it

4    synched to the transcript?

5        MR. HAWISHER:  I'm trying to remember

6    so that is only playable by like special

7    applications, right?  Like if I use a

8    transcript management software?  Or does it

9    come as like a little self-playing -- tell

10   you what, let's just say yes, we'll do that.

11       THE VIDEOGRAPHER:  Yes, you want the

12   video synched to the transcript?

13       MR. HAWISHER:  Yes.

14       THE VIDEOGRAPHER:  Okay.  Thank you.

15       (Whereupon the deposition was

16   concluded at 6:12 p.m.)

17       (Signature reserved.)

18

19

20

21

22

23

24

25

1             SIGNATURE PAGE

2

3

4

5

6

7       _____

8       DAVID J. HETZEL, MD

9

10

11   SUBSCRIBED AND SWORN to before me this _____

12   day of_____, 2025.

13

14

15       _____

16        NOTARY PUBLIC

17

18   My Commission expires:_____

19

20

21

22

23

24

25

CERTIFICATE

1        I, Marisa Munoz-Vourakis, Stenographic Reporter, RMR,

2  CRR and Notary Public, the officer before whom the

3  foregoing proceeding was conducted, do hereby certify that

4  the witness whose testimony appears in the foregoing

5  proceeding, were duly sworn by me; that the testimony of

6  said witness were taken by me to the best of my ability

7  and thereafter transcribed under my supervision; and that

8  the foregoing pages, inclusive, constitute a true and

9  accurate transcription of the testimony of the witness.

10       I do further certify that I am neither counsel for,

11 related to, nor employed by any of the parties to this

12 action in which this proceeding was conducted, and

13 further, that I am not a relative or employee of any

14 attorney or counsel employed by the parties thereof, nor

15 financially or otherwise interested in the outcome of the

16 action.

17 IN WITNESS WHEREOF, I have hereunto subscribed my name

18 this 10th day of September, 2025.

19            MARISA MUNOZ-VOURAKIS

20 Notary #20032900127