**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Case No. 1:23-cv-152-MR-WCM**

|  |  |  |
|---|---|---|
| DAVID JOHN HETZEL, M.D., | ) | |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM IN OPPOSITION** |
| | ) | **TO MISSION HOSPITAL'S MOTION** |
| v. | ) | **FOR SUMMARY JUDGMENT ON** |
| | ) | **HCQIA IMMUNITY** |
| MH MISSION HOSPITAL, LLLP, | ) | |
| | ) | |
| Defendant. | ) | |

Defendant Mission Hospital's[1] Motion for Summary Judgment on HCQIA[2] Immunity[3] should be denied as premature, as it invites piecemeal summary judgment adjudication. It also fails on the substance, despite the selective version of the facts set forth in Defendant's Brief[4], because the National Practitioner Data Bank ("NPDB") report at issue was not reportable and contained misleading representations of the actions taken against Dr. Hetzel. The complete story – which is provided herein – makes clear substantial material factual disputes exist. As determination of these factual disputes fall squarely within the purview of a jury, Defendant Mission Hospital's Motion for Summary Judgment on HCQIA immunity should be denied.

**PROCEDURAL HISTORY**

In the operative July 27, 2023, Amended Complaint, Dr. Hetzel[5] alleges that Defendant Mission Hospital knowingly and erroneously reported him to the NPDB, a national database collecting, *inter alia*, adverse actions against health care providers that is relied upon by medical

---

[1] "Mission Hospital" herein refers to Defendant MH Mission Hospital, LLLP.
[2] "HCQIA" refers to the Health Care Quality Improvement Act of 1986.
[3] "Motion" herein refers to Mission Hospital's Motion for Summary Judgment on HCQIA Immunity.
[4] "Brief" or "Br." herein refers to Brief in Support of Summary Judgment on HCQIA Immunity.
[5] Plaintiff David John Hetzel is herein referred to as "Dr. Hetzel."

entities nationwide in making licensing, hiring and credentialing decisions. (*Id*. at ¶¶ 1-3.) Prior to this, Dr. Hetzel had been a board-certified gynecologist-oncologist employed to perform cancer surgeries at Hope Women's Cancer Center in Asheville, North Carolina. (*Id*. at ¶¶ 1-4.) Defendant Mission Hospital's false and improper reporting to the NPDB, however, has irreversibly marred his reputation and caused him to be unable to secure employment, obtain other state licensure or use his life-saving skills to care for cancer patients. (*Id*.) Based on these facts, Dr. Hetzel asserted claims for, *inter alia*, libel per se, libel, tortious interference with prospective economic advantage, and punitive damages. (*Id.*, *generally*.)

Defendant Mission Hospital moved to dismiss on September 25, 2023, including on the immunity grounds asserted in the instant Motion. On August 7, 2024, Magistrate Judge W. Carleton Metcalf recommended that it be granted in part and denied in part, permitting Dr. Hetzel's claims for libel, libel per se and tortious interference with prospective economic damage to continue. (Dkt. 38.) Magistrate Judge Metcalf recommended that "to the extent the Motion to Dismiss [was] based on Defendants' immunity pursuant to 42 U.S.C. § 11137(c), it be denied." (*Id*. at 10.) On March 24, 2025, Chief United States District Judge Martin Reidinger accepted Magistrate Judge Metcalf's Memorandum and Recommendation. (Dkt. 43.)

While significant written discovery has occurred, there are pending motions regarding the permissible scope of discovery – including Plaintiff's Motions to Compel and for Extension of Time to Complete Discovery (Dkt. 54) and to Disqualify Counsel (Dkt. 56). When Defendant Mision Hospital pursued its Motion, only Dr. Hetzel's deposition had been taken. Discovery is set to closes on January 20, 2026, with dispositive motions due February 20, 2026. (Dkt. 48.)

## MATERIAL FACTS IN DISPUTE

The facts as set forth in Defendant Mission Hospital's Brief are almost uniformly in

dispute; and some cannot be true at all.  *See* Fed. R. Civ. P. 56(c)(1).  The disputes are as follows.[6]

## A.    TIMELINE OF PERTINENT EVENTS

The Brief's timeline of events omits and misstates several pertinent facts.

Defendant Mission Hospital's Brief first inaccurately depicts Dr. Hetzel's testimony regarding being placed on "final warning" status in early 2020 due to failures to regularly attend and present at the breast conference.  (Dkt. 65-1, Br., 3.)  Dr. Hetzel testified that he was asked to present all new breast cases at breast conference, which he was permitted to, and did, in his office.  ((Dkt. 65-4, Dr. Hetzel Dep., 85:22-86:12; 223:14-19.)  He was placed on "final warning status" because of a misunderstanding about this agreement, and as a result he began to understand that he was being pursued by the hospital.  (*Id*. at 87:9-12, 88:7-8.)  Regardless, this fact is not material because it was unrelated to Dr. Hetzel being reported to the NPDB.  On February 25, 2020, J. Chad Patrick, Chief Executive Officer of Mission Hospital, wrote Dr. Hetzel advising he was "approved for reappointment to the Active Medical Staff of Mission Hospital."  (Ex. A, Feb. 25, 2020, letter.)[7] Fred Hyde, MD, Dr. Hetzel's liability expert,[8] testified this letter looked over the prior two years and "basically says … your credentials are clean," so "anything that's alleged that is not involved with what we'll call this indexed case on March 2nd … has no basis in the credentialing process."  (Ex. B, Dr. Hyde Dep., 18:10-18.)

The Brief's discussion of the **March 2, 2020**, procedure central to this litigation also

---

[6] These are the omitted and disputed facts Plaintiff is able to identify without the benefit of Defendant Mission Hospital fact witness testimony, given the stage of discovery and premature filing of the Motion.

[7] Per Defendant Mission policy, this reappointment was the result of a Service Line Leader's written recommendation to the Credentials Committee after considering "the member's clinical performance while a member of the Medical Staff, including the results of quality assessment and peer review activities, focused professional practice evaluation or ongoing professional practice evaluation, as appropriate, and recommendations from the member's peers," thereafter recommendation of the Credentials Committee to the Medical Executive Committee ("MEC") and then the MEC's recommendation to the Board for action.  (Ex. E, Mar. 12, 2020, Letter, at DJH000158.)

[8] Dr. Hyde is "an expert in health facility operations and finance" who "during the past 50 years" has "been a hospital and health facility executive, a professor of hospital management, and an independent consultant specializing in health services."  (Ex. C, Dr. Hyde Report, 1; Ex. D, Dr. Hyde Supp. Report, 1.)

omitted material facts. The surgery addressed a very aggressive, rare type of uterine sarcoma. (Dkt. 65-4, Dr. Hetzel Dep., 27:10-12.) A hole opened in the bowel and began to leak fluid, causing Dr. Hetzel to call in Joseph Buell, MD, a hepatobiliary surgeon. (*Id*. at 27:15-21.) The patient only lost 1800 ccs of blood before Dr. Hetzel left. (*Id*. at 27:24-25; Dkt. 65-1, Br., 5.) By then, Dr. Hetzel had taken out the "large tumor in the pelvis, hysterectomy, the omentum, about 18 centimeters of small bowel, and [he] asked [Dr. Buell] specifically to mobilize the duodenum" so they "could bypass this area tumor, because even if you sewed it shut, it wouldn't heal because there's cancer there." (Dkt. 65-4, Dr. Hetzel Dep., 27:25-28:6.) Instead, Dr. Buell "took out all of the small bowel and all of the large bowel and lost over 5500 cc's [sic] of blood, much more than [Dr. Hetzel] did, and he just happened to be the chief of surgery which Mission Hospital hired." (*Id*. at 27:7-12.) Post-procedure, Dr. Hetzel did not speak to the family because they were not there and he understood the patient did not want that. (*Id*. at 76:23-24.)[9]

On **March 3, 2020**, instead of calling Dr. Hetzel, the main surgeon, administration called Dr. Buell, who had removed all bowel and lost the significant additional blood. (*Id*. at 28:14-18.) Dr. Hetzel was not present but believes he "got thrown under the bus." (*Id*. at 28:18-19.)

Later on March 3, 2020, Dr. Hetzel was told by phone that his clinical privileges were under "precautionary suspension." (*Id*. 28:20-22.) A letter attaching 4.6.1 of a Defendant Mission Hospital policy confirmed. (Dkt. 65-2, Comm. Docs., 2-3.) 4.6.1(b) stated that Dr. Hetzel was to "promptly be given a copy of the member's rights, which shall include a meeting with the Credentials Committee." (*Id*. at 4.) 4.6.1(c) advised he "may address the Credentials Committee during the meeting," and 4.6.1(b) made clear "***[a] precautionary suspension is not in and of itself***

---

[9] A code of conduct concern related to this failure to speak to the family was adjudicated on August 27, 2020, and "[u]ltimately extenuating circumstances regarding family availability for such communication was determined to be mitigating and the Credentials Committee voted unanimously to strike the clinical concern." (Dkt. 65-7 (filed under seal), MH#002738.)

*a final professional review action that is reportable*[.]" (*Id.*) (Emphasis added). This began a many-week period when no one talked to Dr. Hetzel. (Dkt. 65-4, Dr. Hetzel Dep., 28:25-29:2.)

One group of primary facts in dispute are the nature, length and interruption of the reported precautionary suspension. Dr. Hetzel's position is that the suspension was never continuous for more than 30 days: "He had interrupted suspension of privileges in at least two different segments" – March 3 to March 10, 2020, and March 25 to April 23, 2020. (Ex. B, Dr. Hyde Dep., 119:3-9, 272:14-19.)

The Credentials Committee met on **March 10, 2020** (Dkt. 65-2, Comm. Docs., 6-7). It "unanimously approved" a motion "*to modify the preliminary suspension to a lesser sanction – it was concluded that Dr. Hetzel be allowed to continue to see patients* but that for all operative cases he be scrubbed in with a partner." (Dkt. 65-2, Comm. Docs., 7)(emphasis added). Dr. Hetzel was also not to supervise residents until further deliberated by the MEC and Board of Trustees. *Id.* ***This interrupted the first suspension period***. (Ex. B, Dr. Hyde Dep., 114:9-17, 119:3-9.)

A **March 12, 2020**, letter to Dr. Hetzel confirmed his suspension would be "modified" to "lesser sanctions," to take "immediate effect." (*Id.* at 12.) He could "return to practice" but was required to (1) have "a concurrent consultation for all of [his] operative cases," to "be provided by a qualified surgeon employed by Hope Women's Cancer Center and in good standing with the medical staff;" (2) "have another qualified surgeon" "employed by Hope Women's Cancer Center and in good standing with the medical staff" "scrub in with [him] for [his] operative cases;" and (3) "no longer supervise residents." (*Id.* at 12-13.) COVID also hit in March 2020, resulting in the practice slowing and allowing other physicians to handle the caselaod. (*Id.* at 40:12-24.) Though not provided with the Brief, the March 12, 2020, letter attached a full policy document ("October 2019 Policy") including the section attached to the March 3, 2020, letter. (Ex. E, Mar.

12, 2020, letter.)

An Ad Hoc Credentials Committee was assigned and submitted a report without talking to Dr. Hetzel. (Dkt. 65-4, Dr. Hetzel Dep., 29:1-6.) The findings and recommendations included: (1) "[a] Code of Conduct violation for failure to discuss operative findings and surgical difficulty with the family/friend" in the March 2, 2020, surgery, (2) "[r]einstatement of the full precautionary suspension of privileges effective immediately" and (3) "[c]onsider Fit for Duty testing to review if there are underlying medical conditions impairing his ability to use sound medical judgment and perform surgery." (Dkt. 65-2, Comm. Docs., 15-16.)

On **March 24, 2025**, the Credentials Committee met and "unanimously approved" a motion "for *reinstatement* of the full precautionary suspension of privileges." (*Id.* at 17-22) (emphasis added). A **March 25, 2020**, letter to Dr. Hetzel confirmed and explained that "the Investigative Committee…appointed…[would] provide [Dr. Hetzel] the opportunity to meet with [it] pursuant to Section 4.4(e) of the Policy." (*Id.* at 23; *see also* Ex. E, Mar. 12, 2020, letter, DJH000166, Section 4.4(e) policy requirements.) The letter also explained the "right to request a hearing within thirty (30) days." (Dkt. 65-2, Comm. Docs., 23.) ***This began a second suspension period***. (Ex. B, Dr. Hyde Dep., 114:9-17, 119:3-9.)

At an **April 3, 2020**, MEC Executive Session, a motion "unanimously passed to not terminate or modify the full precautionary suspension of Dr. Hetzel's privileges, thus leaving the precautionary suspension in place." (*Id.* at 25, 28.) Also on April 3, 2020, Dr. Hetzel's former counsel requested a hearing and the information forming the basis for the Credentials Committee's decisions and responded to issues identified by the Committee. (*Id.* at 29-34.)

On **April 10, 2020**, the Ad Hoc Committee met with Dr. Hetzel. (*Id.* at 35.) Members asked questions, including "about missing context that was not part of the previous narrative" and

requested that [Dr. Hetzel] respond in writing, specify, and elaborate on the current report for the greater Credentials Committee." (*Id.*) He did on **April 17, 2020**. (*Id.* at 35-41.)

On **April 23, 2020**, the Credentials Committee met and "unanimously approved" a motion "that ***Dr. Hetzel's precautionary suspension may be lifted*** contingent on the findings of a fitness for duty evaluation which will include a Neuropsychologist's and a Neurologist's assessment." (*Id.* at 42-43) (emphasis added). This ended the second period of suspension and was ***not more than 30 days following the March 25, 2020, second period of suspended clinical privileges***. (Ex. B, Dr. Hyde Dep., 114:9-17, 119:3-9.)

As of **May 4, 2020**, the March 3, 2020, suspension lasted seven days before being modified on March 10, 2020, to permit Dr. Hetzel to see patients. (Dkt. 65-2, Comm. Docs., 7; *see also*, Ex. B, Dr. Hyde Dep., 114:9-17, 119:3-9.) The second, March 25, 2020, suspension was also lifted as of April 23, 2020 – not more than 30 days later. (*Id.* at 43; *see also*, Ex. B, Dr. Hyde Dep., 114:9-17, 119:3-9.) Despite these facts, Defendant Mission Hospital reported Dr. Hetzel to the NPDB as follows on May 4, 2020 ("Report 1"):



(Dkt. 65-6, NPDB Mats., 2.) It did so, even though its policy explicitly states "***[a] precautionary suspension is not in and of itself a final professional review action that is reportable***[.]" (Ex. A, Mar. 12, 2020, letter, DJH000168; Dkt. 65-2, Comm. Docs., 4)(emphasis added).

Report 1 states the suspension was "removed" on April 23, 2020. (Dkt. 65-6, NPDB Mats.,

2), which would appear to refer to the second suspension that was imposed on March 25, 2020. (Dkt. 65-2, Comm. Docs., 23, 43.) Despite that, Report 1 inaccurately lists the "Date Action Was Taken" as March 3, 2020, and – despite noting the suspension was "removed" on April 23, 2020 – that the length of action as "INDEFINITE." (Dkt. 65-6, NPDB Mats., 2.) It also inaccurately lists the "Basis for Action" as "CONCERNS ABOUT PREOPERATIVE PLANNING AND INTRAOPERATIVE CARE," though those concerns were evidently relieved by April 23, 2020, no more than 30 days prior. (*Id.*; Dkt. 65-2, Comm. Docs., 43.) Dr. Hyde confirmed these inaccuracies. (Ex. B, Dr. Hyde Dep., 7-39, 114:9-17, 119:3-9, Ex. 25.)

On **May 6, 2020**, Dr. Hetzel wrote a requested letter to the Credentials Committee regarding his attempts to communicate with the March 2, 2020, patient's family post-surgery. (Dkt. 65-2, Comm. Docs., 45-48.)

On **May 11, 2020**, the Credentials Committee met. (*Id.* at 49.) After discussion and review of the fitness for duty assessments, a motion to lift the precautionary suspension with certain stipulations was made. The stipulations were: (1) "prospective concurrent consultation by a qualified OB/GYN surgeon in good standing on the medical staff" for "[a]ll surgical cases," (2) "another operating Gyn Oncologist" for "[a]ll pelvic surgeries," (3) that "[w]ork with interns and residents be discontinued" and (4) a "Focused Practice Performance Evaluation…to capture operative volume and include indications, surgical performance and outcomes." (*Id.* at 50.) A motion "unanimously passed to dissolve the ad hoc Investigative Committee." (*Id.*)

On **June 5, 2020**, a MEC Executive Session met and modified the Credentials Committee's May 11, 2020, action and recommendation following investigation such that the precautionary suspension was lifted subject to the following three conditions: (1) all surgical cases would be the subject of a Focused Professional Practice Evaluation (FPPE) until further determined by the

Medical Executive, which would delegate carrying out the FPPE to the appropriate committee or service line leader the responsibility of carrying out the FPPE; (2) "[p]roctoring [w]ould be required as determined by the Women's Service Line Leader" and (3) the Credentials Committee Chair would provide Dr. Hetzel with a letter of guidance and/or counsel related to "the serious concerns identified as part of the review of the precautionary suspension." (*Id*. at 51-52.) There was no hearing right and Dr. Hetzel was notified by **June 9, 2020**, letter. (*Id*. at 52-54.) No proctoring requirement was ever made by the Women's Service Line Leader.

A **June 17, 2020**, letter provided the following guidance: (1) consultation with a colleague recommended "when the right decision may be uncertain;" (2) more robust operative case family communication, especially when the post-operative course is not as expected, and (3) Peer Review Committee guidance regarding presenting cases to the Breast Conference should have been followed. (*Id*. at 55-56.)

On **July 9, 2020**, Defendant Mission Hospital filed a revision to Report 1 ("Report 2"), indicating "clinical privileges were fully reinstated on or about June 9, 2020, along with conditions that did not limit or restrict Dr. Hetzel's clinical privileges." (Dkt. 65-6, NPDB Mats., 5.) Damaging to Dr. Hetzel, Defendant Mission Hospital chose not to void or correct the report despite the fact that the report was based on a summary suspension that had been vacated.

On **February 2, 2021**, Dr. Hetzel submitted a dispute of Report 1 to the NPDB, which is incorporated herein by reference herein as if fully set forth. (*Id*. at 7-8.)

On **May 11, 2021**, Phillip Jackson, then counsel for Defendant, wrote Dr. Hetzel's counsel that Defendant Mission Hospital would "neither correct nor void" Report 1. (*Id*. at 9.)

On **July 27, 2021**, Donald Illich, Dispute Resolution Manager, for the Division of NPDB, wrote Brenda Shelton of Defendant Mission Hospital, directing Defendant to "use a Date of Action

of March 25, 2020 instead of March 3, 2020," erroneously explaining "[i]t's clear that from March 25, 2020, Dr. Hetzel was suspended without interruption through June 5, 2020." (*Id*. at 10.) This correspondence ignored the April 23, 2020, removal of suspension, but directed that the March 10, modification be included. (*Id*.)

On **August 27, 2021**, Ms. Shelton wrote Mr. Illich asking whether the correction needed to include a description of events occurring between May 4, 2020, and July 9, 2020. (*Id*. at 12-13.) The letter proposed a revision that included the April 23, 2020, lifting of Dr. Hetzel's suspension contingent on the findings of a fitness for duty evaluation. (*Id*. at 12.)

On **September 8, 2021**, Mr. Illich responded that events between May 4, 2020, and July 9, 2020, need not be included as they were not part of the corrected report timeframe. (*Id*. at 14.)

On **October 27, 2021**, Defendant Mission Hospital filed its correction to Report 1 ("Report 3"), which **did not** reference the April 23, 2020, lift of the suspension though it occurred within the timeframe of Report 1. Report 3 speciously stated as follows:

| C. INFORMATION REPORTED | NOTE: Information marked with an asterisk (*) was added, corrected, or removed. |
| --- | --- |
| | Type of Adverse Action: TITLE IV CLINICAL PRIVILEGES |
| | Basis for Action: OTHER - NOT CLASSIFIED, SPECIFY (99) |
| | Other, as Specified: CONCERNS ABOUT PREOPERATIVE PLANNING AND INTRAOPERATIVE CARE |
| | Adverse Action Classification Code(s): SUMMARY OR EMERGENCY SUSPENSION OF CLINICAL PRIVILEGES (1632) SUMMARY OR EMERGENCY LIMITATION, RESTRICTION, OR REDUCTION OF CLINICAL PRIVILEGES (1639) |
| | * Date Action Was Taken: 03/25/2020 |
| | * Date Action Became Effective: 03/25/2020 |
| | Length of Action: INDEFINITE |
| | * Description of Subject's Act(s) or Omission(s) or Other Reasons for Action(s) Taken and Description of Action(s) Taken by Reporting Entity: On March 3, 2020, a precautionary suspension was taken against Dr. Hetzel. On March 10, 2020, a precautionary suspension was modified, allowing Dr. Hetzel to continue seeing patients. But for all operative cases, he was required to have a concurrent consultation for all of his operative cases. That concurrent consultation must have been provided by a qualified surgeon employed by Hope Women's Cancer Center and in good standing with the medical staff. He was also required to have another qualified surgeon scrub in with him for his operative cases. That qualified surgeon must have been employed by Hope Women's Cancer Center and in good standing with the medical staff; he could also no longer supervise residents. On March 25, 2020, all clinical privileges were suspended. |

(*Id*. at 16.) Thus, Report 3 inaccurately states that as of May 4, 2020 (the date of Report 1), Dr. Hetzel's privileges had been suspended indefinitely since March 25, 2020 – even though the suspension was lifted on April 23, 2020. (Dkt. 65-2, Comm. Docs., 43.) It also still lists the action basis as "CONCERNS ABOUT PREOPERATIVE PLANNING AND INTRAOPERATIVE

CARE," though such concerns were relieved as of April 23, 2020, and before Report 1.

On **October 28, 2021**, R. David Henderson, Chief Executive Officer of the North Carolina Medical Board, wrote Dr. Hetzel stating explaining that "the Board determined that there was no violation of the Medical Practice Act and has closed its file." (Ex. F, Oct. 28, 2021, letter.)

On **November 9, 2021**, Dr. Hetzel submitted a dispute to Report 3 to the NPDB, which is incorporated herein by reference as if fully set forth. (Dkt. 65-6, NPDB Mats., 16-17.)

On **December 22, 2021**, Mr. Illich wrote Dr. Hetzel advising there was "no basis on which to conclude that the report should not have been filed in the NPDB or that it is not accurate, complete, timely or relevant," and denying the request it be voided. (*Id*. at 19.) The decision was based on an incorrect understanding that more than 30 days had expired from the time of the March 25, 2020, preliminary suspension. (*Id*. at 21-22.) That was not the case. It was lifted on April 23, 2020, pending fitness for duty evaluations. (Dkt. 65-2, Comm. Docs., 42.)

## B. DEFENDANT MISSION HOSPITAL'S BYLAWS AND POLICY

The Brief also attached policy pages and bylaws. (Dkt. 65-3, Hosp. Gov. Mats.)[10] Defendant Mission Hospital weaves sparing statements about precautionary suspension from these materials, summarily concluding that it followed procedure after the March 2, 2020, surgery. (Dkt. 65-1, Br., 4.) It omits the most pertinent portions of these materials – the many procedures it ***did not follow*** as summarized below:

- 4.6.1(b) requires that "[t]he member shall also be promptly given a copy of the member's rights, which shall include a meeting with the Credentials Committee," or 4.6.1(c), which explains that such member "may address the Credentials Committee during the meeting[.]" (Dkt. 65-3, Hosp. Gov. Mats., at 6.)

- 4.6.1(b) explains that "***[a] precautionary suspension is not in and of itself a final professional review action that is reportable***, but rather an interim step to protect

---

[10] A footnote states the "bylaws" took effect March 18, 2020," "[t]he prior version of the Bylaws has also been produced in discovery," which "is relevantly identical but refers to Mission Hospital, Inc. instead of MH Mission Hospital, LLLP." (Dkt. 65-1, Br., fn.3.)

patients." (*Id.* at 6, 11) (emphasis added).

- 8.4(a) dictates that a precautionary/summary "suspension ***shall not imply any final finding of responsibility for the situation that caused the suspension nor shall it constitute a start of an investigation***." (*Id.* at 11) (emphasis added).

- 8.5(a) mandates that an investigation "begin only after a formal resolution of the Credentials Committee to that effect following receipt of a written request for an investigation." (*Id.*)

- 8.6 sets forth the formal hearing and appeal process. (*Id.* at 13.)

Indeed, Dr. Hyde opined that Defendant Mission Hospital violated the foregoing omitted language in multiple ways. Specifically, Dr. Hyde provided the following opinions:

> Based on the evidence available to date, and within a reasonable degree of professional certainty, Mission systematically violated multiple provisions of their Medical Staff Bylaws, NPDB reporting requirements, and industry standards in their treatment of Dr. Hetzel.

> Mission Hospital's investigation concluded that "the clinical care that was the subject of the initial precautionary suspension did not warrant a limitation on Dr. Hetzel's clinical privileges," yet they maintained their NPDB report in direct contradiction of those findings.

> These violations include: (1) treating a precautionary suspension as a reportable action in direct violation of Section 4.6 of the Mission Hospital Medical Staff Bylaws; (2) failing to follow mandatory investigation procedures required by Article IV; (3) denying due process protections guaranteed under Article V; (4) bypassing the Focused Professional Practice Evaluation (FPPE) as an appropriate alternative; and (5) maintaining an NPDB report that contradicted their investigative conclusions and violated the fundamental purposes of the NPDB.

> These multiple failings, over a prolonged period, demonstrate that Mission acted in bad faith, outside the scope of their established governance procedures. My opinion is that these actions, more likely than not, were motivated by financial or other considerations *unrelated to legitimate patient safety concerns.*

(Ex. C, Dr. Hyde Report, 1, 6; Ex. B, Dr. Hyde Dep., 275:4-18.) Dr. Hyde reiterated and elaborated on these opinions in his supplemental report. (Ex. D, Dr. Hyde Supp. Report, 1-2, 9-10.)

**C.    DR. HETZEL HAS CONSISTENTLY MAINTAINED THE NPDB REPORT IS FALSE**

Defendant Mission Hospital's statement that Dr. Hetzel "does not claim that the

information contained in Report 1 is false" is wildly inaccurate. (Dkt. 65-1, Br., at 15.) Dr. Hetzel

has made crystal clear the report is false and that its very existence is inaccurate – in his Amended

Complaint (Dkt. 4), his dispute to the NPDB (Dkt. 65-6, Comm. Docs., 7-8, 16-17) and his

testimony. He explained that it is difficult to say how something is false when it should not exist:

> [T]he fact that it exists at all is a huge part of, of, of my answer as to why, you know,
> there is an expectation that this should be a blank white board or a blank blackboard,
> that nothing should be written on it, especially since it's not that it's, you know, it's
> not accurate or those things didn't happen, it's not a stock ticker of the day-to-day
> of what goes on in a hospital. You know, it's meant to be a sign board to say pay
> attention. There's something here. And when it's -- instead ends up being oh, by
> the way -- and then the problem is once it's there, it continues to be there, even
> when it's changed and modified. It continues to echo. It continues to grow on
> people, to say well there must be something here.
>
> And so it's -- it's a difficult answer. It's not that there's an inaccuracy about the
> words on the page. It's not there should be nothing on that page and it shouldn't
> exist. So that's my answer.

(Dkt. 65-4, Dr. Hetzel Dep., 125:17-126:11.)

To this point, the report should never have been made and should have been voided.

Defendant Mission Hospital admits the reporting trigger a suspension of more than 30 days (Dkt.

65-1, Br., at 9). Even Mr. Illich agrees this was March 25, 2020. (Dkt. 65-6, NPDB Documents,

10-11). Defendant admits in Report 1, that that suspension was "removed" on April 23, 2020 –

less than 30 days later. (Dkt. 65-6, NPDB Mats., 2.) As Dr. Hyde explained, Defendant Mission

Hospital filed Report 1 "in contravention of its rules, and for reasons entirely unrelated to patient

safety or to Dr. Hetzel's clinical work" and "[i]n refusing to withdraw its original complaint to the

NPDB, … compromised Dr. Hetzel's career from the time of that complaint to the present." (Ex.

C, Dr. Hyde Report, Ltr.; Ex. B, Dr. Hyde Dep., 275:4-8; Ex. D, Dr. Hyde Supp. Report, Ltr.)

## D.     REPORT 1 CAUSED THE DAMAGE

The Brief also attempts to shift blame for the ample damages Dr. Hetzel has suffered from

Report 1 to affiliation-verification responses by the Credentials Committee Chair and the eventual "correction" of Report 1. (Dkt. 65-1, Br., 12-15.) These Brief sections are wholly disputed, with the exception that it is true that Dr. Hetzel had decided to leave Defendant Mission Hospital and was seeking employment opportunities at Texas Tech University Health Sciences Center ("TTUHSC") before the events described herein.

To begin, Defendant takes Dr. Hetzel's cited testimony regarding the effect of the affiliate verifications entirely out of context. Dr. Hetzel testified they are "damaging" "[b]ut to say it's more or less" [than the NPDB], "you have that with the internet, you know, you have scalability, you know, where anybody at any time can look at it and then it can echo, reverberate, perhaps get worse, where [the verification] is an isolated case." (Dkt. 65-4, Dr. Hetzel Dep., 155:23-156:3.) He explained "it's all cumulative" and "hard to tease them apart." (*Id*. at 156:16-18.) That is absolutely the case, and a jury may well so find.

To illustrate, Dr. Hetzel had a fully signed TTUHSC letter of intent as of June 5, 2020. (Ex. G, TTUHSC Documents, 2-5.) He was explicitly asked to "[p]lease put on hold as we discussed until the NPDB" issue was resolved, and he guessed "that they won't consider until the NPDB is cleared of the term license suspension." (*Id*. at 6.) After later re-application, he received a letter informing him that his application to the School of Medicine Professional Staff was "NOT approved." (*Id*. at 9.) The decision was "based on the conditional status of [his] privileges," his "cessation of clinical practice since that status was granted," his "subsequent prolonged absence from clinical practice" and "other information obtained during the credentialing process." (*Id*.) These reasons each flowed from Report 1's false indication of an "indefinite" suspension since March 25, 2020, for preoperative and perioperative concerns that still lives in the NPDB system.

The damage was done, and continues, because of Report 1.[11]  Dr. Hetzel described the cascade of damage created by Report 1 as "the beginning of what continued to be after that a reverberation, a snowballing, … once this is here, then it has to be changed and then corrected, but it's still, you know, it's still out there to this moment, … echoing and continuing to get louder and impact [his] career."  (Dkt. 65-4, Dr. Hetzel Dep., 124:17-25.)  The impact of this reverberation torpedoed Dr. Hetzel's reputation and career, depleted his retirement and atypical assets and forced him to live in a difficult way, including at times not being able to afford winter heat or a phone.  (*Id*. at 204:8-24.)  Since Report 1, he has only found brief work following the 2024, hurricane but has otherwise remained unemployed.  (*Id*. at 204:25-205:1.)  Now Dr. Hetzel is "trying to start over," but "as this ball continues to roll,…the blasted cap of the first National Physician(sic) Data Bank and the impact of that sequence of events has," he worries he may not be able to be hired" because he is "less and less attractive, not only because [he's] older, but because [he] [hasn't] been working."  (*Id*. at 205:8-20.)  Indeed, Dr. Hetzel's present economic damages resulting from Defendant Mission's Hospital's conduct exceeds $10 million.  (Ex. H, Marcum Report.)

## STANDARD OF REVIEW

Summary judgment is appropriate only where the record demonstrates "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Woollard v. Gallagher*, 712 F.3d 865, 873 (4th Cir. 2013); *see also* Fed. R. Civ. P. 56(a).  A fact is "material" if it might affect the outcome of the litigation, and a dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party.  *High v. R & R Transportation, Inc.,* 242

---

[11] This is not alleviated by the reports that followed.  It is indisputable that Reports 2 and 3 would not have occurred but for Report 1 – they were an update (Report 2) and correction (Report 3) of Report 1.  (Dkt. 65-6, NPDB Documents, 4-5, 15-18.)  Nor can Defendant Mission Hospital hide behind any NPDB determination.  Mr. Illich would not have made any determination, correct or not, on Report 1 if it had not been filed in the first place; plus, that determination has no bearing in this Court.

F. Supp. 3d 433, 438 (M.D.N.C. 2017)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986)). Reasonable inferences from the record must be drawn in Dr. Hetzel's favor after viewing

the facts in the light most favorable to him. *Waterman v. Batton*, 393 F.3d 471, 473 (4th Cir.

2005)(citing *Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 229 (4th Cir. 2002)); *Henry*

*v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011). If a genuine issue of material fact exists, the motion

for summary judgment must be denied. *Gray v. Spillman*, 925 F.2d 90, 95 (4th Cir. 1991).

## ARGUMENT

Defendant Mission Hospital's Motion is premature and ignores the Court's role on this

Motion – not "to weigh the evidence and determine the truth of the matter" but "to determine

whether there is a genuine issue for trial." *High,* 242 F. Supp. 3d at 438. As such issues exist here,

Defendant Mission Hospital's Motion must be denied. A jury must determine the critical disputes.

### A.    DEFENDANT MISSION HOSPITAL'S MOTION IS PREMATURE

As an initial matter, Defendant Mission Hospital's Motion should be held in abeyance or

denied as premature, without prejudice to renew the argument at the appropriate time. Summary

judgment is usually inappropriate "where the parties have not had an opportunity for reasonable

discovery." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448–49 (4th Cir.

2011). There is a pending motion to compel and for extension relating to the withholding of

credentialing information, including information redacted in exhibits attached to the Brief. (Dkt.

54.) This is underscored by the heavily-redacted documentation that Defendant Mission Hospital

provides in support of its Motion – essentially arguing that Dr. Hetzel's clinical performance is

subpar using selective and self-serving information from its investigation into the index case and

crafted declarations from witnesses it controls.[12] (*See*, *e.g.*, Dkt. Nos. 65-2, 65-5, 65-7.)

---

[12] Notably, this is the very type of information that has been repeatedly secreted from Dr. Hetzel throughout this litigation and is the subject of several pending motions. (*See* Dkt. Nos. 54, 67.)

Moreover, the Motion was filed before a single witness other than Dr. Hetzel was deposed and months before the January 20, 2026, discovery deadline (Dkt. 48). Dr. Hetzel believes discoverable and yet undisclosed evidence – including the evidence sought in his pending Motion to Compel – may be critical to the issues before the Court on this Motion. Thus, summary judgment is premature at this stage.

Moreover, Defendant Mission Hospital makes clear it intends to move for summary judgment on several other issues at the close of discovery. (Dkt. No. 65-1 at 2.) Both Rule 56 and the interests of judicial economy dictate that all summary dispositive issues be decided in a single stage – preferably at the close of discovery – and not piecemeal. *See*, *e.g.*, *Ballard v. Hatley*, No. 3:17-CV-00393-MR, 2020 WL 3076333, at *5 (W.D.N.C. June 10, 2020) ("Rule 56 does not contemplate or allow piecemeal summary judgment motions"). Given the forecast of more summary judgment motions, the instant Motion should be held in abeyance or denied as premature.

## B.    DR. HETZEL'S PRECAUTIONARY SUSPENSIONS WERE NOT REPORTABLE

Defendant Mission Hospital takes as a given that Dr. Hetzel's precautionary suspensions were reportable, but this is a hotly disputed and essential issue. A jury must decide several pertinent fact questions to determine whether the precautionary suspensions were reportable. If determined in Dr. Hetzel's favor, as they should be, Dr. Hetzel should never have been reported.

The Guidebook the Brief repeatedly cites explains the NPDB "is primarily a ***flagging system*** that may serve to alert users that a more comprehensive review of the qualifications and background of a health care practitioner… may be prudent."[13] Thus, any report made to the NPDB carries with it an implied red flag regarding the reported physician. Entities must report to the NPDB and provide a copy to the State's Board of Medical Examiners "[a]ny professional review

---

[13] (*NPDB Guidebook, available at* https://www.npdb.hrsa.gov/guidebook/AGeneralInformation.jsp#InterpretNPDB Info, last visited Dec. 5, 2025)(emphasis added).

action that adversely affects the clinical privileges of a physician…for a period longer than 30 days[.]" 45 C.F.R. § 60.12.

A "[p]rofessional review action" is "an action or recommendation of a health care entity" that is "(1) Taken in the course of professional review activity; (2) Based on the professional competence or professional conduct of an individual health care practitioner which affects or could affect adversely the health or welfare of a patient or patients; and (3) Which adversely affects or may adversely affect the clinical privileges or membership in a professional society of the health care practitioner." 45 C.F.R. § 60.3. It should be noted, however, that "[t]he NPDB treats summary suspensions differently from other professional review actions because the procedural rights of the practitioner are provided *following* the imposition of a suspension, rather than *preceding* it."[14] The precautionary suspensions at issue are summary suspensions, as they were taken prior to the completion of the investigation into the index case and determination by any reviewing body.

At this stage, the Court must view the evidence and any inferences therefrom in the light most favorable to Dr. Hetzel, as the non-moving party. *Anderson*, 477 U.S. at 255. In that light, Dr. Hetzel's suspensions were not reportable. This will ultimately turn on determination by a jury of several genuine issues of material fact bearing on the question of reportability.

### 1. Factual Issue One: Did Defendant Mission Hospital Report Dr. Hetzel's Precautionary Suspensions Contrary to Its Own Policy?

As a starting point, there are multiple Defendant Mission Hospital policies that state that neither precautionary suspension was reportable. The language in every set is: "*[a] precautionary suspension is not in and of itself a final professional review action that is reportable*[.]" (Dkt. 65-3, Hosp. Gov. Mats., 6, 11; 65-2, Comm. Docs., 4; <u>Ex. A</u>, Mar. 12, 2020, letter,

---

[14] NPDB Guidebook, available at https://www.npdb.hrsa.gov/guidebook/EClinicalPrivileges.jsp#SummarySuspensions, last visited Dec. 5, 2025.

DJH000168)(emphasis added).  Dr. Hyde, Dr. Hetzel's expert, confirms this as well as his opinion that Defendant Mission Hospital violated its policies.  (Ex. B, Dr. Hyde Report; Ex. E, Dr. Hyde Dep. 275:5-8; Ex. D, Dr. Hyde Supp. Report.)  Though Defendant Mission Hospital now attempts to distance itself from that policy in favor of an argument to the contrary, the very fact that it did not comply with its own policy gives way to a jury inference that its report was improper.

### 2. Factual Issue Two: Was There An Interruption in Dr. Hetzel's Suspension?

The evidence is overwhelming that Dr. Hetzel was never suspended without interruption for more than 30 days.  First, he was given a "precautionary suspension," of his clinical privileges on March 3, 2020, which lasted only seven days to March 10, 2020.  It was modified "to a lesser sanction" and Dr. Hetzel was permitted to see patients, though a partner would have to scrub in for surgeries.  (Dkt. 65-2, Comm. Docs., 1-3, 7.)  Then, on March 25, 2020, his clinical privileges were again suspended but not for more than 30 days as the suspension was removed on April 23, 2020, contingent on a fitness for duty evaluation.  (Id. at 23, 43-44.)  Dr. Hyde confirmed.  (Ex. B, Dr. Hyde Dep., 114:9-17, 119:3-9, 272:14-19.)

Mr. Illich's conduct in his investigation also reflects this was an interruption.  He required inclusion of the March 10, 2020, modification in the corrected report (Report 3).  (Dkt. 65-6, NPDB Mats., 10.)  Mr. Illich further explained that, given that Report 1 was dated May 4, 2020, the period following that did not require inclusion in the corrected report (Report 3).  (Id. at 14.)  Under this logic, the April 23, 2020, modification should have been included as an interruption,[15] as confirmed by Ms. Shelton's response letter.  (Id. at 12.)

_____

[15] Mr. Illich ignored the April 23, 2020, modification which should have stopped the perverbial clock.  His deposition has not been taken.  Even if he considered it and found it not an interruption, that is not determinative.  The Court determines whether Report 1 accurately reflects the action taken.  Robinson v. E. Carolina Univ., 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018)(citations omitted).  It does not.

19

### 3. *Factual Issue Three: Was The Suspension More than 30 Days or Not?*

That these two precautionary suspension periods did not last more than 30 days is evident from the record provided by Defendant Mission Hospital, including the Minutes and letters or a memorandum to Dr. Hetzel, and Dr. Hyde, Dr. Hetzel's liability expert confirmed the same. (Dkt. 65-2, *generally*; Ex. B, Dr. Hyde Dep., 272:14-273:17.) These documents, on their face and viewed in the light most favorable to Dr. Hetzel, confirm the suspensions never exceeded 30 days.

### 4. *Factual Issue Four: Was the Suspension Ultimately Vacated?*

Dr. Hetzel maintains that the NPDB report should have been voided because the underlying allegations regarding the at-issue surgery were not substantiated. The NPDB Guidebook heavily relied upon by Defendant Mission Hospital dictates that "[i]f the authorized hospital committee or body vacates the summary suspension, the entity must void the previous report submitted to the NPDB."[16] Contrary to what Defendant Mission Hospital suggests, the NPDB findings regarding this issue are neither determinative nor admissible. *See, e.g.*, *Arlio v. Lively*, 474 F.3d 46, 53 (2d Cir. 2007) ("District courts must assiduously guard juries against the siren song of irrelevant and prejudicial prior determinations"). Neither Mr. Illich nor the NPDB are the fact finder here. The jury is. As such, it is the jury who must decide whether Dr. Hetzel's summary suspension was "vacated" by the MEC's subsequent findings and revisions to it.

### C.   A JURY MAY – AND LIKELY WILL – DETERMINE THAT THE REPORT WAS FALSE AND THAT DEFENDANT MISSION HOSPITAL KNEW IT.

"[E]ntities are responsible for the accuracy of information which they report to the NPDB." 45 C.F.R. § 60.6(a). As such, an entity may be held liable in a civil action regarding a report it made to the NPDB if that had "knowledge of the falsity of information contained in the report."

---

[16] NPDB Guidebook, *available at* https://www.npdb.hrsa.gov/guidebook/EClinicalPrivileges.jsp#SummarySuspensions, last visited Dec. 5, 2025.

42 U.S.C. § 11137(c); see also, 45 C.F.R. § 60.22. Immunity does not attach if facts in NPDB reports related to revocation of clinical privileges are false. *See*, *e.g.*, *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324, 1334 (10th Cir. 1996) (affirming district court's determination that immunity did not apply because the record contained sufficient evidence from which a reasonable jury could conclude the report was false); *Zawislak v. Mem'l Hermann Hosp. Sys.*, No. CIV.A. H-11-1335, 2011 WL 5082422, at *3 (S.D. Tex. Oct. 26, 2011) (denying hospital immunity on defamation claim for NPDB report because "a trier of fact could conclude that the reviewing committee did not make a reasonable effort to obtain the facts" underlying the reported action). Thus, Defendant Mission Hospital may be held liable if its NPDB reports were false and it knew it. 42 U.S.C.A. § 1137(c). Both are true.

The "general consensus" is that Court's role is not to "evaluate whether the underlying merits of the reported action were properly determined" but to "evaluate whether the report itself accurately reflected the action taken." *Robinson v. E. Carolina Univ.*, 329 F. Supp. 3d 156, 177 (E.D.N.C. 2018) (citations omitted). Whether the report is knowingly false presents a central, genuine issue of material fact – and that issue must be determined by a jury. *See Miller v. Huron Reg'l Med. Ctr., Inc.*, 145 F. Supp. 3d 873, 885 (D.S.D. 2015) (denying summary judgment on 42 U.S.C. 11137(c) immunity grounds because a jury could find that the report was knowingly false).

### 1. The Report is False on its Face.

Report 1 is inaccurate on its face in ***at least*** four ways, and Report 3 in ***at least two***. Their falsity was known to Defendant Mission Hospital by its own documents, including Report 1.

<u>First</u>, Report 1 and 3 state: "Length of Action: INDEFINITE." This is false based on information known to Defendant Mission Hospital at the time of Report 1 and on the face of Report 1. Report 1 states: "This precautionary suspension was modified with the most recent modification

being on 4/23/20 when the precautionary suspension was removed subject to the practitioner's satisfactory completion of fitness for duty evaluations." (Dkt. 65-6, NPDB Mats., 2.) Defendant Mission Hospital Minutes and memorandum to Dr. Hetzel confirm this modification. (Dkt. 65-2, Comm. Docs., 42-44.)

Second, by April 23, 2020, Report 1 as well as Defendant Hospital Minutes and correspondence to Dr. Hetzel prior to Report 1 reflect that his suspension was removed by April 23, 2020, subject to fitness for duty evaluations. (*Id.*; Dkt. 65-6, NPDB Mats., 2.) The statements in Reports 1 and 2 that the adverse action regarded "CONCERNS ABOUT PREOPERATIVE PLANNING AND INTRAOPERATIVE CARE," are both false and plainly harmful to this physician's reputation. The Reports themselves are damning, but this misstatement elevates them to a higher level that make it no wonder Dr. Hetzel has not been rehired, despite not being the surgeon at fault for the problems identified in the index case. Dr. Hetzel explained:

> [T]here is an expectation that this should be a blank white board or a blank blackboard, that nothing should be written on it, especially since it's not that it's, you know, it's not accurate or those things didn't happen, it's not a stock ticker of the day-to-day of what goes on in a hospital. You know, it's meant to be a sign board to say pay attention. There's something here. And when it's -- instead ends up being oh, by the way -- and then the problem is once it's there, it continues to be there, even when it's changed and modified. It continues to echo. It continues to grow on people, to say well there must be something here.

(Dkt. 65-4, Dr. Hetzel Dep., 125:20-126:7.)

Third, and as pointed out by Mr. Illich, Report 1 is false because no reportable suspension occurred on March 3, 2020. Mr. Illich directed that the "Date of Action" be changed to March 25, 2020, to reflect the period of suspension "*without interruption*," discounting the March 3, 2020, precautionary suspension because it was modified on March 10, 2020. (Dkt. 65-6, NPDB Mats., 10.) His letter confirms March 3, 2020, was inaccurate *and* Defendant Mission Hospital's correction admits the same. (Dkt. 65-6, NPDB Mats., 10-11, 16.)

Fourth, Mr. Illich required the March 10, 2020, modification be included because it was an interruption to the suspension. *Id.* The failure to include it falsely stated the end date of the March 3, 2020, suspension. Report 3 is similarly inaccurate for not listing the April 23, 2020, interruption.

These statements – and the knowledge of their falsity – are underscored by the potential pretextual reasons for this report, given the circumstances in which it was made. Pretextual reporting is knowingly false reporting and abrogates immunity. For instance, a Florida court found that it would abrogate HCQIA immunity where an NPDB report stating a physician performed substandard care was made in retaliation for his decision to move practices. *Gudes v. Health*, No. 3:22-CV-341, 2023 WL 5002053, at *4 (S.D. Ohio Aug. 4, 2023). Dr. Gudes – like Dr. Hetzel – had informed the hospital where he worked that he was leaving and, only after this, the hospital made inaccurate and pretextual NPDB reports. *Id.* at *4. There is a reasonable inference, like in *Gudes*, that Defendant Mission's report was retaliatory. As Dr. Hyde explained, "[t]he multiple failings, over a prolonged period, demonstrate that Mission acted in bad faith, outside the scope of their established governance procedures," and that, in his opinion, "these actions, more likely than not, were motivated by financial or other considerations *unrelated to legitimate patient safety concerns*." (Ex. C, Dr. Hyde Report, 6; Ex. D, Dr. Hyde Supp. Report, 9) (emphasis in originals).

In totality, the record viewed in the light most favorable to Dr. Hetzel shows that Report 1 was false and Defendant Mission Hospital knew it. The evidence shows that – by NPDB standards, by Defendant Mission Hospital standards, and by the industry standards articulated by Dr. Hyde – Defendant Mission Hospital knowingly submitted these false reports.

## 2. The Report Is False Because the Suspensions Were Not Reportable.

The determination of falsehood is not just about what is in the report but also a potential employer's interpretation. The Eighth Circuit found persuasive one expert's testimony that "a[n]

NPDB report indicating that a physician voluntarily reduced her privileges while under investigation would be 'absolutely devastating' to the physician's career" and another expert's description of a report as "the kiss of death." *Miller v. Huron Reg'l Med. Ctr.*, 936 F.3d 841, 845 (8th Cir. 2019). An Eastern District of Pennsylvania Court also described what may be inferred from a report about a medical malpractice payment, if it was false and paid over objection:

> [T]he clear defaming inference is that his medical dereliction becomes actionable: it tends to tell the reader that Dr. Anbar is one who negligently injures, or has injured, his patient or patients. That is the sort of inference that can tend to empty his reception room and diminish his future job prospects.

*Anbar v. Leahan*, No. CIV. A. 97-CV-1138, 1998 WL 314691, at *5 (E.D. Pa. June 11, 1998).

No one disputes that a report to the NPDB carries with it great negative weight for a prospective employee physician. In addition to being false on its face, interpretation of the words in the NPDB report regarding Dr. Hetzel are defamatory because of how it has been viewed. It has, indeed, been the "kiss of death" for Dr. Hetzel's once-thriving career. Report 1 is thus false because it exists at all. The record is replete with evidence of this as well as Defendant Mission Hospital's knowledge of this fact. Report 3 is thus also false – it exists only because of Report 1.

Defendant Mission Hospital's Brief admits it knew when it filed Report 1 that the only reason a report should be filed in Dr. Hetzel's case was if the precautionary suspension lasted more than 30 days. (Dkt. 65-1, Br., 9)("When a precautionary suspension lasts more than 30 days, it must be reported to the National Practitioner Data Bank.") Defendant Mission Hospital also knew that the measure for filing a report of more than 30 days was not met. Indeed, Report 1 makes clear Defendant Mission Hospital knew that the March 25, 2020, suspension had been removed before it surpassed the 30-day mark. It references the April 23, 2020, "modification" of Dr. Hetzel's suspension and indicates that the suspension "was removed" subject to the fitness for duty evaluations. (Dkt. 65-6, NPDB Mats., 2.)

Its (1) March 10, 2020, March 24, 2020, and April 23, 2020, Credentials Committee Minutes; (2) March 12, 2020 and March 25, 2020 letters and (3) April 23, 2020 memorandum to Dr. Hetzel make clear what it knew. It knew that (1) Dr. Hetzel's initial March 3, 2020, precautionary suspension was interrupted on March 10, 2020, by a modification to a "lesser sanction," (2) that a new, second period of suspension of all clinical privileges period began on March 25, 2020, and (3) that this second period of suspension was also interrupted and cut short by a modification of and lifting of the suspension contingent on the findings of a fitness for duty evaluation. (Dkt. 65-2, Comm. Docs., 7, 12-13, 22-23, 43-44.)

Dr. Hetzel has also repeatedly reiterated throughout this litigation, including in testimony cited above, that the report itself makes the report false. In answer to "is it not accurate," Dr. Hetzel testified (as further detailed above) that "*there should be nothing on that page* and *it shouldn't exist*." (Dkt. 65-4, Dr. Hetzel Dep., 125:17-11) (emphasis added). Indeed, if it did not exist, Dr. Hetzel would be employable today.

Accordingly, based on the facts in the record viewed in the light most favorable to Dr. Hetzel, these Reports 1 and 3 were false on their face, false because they exist at all and false in what they imply to the many prospective employers who once sought to hire Dr. Hetzel.

## CONCLUSION

Not only is Defendant Mission Hospital's Motion premature, but it also asks the Court to substitute its own judgment for the judgment of a jury as to several genuine issues of material fact, including whether Dr. Hetzel was suspended for more than 30-days without interruption, whether the suspension was revoked and whether the reports were knowingly false. As that would be improper, Dr. Hetzel respectfully requests that Defendant Mission Hospital's Motion be denied.

This the 5th day of December, 2025.

              Respectfully submitted,

              **EDWARDS BEIGHTOL, LLC**

              <u>/s/ Catharine E. Edwards</u>
              Catharine E. Edwards
              N.C. State Bar No. 52705
              Kristen L. Beightol
              N.C. State Bar No. 27709
              P.O. Box 6759
              Raleigh, NC 27628
              (919) 636-5100
              cee@eblaw.com
              klb@eblaw.com

## CERTIFICATION PURSUANT TO STANDING ORDER – IN RE: USE OF ARTIFICIAL INTELLIGENCE

I hereby certify as follows pursuant to the Court's June 18, 2024, Standing Order In re: Use of Artificial Intelligence:

1. No artificial intelligence was employed in doing the research for the preparation of this document, with the exception of such artificial intelligence embedded in the standard on-line legal research sources Westlaw, Lexis, FastCase, and Bloomberg;

2. Every statement and every citation to an authority contained in this document has been checked by an attorney in t his case and/or paralegal working at his/her direction (or the party making the filing if acting pro se) as to the accuracy of the proposition for which it is offered, and the citation to authority provided.

This the 5th day of December, 2025.

/s/ Catharine E. Edwards
Catharine E. Edwards
N.C. State Bar No.: 52705
PO Box 6759
Raleigh, North Carolina 27628
Telephone: (919) 636-5100
Facsimile: (919) 495-6868
Email: cee@eblaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 5, 2025, I electronically filed on behalf of Plaintiff the foregoing **MEMORANDUM IN OPPOSITION TO MISSION HOSPITAL'S MOTION FOR SUMMARY JUDGMENT ON HCQIA IMMUNITY** using the CM/ECF system, which will send notification of such filing to all parties and/or their attorneys who have appeared in this action.

This the 5th day of December, 2025.

/s/ Catharine E. Edwards
Catharine E. Edwards
N.C. State Bar No.: 52705
PO Box 6759
Raleigh, North Carolina 27628
Telephone: (919) 636-5100
Facsimile: (919) 495-6868
Email: cee@eblaw.com