# EXHIBIT B

1                 UNITED STATES DISTRICT COURT

2                WESTERN DISTRICT OF NORTH CAROLINA

3                      ASHEVILLE DIVISION

4

5                                    .
      DAVID JOHN HETZEL, M.D.,       .     Civil Action No.:
6                                    .     1-23-cv-152
               Plaintiff,            .
7                                    .     Windsor Locks,
            vs.                      .     Connecticut
8                                    .
      MH MISSION HOSPITAL, LLLP,     .     November 6, 2025
9                                    .
               Defendant.            .     10:00 a.m.
10                                   .
      . . . . . . . . . . . . . . .  .
11

12

13                            REVISED

14                         DEPOSITION OF

15               FREDERICK HERBERT HYDE, M.D.

16                    Taken by the Defendant

17

18

19            CATHERINE PASTOR, CER 0194130

20

21

22

23

24    Proceedings recorded by a reporter using electronic
      sound recording; transcript produced by the reporter and
25    transcriber.

1                    APPEARANCES OF COUNSEL

2

3    On behalf of DAVID JOHN HETZEL, M.D.:

4        KRISTEN L. BEIGHTOL, ESQ.
         EDWARDS BEIGHTOL
5        714 St. Mary's Street
         Raleigh, North Carolina 27605
6        919-636-5100
         klb@eblaw.com
7
     On behalf of MH MISSION HOSPITAL, LLLP:
8
         DAVID C. HAWISHER, ESQ.
9        ROBERTS & STEVENS, P.A.
         Post Office Box 7647
10       Asheville, NC 28802
         828-252-6600
11       dhawisher@roberts-stevens.com

12

13

14   Also present:

15       Derek Rose, Videographer

16

17

18

19

20

21

22

23

24

25

```
 1              INDEX TO EXAMINATION

 2

 3   EXAMINATION                              PAGE

 4   Examination by Mr. Hawisher              5

 5   Examination by Ms. Beightol              271

 6

 7              INDEX OF EXHIBITS

 8   DEFENDANT'S     DESCRIPTION          REF/MARKED

 9   Exhibit 1 Hyde report                --
     Exhibit 2 NPDB Documents             15
10   Exhibit 3 NPDB Guidebook             45
     Exhibit 4 NPSB Code List             --
11   Exhibit 5 Disclosure History         --
     Exhibit 6 NPDB Response to Self-Query  --
12   Exhibit 7 Comprehensive Accreditation Manual  --
     Exhibit 8 Federal Statutes           77
13   Exhibit 9 CFR                        --
     Exhibit 10 Affiliation Verifications --
14   Exhibit 11 Committee Documents Redacted  35
     Exhibit 12 Hetzel Deposition         --
15   Exhibit 13 Evaluations               --
     Exhibit 14 Shelton Declaration       136
16   Exhibit 15 Bylaws                    --
     Exhibit 16 Policy on Appointment     170
17   Exhibit 17 Hetzel Operative Complaint  --
     Exhibit 18 Szurkus Report(3750151.1) --
18   Exhibit 19 Gutierrez Report(3750153.1) --
     Exhibit 20 Sagin Report(3750154.1)   --
19   Exhibit 21 NPDB article              --
     Exhibit 22 Tenet emails              --
20   Exhibit 23 Tenet emails              --
     Exhibit 24 Tenet emails              --
21   Exhibit 25 Notes                     7
     Exhibit 26 Accreditation Standards   40
22   Exhibit 27 Bylaws                    73
     Exhibit 28 Mission Bylaws            95
23   Exhibit 29 NPDB Guidebook            97
     Exhibit 30 Excerpt of Mark A. Hall article  279
24
         (Exhibits 1 through 30 were attached to the
25   original transcript.)
```

1          THE VIDEOGRAPHER:  Good morning.  We are now

2    on the record.  The time is 10:00 on November 6th, 2025.

3    This begins media number 1 to the videotaped deposition

4    of Fred Hyde, taken in the matter of David John Hetzel,

5    M.D. v. MH Mission Hospital, LLLP.

6          My name is Derek Rose.  I am your videographer

7    today.  The court reporter is Cat Pastor.  We are

8    representing Esquire Deposition Solutions.  Counsel will

9    be noted on the stenographic record.

10          THE REPORTER:  All right.  As he said, my name

11    is Cat Pastor, notary public and digital reporter on

12    behalf of Esquire Deposition Solutions in the state of

13    Connecticut.  Pursuant to the Federal Rules of Civil

14    Procedure, I will be capturing the verbatim record of

15    today's proceeding using electronic audio equipment, a

16    computer, and specialized recording software, which is

17    not a form of stenography.

18          The witness is located in Windsor Locks,

19    Connecticut, and has confirmed his identity with a

20    Connecticut driver's license issued by the Connecticut

21    Department of Motor Vehicles.  Absent any objection at

22    this time, counsel and witness agree to my

23    administration of the oath to this witness and that the

24    final transcript may be used for all purposes allowed by

25    the Federal Rules of Civil Procedure.

1       Hearing no objection, this shall constitute

2   agreement and stipulation of such, and I will now swear

3   in the witness.

4       Please raise your right hand.

5               FREDERICK HERBERT HYDE, M.D.,

6    having first been duly sworn, testified as follows:

7               THE REPORTER:  Great.

8               Now I'm handing Counsel back his mic, and he

9   may proceed.

10              MR. HAWISHER:  Thank you.

11                      EXAMINATION

12  BY MR. HAWISHER:

13  Q.   Good morning, Doctor Hyde.

14  A.   Good morning.

15  Q.   Thank you for being here.  It looks like you have

16  brought some materials with you.

17       What are those?

18  A.   They are materials that I brought in anticipation

19  of the deposition.  I can go through them if you'd like

20  now, or we can go through them --

21  Q.   Please do.

22  A.   All right.  I have a -- a copy of my report dated

23  August 27, 2025.  I have some notes that I've made for

24  myself.  I have copies if you want them.  Key points

25  that I'd like to make today.  I have an excerpt from the

1 | American Medical Association's Medical Staff

2 | Organization Bylaws.  I have an excerpt from the 2020

3 | Joint Commission Hospital Accreditation Standards.

4 |            I have a copy of a letter, February 25, 2020,

5 | from Mr. Chad Patrick, chief executive officer, Mission

6 | Hospital, to Dr. Hetzel.  I have excerpts from the

7 | medical staff bylaws.  I have excerpts from the report

8 | of Professor Mark Hall at the Wake Forest University.  I

9 | have two different excerpts.  I have materials presented

10 | as part of the case from the National Practitioner Data

11 | Bank.  I have an exhibit, which is 65-2 from, I believe,

12 | your materials, more NPDB.

13 |            I have an article from Medscape entitled,

14 | "When Is It Worth Fighting Your NPDB Report?"  I have

15 | a -- a title page and an excerpt from a law review

16 | article from the Cardozo Law Review, "The

17 | Constitutionality of the Federal System for Publishing

18 | Reports of Bad Doctors in the National Practitioner Data

19 | Bank."  I have an editorial from the editor of Journal

20 | of American Physicians and Surgeons in 2017, entitled

21 | "Sham Peer Review and the National Practitioner Data

22 | Bank."  And then I have some excerpts from the National

23 | Practitioner Data Bank Guidebook from October of 2018.

24 | Q.   You said you have extra copies of the notes?

25 | A.   Yes, sir.

1  Q.   If I -- if I could have one of those, that would be

2  great.

3  A.   Yep.  Would you like a copy of everything or

4  really, my notes?

5  Q.   If you have a copy of everything, I'll take a copy

6  of everything.

7  A.   Yes, sir.  Yep.  Here are two copies of my notes,

8  one for you and one for our reporter.  There are two

9  copies of the excerpts from the AMA Medical Staff

10 Bylaws.

11          MR. HAWISHER:  So I'm not sure I'm going to

12 enter everything in as an exhibit yet, but I am going to

13 mark the notes as -- let's see.  What was my last

14 number?  I'm going to mark them as 25.

15      (Defendant's Exhibit 25 was marked for

16 identification.)

17          THE WITNESS:  Do you want two copies of the

18 Hospital Accreditation Standards excerpts?

19          MS. BEIGHTOL:  I don't know if I have that

20 one.

21          THE WITNESS:  You don't?  You don't have that

22 one?

23          MR. HAWISHER:  You can -- you can take this

24 one at least for now.  We can make two.

25          MS. BEIGHTOL:  Oh.

```
 1           THE WITNESS:  I have an extra one.
 2           MS. BEIGHTOL:  Oh, okay.
 3           THE WITNESS:  That's why I have an extra one.
 4           MS. BEIGHTOL:  Oh.
 5           MR. HAWISHER:  Oh, perfect.
 6           THE WITNESS:  Here are -- I have one copy,
 7  unfortunately, the letter to Dr. Hetzel.
 8           MS. BEIGHTOL:  I've got that one.
 9           THE WITNESS:  Okay.  Good.
10           Here are two copies of the excerpts from the
11  medical staff bylaws.
12      Do you have one of those?
13           MS. BEIGHTOL:  I do not.
14           THE WITNESS:  Okay.  That's what I -- there
15  are two copies of one excerpt from Professor Hall's
16  thesis on Lessons Learned from HCA's Purchase of Mission
17  Hospital.  I think it's just a duplicate of what I have.
18  Yes, it is.
19           MS. BEIGHTOL:  Okay.
20           THE WITNESS:  And then I have materials that I
21  think, Counsel, you have as well.  Do you --
22           MS. BEIGHTOL:  I think this is the MPD exhibit
23  to your --
24           MR. HAWISHER:  Oh, that's fine.
25           MS. BEIGHTOL:  -- to your --
```

1            MR. HAWISHER:  Don't worry about that.

2            MS. BEIGHTOL:  He's got that and the

3   correspondence exhibit from your --

4            THE WITNESS:  And then the 65-2?

5            MS. BEIGHTOL:  -- since they were so nicely

6   coupled.

7            THE WITNESS:  Then I have this article from

8   Medscape.

9            Let me hand that one.

10           MS. BEIGHTOL:  I've got that.

11           THE WITNESS:  You got that?

12           MS. BEIGHTOL:  Yeah, you just handed that one

13   to me, so I've got that one.

14           THE WITNESS:  I've got one copy.  Okay.  And I

15   have this title page and excerpt --

16           MS. BEIGHTOL:  Got that.

17           THE WITNESS:  -- from Cardozo Law Review.  And

18   I have the article on sham peer review.  Then we have

19   excerpts from the National Practitioner Data Bank

20   Guidebook.

21           MS. BEIGHTOL:  Got it, that one.

22           THE WITNESS:  And that's the -- that's the

23   crop.

24   BY MR. HAWISHER:

25   Q.   So is that everything that you brought with you?

1  A.   It's everything pertinent to the case.  That's

2  correct.

3  Q.   Okay.  So let's -- let's start with what's in your

4  report.  Your report articulates three opinions as I

5  read it.  One of them is about whether Mission should

6  have reported Dr. Hetzel.  That's Opinion 1.  One is

7  about whether --

8          MS. BEIGHTOL:  I'm just going to object to the

9  statement and to the form of --

10         MR. HAWISHER:  Okay.

11         MS. BEIGHTOL:  -- the question that hasn't

12  been a question yet.

13         MR. HAWISHER:  Well, it -- it was about to be.

14  BY MR. HAWISHER:

15  Q.   Opinion 2 was about Mission's adherence or lack of

16  adherence to its investigation procedures.  And then

17  Opinion 3 is about due process protections that were or

18  were not reported to Dr. Hetzel during the suspension

19  and investigation.

20     Do I have that right?

21         MS. BEIGHTOL:  Same objection.

22         THE WITNESS:  Well, the report is -- is what

23  it is.  It says what it says.  It sounds like a -- a

24  decent summary, but it's not in lieu of the report.

25  BY MR. HAWISHER:

1  Q.   Okay.  So I am seeing in these notes that you have

2  points that you would like to make related to

3  "inaccuracies in Mission NPDB documents" and "subsequent

4  NPDB communication flaws."

5       Are those referenced in your report anywhere?

6  A.   They're -- and these notes, entirely, are assembled

7  in response to your defense expert.  I saw lines of

8  reasoning, or contentions, or a testimony, if you will,

9  in your defense expert report, and decided that I should

10 try to bring something that looks objectively

11 ascertainable to the table.  Otherwise, we'll be in the

12 situation of having two people debating the meaning of

13 words without, frankly, shedding any illumination.  So

14 my notes here are notes developed in preparation for

15 this deposition, which is based on my report and my

16 response to the defense expert contentions.

17 Q.   Okay.  So -- and -- and I just want to make sure

18 I'm not missing it.  Are the points that you would like

19 to make related to inaccuracies in Mission NPDB

20 documents, or subsequent NPDB communication flaws,

21 referenced in your report anywhere?

22 A.   Let's take a look here.  In the first paragraph of

23 my first opinion, on Page 3, I note that the language in

24 the medical staff bylaws is inconsistent with the

25 language used by Mission Hospital in reporting Dr.

1  Hetzel to the NPDB.  Then in the second paragraph, I

2  note the timetable dependent on March 3rd, but of

3  course, the March 3rd date turned out to be a mistake.

4  Q.   Does your report say anywhere that the March 3rd

5  date was a mistake?

6         MS. BEIGHTOL:  Objection to the form.  He --

7  and mischaracterization of the testimony he just gave.

8         MR. HAWISHER:  I didn't characterize his

9  testimony at all.

10         THE WITNESS:  In three different areas,

11 beginning on Page 8 of my report, I note mistakes, or

12 alleged mistakes, if you will.  Under February 2, 2021,

13 the recap of Dr. Hetzel's dispute of NPDB information.

14 On Page 9, the letter from Donald Illich of the NPDB

15 with regard to corrections that, on behalf of NPDB, he

16 was requesting, and the corrected report memorialized in

17 October 27 and December 22.

18         So the question of whether there are

19 corrections noted in my report is yes.  The -- the

20 question of whether or not I've alleged additional

21 mistakes, I don't see the word mistake in there, but I

22 do see the corrections.  Yep.

23 BY MR. HAWISHER:

24 Q.   So that was not quite my question.  My question

25 was, Anywhere in your report, is the date of action of

 1  3-3-2020 described as an inaccuracy or, for that matter,

 2  a mistake or any other synonym you would like?

 3          MS. BEIGHTOL:  Objection to form.  Asked and

 4  answered.

 5          THE WITNESS:  Could -- I'm sorry.  Could you

 6  restate that?

 7  BY MR. HAWISHER:

 8  Q.   Anywhere in your report is the date of action being

 9  coded as March 3rd, 2020, described as a mistake, an

10  inaccuracy, or any synonym for that that you would like?

11          MS. BEIGHTOL:  Objection.

12          THE WITNESS:  I don't believe it's described

13  as a mistake in the report, which is why I, of course,

14  bring it up here, because you now have a defense expert

15  relying on -- contesting my report, and we have now NPDB

16  communications, and we now have a clearer record, if you

17  will, of what information was submitted in the May 4th

18  filing, in the 4-23 filing, in the 3-3 to 3-25 filing.

19  BY MR. HAWISHER:

20  Q.   What do you mean by a clearer record?

21  A.   In the May 4th filing, it lists the date of action

22  as 3-3, but Mr. Illich corrected that to 3-25.  In the

23  5-4 filing, the length of action is listed as

24  indefinite, but of course, that's in error.  In the 5-4

25  filing, there's no mention made of the March 10

 1   modification.  In the 5-4 filing, there's no mention of
 2   the 4-23 recommendation to restore privileges.  That's
 3   what I mean about inaccuracies in the Mission documents
 4   sent to the NPDB.
 5   Q.   I'm sorry.  You said, "now we have a clearer
 6   record."  What do you mean by that?
 7   A.   I guess what I -- what I meant was now we have a
 8   clearer record.  We have the NPDB filings, and we can
 9   see -- because, of course, there's quite a bit of
10   confusion amongst the parties, not the least of which is
11   the confusion by the medical staff office official from
12   Mission who corresponded with the NPDB.
13   Q.   Are you saying you did not have this record when
14   you submitted your report?
15   A.   No.
16   Q.   Then when you say, "now we have a clearer record,"
17   we have a clearer record now relative to when?
18   A.   Relative to mistakes that were made by Mission in
19   the submission of various reports to the NPDB.
20   Q.   Okay.  Anywhere in your report, do you characterize
21   length of action indefinite as an inaccuracy, a mistake,
22   or anything like that?
23   A.   No.  As I mentioned, my notes and my testimony
24   today are in response to support for my report and in
25   opposition to points made by your expert, subsequent to

1   my report, of course.

2   Q.   So you have five points that you describe as

3   inaccuracies in the May 4th, 2020, filing.  One of them

4   is that there's no mention of the April 23rd, 2020,

5   recommendation to restore privileges; is that right?

6   A.   Yes.

7   Q.   How did you form that opinion?

8   A.   I looked at the May 4th filing.

9   Q.   Okay.  When did you form that opinion?

10  A.   Somewhere between receipt of the defense expert's

11  report and this morning.

12  Q.   So --

13  A.   I reviewed materials that I would want to -- want

14  to discuss this morning.

15  Q.   Okay.  I'm going to pass you a -- a tablet.  And

16  it's -- so you know, it's got all of the exhibits I had

17  planned to use on it.  If you have any trouble with it,

18  just let me know.  This is Exhibit 2.  It is the -- it

19  is a collection of NPDB documents.  And I'm showing you

20  Page 2 of that exhibit, which is from the May 4th, 2020,

21  report.

22       Can you read the narrative portion of that report,

23  please?

24            MS. BEIGHTOL:  If he has a copy of that

25  report --

1           MR. HAWISHER:  I'm -- I'm perfectly happy for

2     him to use that.

3           MS. BEIGHTOL:  Dr. Hetzel (sic), it may be

4     easier than reading on there.  I think you had a copy of

5     that report with you, if you're looking at the May 4,

6     2020, report.

7           THE WITNESS:  I believe you're correct.  The

8     4-23 precautionary suspension removed, and I had

9     overlooked that.

10    BY MR. HAWISHER:

11    Q.   Okay.  As for the following point, at -- you can --

12    you can keep the tablet.  That the -- that the report

13    lists "concerns about preoperative planning and

14    intraoperative care, which had already been resolved."

15    What is that opinion based on?

16    A.   The opinion is based on the knowledge of the

17    credentialing process in hospitals, what the standards

18    are.  If there had been issues in the credentialing of

19    Dr. Hetzel, quite aside from the dispute that took place

20    on March 2nd and 3rd.  If there had been any issues in

21    the ordinary course of events and in a -- an environment

22    that was a professional environment between the medical

23    staff and management and credentials committee, they

24    would've been raised as part of the re-credentialing

25    process.  In other words, if there have been cases or

1  disputes that were of any import in terms of the medical

2  staff, they would've been brought up as part of the re-

3  credentialing process.  But as you may know, the re-

4  credentialing took place of Dr. Hetzel with no

5  limitations and no -- no controversies.  And he was

6  given a letter dated February 25, 2020, just days before

7  this incident, awarding him full privileges without

8  limitations.

9       So I take some evidence, if you will, for whether

10 anything, aside from the dispute we're talking about,

11 amounted to what people would call a trumped-up, phony,

12 sham additions to apparently give weight to one point of

13 view concerning the unfortunate surgery on March 2nd.

14 Q.   Maybe I'm not understanding.  When you say, "the

15 concerns about preoperative planning and intraoperative

16 care had already been resolved," you do not mean as part

17 of the investigation or precautionary suspension.

18      You mean as part of the prior credentialing of Dr.

19 Hetzel?

20 A.   Yes.  No, I mean, if there had been any legitimate

21 issues with regard to patients prior to March 2nd, they

22 would've been raised in the course of the credentialing

23 process.  That's the way medical staffs examine such

24 issues.  To the contrary, and that's the reason I

25 brought a copy of the letter to Dr. Hetzel concerning

 1   his -- his privileges, he has a letter dated February
 2   25, 2020, from the chief executive.  It says, "On behalf
 3   of the board of directors, I inform you, you're approved
 4   for reappointment to the active medical staff with
 5   privileges I delineated in the credentialing portal."
 6   He talks about the fact that there are rules and
 7   regulations and so forth, all very appropriate and --
 8   and pro forma.  This is the type of letter that any
 9   physician who was an active member of a medical staff
10   would welcome.  It basically says we've taken a look on
11   our -- every two-year basis, and this is now from 3-1-
12   2020 to 2-28-2021 as the period, and your credentials
13   are clean, to adopt a phrase.  So I think anything
14   that's alleged that is not involved with what we'll call
15   this indexed case on March 2nd, we can deal with that in
16   a moment.  But anything which is alleged as additional
17   shortcomings of Dr. Hetzel has no basis in the
18   credentialing process.
19        Anyone experienced in the hospital field knows that
20   things are said all the time.  This one doesn't like
21   that one.  This one is leaving that one's partnership.
22   This one is leaving the hospital.  Things are said all
23   the time.  But the reason the medical staff has the
24   bylaws, the reason the state boards oversee the
25   operation of these hospitals, the reason the AMA has

 1  standards for medical staff is to protect physicians

 2  against what amounts to gossip or unsupported

 3  allegation.  So the postoperative, preoperative,

 4  intraoperative, whatever it might have been with regard

 5  to two patients, one of whom was nine months prior, one

 6  of whom was, I believe, four or five months prior, is

 7  from my point of view, rendered moot by the re-

 8  credentialing, which, from the hospital to Dr. Hetzel

 9  says, you got another two years, and there are no

10  limitations here.

11  Q.   Does the May 4th, 2020, report say anything about

12  which patients -- which patients that involved?

13  A.   Does it say anything about --

14  Q.   Which patients, or which patient care incidents,

15  the precautionary suspension was based on?

16  A.   It talks about the so-called precautionary

17  suspension beginning on March 3rd, which, of course, is

18  directly related to the operation on March 2nd.

19  Q.   Right.  And the operation on March 2nd happened

20  after the re-credentialing, right?

21  A.   Correct.

22  Q.   So what is inaccurate about the statement that the

23  precautionary suspension was imposed based on concerns

24  about preoperative planning and intraoperative care?

25  A.   That's -- that's not what I alleged.  You asked me

1  about allegations concerning preoperative,

2  postoperative, intraoperative care.  And I thought you

3  were asking me about the patients aside from the indexed

4  case.  I think I made that clear in my response.  It

5  was -- these cases were used in the correspondence and

6  in the testimony as giving additional weight somehow to

7  the argument that Dr. Hetzel had been in the wrong in

8  his treatment of the patient on March 2nd.  My point of

9  view is we can deal with the March 2nd, March 3rd,

10  allegations, the precautionary suspension, and so forth,

11  but we need to cut away the -- the underbrush here.  And

12  the underbrush is any allegations against Dr. Hetzel

13  that had to do with patients from the past that may have

14  been brought up by side comments from his partners or

15  former partners, or comments from anybody else outside

16  of the medical staff bylaw framework.

17  Q.   So it is not your position that the May 4th, 2020,

18  NPDB report lists concerns about preoperative planning

19  and intraoperative care that had already been resolved?

20       MS. BEIGHTOL:  Objection to the form of the

21  question.

22       THE WITNESS:  Yes.  My position that the

23  precautionary suspension, that the rationale for it, the

24  justification for the precautionary suspension, was

25  twofold.  It was -- in terms of the correspondence and

1   the deposition testimony, it was the outcome of the

2   patient who was cared for on the 2nd of March, and it

3   was other patients who had been taken care of by Dr.

4   Hetzel with regard to whom there were issues raised in

5   the previous, it was alleged, six months.  One turns out

6   to be nine months, but that really doesn't matter.

7        My position is very simple, very simple.  And that

8   is that when Mission Hospital gives a clean bill of

9   health to Dr. Hetzel on the 25th of February, they

10  essentially have taken into account whatever issues or

11  sanctions or allegations, anything that might have taken

12  place.  For example, there's a -- there's a -- a

13  protocol for Dr. Hetzel to show up in breast cancer

14  seminars, tumor boards.  And he indicates that he did

15  show up, but somehow that was -- was faulted.  He was

16  faulted for not having been there.  Whatever it is, it

17  gets taken into account in the credentials process.  And

18  the credentials committee, the medical executive

19  committee, and the board say, now we are happy with you

20  for the next two years.

21  BY MR. HAWISHER:

22  Q.   Okay.  So if you will look at Page 2 of Exhibit 2

23  again, please.

24  A.   Page 2 of --

25  Q.   Exhibit 2, the -- the same document that is still

1   open.

2   A.   This one?

3   Q.   Yes.  And -- and that should be the --

4         MS. BEIGHTOL:  It's this, if it's easier to

5   look at it.

6   BY MR. HAWISHER:

7   Q.   Yeah.  And that should be Section C, information

8   reported of the May 4th report.

9         MS. BEIGHTOL:  I think you have my copy of

10  this too, right here.  Somehow they got switched.

11        THE WITNESS:  Okay, this -- this page, Page 2

12  of three pages on the NPDB report with a process date of

13  May 4, 2020, talks about the indefinite period, which

14  is -- which is incorrect.

15  BY MR. HAWISHER:

16  Q.   Hold on.  Hold on, please, Doctor.

17        MS. BEIGHTOL:  Let him finish his answer,

18  please.  You can't interrupt the witness while he's

19  speaking.

20        MR. HAWISHER:  I didn't ask a question yet.  I

21  asked him to turn to a page of the report, which I'm now

22  going to ask him a question about.

23  BY MR. HAWISHER:

24  Q.   So Dr. Hyde, if you see where it says, "Basis for

25  action, other as specified:  concerns about preoperative

 1  planning and intraoperative care."  Is that portion of

 2  that report accurate?

 3          MS. BEIGHTOL:  Objection to the form of the

 4  question.

 5          THE WITNESS:  I -- I don't believe it's

 6  possible from these words to distinguish the March 2nd

 7  operation from allegations concerning previous

 8  operations by Dr. Hetzel.  I had understood that by the

 9  4th of May, the only issue left was his fitness for

10  duty.  In other words, his privileges had been restored.

11  And this is, of course, the one that has the erroneous

12  date of May 3, and the erroneous length of action as

13  indefinite.

14  BY MR. HAWISHER:

15  Q.  So are you saying that the "Basis for action, other

16  as specified, concerns about preoperative planning and

17  intraoperative care" was or was not accurate?

18          MS. BEIGHTOL:  Objection to the form of the

19  question.

20          THE WITNESS:  I'm saying it's impossible to

21  assess whether we're talking about three operations or

22  one from that phrase alone.  I had associated that

23  phrase with both the March 2nd operation and with Dr.

24  Hetzel's care of two patients, one nine months

25  previously, one four or five months previously.  I'm not

 1  sure that it's possible, whether I can do it or not, to

 2  separate those three cases in that phrase.

 3          I do know that the testimony shows that it was

 4  not only the March 2nd operation.  It was the additional

 5  weight, if you will, given to the idea that somehow Dr.

 6  Hetzel had done something wrong on March 2nd, and by the

 7  way, he had these two other patients on which he had

 8  done something wrong.  From my point of view, the fact

 9  that the hospital has granted him unrestricted new

10  privileges for a two-year period essentially eliminates

11  as -- as any kind of weight allegations concerning care

12  which might have been made previously, but were not.

13  BY MR. HAWISHER:

14  Q.   Okay.  And -- and that's fine.  Let me get at it

15  this way.

16      So regardless of what other factors there were in

17  the hospital's decision, would you agree that there were

18  concerns about preoperative planning and intraoperative

19  care that led to or contributed to the imposition of the

20  precautionary suspension?

21          MS. BEIGHTOL:  Objection to the form of the

22  question.

23          THE WITNESS:  And I -- I need to ask you, are

24  you talking about the March 2nd operation only?

25  BY MR. HAWISHER:

1  Q.   I have not specified.  I'm just asking if there

2  were concerns.

3  A.   Okay.  That's part of the problem, of course, is

4  that when we -- when we deal, as the AMA would put it,

5  with sham peer review, with allegations that are

6  unsupported by evidence, with perversion in the medical

7  staff process, we need to be precise, because it -- it

8  avoids all of those shortcomings.  So if you can ask a

9  question with regard to the March 2nd incident, we can

10  respond to that with regard to the index case.  That's

11  what I'm thinking.

12      If you're asking about allegations about previous

13  cases, the answer is gossip, and gossip which did not

14  reach even the -- the level of the chief executive

15  trying to -- to do anything about it, because the chief

16  executive writes to Dr. Hetzel on the 25th of February

17  and says, you're -- you're fine for another two years.

18  That's -- that's the official hospital word on Dr.

19  Hetzel's privileges pre March 2nd.

20  Q.   Okay.  So let -- let me ask it this way then.

21  Would you agree that there were concerns about

22  preoperative planning and intraoperative care related to

23  the index surgery of March 2nd?

24  A.   Okay.

25          MS. BEIGHTOL:  Objection to the form of the

ESQUIRE
DEPOSITION SOLUTIONS
800.211.DEPO (3376)
EsquireSolutions.com

1  question.  Asked and answered.

2        THE WITNESS:  Okay.  Yes, there obviously are

3  concerns, and there are two points of view.  Dr. Hetzel

4  notes in his deposition that when he left the patient,

5  there had been about 1,500 ccs of blood loss.  He notes

6  that when the patient left the operating room, there had

7  been 4,000 more ccs of blood loss.  Dr. Buell, who was

8  part of the team, Dr. Ahaerne and Dr. Ramaswamy, who

9  took over from Dr. Hetzel, apparently blamed Dr. Hetzel.

10  But Dr. Hetzel, in his deposition, calls attention to

11  the fact that Dr. Buell, an HCA employee and the chief

12  of surgery, could just as well have been at fault.

13        Now, we have a situation that would call for

14  the regular medical staff bylaws.  You've got two

15  different points of view, as opposed to one point of

16  view from the management and the employees of HCA.  And

17  in those two points of view, all parties would be

18  represented.  There would be a hearing with evidence and

19  counsel.  Here, we have a one-sided preemptory move, not

20  in accord with the bylaws for Mission Hospital, which is

21  made in the absence of any evidence and in the absence

22  of any representation for Dr. Hetzel, on the -- on the

23  word of one surgeon who had a role in the same procedure

24  and, of course, would have, in such a proceeding, an

25  obvious conflict of interest, having both participated

1  in the surgery and then been a critical part in

2  attempting to punish Dr. Hetzel.

3  BY MR. HAWISHER:

4  Q.   One of the points that you described as an

5  inaccuracy in the May 4th, 2020, report is the

6  description that the length of action was indefinite.

7  Why do you believe that the length of action was not

8  indefinite as of May 4th, 2020?

9  A.   I don't believe the action was ever indefinite

10  because the bylaws called for various steps to be taken

11  when such a preemptory suspension is underway.  In

12  the -- let me take a quick look for the May 4th action

13  here.  So as of April 23rd, Dr. Joslin, as credentials

14  committee chair, corresponded with Dr. Hetzel concerning

15  the outcome of the April 23rd credentials committee

16  meeting, in which they reviewed the so-called

17  investigative findings of the ad hoc committee.  And in

18  this letter, this memo, the committee has determined

19  that the precautionary suspension is lifted, and now

20  they say contingent on some fitness-for-duty evaluation.

21  So in a May 4th filing from the hospital, they have

22  indicated the length of action is indefinite, even

23  though the action of 4-23 has brought this to a halt,

24  pending the so-called fitness-for-duty evaluation.  So I

25  don't see the word indefinite anywhere in any of the

1   medical staff communications, but I do see it on the

2   report made by Mission to the NPDB.

3   Q.   Okay.  What length of action should it have said?

4   A.   The length of action is constrained and set by the

5   medical staff bylaws, that steps have to take place

6   within a certain number of days, or a certain number of

7   days.  And the suspension, therefore, can be seen as

8   serial progress, if you will, as different meetings take

9   place.  As of May 4th, the suspension was no longer

10  indefinite.

11  Q.   Okay.  As of May 4th, what was the length of

12  action?

13  A.   The action was -- the credentials committee had

14  made a recommendation to the medical executive committee

15  to lift the precautionary suspension contingent on the

16  so-called fitness-for-duty evaluation.

17  Q.   Yeah.  So what is the length of action that should

18  have been recorded?

19        MS. BEIGHTOL:  Objection to the form of the

20  question.

21        THE WITNESS:  Yeah.  It, of course, will

22  depend on the start date, which is mistakenly listed

23  here as March 3rd, and at Mr. Illich's request, had been

24  repositioned to be March -- let me see where he had

25  recommended that.  3-25 is what he -- he recommended.

1   And so the length of action would have been from 3-25 to

2   4-23.

3   BY MR. HAWISHER:

4   Q.    And -- and so your position is that, as of 4-23,

5   Dr. Hetzel's privileges had actually been restored?

6   A.    Contingent on a so-called fitness-for-duty

7   evaluation.

8   Q.    Had the fitness-for-duty evaluation happened yet?

9   A.    It -- it was a recommendation to the medical

10  executive committee, which frankly, was in the category

11  of -- it was a -- a conflation.  The Joint Commission

12  has very strict guidance separating fitness for duty or

13  evaluation of a physician's physical or mental health

14  from punitive or regulatory or disciplinary actions.

15  And here, they were conflated.  So Dr. Hetzel would be

16  justified in believing that this was a restoration of

17  his privileges.  The medical executive committee shows

18  what they felt about that by imposing conditions that

19  were quite different in their letter of June 9th, 2020.

20  Q.    So as of May 4th, had the fitness-for-duty

21  evaluations taken place here?

22  A.    No, it -- it -- it had not taken place then.

23  Q.    As of May 4th, was there a date set on which Dr.

24  Hetzel's privileges would be restored?

25  A.    I don't believe so.

1  Q.   So as of May 4th, the length of action was

2  indefinite because it did not have a definite end date?

3           MS. BEIGHTOL:  Objection to the form of the

4  question.

5           THE WITNESS:  Well, I -- I appreciate the

6  point of view, but the point of view is contingent on,

7  first, recognition of the legitimacy of the fitness for

8  duty, but secondly, recognizing that the medical

9  executive committee did not accept it, and third,

10  recognizing the end of a period that took -- that drew

11  into question Dr. Hetzel's conduct with regard to the

12  March 2nd operation.  We know, just to go back to a

13  previous issue, that anything else aside from the March

14  2nd operation would have been taken into account in any

15  deliberation by the medical executive committee, and so

16  the fitness for duty is presumably inherent in the

17  conduct of his care of the patient -- the index patient,

18  and of his activity on March 2nd.

19       And I understand your point of view, which is

20  you're saying that because a definite date was not put

21  down there, somehow indefinite is the right answer.  And

22  I think my only response is that it will depend on

23  advocacy more than the evidence.

24  BY MR. HAWISHER:

25  Q.   I don't understand your point on that -- that last

1   point you made.

2   A.    That one could argue that indefinite would be a

3   period of time which is not consistent with March 25 to

4   April 23rd and that labeling this indefinite by people

5   who are knowledgeable about the Practitioner Data Bank

6   would appear to be either by accident or guile, labeling

7   the period as being longer than 30 days.  In other

8   words, if what is clearly the restoration of privileges

9   from March 25 to April 23rd is less than 30 days, the

10  labeling of this activity as being indefinite would seem

11  to drag it into a 30-day-plus period.

12  Q.    Have you reviewed Dr. Hetzel's deposition?

13  A.    Yes.

14  Q.    Okay.  Did you see where he testified that he did

15  not have clinical privileges from March 25 to June 9th?

16  A.    I --

17          MS. BEIGHTOL:  Objection.

18          THE WITNESS:  -- took into account Dr.

19  Hetzel's report that he was discouraged from having

20  representation, that he was told he could not have a

21  hearing, that he did not have any opportunity to talk to

22  or meet with this ad hoc investigative committee before

23  it put together its first report.  So I -- I can accept

24  Dr. Hetzel's testimony in matters that were within his

25  expertise.  But looking at a deposition of someone who

1  was told he couldn't have a hearing, he couldn't have

2  counsel, and by the way, was going to be faced with a

3  variety of things that he thought were in the past, that

4  it -- it's not -- it's not credible, not plausible to

5  think that he's going to have exact answers for when he

6  did or when he did not have privileges.  Yes, he said

7  that, but I'm again, pointing out that when he is

8  testifying in the absence of any assistance, counsel, or

9  hearing, he's testifying essentially unarmed.

10 BY MR. HAWISHER:

11 Q.   Well, he did have counsel at his deposition, right?

12 A.   He was told he couldn't have counsel.  I'm talking

13 about the meetings that took place with the ad hoc

14 investigative committee and the credentials committee.

15 He was told that he couldn't have counsel there because

16 it wasn't a hearing.

17 Q.   Okay.  So, and your position is that he doesn't

18 know whether he has privileges as of, say, April 24th,

19 2020?

20 A.   No, that's not my position.  My position is that

21 with regard to these pieces of paper, he may not have

22 had an opportunity to focus on all the errors in them,

23 the four errors that remain in this particular filing,

24 and the consequence or importance to him.

25 Q.   Okay.  That's fine, but my question is about

1   whether he had privileges as of, for example, April

2   24th, 2020.

3   A.   I don't believe he did.

4   Q.   You do not believe that he did have privileges?

5   A.   I -- he -- he believes he did not.  I don't believe

6   that he was able to see patients without limitation, but

7   he was awarded privileges, if you will, or the

8   suspension was eliminated pending this fitness-for-duty

9   evaluation.

10  Q.   So is it your position that on April 24th, 2020, he

11  did or he did not have privileges?

12  A.   My position is that the credentials committee had

13  made a recommendation to the medical executive

14  committee, and that the medical executive committee

15  accepted the part which has to do with the restoration

16  of privileges and did not accept any of the rest of it.

17  Q.   Okay.  When did the medical executive committee

18  accept that recommendation?

19  A.   I had that just now.

20  Q.   I'll make it easier.  Did -- did the medical

21  executive committee accept that recommendation in April?

22  A.   No, they -- they did not.  They -- they accepted it

23  in -- hold on a second here.  So his complete

24  exoneration, if you will, comes at the medical executive

25  committee meeting of June 5, and he's notified by letter

1  of June 9.

2  Q.   So as of April 23rd, 2020, his privileges had not

3  been restored?

4         MS. BEIGHTOL:  Objection to the form of the

5  question.

6  BY MR. HAWISHER:

7  Q.   Do you agree or disagree?

8         MS. BEIGHTOL:  Objection.

9         THE WITNESS:  I -- I can only state what I've

10 said previously.  As of April 23rd, his privileges were

11 restored contingent on a fitness-for-duty exam, which

12 never took place, and was not accepted by the medical

13 executive committee.

14 BY MR. HAWISHER:

15 Q.   The fitness-for-duty exam never took place?

16 A.   The fitness-for-duty exam was -- was not accepted

17 by the medical executive committee.

18 Q.   Okay.  So April -- say April 24th of 2020, Dr.

19 Hetzel shows up at the hospital and says, hey, I want to

20 see one of my patients and do a surgery on them.  What

21 happens?

22 A.   It's a hypothetical, but I -- I assume that,

23 because he testified that he didn't have privileges,

24 that he didn't do that.

25 Q.   Right.  So if he had done that, would they have let

1  him do it?

2  A.   Well, I don't know.  What we know is that they

3  reported erroneously to the NPDB in four different

4  areas.  Whether or not they would have said, oh, by the

5  way, this fitness for duty thing is going to stand in

6  the way, or by the way, you have to wait until June, I

7  don't know what they would've said.

8  Q.   Can you maybe rephrase your answer?  I'm -- I don't

9  think I understood it.

10  A.   Had Dr. Hetzel shown up on the 24th of April, we

11  could argue hypothetically what might or might not have

12  happened.  You were asking me, did he have privileges?

13  And I think the action of the committee on the 23rd,

14  essentially was intended to restore his privileges

15  within the 30-day period.  I could be in error on that.

16  There is no evidence concerning whether the 30-day

17  period was on their agenda, target, the horizon, or

18  whatever it might be.  His -- his technical restoration

19  of privileges, quite correct, didn't take place until

20  June.  So what was the import of the action April 23rd?

21  Did Mr. Illich, when he received information from the

22  hospital, do his calculation based on March 25 to April

23  23rd, or did he do it March 25 to May 4, or some other

24  date, which would be beyond 30 days.

25  Q.   Could you turn on the tablet to Exhibit 11?  And if

1  you need me to, I can navigate to that for you.

2  A.   Yeah, if you wouldn't mind.

3  Q.   All right.  So I'm handing you back Exhibit 11, and

4  we're at Page 43 of that exhibit.  And if you'd like,

5  you can scroll up to the previous page so that you can

6  verify which specific item within that exhibit we're

7  looking at.  But I will represent to you that it is the

8  credentials committee minutes from April 23rd, 2020.

9  A.   Okay.

10  Q.   Will you read to yourself, please, the

11  conclusion/action portion of those minutes, and let me

12  know when you're done with that?

13  A.   Beginning with "Once these evaluations" or --

14  Q.   The whole thing.

15  A.   Okay.  Well, I've -- I've read this to myself.

16  What point would you like to make?

17  Q.   Sorry about that.  I thought I had a minute there.

18  A.   It's okay.  What -- what would you like me to --

19  Q.   You see -- you see the part that says, "Once

20  these" --

21       THE VIDEOGRAPHER:  Actually, you need to wait

22  a minute.

23       MR. HAWISHER:  Sorry.

24  BY MR. HAWISHER:

25  Q.   You see the part that says, "Once these evaluations

1  are completed, the credentials committee will reconvene

2  to review redacted" --

3  A.    Right.

4  Q.    -- "in order to lift the precautionary suspension."

5  A.    Right.

6  Q.    So the precautionary suspension hasn't been lifted

7  yet?

8  A.    Well, we don't know that.  We have two and a half

9  lines that are entirely redacted, and we have the same

10  flaw in another set of minutes.  It could well say, the

11  credentials committee will reconvene to review how these

12  charges were levied in the first place and what kind of

13  recompense we can offer to Dr. Hetzel, in addition, of

14  course, in order to lift the precautionary suspension.

15         I'm not trying to be flippant about it, but I

16  am trying to indicate that you -- you really can't tell

17  exactly what's happening here.  I can see your

18  inference, which is that there are a variety of things

19  taking up two lines of redacted information that are

20  necessary in order to lift the precautionary suspension.

21  Q.    Okay.  I don't really care what is in the

22  redactions.  The point that I'm trying to make is if

23  something is needed in order to lift the precautionary

24  suspension, the precautionary suspension has not yet

25  been lifted, correct?

1    A.   No.  I --

2           MS. BEIGHTOL:  Objection to the form of the

3    question.

4           THE WITNESS:  I do care what's in the redacted

5    material and am unable to likely accept the

6    representation that it's innocuous.  Otherwise, why is

7    it redacted?

8    BY MR. HAWISHER:

9    Q.   Can you think of anything that could be in that

10   redaction that would negate the inference I have just

11   described to you?

12   A.   I've -- I've just indicated somewhat flippantly,

13   but I -- I don't like to do things that are hypothetical

14   or without evidence, and there's so much in this matter

15   in the hospital's activities that has no evidence, that

16   I don't want to add to it.  So you've got two lines here

17   which are redacted.  If they are not important, I can't

18   imagine why they would be redacted.  And therefore, I'm

19   unable to respond to your question, not having the

20   entire wording in front of me.

21   Q.   So in the hypothetical that you gave, which you

22   said was somewhat flippant, but I think that's okay.

23   Even in that circumstance, the precautionary suspension

24   still has not been lifted, but will be lifted in the

25   future, correct?

1           MS. BEIGHTOL:  Objection to the form of the

2    question.

3           THE WITNESS:  My -- my point, I'm sorry to

4    say, remains unmoved, which is that you've got four

5    lines in this sentence, two of which are entirely

6    redacted.  And it's very difficult for a reasonable

7    person to decide that they have exactly the right

8    meaning, interpretation, whatever from a halfway -- half

9    a revelation, if you will, of the sentence.

10   BY MR. HAWISHER:

11   Q.   Okay.  So then let's go up to the preceding

12   paragraph, which is not redacted at all.  Do you see the

13   bit that says, "Dr. Hetzel's precautionary suspension

14   may be lifted contingent on the findings of a fitness-

15   for-duty evaluation"?

16   A.   Right.

17   Q.   Okay.  So do you interpret that to say that the

18   precautionary suspension is currently being lifted, or

19   that it may be lifted in the future?

20   A.   It -- it may be lifted in the future would be my

21   interpretation of that sentence.

22   Q.   Okay, then.  So what is the basis for saying that

23   the precautionary suspension was lifted as of April

24   23rd?

25   A.   It's a matter of, as I mentioned, advocacy rather

 1   than evidence.  I don't believe that -- let me just

 2   indicate why I'm -- why I'm making a -- a point of that.

 3   The Mission Hospital, of course, is a -- is a Joint

 4   Commission hospital.  I'm drawing your attention to the

 5   2020 Hospital Accreditation Standards.  There is a

 6   process for matters of individual health for licensed

 7   independent practitioners, which is separate from

 8   actions taken for disciplinary purposes.  This is the

 9   last -- Page 42 of the -- of the pages:  the standard

10   medical staff 11.01.01.

11           MR. HAWISHER:  And if I could pause so we can

12   mark this as an exhibit.  Let's see.  I think this will

13   be 26.

14       (Defendant's Exhibit 26 was marked for

15   identification.)

16   BY MR. HAWISHER:

17   Q.   Please go ahead.

18   A.   So you'd have to be comfortable saying that the

19   hospital and its medical staff were not mindful of the

20   importance of separating matters of individual health

21   from disciplinary purposes by adding on the requirement

22   that there be a so-called fitness-for-duty examination

23   before lifting privileges.  In other words, even if the

24   Medical Staff Credentials Committee thought this was the

25   right thing to do, it's against the -- the Joint

1  Commission standards and a violation of Joint Commission

2  principles, and by the way, a blatant violation of both

3  AMA and North Carolina Medical Board requirements.

4       So you'd have to say, yes, that that's what they

5  may be saying.  Is that legitimate?  Is that a -- a

6  legitimate point of view that they could continue --

7  that they could give this doctor back his privileges,

8  and yet at the same time, have this requirement?  And

9  I'm raising the question that it may not have been

10  intended to trigger the 30-day limit for reporting, but

11  that was the effect of what it was for at least the

12  NPDB, as they measured the length of time.

13  Q.   I want to be sure I'm understanding.  Are you

14  saying that because it was not legitimate to require

15  fitness-for-duty evaluations in this context, we should

16  basically cross out that part of the committee's actions

17  and say all that we're left with is the committee is

18  restoring his privileges now?

19  A.   Yes, that's what I'm -- that's what I'm saying,

20  because the lawful activity, as opposed to the

21  conflation of individual fitness with regulatory or

22  punitive action, is -- is not consistent, if you will,

23  with Joint Commission or other national standards.  The

24  fact that they suddenly have a fitness-for-duty add-on,

25  if you will, in the face of, several weeks before,

```
 1  having given Dr. Hetzel a clean bill of health with two
 2  years' worth of new privileges, has all the earmarks of
 3  an after-the-fact, ill-considered, if you will,
 4  initiative by one or more members of the committee.
 5       The thing they did on the 23rd was to lift the
 6  suspension.  What they eventually came to in the June
 7  meeting of the medical executive committee was
 8  essentially ignoring all of the more difficult, if you
 9  will, requirements of the credentials committee.  So
10  yes, that's what I'm saying.
11  Q.  Okay.  If you could scroll down to Page 49 of that
12  same document, Exhibit 11.
13  A.  I'll give it back to you to --
14  Q.  Okay.
15  A.  -- have your assistance if I may.
16          MS. BEIGHTOL:  Is anyone else cold?
17          MR. HAWISHER:  I am a little bit.
18          MS. BEIGHTOL:  I'll -- I'm going to try to
19  rectify that real quick.
20          MR. HAWISHER:  Sure.
21          MS. BEIGHTOL:  And then I will --
22  BY MR. HAWISHER:
23  Q.  And, Doctor, if you just want to read that to
24  yourself while Ms. Beightol is -- well, she's already
25  back.
```

1       MS. BEIGHTOL:  I need to call --

2       THE WITNESS:  It looks like we're in May 12th,

3   2020, credentials committee meeting, conclusion and

4   action.  A motion was made to lift the precautionary

5   suspension with the following stipulations.  And your

6   question?

7   BY MR. HAWISHER:

8   Q.   So on May 11th, 2020, the credentials committee is

9   voting to lift the precautionary suspension, right?

10  A.   This is May 12th of the credentials committee, but

11  yes, that's exactly right.

12  Q.   Where do you see May 12th?  I'm sorry.

13  A.   I saw it up above, Page 1 of 2, May 12th, 2020,

14  special called credentials committee meeting.  If you --

15  Q.   Oh, I -- I see what you're saying.

16  A.   Yeah.

17  Q.   So the footer says May 12th.  The header says May

18  11th.  The -- the difference is really not important?

19  A.   It doesn't matter.  Yeah.

20  Q.   But the point I'm getting at is as of that date,

21  the date of that vote, the precautionary suspension was

22  still in effect and they're lifting -- they're voting to

23  lift it, right?

24  A.   With the same caveat that we've talked about

25  previously, namely, the important thing for Dr. Hetzel

1  would be his privileges.  The question is whether or not

2  these other requirements are lawful requirements, and

3  they -- they would appear to be, so that -- yes, he

4  would not have privileges prior to this action.

5  Q.   Okay.  And that happened after the May 4th, 2020,

6  report was filed?

7  A.   Yes.

8  Q.   Okay.  So as of May 4th, 2020, his privileges had

9  not yet been restored.  Therefore, the action has not

10  yet ended, right?

11         MS. BEIGHTOL:  Objection to the form of

12  question.

13         THE WITNESS:  You're going to ask me if the

14  indefinite is the right answer to put there.

15  BY MR. HAWISHER:

16  Q.   Yes.

17  A.   And I will agree with the answer to your question,

18  that it had not yet been restored fully, but indefinite

19  is still the wrong answer.

20  Q.   What would've been the right answer?

21         MS. BEIGHTOL:  Objection.  Asked and answered.

22         THE WITNESS:  I think the correct answer

23  would've been unknown.

24  BY MR. HAWISHER:

25  Q.   Is that an option?

1  A.   I beg your pardon?

2  Q.   Is that an option?

3  A.   I -- I'm sure I can look it up, but it's -- it's

4  the truth.  It's the -- unknown is the actual duration.

5  And the reason it's the actual duration, of course goes

6  back to the very beginning, which is this entire

7  referral by Mission Hospital to the NPDB was wrong, was

8  inappropriate, was not in line with their own medical

9  staff bylaws.  And so arguing about when it was lifted

10  or not lifted, and so forth, is the secondary

11  consideration.  The primary consideration is that the

12  original referral was not in accord with the medical

13  staff bylaws.

14  Q.   Sure.  That's fine.  If you'll pass me the -- the

15  tablet, I'm going to --

16  A.   Yep.

17  Q.   -- turn to a different exhibit.  This is going to

18  be Exhibit 3, which is the NPDB Guidebook.

19       So I've turned to Page E41 of the NPDB Guidebook.

20  First of all, before I ask you about that, are you

21  familiar with the guidebook?

22  A.   Yes.

23  Q.   What is the purpose of the guidebook?

24  A.   Well, a publication in, I believe October of 2018,

25  which essentially set out the staff interpretation of

1   the statutory and regulatory rules for reporting.

2   Q.   Who published it?

3   A.   The NPDB published it.

4   Q.   Is it authoritative?

5   A.   Sorry?

6            MS. BEIGHTOL:  Objection to form.

7            THE WITNESS:  Is it?

8   BY MR. HAWISHER:

9   Q.   Authoritative?

10  A.   Oh, my goodness.  That's --

11           MS. BEIGHTOL:  Objection to form.  Are -- are

12  you asking that in a legal terminology?  How are you

13  asking that, David?

14           MR. HAWISHER:  I'm asking him if it's

15  authoritative.

16           MS. BEIGHTOL:  Then objection to form of the

17  question, misleading, confusing, and --

18           THE WITNESS:  It -- it certainly is the

19  position of the NPDB staff.

20  BY MR. HAWISHER:

21  Q.   I'm sorry.  Can you say that again, please, Doctor?

22  A.    It certainly is the position of the NPDB staff.

23  Q.   Okay.  Are hospitals required to adhere to it?

24           MS. BEIGHTOL:  Objection.

25           THE WITNESS:  The statutory requirement to

1   adhere to it is pretty clear.  The answer is yes.

2   BY MR. HAWISHER:

3   Q.   Okay.  Could you please read to yourself -- or

4   actually, could you read into the record, the first full

5   paragraph on the page that I've shown you?

6   A.   "A healthcare entity may choose the structure or

7   restriction based on when a healthcare practitioner

8   demonstrates clinical competence, rather than attaching

9   a specific time frame to the action.  A significant

10  percentage of clinical privileging actions are reported

11  to the NPDB as indefinitely, placing the responsibility

12  on a practitioner to demonstrate to the entity that he

13  or she no longer needs the restriction.  If such an

14  adverse action is in effect for more than 30 days, it

15  must be reported."

16  Q.   Isn't that what happened here?

17         MS. BEIGHTOL:  Objection to form of the

18  question.

19         THE WITNESS:  Well, no.  What happened here

20  was that a precautionary suspension was reported, and

21  that's in violation of Section 8.4 of the medical staff

22  bylaws, which say a precautionary suspension is not in

23  and of itself, a final professional review action that

24  is reportable.

25         The NPDB makes it clear, and also in the

 1   article I've submitted with regard to when it is worth
 2   fighting your NPDB report, and also with regard to the
 3   Law Review Journal I've submitted, that indicates that
 4   due process is more likely to be afforded to sexual
 5   predators and terrorists than to doctors facing the
 6   NPDB.  The -- the scheme of things, the NPDB says
 7   clearly, we are not going to decide for you, hospital,
 8   exactly what it is you call things or what's reportable.
 9   If you call something which is reportable X or Y or Z,
10   then you need to report it if it goes in place after --
11   for longer than 30 days.
12        Here, the precautionary suspension, which is --
13   which is built, by the way, on fiction -- on the fiction
14   of the two patients that were referenced in the memo
15   from Dr. Frisch to Dr. Hetzel on March 3rd.  Built on
16   fiction, not reportable, in any event, and -- and
17   clearly has no protection of Dr. Hetzel's rights, or
18   even of patient rights.
19   BY MR. HAWISHER:
20   Q.   Okay.  And we will certainly talk about whether the
21   precautionary suspension was reportable in a moment.  My
22   question was really just about the indefinite length
23   versus reporting a specific length of action.  It seems
24   to me that what the NPDB Guidebook is describing is
25   exactly what happened here.  I'd like to understand why

1  you disagree.

2          THE WITNESS:  Well --

3          MS. BEIGHTOL:  Objection to the form of that

4  question.

5          THE WITNESS:  -- Mission Hospital has used the

6  word indefinite, and the NPDB says you can use the word

7  indefinite.  There's no disagreement there.

8  BY MR. HAWISHER:

9  Q.   Okay.  So final thing that I wanted to ask you

10  about was -- on -- on this list of inaccuracies that you

11  have provided, was the date of action of 3-3-2020.  And

12  you note that Don Illich at the NPDB directed Mission

13  Hospital to use the date of 3-25.

14      Why did Mr. Illich do that?

15  A.   Well, let's find his -- his letter here, if we

16  can -- if we can find that.

17          MS. BEIGHTOL:  Oh, it's in the other set.

18          THE WITNESS:  Hmm?

19          MS. BEIGHTOL:  It's in -- it's in the other

20  set with the -- it's with -- it's in your other set of

21  documents, in this set.

22          THE WITNESS:  Okay.  Thank you.

23          All right.  I am looking at the July 27th,

24  2021, letter to Brenda Shelton and the medical staff and

25  credentialing office of Mission Hospital from Mr.

1   Illich.  And he said, "We believe a correction should be
2   made to the description of subject's acts of remissions,
3   using the date of action of March 25, 2020, instead of
4   March 3."  He says, "It's clear that from March 25, Dr.
5   Hetzel was suspended without interruption, through June
6   5."
7        Do you want to anymore?  That's what he says.
8   BY MR. HAWISHER:
9   Q.   Yes.  I -- I am asking why, in your view, that
10  change was required?
11  A.   Why the change was required?
12  Q.   Yes.
13  A.   All he does is repeat the -- the various elements
14  of timing here.  He doesn't give a, from what I can see,
15  a -- a reason.  His view is the -- March 25, Dr. Hetzel
16  was suspended without interruption through June 5.  I
17  think that's his view.
18  Q.   And my question is why is March 3rd not the date
19  that should have been reported?
20  A.   Why is March 3rd not the date?
21  Q.   Yes.
22  A.   Well, I can't tell from his letter why he thinks
23  March 25 and not March 3rd.
24  Q.   Do you think March 25 and not March 3rd?
25  A.   I think the entire reporting is in violation of the

1   medical staff bylaws and is -- gives every indication of

2   being unrelated to patient safety and adverse patient

3   safety events or patient care, and every indication of

4   being a punitive action against Dr. Hetzel, and one in

5   which essentially he was not given the protection which

6   the medical staff bylaws would ordinarily afford.

7   Q.   So do you believe that it -- it was inaccurate for

8   the May 4th, 2020, report to list a date of action of

9   March 3rd?

10  A.   Do I believe that the date of action in the May 4th

11  filing should have been -- I'm -- I'm sorry, I'm missing

12  your question.

13  Q.   Do you believe that it was inaccurate for the May

14  4th, 2020, report to list a date of action as 3-3-20

15  instead of 3-25?

16          MS. BEIGHTOL:  Objection.  He's talked about

17  that already.

18          THE WITNESS:  Yeah.  Well, of course they

19  didn't have Mr. Illich's letter, which didn't come until

20  the middle of 2021.  Is the date of action presumably 3-

21  3-20?  I think that's the date on which the individuals,

22  who in contravention of the medical staff, decided to

23  report Dr. Hetzel, and did so.  And that's the -- that's

24  the incident.  They -- Dr. Frisch indicates not only the

25  March 2nd operation.  He also pulls in two

1  intraoperative organ injuries in the last six months,

2  which we've talked about previously, which are

3  erroneous.  So was March 3rd or March 25th the -- the

4  date that would justify the submission of an NPDB

5  report?  The answer is no, neither one of them would

6  justify it.

7  BY MR. HAWISHER:

8  Q.   And my question is a little bit different because

9  my question is accepting for the sake of argument that

10 the report is being submitted, which date of action

11 should be listed?

12 A.   I'm not sure either one of them is more legitimate

13 than the other, but I -- I would underline that I

14 believe they're -- they're both illegitimate.

15 Q.   Do you believe that the narrative portion of the

16 May 4th, 2020, report was inaccurate?

17 A.   Well, it lists the date of action as 3-3.  It lists

18 the action as indefinite.  It makes no mention of the 3-

19 10-20 modification.  And it lists concerns about

20 preoperative planning and intraoperative care.  And I

21 believe we've discussed all of those subjects.

22 Q.   So when I say the narrative portion, I mean, the

23 paragraph that corresponds to the field, description of

24 subject acts or omissions or other reasons for actions

25 taken and description of actions taken by reporting

 1  entity.

 2          MS. BEIGHTOL:  I just handed him his own --

 3          THE WITNESS:  Thank you.

 4          MS. BEIGHTOL:  -- copy of the report.

 5          THE WITNESS:  So he says is -- the narrative

 6  says Dr. Hetzel is the subject of a precautionary

 7  suspension beginning 3-3-20, which is, of course

 8  incorrect.  This precautionary suspension --

 9  BY MR. HAWISHER:

10  Q.   If we could pause there real fast?

11  A.   I'm sorry?

12  Q.   Why is that incorrect?

13  A.   By definition, because the NPDB told him it's the

14  wrong date.  They don't know that yet, but it's listed

15  as 3-3, and not 3-25.

16  Q.   So to be clear, I -- I'm not asking about the date

17  action was taken field of the report.  I'm asking about

18  the -- the narrative description in the paragraphs.

19  And -- and I think the NPDB's treatment of those two

20  things was a little bit different.

21          MS. BEIGHTOL:  Just, David, look at the

22  paragraph.  It has 3-3-2020.

23          MR. HAWISHER:  Yeah.  It -- it -- it does.

24          MS. BEIGHTOL:  Yeah.  And he's just talking

25  about that paragraph that you just asked him about, so

1   I'm not --

2           MR. HAWISHER:  Yeah.  I -- I --

3           MS. BEIGHTOL:  -- sure your confusion.

4           MR. HAWISHER:  Kristen, I'm -- I'm not

5   confused about this.  I realize what he's saying.

6   I'm -- I think Dr. Hyde is confused on this.

7   BY MR. HAWISHER:

8   Q.   Dr. Hyde --

9           MS. BEIGHTOL:  Objection.

10  BY MR. HAWISHER:

11  Q.   -- are you saying that the NPDB determined that

12  that first sentence of that paragraph was incorrect?

13  A.   Yes.  They determined that it should be 3-25.

14  Q.   Okay.  So if you will turn -- or actually, if

15  you'll hand me the tablet, I will turn to the NPDB

16  decision on that issue.

17          MS. BEIGHTOL:  If you turn to Page 10 of that,

18  I think is what he's talking about.

19          Are you talking about the July 27 letter to

20  Brenda?

21          MR. HAWISHER:  Yes.

22          MS. BEIGHTOL:  Yeah.  Just --

23          MR. HAWISHER:  And this is Page 10 of Exhibit

24  2.  Okay.

25          So do you -- if you could pass that to him in

 1  case he does want to look at it, but he should be

 2  looking at the same thing I --

 3          MS. BEIGHTOL:  You're looking at the same

 4  thing you have in front of you there.

 5  BY MR. HAWISHER:

 6  Q.  So the bottom paragraph on the page we're looking

 7  at, states, "The report narrative should include that

 8  one, March 3, 2020, a precautionary suspension was taken

 9  against Dr. Hetzel."  Do you see that?

10  A.  Yes.

11  Q.  Okay.  That is what the NPDB is saying the report

12  narrative should include, right?

13  A.  Yes.

14  Q.  Is it still your position that it is not accurate

15  to say that Dr. Hetzel was the subject of a

16  precautionary suspension beginning on 3-3-20?

17  A.  It -- it's my position very simply, that in the

18  same letter, the previous line, that the hospital should

19  use the date of March 25, 2020.

20  Q.  Yes.

21  A.  I'm not sure that's a mystery.

22  Q.  And that corresponds to the date action was taken

23  and/or date action became effective fields, which are

24  above the narrative description.  Do you see those on

25  the report?

1  A.   Date action taken, 3-3, date action became

2  effective, 3-3, length of action indefinite.  Is that

3  what you're referring to?

4  Q.   Yes.  Yes.  That's what I'm referring to.

5  A.   Okay.  Yeah.

6  Q.   So as I read Mr. Illich's letter, he has directed

7  Mission Hospital to correct the date action was taken

8  and date action became effective to the March 25th date,

9  but he has not directed them to change the statement

10  that the precautionary suspension began on March 3rd in

11  the narrative description; do you disagree?

12        MS. BEIGHTOL:  Objection to the form to the

13  extent -- objection to form.

14        THE WITNESS:  Well, I see what you're -- I see

15  what you're saying, but I'm not sure what your question

16  is of me.  He directs them to use March 25 as the date

17  of action.

18  BY MR. HAWISHER:

19  Q.   Yes.

20  A.   Not March 3.

21  Q.   Yes.  And my question is not about the date of

22  action field.  My question is about the narrative

23  description, and specifically, the first sentence of

24  that narrative description.

25        Are -- are you saying that the first sentence of

1   that narrative description is inaccurate?

2          MS. BEIGHTOL:  Asked and answered.  Objection.

3          THE WITNESS:  The first sentence is, "Dr.

4   Hetzel was the subject of a precautionary suspension

5   beginning on 3-3-20."

6   BY MR. HAWISHER:

7   Q.   Yes.

8   A.   Is that the sentence?

9   Q.   Yes.

10  A.   That's the one that Illich tells him to change.

11  Q.   He directs them to change it to March 3rd, 2020, a

12  precautionary suspension was taken against Dr. Hetzel,

13  right?

14  A.   He directs them to change it to 3-25?

15  Q.   No, that -- that -- that's not correct.  If you

16  will use -- if you'll refer back to his letter.  And I'm

17  going to read you -- and I'm just going to read into the

18  record the relevant paragraph.

19          "We believe a correction should be made to the

20  description of subject's acts or omissions field.  The

21  hospital should use a date of action of March 25th,

22  2020, instead of March 3rd, 2020.  It's clear that from

23  March 25th, 2020, Dr. Hetzel was suspended without

24  interruption through June 5th, 2020.  The report

25  narrative should include that, one, March 3rd, 2020, a

1   precautionary suspension was taken against Dr. Hetzel."

2   And then it goes on to say March 10th and March 25.

3        So Mr. Illich has directed Mission Hospital to

4   state in the narrative description that on March 3rd,

5   2020, a precautionary suspension was taken against Dr.

6   Hetzel, right?

7   A.   Well, that's what -- that's what his letter says.

8   It says that they should use March 25, and as you were

9   reading, that the report narrative should include some

10  other information.  But it doesn't say that they should

11  say Dr. Hetzel was the subject of a precautionary

12  suspension beginning on 3-25.

13  Q.   Beginning on 3-25?

14  A.   The -- the -- the report narrative says -- the

15  hospital should use date of action March 25, the report

16  narrative does not say that.

17  Q.   I don't -- I'm not sure I understand what you're

18  saying.

19       Are you -- is it your contention that the date

20  action was taken field was not required to be changed to

21  3-25?

22            MS. BEIGHTOL:  Objection to form.

23            THE WITNESS:  It's -- it's exactly that date

24  that Mr. Illich tells him to change when he corresponds

25  with him in July of 2021.

1    BY MR. HAWISHER:

2    Q.   Okay.  So we do agree on that.  And -- and so then

3    we get to the --

4            THE VIDEOGRAPHER:  I'm sorry.  My -- actually,

5    do you mind if we can take a break when we have a

6    chance?

7            MR. HAWISHER:  In, I think about three or four

8    minutes.

9            THE VIDEOGRAPHER:  That's fine.

10   BY MR. HAWISHER:

11   Q.   So I agree with you, that Mr. Illich directed

12   Mission Hospital to change the date action was taken

13   field from 3-3-2020 to 3-25-2020.  My questions now are

14   about the narrative description.

15        And the narrative description, he instructs them,

16   should include that the precautionary suspension was

17   imposed on 3-3, correct?

18   A.   That's what he says, yes.

19   Q.   Okay.  So it is correct to state that Dr. Hetzel

20   was the subject of a precautionary suspension beginning

21   on 3-3-2020?

22            MS. BEIGHTOL:  Objection to the form.

23            THE WITNESS:  You're saying that the formula

24   that he uses, the phraseology that he uses in his letter

25   of July 2021, informs their submission of May 4, 2020?

1  BY MR. HAWISHER:

2  Q.   That is not what I'm saying.  I am asking you if

3  the sentence that states, "Dr. Hetzel was the subject of

4  a precautionary suspension beginning on March 3rd,

5  2020," is factually accurate?

6          MS. BEIGHTOL:  Objection to the form of the

7  question.  In this context, it's confusing.

8          THE WITNESS:  I -- I'm not sure, basically

9  what the import of your question is.  Are saying the

10  phraseology, which Mr. Illich uses in July of 2021,

11  should be mirrored in the report in May of 2020, and if

12  not, that report is deficient?

13  BY MR. HAWISHER:

14  Q.   I am asking you if it is -- if this sentence in the

15  May 4th, 2020 report was factually accurate, quote, "Dr.

16  Hetzel was the subject of a precautionary suspension

17  beginning on March 3rd, 2020."  End quote.  Is that

18  sentence factually accurate?

19          MS. BEIGHTOL:  Let me clarify.  Are you asking

20  if it's accurate in this report or accurate in general,

21  because those are two different things.

22          MR. HAWISHER:  I have asked the question I've

23  asked.

24          MS. BEIGHTOL:  Objection to the form and

25  the -- and because it does not differentiate between

1  those two things.

2          THE WITNESS:  Yep.  Well, as of May 4, it

3  would -- it would've been accurate in the minds of the

4  Mission Hospital people submitting the information.

5  BY MR. HAWISHER:

6  Q.  Okay.  The following sentence states, "This

7  precautionary suspension was modified, with the most

8  recent modification being on April 23rd, 2020."  And I'm

9  going to pause there because that's a long sentence.

10         Is that first clause of that sentence factually

11  accurate as of May 4th, 2020?

12  A.  So, take a look.  I believe there was action March

13  10, which is not reflected in that document.

14         MR. HAWISHER:  And if you want to take a look

15  at those and refresh your memory, maybe this would be a

16  good time for a break if the videographer needs one.

17         MS. BEIGHTOL:  Yeah.  If you want to do that,

18  David, but also, should we discuss, are we taking a

19  lunch break?  What are we doing?

20         MR. HAWISHER:  Yeah.  Let's -- let's go off

21  the record.

22         THE REPORTER:  Okay.

23         THE VIDEOGRAPHER:  The time is 11:31 a.m.

24  We're going off the record.

25      (A recess was taken.)

1              THE VIDEOGRAPHER:  The time is 11:38 a.m.

2      We're going back on the record.

3      BY MR. HAWISHER:

4      Q.   All right.  So Dr. Hyde, my question was about the

5      first half of the second sentence of the narrative from

6      the May 4th report.  "This precautionary suspension was

7      modified, with the most recent modification," and in

8      brackets, I'm going to say, "most recent as of May 4th,

9      2020, being on April 23rd, 2020."

10          Is that -- is anything about that statement untrue?

11             MS. BEIGHTOL:  And again, I'm just going to

12     object to the form, to the extent you're not going to

13     differentiate whether that is true as a sentence or true

14     that it is sitting in an NMPD (sic) report.

15             MR. HAWISHER:  I would ask that you simply

16     object to the form.

17             THE WITNESS:  You're asking whether anything

18     has happened as of the May 4th report?

19     BY MR. HAWISHER:

20     Q.   I'm asking whether the statement that I read to you

21     was accurate.  And I will read it again.  "This

22     precautionary suspension was modified, with the most

23     recent modification as of May 4th, 2020, being on April

24     23rd, 2020."

25     A.   That's my understanding.

1  Q.   Okay.  The second half of that sentence states,

2  "When the precautionary suspension was removed, subject

3  to the practitioner's satisfactory completion of fitness

4  for duty evaluations."  Is that statement also accurate?

5  A.   It's accurate in the sense that's what the hospital

6  submitted.

7  Q.   What do you mean?  What do you mean by that?

8  A.   Well, let me get it in front of me.  I think you

9  were asking me about the accuracy of hospital

10  submission, and then they --

11          MS. BEIGHTOL:  I think you're in the --

12          THE WITNESS:  Yes, I think that's correct.

13  I'm looking at Page 2 of 3, 093 as the Bates number at

14  the top.  Is that what you're asking now?  I think

15  that's accurate.

16  BY MR. HAWISHER:

17  Q.   My -- my question is not, did I read it correctly.

18  My question was, is the statement accurate?

19          MS. BEIGHTOL:  Oh, you're in a --

20          THE WITNESS:  Yes.  I think that's accurate,

21  based on what I -- what I've seen.

22  BY MR. HAWISHER:

23  Q.   Okay.  So we agree that every statement in the May

24  24th, 2020, narrative is accurate?

25          MS. BEIGHTOL:  Objection to form.  You just

1   said May 24th.

2            THE WITNESS:  I -- I'm not sure I could say

3   that.

4   BY MR. HAWISHER:

5   Q.   If I -- I'm sorry.  May 4th, 2020.  Thank you.

6            MS. BEIGHTOL:  And objection to form.

7            THE WITNESS:  You want to know if every

8   statement in the May 4th, 2020, submission is accurate?

9   BY MR. HAWISHER:

10  Q.   Every statement in the narrative description, which

11  is the two sentences that we have just talked about.

12  A.   That's my understanding of, in the narrative

13  description, beginning with Dr. Hetzel, and ended with

14  evaluations.

15  Q.   Your understanding is that the entirety of that

16  paragraph is accurate?

17           MS. BEIGHTOL:  Objection to the form of the

18  question.

19           THE WITNESS:  It's my understanding that this

20  is the hospital's representation, and I have no reason

21  to think that as of May 4th, they knew this was

22  inaccurate.

23  BY MR. HAWISHER:

24  Q.   Okay.  So -- and I -- I appreciate that statement

25  about what they knew or may have known.  My question is,

1   was it in fact accurate, regardless of what they knew at

2   the time?

3   A.   As far as I know, yes.

4   Q.   Okay.  The following section of your -- of the

5   notes that you've brought here, and when I say

6   following, I mean, after the section entitled

7   Inaccuracies in Mission NPDB Documents, the next section

8   is, Subsequent NPDB Communication Clause.  You state,

9   "Length of action still quote, "indefinite."  No mention

10  of recommendation to restore privileges on 4-23.  They

11  wait until July 9th to submit the revision report."

12       Are those your three criticisms of what Mission

13  Hospital did after the May 4th, 2020 report?

14  A.   Yes.

15  Q.   So with respect to the indefinite length of action,

16  we have talked about that in the context of the May 24th

17  report -- or the May 4th report already.  My question,

18  as it relates to subsequent submissions, is this.

19       Did the NPDB take issue with or criticize the

20  decision to report Dr. Hetzel's precautionary suspension

21  as indefinite in length?

22  A.   No.

23  Q.   Why not?

24  A.   Well, it's, as you pointed out, one of the options

25  they have as a -- as an institution to report.

1   Q.   Okay.  But the NPDB reviewed the report for

2   accuracy, correct?

3   A.   They -- they make it clear they don't review these

4   reports for accuracy.

5   Q.   Where do they make --

6   A.   That's -- that's -- that's part of what they say in

7   their guidebook.  They're not going to straighten out

8   any -- any misrepresentation on the part of the

9   hospital.

10  Q.   Where do they say that?

11  A.   Well, I can find it, but I can't find it right

12  away.

13  Q.   Please do review the -- the portion of the

14  guidebook that you brought.  And if you need the whole

15  guidebook, it's on the tablet, and see if you can find

16  that.

17  A.   Well, I want to -- either have to take a break to

18  look for it, or we can submit that as part of the errata

19  sheet.  It's up to you.

20  Q.   Let's -- let's put a pin in that for now then.

21  A.   I'll point to one commentary, the commentary

22  entitled, "When is it worth fighting your NPDB report,"

23  from Medscape.  It indicates the NPDB relies on the

24  healthcare organization that submit the reports to check

25  that they're factually accurate and to make any

1  corrections or changes in the reports.

2  Q.   Okay.  So I'm going to turn to Exhibit 3 in the

3  guidebook, and I'm going to show you Page F5 of that

4  exhibit.  If I can ever get to it.

5          MS. BEIGHTOL:  Does anyone have my copy of

6  this note?  It disappeared for me.

7          MR. HAWISHER:  This one, it -- you'll have to

8  give it back, but --

9          MS. BEIGHTOL:  No.  I don't want to take that

10  one and accidentally run off with it.  I'm just -- it

11  was just right here and I don't know whether it got

12  stuck to something or what.  Is that your version there?

13  I don't know where it ran off to.

14          THE WITNESS:  That's your copy I took by

15  mistake.

16          MS. BEIGHTOL:  Oh, okay.

17          THE WITNESS:  I wanted some extra copies.

18          MS. BEIGHTOL:  I thought I was crazy.  I

19  thought -- I was like, I have this all set right here.

20  BY MR. HAWISHER:

21  Q.   So Dr. Hyde, I'm -- I'm passing you the NPDB

22  Guidebook, Exhibit 3.  You see the heading on Page F5,

23  Dispute Resolution Limitations?

24  A.   Yes.

25  Q.   It says, "The dispute resolution process can

1    determine only whether a report was submitted in

2    accordance with NPDB reporting requirements," a little

3    further down, "whether the report accurately depicts the

4    action taken as reflected in the written record provided

5    by the reporting entity, and/or whether the reporter's

6    basis for the action is reflected in the written record

7    provided by the reporting entity."  Correct?

8    A.    Yes.

9    Q.    So the NPDB does review whether the report

10   accurately depicts the action taken, correct?

11   A.    They -- they don't -- how shall I put it?  They --

12   as indicated in the commentary, they rely on the

13   healthcare organization for the accuracy of reports that

14   are submitted to be factually accurate.  The NPDB

15   doesn't send out investigators to check on the factual

16   accuracy.  And they do say in the paragraph right after

17   the one that you cited, what they don't review.  They

18   don't review the reasons for the report, the merits of

19   any claim, the extent to which there's been any due

20   process involved.  So they are reviewing their own

21   requirements.  They're not reviewing the hospital's

22   integrity.  Their requirements would appear to attempt

23   to fit the hospital's report into the categories which

24   they have.  But the reporter's base for the action,

25   that's the hospital, is reflected in whatever written

 1   report is provided by the hospital.  So they're --
 2   they're confirming that the hospital says what the
 3   hospital says, if you will, as opposed to confirming any
 4   reasons for the report or the merits of the report.
 5   Q.   Okay.  And --
 6   A.   Or indeed, in court with this article with a
 7   factual accuracy as well.
 8   Q.   -- and we can talk in just a moment about the
 9   underlying reasons for the report being submitted.  My
10   question is about the decision to report the length of
11   action as indefinite.
12        Isn't that an issue that the NPDB would review as
13   part of its scope of review?
14            MS. BEIGHTOL:  Objection.  Objection to the
15   form of the question.
16            THE WITNESS:  I'm not sure that they actually
17   specifically reviewed that in this report, but in
18   general, the answer would be yes.
19   BY MR. HAWISHER:
20   Q.   Okay.  And when you say you're -- you're not sure
21   that they reviewed that in this report, why -- why do
22   you say that?
23   A.   Looking at the letters from both Mr. Illich and his
24   supervisor in the secretary's office there --
25            MS. BEIGHTOL:  That's in the set.

1           THE WITNESS:  -- I don't think there's any

2    representation that they reviewed the accuracy of

3    exactly what was happening on the 2nd or the 3rd.  They

4    review the accuracy of the representation by the

5    hospital, but they don't review the accuracy of any

6    underlying facts.

7    BY MR. HAWISHER:

8    Q.   Right.  And -- and I -- and I agree with that.  And

9    my question is just about the accuracy of the

10   representation by the hospital that the length of action

11   was indefinite.

12          MS. BEIGHTOL:  An objection.  Misstates --

13          THE WITNESS:  No reason to think that's not

14   accurate.

15   BY MR. HAWISHER:

16   Q.   Okay.  You criticize Mission Hospital for waiting

17   until July 9th to submit the revision to action report.

18   Why are you critical of that?

19   A.   Well, we've to some extent, lost sight of my basic

20   criticism, which is that --

21          THE VIDEOGRAPHER:  Hold on.  Let me just clip

22   it before you continue, please.

23          THE WITNESS:  Yeah.  Lost sight of my basic

24   criticism, which is that this entire report is not in

25   accord with the Medical Staff Bylaws of Mission

1   Hospital, and therefore everything which follows

2   thereafter is merely a matter of the punctuation in the

3   sentence, which is -- which has gone wrong.  So my

4   criticism of the hospital is not necessarily limited to

5   this or that accuracy or inaccuracy with regard to

6   dates.  It is, frankly, more fundamental with regard to

7   the reporting of Dr. Hetzel in the first place.

8   BY MR. HAWISHER:

9   Q.   Then let's talk about the decision to report Dr.

10  Hetzel.  Do we agree that the precautionary suspension

11  was a professional review action?

12  A.   Was a what?

13  Q.   Professional review action as that term is defined

14  in the HCQIA and its implementing regulations?

15  A.   I don't believe it's at all clear that it was a

16  professional review action.  In fact, the bylaws say

17  it's not in and of itself a professional review

18  action --

19  Q.   Okay.

20  A.   -- in -- in 8.4.

21  Q.   So other than the bylaws, do you have any reason to

22  say that it is not a professional review action?

23          MS. BEIGHTOL:  Objection.

24          THE WITNESS:  Well, I -- I do, in the sense

25  that the professional review action would be a final

1  action which is reportable.  When you have, at least in
2  my experience, a difference in interpretation, let me
3  put it that way, of a static document, I think it helps
4  to see what was underway, what was happening in the --
5  in the industry of which the hospital is part.  And
6  the -- the first place that -- that I would look is in
7  the state of North Carolina.  State of North Carolina,
8  on its website, says that it doesn't want to hear from
9  institutions until they have final action.  They don't
10  want to have the back and forth kind of thing that our
11  questions and answers have unfortunately been reduced
12  to, concerning technicalities of timing and so forth.
13  They want to hear about a final report where there's --
14  it's really unarguable that something happened, and here
15  it is.
16       Then I would look beyond the state to the
17  Federation of State Medical Boards, which includes North
18  Carolina as a member, which has endorsed the same -- the
19  same principle, which is the final action -- is that --
20  which they want to they want to hear about.  In addition
21  to the state, you would look to professional societies,
22  and I've given you a -- an excerpt from the
23  Comprehensive American Medical Association Physicians
24  Guide to Medical Staff Organization Bylaws.  And with
25  your permission, I'll read just one paragraph.

1   BY MR. HAWISHER:

2   Q.   So I am happy for you to do that, but before you

3   do, let me find it so I can follow along.  This is --

4   A.   That's it.

5   Q.   This is it?

6   A.   Correct.

7   Q.   Okay.  I'm going to --

8   A.   Page 128 in the upper right-hand corner.

9          MR. HAWISHER:  I'm going to mark this 27.  And

10  these --

11      (Defendant's Exhibit 27 was marked for

12  identification.)

13         MS. BEIGHTOL:  What was 26?

14         MR. HAWISHER:  26 was the Joint Commission

15  Hospital Accreditation Standards.

16         What happened to the Sharpie?

17         THE REPORTER:  That is a good question.

18         MR. HAWISHER:  Probably -- ah, there it is.

19  BY MR. HAWISHER:

20  Q.   Okay.  You said which page, Dr. Hyde?

21  A.   128.

22  Q.   And please go ahead.

23  A.   I'm going to read the beginning here.  "Medical

24  staff should be wary of any attempt to circumvent the

25  parameters the federal law lays out for protected and

1   reportable summary suspension by renaming it

2   precautionary suspension or investigative suspension."

3   On the next page, 129, it indicates that as a sample

4   from the Massachusetts Medical Society Bylaws, "Summary

5   suspension is imposed to prevent imminent danger" --

6   'imminent danger to the health of one or more

7   individuals.  Summary suspension is used only to protect

8   people, not used to punish members or privilege holders

9   or their patients by preventing the member from caring

10  for patients."

11          So the -- and of course, then it calls for

12  immediate review and so forth.  So if you're in -- if

13  you're in my shoes and you're saying to yourself, we

14  have a difference of opinion as to whether or not

15  Section 8.4, which is the precautionary or summary

16  suspension of clinical privileges of the medical staff

17  bylaws, should in fact be taken on its face,

18  precautionary suspension is not in and of itself, a

19  final professional review action that is reportable, but

20  rather an interim step to protect patients.  Should we

21  take that on its face as the rules that should be

22  followed if you're Mission Hospital.  Or should we take

23  the alternative point of view of the NPND (sic) or the

24  National Practitioner Data Bank, the requirement that

25  says you have to report everything, no matter what you

1   call it?

2       So Dr. Hetzel's privileges, if you will, are in the

3   cross-hair here because he has every reason to believe

4   that when he gets a phone call, as opposed to some peer-

5   review committee, or when he has a memo from the chief

6   executive, that, in fact, he is protected by the

7   ordinary operation of medical staff bylaws, and that

8   these so-called precautionary suspensions are nothing of

9   any, how shall I put it, consequence except that they're

10  not reportable.  That's what he knows from his own

11  bylaws.  So I can imagine that it was a very unpleasant

12  surprise to find that the passage of time, I won't say

13  delay because that implies motive, that the passage of

14  time between step A, step B, step C, which you have

15  thoroughly chronicled in the description of dates and

16  when they were reported and so forth to the National

17  Practitioner Data Bank, he is hampered by the passage of

18  time in terms of having any ready resolution.  He

19  could -- he could responsibly say, that's not allowed in

20  the bylaws reporting, but he could also hope for some

21  kind of resolution within, say, 30 days, which would

22  prevent the reporting of what amounts to a contentious

23  dispute, as opposed to one which is -- had been reviewed

24  by any medical staff peer review committee or anyone

25  else in the medical staff.  So that's my -- that's my

1  point of view, that in the interpretation of these

2  medical staff bylaws, I would look to state statute and

3  to professional organizations to interpret what their

4  responsibilities are.

5  Q.   What state statute are you referring to?

6  A.   In North Carolina, the North Carolina Medical Board

7  has extensive instructions concerning the reporting of

8  information by practitioners who hold licenses and when

9  they want to have these reports.  My recollection is in

10 fact, they even opposed something of that sort on

11 their -- on their website.  So there are -- and by the

12 way, the North Carolina Medical Board has a plethora of

13 resources for any reasonable hospital to use to address

14 perioperative, and intraoperative, and postoperative

15 care communication, collegial relations, any number of

16 things that are -- really appear to be a very active

17 group in offering tools to hospitals.

18 Q.   Okay.  But I'm not sure I understand the connection

19 between the North Carolina Medical Board and the data

20 bank, but let's come back to that.  Have you ever

21 reviewed the statutory definition of professional

22 review -- of the term, professional review action?

23 A.   In the HCQIA or in -- in North Carolina?

24 Q.   In the HCQIA context?

25 A.   Yes.

1  Q.   Okay.  I'm going to pass you Exhibit 8, which has

2  that definition.  And if you need to, please look over

3  it, refresh your memory, and then once you are ready to

4  talk about it, just let me know.

5  A.   Yeah.  No, I can see this.  Yeah.

6  Q.   Okay.  So I'm going to go through the elements of

7  that -- of that definition.  "Professional review action

8  means an action or recommendation of a professional

9  review body."

10      Was Mission -- was Mission Hospital and its

11  credentials committee, were those professional review

12  bodies?

13  A.   Well, the -- the -- the very first thing here,

14  which is determine they have clinical privileges.  Is

15  that what you're referring to as 10A, here?

16  Q.   Not -- I'm looking at Paragraph 9.

17  A.   Looking at?

18  Q.   Paragraph 9.

19  A.   Oh, Paragraph 9.  I'm sorry.

20  Q.   The term -- yeah.  There --

21  A.   Yeah.  Professional review action, yes.

22  Q.   So the first part of the definition, "an action or

23  recommendation of a professional review body."  Is

24  Mission Hospital a professional review body?

25  A.   Well, you're asking about the definition with

1   regard to the HCQIA.  And by the terms of this, yes,
2   they would be.
3   Q.   Okay.  Was Dr. Hetzel's precautionary suspension
4   taken or made in the conduct of professional review
5   activity?
6   A.   No.
7   Q.   Why not?
8   A.   Because it is defined -- the professional review
9   activity, happily for him, is defined in the medical
10  staff bylaws at 8.4, "A precautionary suspension is not
11  in and of itself, a final professional review action."
12  Q.   Okay.  So we can come back to the bylaws in a
13  minute.  I want to note that professional review action
14  and professional review activity are different terms.
15      If you could scroll down to Paragraph 10?  Let me
16  know when you're there?
17  A.   Yep.  Got it.
18  Q.   So professional review activity is also a statutory
19  defined term.  Under this statutory definition, was Dr.
20  Hetzel's precautionary suspension taken as part of
21  professional review activity?
22  A.   Well, it turns out that 10A calls for determination
23  of whether or not the physician may have clinical
24  privileges.  And the precautionary suspension is not
25  going to determine whether or not he may have clinical

1  privileges because it's not in and of itself a final

2  action.  So the HCQIA definitions are fine for HCQIA

3  purposes, but if a mistake is made, in terms of -- of

4  the reporting of something which falls outside, for

5  example, the peer protection of the HCQIA, then it may

6  be -- it may be moot.

7  Q.  So did Dr. Hetzel's precautionary suspension change

8  or modify his privileges?

9  A.  Oh, sure it did.  Yeah.

10  Q.  Okay.  So if you look at Paragraph 10C, can we

11  agree that the precautionary suspension was part of a

12  professional review activity?

13          MS. BEIGHTOL:  Objection.

14          THE WITNESS:  Yeah.  It -- it -- it is not a

15  reportable activity according to the medical staff

16  bylaws, but according to the HCQIA, it would be.

17  BY MR. HAWISHER:

18  Q.  Oh, okay.  So do we agree that the precautionary

19  suspension was reportable according to the HCQIA?

20          MS. BEIGHTOL:  Objection to the form of the

21  question.

22          THE WITNESS:  In the absence of any of the

23  exceptions to HCQIA reportability, fraud and

24  misrepresentation, and so forth.

25  BY MR. HAWISHER:

1   Q.   Okay.  So if -- and I'm not conceding that they do,

2   but if the bylaws conflict with the HCQIA reporting

3   requirements on this issue, which of those is Mission

4   Hospital required to follow?

5   A.   I don't -- I don't believe the words are self-

6   explanatory, self-actuating, so to speak.  For purposes

7   of medical staff membership, the medical staff bylaws of

8   the hospital should govern.  For purposes of reporting

9   in the HCQIA, the language of the HCQIA should govern,

10  but for a mistake, a fraud, and misrepresentation.

11  Q.   Okay.  I -- I don't think that you're going to

12  agree with this, but I'm going to tell you how --

13  what -- how that sounds to me, and you tell me where

14  I've gone wrong.  It sounds to me like you are agreeing

15  that for HCQIA purposes, Mission Hospital was required

16  to submit this report?

17          MS. BEIGHTOL:  Objection to the form of the

18  question.  Misstates his testimony.

19          THE WITNESS:  And -- and you're correct.  I --

20  I don't agree with you because I believe there was

21  misrepresentation of exactly what took place with regard

22  to this precautionary suspension.

23  BY MR. HAWISHER:

24  Q.   Okay.  What was the misrepresentation?

25  A.   Well, first of all, it's not an action, which is a

1   professional review action, which is reportable.

2   Q.   All right.  Then let's go back to the statutory

3   definition of professional review action.  So far, we

4   have made it through the second line because we have

5   agreed that this was a professional review activity.

6        Was the action based on the professional conduct of

7   Dr. Hetzel, which affects or could affect adversely the

8   health or welfare of a patient or patients?

9   A.   Again, that's -- that's arguable.  You could make

10  an argument that a patient had a terrible outcome, which

11  was Dr. Buell's fault, and that Dr. Buell's position

12  with HCA, combined with the cooperation, if you will, of

13  the chief executive, took it out on Dr. Hetzel.  So

14  it's -- these are not words that automatically apply

15  themselves with regard to -- to bring a resolution.

16  Q.   Would you agree that performing a surgery on a

17  patient could affect adversely the help or welfare of

18  that patient?

19           MS. BEIGHTOL:  Objection to the form of the

20  question.

21           THE WITNESS:  Absolutely.

22  BY MR. HAWISHER:

23  Q.   Okay.  So it -- it sounds like a precautionary

24  suspension based on a surgery is based on professional

25  conduct that could affect adversely the health and

1   welfare of the patient?

2   A.   Not really.

3           MS. BEIGHTOL:   Objection to the form of the

4   question.

5           THE WITNESS:   The precautionary suspension

6   affects an individual.  You asked me an abstract

7   question.  Could surgery be -- could have an effect

8   on -- on an individual patient and so forth, and clearly

9   it could.  But with regard to precautionary suspension,

10  there's a target with regard to the precautionary

11  suspension, and that was, in this case, unfortunately

12  for him, Dr. Hetzel.

13  BY MR. HAWISHER:

14  Q.   I -- I don't understand how that relates to my

15  question.

16  A.   You asked me a -- a -- a broad general question

17  of -- with regard to would surgery have an effect on a

18  patient, or something along those lines.  And I agreed

19  with that.

20      Then you asked me, would a precautionary suspension

21  automatically be an activity defined in the statute?

22  And my answer was, because a precautionary suspension is

23  aimed at an individual, we have to interpret what

24  happens with the individual and the medical staff.  So

25  we don't have a clear line here.  We have medical staff

1  bylaws that essentially say, this is not a final action

2  for reporting activity.  And on the other hand, we have

3  the HCQIA that says, we -- we want to define what a

4  professional review activity is.

5  Q.   Right.  So Dr. Hyde, I appreciate your interest in

6  referring back to the bylaws.  However, I have limited

7  time with you here, and I really need to get through the

8  statutory elements of the definition of professional

9  review action, so please focus on those in your answers.

10  A.   I think --

11  Q.   Is -- was Doctor --

12  A.   -- if I may say so --

13  Q.   Go ahead.

14  A.   -- I'd -- I'd be happy to help you, but I think

15  you're wasting your time.  I'm happy to -- to tell you

16  that the HCQIA is -- since 1986 has been in operation,

17  that it has definitions which govern its own activities,

18  which govern the institutions which are subject to its

19  jurisdiction.  It has nothing to do with the medical

20  staff bylaws.

21       And the question is, whether or not the provision

22  in 8.4 would have prevented the reporting of this

23  incident in the first place.  Bad faith, conflict of

24  interest, possible responsibilities for other physician,

25  they all are issues to be taken into account.  And

1  that's why the hospitals have medical staff bylaws, is

2  so that the physicians won't be so severely compromised

3  in their professions based on unsupported, or at least

4  controversial allegations that they're going to suffer

5  professional and personal consequences.  So I can agree

6  with your reading of the HCQIA, but I -- and I'm happy

7  to stay as long as you want, but I believe it would be a

8  misuse of our time together.

9  Q.   Okay.  So was Dr. Hetzel's performance of the index

10  surgery on March 2nd, 2020, professional conduct that

11  could affect adversely the health or welfare of the

12  patient?

13  A.   I think so.

14         MS. BEIGHTOL:  Objection to form.

15  BY MR. HAWISHER:

16  Q.   Okay.  So did Dr. Hetzel's precautionary suspension

17  affect adversely his clinical privileges?

18  A.   Absolutely it did.

19  Q.   Is there any element of the statutory definition of

20  the term professional review action, that you believe

21  Dr. Hetzel's precautionary suspension did not satisfy?

22         MS. BEIGHTOL:  Objection to the form of the

23  question.

24         THE WITNESS:  Yes.  As I believe, and I -- I

25  can't -- but I -- but I will -- we'll put another pin in

1  this if you wish.  There are -- there are exceptions in

2  the interpretation of the HCQIA for a misrepresentation

3  of fraudulent or bad faith submission of information.

4  So the answer is, if in fact, the precautionary

5  suspension was consistent with the medical staff bylaws,

6  and if in fact, Dr. Hetzel had adequate representation,

7  notice and an opportunity to participate in an -- in an

8  activity that weighed evidence, and if as a consequence,

9  his professional review activity reached a final answer,

10  then the answer is very easy, which is that he would be

11  subject to the precautionary suspension.

12      But it's not that easy.  And all I'm pointing out

13  is that in interpretation conflict of -- of, if you

14  will, the words that are on the paper here, what would

15  you look to?  And you would look to what happens in the

16  state of North Carolina, what happens in the profession

17  of medicine nationally, and what happens in areas where

18  there may be incentives, aside from patient safety

19  protection, to either reward or punish physicians,

20  especially in controversial areas, such as that which

21  has befallen the Mission Hospital.

22  BY MR. HAWISHER:

23  Q.   Okay.  So just with respect to the statutory

24  definition that is in Paragraph 9, is there any element

25  of that statutory definition that you believe is not

1   satisfied?

2   A.    You're saying Paragraph 9 is to be -- the action is

3   based on the physician's association with the society,

4   physician's fees or advertising, participation in group

5   plans, association with delegation of authority, any

6   other matter, you might find that there are other

7   matters, depending upon what we end up discussing.  I

8   certainly think there are other matters, but the

9   remainder of this is irrelevant to Dr. Hetzel's case.

10  Q.    So it is your position that this was not a

11  professional review activity because it was primarily

12  based on another matter that did not relate to the

13  competence or professional conduct of the physician?

14  A.    Yeah.  The professional review action -- action, is

15  a -- a definition from the medical bylaws.  Professional

16  review action here pertains to a professional review

17  body taken out of court, so on and so forth, and it's a

18  very different matter than -- than what happened in

19  Mission Hospital.

20  Q.    Okay.  So with respect to your contention that the

21  precautionary suspension was based on another matter

22  that does not relate to the competence or professional

23  conduct of the physician, what was that other matter, or

24  what were the other matters?

25  A.    Right.  And I'm -- I'm not ceding that 9 itself is

1  inclusive or dispositive with regard to Dr. Hetzel's

2  case, but the other matters are very clear, and I'll

3  simply summarize them.  So if you -- if you want to talk

4  about them, we can.  And if not, at least I'll put them

5  on the record.

6      First, that the actions of Mission Hospital were at

7  variance with the expectations in the reporting of

8  adverse information concerning the physician as

9  articulated by the North Carolina Medical Board.

10  Second, those actions were at variance with the

11  recommendations for model bylaws and model behavior, if

12  you will, by the American Medical Association.  Third,

13  there is ample evidence that those actions were in fact

14  motivated by information not -- motivated by motives,

15  motivated by -- by matters other than adverse patient

16  safety.  You would be hard-pressed to find a more

17  scandal-ridden hospital in the nation in the last five

18  years.  The attorney general, now governor, made his

19  views known.  The current attorney general has faulted

20  the hospital for the very things which have alienated

21  physicians, which is serial reduction, dramatic

22  reduction in staffing, and the disruption of services,

23  even to the extent the only repost, if you will, which

24  came back from the hospital, was they never promised to

25  continue quality services.  It's been the subject of a

1  university, Wake Forest, with Professor Mark Hall,
2  review in which the number of adverse commentaries
3  concerning the hospital in appendix A to his report,
4  took up ten pages.  That's just the titles of adverse
5  reports.
6      So it's a hospital which has, for better or worse
7  since its sale in 2019, lost an estimated 300
8  physicians, has lost a lot of community confidence, has
9  made a -- a lot of money for its owners, but at the same
10 time can always be suspect of having motivations,
11 especially by a surgeon such as Dr. Hetzel, well-
12 respected in the community, who had already decided to
13 leave and in leaving, would undoubtedly have taken
14 patients from the community with him to another
15 hospital.  So there are other matters, and those are the
16 other matters.
17 Q.   Okay.  So two of those matters we can --
18          THE VIDEOGRAPHER:  I --
19          MR. HAWISHER:  Go ahead.
20          THE VIDEOGRAPHER:  No, I'm sorry.
21 BY MR. HAWISHER:
22 Q.   Two of those matters we have -- we can talk about
23 in a minute because I do not believe they were the basis
24 for the action, but the third point that you just
25 discussed, which was the motives for Dr. Hetzel's

1  precautionary suspension, what do you contend were the
2  motives for Dr. Hetzel's precautionary suspension?
3  A.   Well, we'd have to take a look at what evidence we
4  have because we -- none of us will be in a position to
5  testify with absolute certainty.  But the first motive
6  is, of course, the harassment of Dr. Hetzel.  He
7  testifies to that in his -- in his deposition.  And you
8  can see from the actions of the hospital here, for
9  example, the -- the note on March 3rd from Dr. Frisch,
10 who -- who -- who conjures up the -- recently had two
11 intraoperative organ injuries and so forth,
12 notwithstanding the fact that Dr. Hetzel had just been
13 given a clean bill of health with new privileges for two
14 years.
15      Secondly, you clearly have a situation with a
16 conflict of interest with Dr. Buell, whose activity in
17 the operating room could be just as easily criticized by
18 someone intent on criticizing that.  But Dr. Buell has
19 the -- the great structural advantage of being an HCA
20 recruit and presumably close to and knowledgeable with
21 the chief executive.  Dr. Buell calls, and the next
22 thing you know, Dr. Hetzel is -- has been
23 precautionarily, if you will, suspended.
24      So it looks like every bit of -- of motivation to
25 either make an example of Dr. Hetzel for having left and

 1  the prospect is taking patients with him, and/or from

 2  Dr. Buell to point the -- the blame, if you will, for

 3  the -- for the poor outcome, not of the patient's

 4  condition, which apparently was very severe, but at --

 5  at Dr. Hetzel, and in the scheme of things to see what

 6  could be done about keeping one more voice, if you will,

 7  inactive, the report from Professor Hall having done a

 8  very fine job of chronicling, the attempts to mute

 9  whistleblowers.  So not --

10  Q.   I'm sorry.  Are you saying Dr. Hetzel was a

11  whistleblower?

12  A.   Dr. Hetzel says in his deposition that he had made

13  known his -- his reasons for -- for leaving, and he had

14  been dissatisfied.  To some extent, he's a relatively

15  quiet whistleblower, but the -- the dynamic between

16  hospital executives and medical staff will always have

17  financial, professional, personal relationships.  And in

18  the scheme of things, Dr. Hetzel had already indicated

19  he's leaving.  So the medical leadership, if you will,

20  admission, has no particular interest in providing him

21  with an even platform to have his claims weighed against

22  any claims that he might make against Dr. Buell, if in

23  fact either one of those were -- were worthy claims.  It

24  seems like a phone call from Dr. Buell at the end of the

25  procedure, with additional items added, that were

1   neither pertinent nor -- nor relevant, if you will, to

2   the so-called precautionary suspension, in violation not

3   only of any kind of fair play or due process, but in

4   violation of the medical staff bylaws, is what led to

5   this situation in which Dr. Hetzel and everyone else

6   finds themselves.

7       So a bad decision -- you have to ask yourself, why

8   was this decision made?  I've -- I've given some

9   speculations, some hypotheses.  I would not pretend for

10  a minute that I could demonstrate with certainty what

11  the motivation was.

12  Q.   Okay.  So other than speculation, there are no

13  other matters that do not relate to the competence or

14  professional conduct of the physician that were the

15  basis for the action?

16          MS. BEIGHTOL:  Objection to the form of the

17  question.

18          THE WITNESS:  You know, I think that covers

19  it.

20  BY MR. HAWISHER:

21  Q.   Just, by the way, to the suggestion that Dr. Hetzel

22  was going to be taking patients, you know he was going

23  to Texas, right?  His -- his plan was to resume medical

24  practice in Texas at the end of the year?

25  A.   Well, they don't know he's going to end up in

1   Texas.  In fact, he's encountered stumbling blocks

2   precisely because, for whatever reason, the hospital

3   helped put them there.  When a physician leaves, a

4   surgeon especially, especially a surgeon who is

5   respected and in an area that is a -- a shortage area

6   with oncology and gynecologic oncology, and especially

7   when it's a controversial one, this is one of the

8   attorney general's points in the authorizing the sale of

9   a hospital was the preservation of medical oncology.  So

10  if you're -- if you're looking at a doctor who's leaving

11  and you're not going to have at least his patients

12  anymore, is he going to end up in Texas or going to end

13  up next door?  We don't know.

14  Q.   If, for the sake of argument, Dr. Hetzel's

15  precautionary suspension was a professional review

16  action, do you agree that Mission Hospital was required

17  to report it to the NPDB?

18       MS. BEIGHTOL:  Objection to the form and

19  objection to the mischaracterization of his testimony so

20  far.

21       THE WITNESS:  It's not.  So I -- I can't agree

22  to a hypothetical which I know to be untrue.

23  BY MR. HAWISHER:

24  Q.   Okay.  So why was it not a professional review

25  action?

1  A.   Because the bylaws say it's not.

2  Q.   Okay.  For the purposes of the HCQIA, which is the

3  statutory scheme that covers data bank reporting, was it

4  a professional review action?

5           MS. BEIGHTOL:  Objection to the form of the

6  question.  This has been covered.

7           THE WITNESS:  For the purposes of the HCQIA,

8  I'm not giving legal advice to this hospital.  All I am

9  observing is that the precautions that are ordinarily in

10 place to protect physicians against sham activity, sham

11 peer review, sham reporting, blackmailing over the

12 question of potential reports to the NPDB.  All of those

13 precautions are in the medical staff bylaws for a

14 reason.  And I don't believe for a minute, having lived

15 with it now for almost 40 years, the HCQIA intends to go

16 around medical staff bylaws.  I think they have their

17 own requirements, and their own requirements would, of

18 course, command the obedience, if you will, of the

19 hospital.  But the protection for the individual is not,

20 I don't believe, in the HCQIA.  And again, I'm not

21 pretending to give legal advice to the hospital, but I

22 don't believe that act is meant to obviate the

23 protections that are in medical staff bylaws.

24 BY MR. HAWISHER:

25 Q.   Okay.  So say for the sake of argument, the medical

1   staff bylaws say, we're not big fans of the HCQIA.  We

2   don't report anything.  Would it be your position that

3   hospitals are not required to report -- report anything

4   to the -- to the NPDB?

5   A.   No.  I -- as I mentioned, I -- I'm not sure

6   you're -- going to get any mileage, going down this

7   road.  I'm -- I'm not interpreting the HCQIA, and I am

8   not really interested in telling the hospital what it

9   has to do or not do, by way of obedience to the HCQIA.

10  Hopefully they've got legal counsel, and hopefully their

11  legal counsel has told them.  If their legal counsel has

12  told them that by the way, obedience to the HCQIA

13  requires that you not pay attention to your own medical

14  staff bylaw protections under the precautionary

15  suspension, I would assume their legal counsel has told

16  them this.  And by the way, that would be a wonderful

17  defense if their legal counsel was in fact, paying

18  attention to the HCQIA.

19  Q.   I'll tell you, just so you're aware, that if I have

20  seemed uninterested in the bylaws, so far, it is because

21  I think they're legally irrelevant, and all that matters

22  is the HCQIA.  But now is --

23  A.   How do you share that with Mission Hospital's

24  administration?

25  Q.   Now is probably a good time to talk about the

 1  bylaws.  Do you have the -- you said you do have those

 2  with you, or some portions?

 3  A.   I have some excerpts with me, and I gave you a -- a

 4  copy of the excerpts that I have.

 5  Q.   Okay.

 6  A.   It has -- it looks like -- looks like it might be

 7  covered --

 8  Q.   Looks like it might be the whole thing.

 9  A.   It's an adoption of the --

10  Q.   Oh, no, no.  That -- that's because I've got two

11  copies.

12  A.   Okay.  I'm going to, at -- at risk of breaking it,

13  give you back your tablet, unless I --

14  Q.   All right.

15       MR. HAWISHER:  I'm going to mark the packet

16  that you brought, which is the -- includes the bylaws

17  and the policy on appointment, as 28.

18       (Defendant's Exhibit 28 was marked for

19  identification.)

20  BY MR. HAWISHER:

21  Q.   So let's turn to Section 8.4 of the bylaws.  And

22  I -- I notice you have already highlighted certain

23  portions of -- of the bylaws, and the first highlight on

24  this -- on this page, it says, "A precautionary

25  suspension is not, in and of itself, a final

1  professional review action that is reportable, but

2  rather an interim step to protect patients." You have

3  testified a few times that the bylaws say a

4  precautionary suspension is not a professional review

5  action.

6      Are you basing that view on this highlighted

7  portion of Section 8.4?

8  A.   Yes.

9  Q.   Okay.  Do you understand there to be any difference

10 between final professional review action and

11 professional review action?

12 A.   Yes.  It's not reportable unless it's a -- it's not

13 a precautionary suspension, not in and of itself, a

14 final professional review action.  So the reportability

15 is the key difference.

16 Q.   Okay.  Well, so if a precautionary suspension is a

17 non-final professional review action, that would be

18 consistent with the bylaws, right?

19          MS. BEIGHTOL:  Objection.

20          THE WITNESS:  It -- it's not a final

21 professional review action.

22 BY MR. HAWISHER:

23 Q.   I am sorry.  I said a non-final professional review

24 action.  But it is a professional review action.  That's

25 the interpretation offered.

1  A.   It says it's not, in and of itself, a final

2  professional review action.  I'm not sure what a non-

3  final action would be.

4  Q.   Okay.  So I may have to give the tablet back to

5  you.  Let me see if I can -- perfect.

6         MR. HAWISHER:  So the portion of the NPDB

7  guidebook that you brought, which I will label Exhibit

8  29, if you'll turn to Page E32.

9     (Defendant's Exhibit 29 was marked for

10  identification.)

11         THE WITNESS:  Okay.

12  BY MR. HAWISHER:

13  Q.   So the highlighted portion at the very bottom of

14  the page, says, "Clinical privileges actions are

15  reportable once they are made final by the healthcare

16  entity.  However, summary suspensions lasting more than

17  30 days are reportable, even if they are not final."

18  A.   Right.

19  Q.   Did I read that right?

20  A.   You did.

21  Q.   Okay.  So does that not suggest to you that a

22  professional -- that a precautionary suspension may be a

23  non-final professional review activity?

24         MS. BEIGHTOL:  Objection to the form of the

25  question.

1            THE WITNESS:  Yes.  I can -- I can see that
2     interpretation, as one reason why in the, for example,
3     the American Medical Association exegesis on medical
4     staff bylaws, they caution against the -- the use of
5     precautionary or summary suspensions, because they take
6     place without any protection of the physician's
7     interest.  And I can see exactly what you're pointing
8     to, which is that the NPDB Guidebook is in -- is in
9     conflict, it looks like, with the medical staff bylaws
10    of Mission Hospital.
11    BY MR. HAWISHER:
12    Q.   What is the conflict?
13    A.   The conflict would be in the Mission Hospital,
14    would have to regard a precautionary suspension as not
15    in and of itself, a final professional review action
16    that's reportable.  And the guidebook, on its face,
17    would seem to say that even though, and they call it a
18    summary suspension, but even though a summary suspension
19    is not final, it's reportable.
20         Now, you'd have to have a lot of interpretation to
21    see the conflict.  For one thing, the reporting of
22    information, which is based on inadequate background and
23    examination, is itself, a -- a fraudulent act on the
24    part of Mission Hospital.  The precautionary suspension
25    takes place, why?  Dr. Frisch says, it takes place

1  because of a couple of patients in the last six months,

2  which is inaccurate, and that it takes place because of

3  his activity with the index patient on March 2nd, which

4  is contestable, and his source of information, of

5  course, is a person who has a direct interest in putting

6  whatever blame is to be apportioned on Dr. Hetzel, and

7  not on himself.  So you'd have to have some

8  interpretation.  But looking at -- at these two phrases,

9  you can see exactly why the medical staff bylaws

10  indicate that a precautionary expansion is not, in and

11  of itself, a final professional review action that's

12  reportable.  You can also see, under the NPDB book, that

13  if you drag out the timetable for lifting a

14  precautionary suspension, you will, at least according

15  to the NPDB, make it a reportable event.

16  Q.   So what I'm asking about is -- strike that.

17       The bylaws say that a precautionary suspension is

18  not, in and of itself, a final professional review

19  action that is reported.  With respect to the final

20  professional review action portion of that statement,

21  the bylaws and the guidebook are in agreement, right?

22  A.   The bylaws and the guidebook are in agreement with

23  regard to final actions.

24  Q.   Yes.

25  A.   Yes.

1  Q.   Okay.  And the question -- the issue is the

2  reportability piece.

3  A.   Yes.

4  Q.   Okay.  I'm going to offer you an interpretation of

5  the bylaws that I think is consistent with the

6  guidebook, and I want to see what you make of it.  I

7  interpret the -- I interpret the bylaws as saying a

8  precautionary suspension is not in and of itself,

9  reportable, but becomes reportable once it has lasted 30

10 days.  I view that as consistent with the guidebook.

11      What do you think?

12           MS. BEIGHTOL:  Objection to the form of the

13 question, and also to Counsel's view.

14           THE WITNESS:  Yeah.  No, I -- I don't, and --

15 and I don't for three reasons.  One is -- and I've spent

16 the better part of half a century working with

17 physicians in any number of different settings.  I don't

18 give talks about it, but I have worked with many of

19 them.  I began that career as director of the faculty

20 practice plan at Yale, and -- and continuing it today,

21 advising medical staff members of the four State

22 University of New York campuses, who are members of the

23 union, which is my client.  So I've got fairly

24 continuous and -- and widely-varied, if you will,

25 experience working with physicians.

1        What do physicians fear?  They fear bureaucrats.

2   It's the name, which is ordinarily applied to people who

3   we think of as management, executive, board, and so

4   forth.  And what do they want?  They want, in return for

5   bringing their patients and their expertise to a

6   hospital, to have some protection that the bureaucrats,

7   the pencil-pushers, whatever they want to call them,

8   don't turn on them when it's financially advantageous to

9   do so, or when they've caused some kind of contretemps

10  or controversy, which has been financially

11  disadvantageous.  So the first thing --

12  BY MR. HAWISHER:

13  Q.  And Doctor, I'm sorry.  I'm just going to --

14          MS. BEIGHTOL:  Let him finish this.

15          MR. HAWISHER:  No.  I'm not going to let him

16  finish this.

17          MS. BEIGHTOL:  Hey, no.  You are not going to

18  interrupt.

19          MR. HAWISHER:  This is non-responsive.

20      No.  I am, because this is not responsive.

21          MS. BEIGHTOL:  He can absolutely finish this

22  question and you can bring it up with the court, but you

23  are not interrupting this witness.  He gets to finish

24  his answer.  That is unacceptable, and inappropriate.

25          MR. HAWISHER:  I will -- I get seven -- I get

1  seven hours with him --

2         MS. BEIGHTOL:  You -- and he can answer your
3  question.

4         MR. HAWISHER:  -- and I have spent most of
5  this listening to what he wants to talk about, rather
6  than what I have asked him about.

7         MS. BEIGHTOL:  That is false.

8         Doctor, you can continue your answer.

9         THE WITNESS:  I'll try to make it short.  The
10  reasons why a physician would have, and a -- a medical
11  staff would have a different interpretation, first of
12  all, fear of arbitrary action.  That's why we have
13  bylaws in the first place.  Secondly, federal and state
14  statutes come and go, just as bylaws do.  And while the
15  HCQIA has been very helpful for purposes of protecting
16  peer review, it's not meant to be, at least at my
17  recollection, having lived through it, not meant to be
18  an assault on medical staff bylaws, so I think we can
19  assume that the people who are responsible in HRSA, H-R-
20  S-A, for the administration of HCQIA are generally well-
21  disposed to protecting physician interests.  They --
22  after all they exist to protect confidentiality and peer
23  review.  And finally, I think these words, from what I
24  have seen, certainly in this case, are carefully chosen.
25  They're carefully chosen to indicate limits on the

1    authority of nonmedical staff intervention.

2         The precautionary suspension -- I suspended a

3    physician once, overnight, and the medical staff met the

4    next day and put him back in.  So I'm -- I'm familiar

5    with the -- the sort of dynamics of -- of what happens

6    in these precautionary suspensions.  It's -- it's a term

7    of art, the fear of bureaucracy, the indisposition to

8    believe, on my part at least, that there is supposed to

9    be a conflict between protecting the physicians' due

10   process rights and protecting peer-review information.

11   And -- and finally, the selection of these words, argue,

12   I believe, in favor of adherence and fidelity by the

13   hospital to their own limitations.  If in fact, that's

14   not the case and they're relying on their knowledge of

15   HCQIA, so as to, perhaps by inadvertence, prolong this

16   precautionary suspension to beyond 30 days, that would

17   be unfortunate and regrettable.

18        But in any event, I think the bylaws are there for

19   a reason and I don't think they were in conflict with

20   the HCQIA.  Sorry that took so long.

21   BY MR. HAWISHER:

22   Q.   No.  That -- that's -- that's fine, and that was --

23   that was helpful.  So I -- I also don't think the bylaws

24   are in conflict with the HCQIA, but it sounds like we

25   think that for different reasons.

1      Are you saying the bylaws are not in conflict with

2  the HCQIA because the HCQIA never requires the reporting

3  of precautionary suspensions, or for some other reason?

4  A.   Oh, for some other reason.

5  Q.   Okay.  What -- what is the other reason?

6  A.   The medical staff bylaws are always to be

7  interpreted on their own basis within an organization,

8  governing organization.  HCQIA is between federal

9  regulatory activity and people who are either benefiting

10  from, or subject to it.  So they're -- they're different

11  universes, urbi et orbi, and my scheme in -- in my own

12  mind, and what I've lived with and experienced is that

13  the medical staff bylaws are there for a reason, which

14  is quite different from the reason that the HCQIA is

15  there, and that is to protect the interest of

16  individuals as over against the organization, which

17  might be arbitrary, might be unfounded, and might be --

18  even meant to be punitive.

19  Q.   Okay.  I think I'm starting to understand your view

20  on this.  What I do not understand is it seems to me

21  that you could have a scenario where the HCQIA and the

22  guidebook say you must report a precautionary

23  suspension, and the bylaws -- and I'll -- I'll give you

24  a -- a slightly different hypothetical.  Say, the bylaws

25  just say, we never report precautionary suspensions,

 1  period.  They're not reportable, ever.  That seems to me
 2  like a conflict between the HCQIA and the bylaws, and it
 3  has to be resolved one way or the other.  Either you
 4  report or you don't report it.
 5      What is your view on what is required in that
 6  situation?
 7  A.   What was missing from your hypothetical was the
 8  definition of a precautionary suspension as being, or
 9  not being, a final professional review action.  In other
10  words, precautionary suspension doesn't exist in a
11  vacuum.  It has a definition within the sentence, and
12  the definition, it says, is not a final professional
13  review action that is reportable.  So --
14  Q.   The trouble I'm having with that analysis is
15  that -- is that professional review action has a
16  statutory definition.  And it seems like whether --
17  A.   Oh, no.
18  Q.   -- an action meets the statutory definition is up
19  to the statute --
20  A.   Yep.
21  Q.   -- and not up to the medical staff bylaws.
22  A.   Yeah.  Professional review action is not a term of
23  art in the medical staff bylaws.  It is defined in the
24  statute, but it's not overlapping or entirely consistent
25  with the meaning, here.  And the fact that the medical

1  staff bylaws say that it's not, in and of itself, a

2  professional review action, that doesn't subject these

3  bylaws to conflict, if you will, with the HCQIA.  That's

4  my view.

5  Q.   So if the HCQIA say this is a professional review

6  action, and the bylaws say this isn't a professional

7  review action, when it comes to -- to the decision of

8  whether or not to report the precautionary suspension to

9  the NPDB, which of those interpretations or definitions

10  controls?

11  A.   Well, the reporting, of course, is something that's

12  done by the hospital management, and they're supposed to

13  be relying on the medical staff to review the clinical

14  questions which have arisen.  There's -- there's no

15  evidence that any kind of review took place before this

16  so-called precautionary suspension was levied on Dr.

17  Hetzel.  So the absence of -- of any considered opinion,

18  if you will, combined with the -- the potential that the

19  precautionary suspension is, through inadvertence

20  perhaps, dragged out beyond 30 days, is a good reason

21  that the language has been drafted, I think, is -- and

22  of course, they're -- the folks who are drafting these

23  things are was aware of the HCQIA as you or I are, and I

24  think there's a reason why they put this language in

25  here.  This is not a reportable activity by the

 1  hospital's definition.  And if -- and if the -- as I

 2  say, I -- I didn't mean this in a flippant way, but if

 3  the hospital's counsel thought this was a reportable

 4  professional review action in accord with the NPDB

 5  Guidebook or in accord with HCQIA, it would presumably

 6  have advised its client at some point that that was

 7  true.

 8  Q.   Okay.  I understand what you were saying about due

 9  process protections.  My question is about, effectively,

10  what standard controls whether an action must be

11  reported to the data bank.

12        If the HCQIA says one thing, and the hospital

13  bylaws say another thing, which standard controls

14  whether the action is actually reportable?

15  A.   As a -- as a practical matter, the medical staff

16  has jurisdiction over clinical activity, and frankly,

17  over the interpretation of its own bylaws.  If the

18  hospital management and/or the medical staff office

19  takes it upon itself, or is instructed by the medical

20  leader or chief executive to make a report, net of the

21  precautions and balances that are contained in the

22  medical staff bylaws, that by the way, is a very

23  plausible and realistic outcome.  I don't think for a

24  minute that the medical staff was convened in its

25  credentials committee or peer review committee to

1  deliberate on these actions before the so-called

2  precautionary suspension was in place.

3  Q.   I -- I -- I -- I'm still not understanding, because

4  what -- what I'm saying is, if -- if you have a scenario

5  where the HCQIA says, you must report this and the

6  bylaws say you must not report this, the hospital has to

7  report it, right?  They have to follow federal law.

8  A.   Yeah.  Well, I don't -- I don't believe that's what

9  these, respectively, a statute and bylaws say.  I think

10 they -- they both have their qualifications and

11 characterization, and the reporting of information that

12 imperils the credentials and privileges of a physician

13 has guidelines and guardrails, if you will.  And I don't

14 believe the HCQIA is in a contravention of that.  To the

15 contrary, I think the entire HCQIA, I remember

16 Congressman Waxman talking about this at the time, was

17 meant to protect peer-review and peer-related

18 activities, not management of vendettas.

19 Q.   I -- I -- I still don't understand what your answer

20 is to the scenario where there is a direct conflict

21 between what the HCQIA requires and what the bylaws

22 require in that scenario.

23 A.   Briefly, I don't believe there's a direct conflict.

24 Q.   In that scenario, what would the hospital have to

25 do?

1  A.   I don't believe there is such a conflict.

2  Q.   Okay.  And is the reason you don't believe there is

3  such a conflict because you do not believe the HCQIA

4  requires reporting in this case?

5  A.   No.  I -- I went through the three reasons that I

6  thought the -- there was no direct conflict.  They had

7  to do with the -- the role and integrity of the medical

8  staff bylaws, the nature, history, and scope of HCQIA,

9  and the professional suspicion, if you will, that

10  barring the -- the guardrails in place, there will be a

11  temptation to weaponize patient safety reporting.

12  Q.   I don't understand how any of those relates to the

13  question of is a precautionary suspension required to be

14  reported in this case.

15  A.   Well, that's my answer.

16  Q.   Is it your testimony that Dr. Hetzel's

17  precautionary suspension did not meet the definition

18  of -- the statutory definition of professional review

19  action?

20          MS. BEIGHTOL:  Objection to form.  Asked and

21  answered.

22          THE WITNESS:  It's -- it's my testimony that

23  the precautionary suspension was a fraudulent

24  misrepresentation of the circumstances involving Dr.

25  Hetzel.  It, of course, was not in and of itself, a

1   final professional review action.  It wasn't any kind of

2   professional review action, final or otherwise.  It was

3   an organizational reaction, if you will, and has had

4   very expensive and very unfortunate consequences for Dr.

5   Hetzel and everybody else.

6   BY MR. HAWISHER:

7   Q.   Okay.  Then let's go back to the statutory

8   definition of professional review action, because the

9   last time I asked you to identify an element of that

10  definition that was not satisfied, I don't believe you

11  did.  And let's see if you can identify one, this time.

12          MS. BEIGHTOL:  Asked and answered.

13  BY MR. HAWISHER:

14  Q.   Okay.  Passing back Exhibit 8, and we're in

15  Paragraph 9, including its sub-paragraphs.  Please

16  identify the element of the statutory definition that

17  you believe was not satisfied in this case.

18  A.   And I want to point out, what you're asking me to

19  do, here -- luckily I passed the bar exam the first time

20  I took it.  You're asking me to interpret a phrase in

21  the medical staff bylaws, in light of definitions that

22  appear in a federal statute.

23  Q.   I am not asking you to do that, Doctor.

24  A.   Sure, you are.

25  Q.   No.  I am asking you to -- I am asking you to apply

1  the definition of a professional review action that is

2  in the statute.  I do not care what is in the bylaws,

3  for the purposes of this question.

4  A.   Well, I've said before, I think that mirrors the

5  management's interest, as well.  But my interpretation

6  is you're asking me to take a statutory definition of

7  professional review action and apply it to these medical

8  staff bylaws, and/or vice versa.  And I don't believe

9  that's -- makes any sense, whatsoever.

10 Q.   I'm not --

11 A.   And I'm --

12 Q.   I'm not asking you to apply a statutory definition

13 to the bylaws.

14 A.   Yeah.

15 Q.   I'm asking you to apply the statutory definition to

16 the factual events that happened in this case.

17 A.   Yeah.  I've mentioned this twice before, and I'll

18 say it one more time, and then I'll stop.  If what

19 you're saying is true, presumably the hospital has

20 professional legal counsel, which would have advised it,

21 with regard to the professional review action meaning,

22 in its own medical staff bylaws, and/or would've adopted

23 this strategy to obviate whatever impediments were in

24 the way of management, in imposing, if you will,

25 arbitrary discipline on doctors.

1  Q.   Yeah, you may -- you can --

2  A.   So I'm not really interested in interpreting the

3  definition in the federal statute for purposes of the

4  medical staff bylaws.  They each exist on their own.

5  They each have their own interpretation.  If there is a

6  conflict, somebody at a higher pay grade will take this

7  into account.  Some court will hear a case that has

8  these two, opposed one to another.  Perhaps it's this

9  case.  Who knows?  My point of view, I believe I've had

10  a chance to say, and I -- I appreciate that.  I've gone

11  on at some length.  It's not going to change.

12       Your point of view, which is that the medical staff

13  bylaws are subject to the definitions that are in the

14  HCQIA, I don't believe is accurate.  And even if it were

15  accurate, it does not obviate the fact that this is not

16  a professional review action, okay?  A (inaudible)

17  precautionary suspension is not a final professional

18  review action.

19  Q.   Okay.  So you said, "even if it," it being my view

20  that the bylaws are subject to the definitions in the

21  HCQIA, were accurate, it does not obviate the fact that

22  this is not a final professional review action.  But

23  isn't that what's at issue when we say, does the HCQIA

24  control?

25  A.   No, it's not a what's-at-issue.  The what's-at-

1  issue is was there any justification at all for the so-

2  called precautionary suspension, and then, was there any

3  justification for dragging out the timetable in such a

4  way that Dr. Hetzel's precautionary suspension became a

5  reportable suspension?  And so I -- I don't think either

6  one of those are -- are false.

7            MR. HAWISHER:  We can go off the record.  I

8  think you need to take a break to change the memory

9  card, anyway.

10           THE VIDEOGRAPHER:  The time is 12:47 p.m.

11  We're going off the record.

12      (A recess was taken.)

13           THE VIDEOGRAPHER:  The time is 1:23 p.m.

14  We're going back on the record.

15  BY MR. HAWISHER:

16  Q.   All right.  Dr. Hyde, I think earlier, you used the

17  word, exonerate or exoneration, to refer to the medical

18  executive committee action in June of 2020.  What did

19  you mean by that?

20  A.   Well, we had a couple of interruptions in the

21  precautionary suspension drama.  We went from March 3 to

22  March 7, and we went from, I believe it was, March 25 to

23  April 23rd.  Eventually, the medical executive committee

24  restored Dr. Hetzel's privileges, and I should say,

25  toned down -- that's probably not a good phrase,

1  modified quite a bit, the recommendations from the

2  credentials committee.  So that's what I meant by

3  exonerated.

4  Q.   Okay.  To -- to your point about what happened on

5  April 23rd, I had thought that where we left it the last

6  time we talked about this, was Dr. Hetzel continued to

7  be suspended after April 23rd.  Is that no longer your

8  position?

9  A.   Well, it was my view at the time that he was

10  suspended, but none of this continuous.  It goes from

11  March 3 to March 10, and then it goes from April 23,

12  to -- 25, to March 23.  So with different conditions

13  each time, and I think that was part of our discussion,

14  that there were some conditions on the 10th, there was

15  some conditions on the 23rd, and the 25th.  So yes, it's

16  my position that he was -- he was suspended, but it was

17  not continuous.  It was discontinuous.

18  Q.   And the way in which it was discontinuous was that

19  the conditions on his privileges changed at various

20  times?

21  A.   Yes.  The modification of requirements of him and

22  limitations on him.

23  Q.   Do we agree that his privileges were continuously

24  limited from March 3rd until June of 2020?

25           MS. BEIGHTOL:  Objection to the form of the

1   question.

2           THE VIDEOGRAPHER:  Yeah.  I'm sorry, is your

3   microphone on?

4           MS. BEIGHTOL:  Oh, I'm sorry.  I did the thing

5   I wasn't supposed to do, and took my microphone off.  I

6   am back in action, now.  Sorry about that, sir.

7           THE WITNESS:  Well, for the -- the very reason

8   we've been talking about, they weren't continuously

9   limited, in the sense that there was no interruption or

10  modification.  So they were limited, but there were

11  interruptions and modifications.

12  BY MR. HAWISHER:

13  Q.  Was there ever a period during that interval, in

14  which he had his full and unrestricted privileges?

15          MS. BEIGHTOL:  Objection to the form of the

16  question.

17          THE WITNESS:  Yeah, I -- I don't believe so.

18  I think, however, there were modifications at each step.

19  Full and unrestricted only came at the end.

20  BY MR. HAWISHER:

21  Q.  So during the first modification, March 10th to

22  March 24th, 2020 --

23          MS. BEIGHTOL:  Objection.  Those dates are

24  wrong, I think.  You just said, March 10 through March

25  25th.  I think you meant March 3rd, through the 7th --

1    or the 10th.

2              MR. HAWISHER:  Sorry.  I -- I -- I meant to

3    say the first modification, so --

4              MS. BEIGHTOL:  March 3 through 10?

5    BY MR. HAWISHER:

6    Q.   It is -- March 3 through 10 is the first period of

7    the precautionary suspension.  It was then modified,

8    either March 10th or March 12th, depending on how you

9    count, and -- and that is what I'm calling the first

10   modification.

11        The first modification is a lesser sanction, which

12   still is a limitation on his clinical privileges, right?

13             MS. BEIGHTOL:  Objection to the form of the

14   question.

15             THE WITNESS:  Sure.  He's still limited in

16   each of these, with various modifications.

17   BY MR. HAWISHER:

18   Q.   March 25th, the precautionary suspension is

19   modified, again, to -- to again, become total, and he

20   has no clinical privileges at all, at that point, right?

21   A.   Correct.

22   Q.   Okay.  Mark it from that point until June of 2020,

23   when his privileges are restored, he still has no

24   clinical privileges, whatsoever, right?

25             MS. BEIGHTOL:  Objection to the form of the

1   question.

2           THE WITNESS:  Yeah.  Well, within the 30 days,

3   of course, there's a change, so it's not continuous

4   without change.  During the period, March through June,

5   there was a change in April, and further modification.

6   BY MR. HAWISHER:

7   Q.   So that was not my question.  My question was, he

8   did not have any clinical privileges, whatsoever, during

9   that period, correct?

10          MS. BEIGHTOL:  Objection to the form of the

11  question.

12          THE WITNESS:  Well, I don't think that's true.

13  They -- they allowed him to see patients.  They just --

14  he just had to have someone with him, which he found

15  unrealistic, and so forth.  But it's not as if he had no

16  privileges.

17  BY MR. HAWISHER:

18  Q.   When did they allow him to see patients?

19  A.   Okay.  Well, let's find out.

20  Q.   I will give you a hint.  I believe it's May 11th.

21          MS. BEIGHTOL:  Is that interrupting the video?

22          THE VIDEOGRAPHER:  We can hear the -- your

23  voices (inaudible).

24          THE REPORTER:  This is the loudest room I've

25  been in, so far.

1            MS. BEIGHTOL:  It's amazing, the -- to have

2      the privilege of hearing that.

3            THE VIDEOGRAPHER:  I was expecting --

4            THE WITNESS:  So in April 23rd, and this is a

5      page we were looking at, the redactions, precautionary

6      suspension was lifted, contingent on the findings of a

7      fitness-for-duty evaluation.  So that's April 23rd,

8      credentials committee.

9      BY MR. HAWISHER:

10     Q.   So at -- at the risk of rehashing what we talked

11     about earlier, he still doesn't have any privileges on

12     April 24th, 2020, right?

13     A.   Well, but --

14            MS. BEIGHTOL:  Objection to the form.

15     Subject -- I mean, it -- again, reiterating that there

16     was testimony on this -- significant testimony, earlier.

17          But yet we hear no airplanes.  What is that about?

18     We're literally at the airport.

19            THE WITNESS:  So I'm looking at the memo to

20     Dr. Hetzel from Dr. Joslin dated April 23rd.  And he

21     says, "The March 10, the credentials committee met and

22     modified your precautionary suspension to allow you to

23     operate scrubbed in with a partner," blah, blah, blah.

24     Then they met again March 23rd and reimposed the

25     suspension.  So he had privileges of a sort from the

1  10th through the 23rd.  Then on the 23rd, they lifted

2  the precautionary suspension, contingent on the fitness

3  for duty.  So your question of whether or not he had

4  continuous precautionary suspension during the period

5  March 3rd to May 4th, June, anything of the sort, the

6  answer is, no.  He had interrupted suspension of

7  privileges in at least two different segments.  He had

8  March 3rd to March 10th, and he had March the 25 to

9  April 23rd.

10  BY MR. HAWISHER:

11  Q.   So my question was, from March 25 to June of 2020,

12  he did not have any clinical privileges at all, and it

13  sounds like your view is no, his privileges were

14  restored on April 23rd; is that right?

15  A.   Yeah.  On his -- this note from Dr. Joslin says

16  that the precautionary suspension is lifted, contingent

17  and so forth.  And presumably -- so the -- the answer is

18  no, that's not continuous.  It's not -- it's -- it's

19  interrupted and modified with the meeting on April 23rd.

20  Q.   So my question was not was it continuous.  My

21  question was, did he have any clinical privileges?  And

22  so now my question for you is what clinical privileges

23  did he have effective April 23rd, 2020?

24  A.   I have to presume he had the same privileges that

25  he had previously with regard to conditions.  In other

1   words, he could see patients, but he just had

2   limitations about whether or not he could operate and so

3   on and so forth.  There's -- there's nothing in the

4   minutes of the April meeting that says to the contrary.

5   Q.   Okay.  So --

6   A.   His precautionary suspension may be lifted,

7   contingent and so forth, and --

8   Q.   What do you understand the word contingent to mean

9   in that sentence?

10  A.   Contingent on the fitness-for-duty examination.

11  Q.   Yeah.  What do you understand the word contingent

12  to mean?

13  A.   I'm not relying on the contingency.  I'm relying

14  on -- you asked if he had any privileges at all, and my

15  answer is I think it's reasonable to assume he had the

16  same privileges that he would have had previously.  That

17  is, he could see patients, but he could not operate by

18  himself, and so on and so forth.

19  Q.   What I'm getting at is that as of April 23rd, the

20  fitness-for-duty evaluations that this recommendation

21  was contingent on had not yet occurred.

22  A.   Right.

23  Q.   So if the recommendation is contingent on something

24  that has not yet occurred, how can you say that his

25  privileges have been restored?

```
 1   A.    I --
 2              MS. BEIGHTOL:  Objection.
 3              THE WITNESS:  I -- I -- I actually have a
 4   point, and I -- I believe you're missing it, fairly,
 5   honestly.  He had limitations imposed with the
 6   precautionary suspension on the 3rd.  They were modified
 7   on the 10th.  They were further changed in March, and
 8   they were further changed in April.  The limitations
 9   that were imposed on him in March were, I believe, he
10   couldn't supervise residents.  He couldn't see
11   patients -- he couldn't operate on patients by himself.
12   He had to have a proctor or something of the sort for
13   anything, which -- which he did.  In other words, he had
14   suspension of privileges, but for these things.  Those
15   things, from my point of view, remain in effect because
16   they weren't taken away.  In other words, the
17   credentials committee didn't come back and say, and by
18   the way, you can't see any patients anymore, and you
19   can't operate, even if you've got somebody else with
20   you, and you can't supervise residents, even if you've
21   got somebody with you.  So the fact that those things
22   were conditions previously, they remained conditions.
23        And just the answer to your question, did he have
24   privileges?  He had very limited privileges during this
25   period of time, but they were constantly changed in
```

1    accord with the well-known path that we've trod here.

2    BY MR. HAWISHER:

3    Q.   Okay.  So I -- I think I understand what you're

4    saying now, and I think you are forgetting the March

5    25th action because -- or excuse me, the March 25th

6    letter, the March 24th action.  So March 10th, the

7    precautionary suspension is modified to allow Dr. Hetzel

8    to see patients and with proctoring, et cetera, perform

9    cases.

10        March 25th, the precautionary suspension becomes

11   total again, right?

12   A.   The minutes of the meeting that we'd be talking

13   about, the March 24th minutes, are entirely redacted

14   with the exception of one sentence, "Motion was made,

15   seconded, and unanimously approved by those present for

16   reinstatement of the full precautionary suspension of

17   privileges."

18   Q.   So that's --

19   A.   And that's -- that's your interpretation, that he

20   didn't have any privileges, even those that were

21   severely circumscribed earlier.

22   Q.   Yes.  Do you disagree?

23   A.   Yeah.  Well, I -- I can't tell, because 90 percent

24   of this thing is redacted.

25   Q.   Okay.  So if -- do you have the March 25th letter

1 | from Chad Patrick and Scott Joslin?
2 | A.    I do.
3 | Q.    Okay.  If you'll turn to that, I believe that will
4 | answer the questions that you're raising.
5 | A.    Oh, no.  This only answers what Mr. Patrick's view
6 | is of the minutes.  And I've already indicated -- I
7 | don't mean to be awkward about it, but I've already
8 | indicated that deep suspicion of the motives of Mr.
9 | Patrick and of the Mission leadership undoubtedly is
10 | part of this case, and certainly is the reason why we
11 | have medical staff bylaws as guardrails.  So if you
12 | wanted to know what was in the minutes from March 24th,
13 | you would look at the minutes of March 24th.  The fact
14 | that Dr. -- that Mr. Patrick characterizes this in the
15 | way he does is -- it is what it is.
16 | Q.    Okay.  Well, so do you see on the signature page
17 | that the letter is also signed by the chair of the
18 | credentials committee?
19 | A.    Yes.  Well, a -- a big part of what Professor Mark
20 | Hall found in his study in the loss of 300 physicians in
21 | this hospital is that there was great suspicion about
22 | cooperative or collusive action between medical staff
23 | and hospital leadership.  I don't testify to that.  I
24 | don't know anything about it, but I'm only saying that
25 | if you are asking for absolute confidence that there

1  were no privileges whatsoever as a result of this March

2  24th meeting, I can't say that.

3  Q.   And you cannot say that because why?

4  A.   90 percent of the minutes of the committee are

5  redacted.

6  Q.   All right.  And the portion that is not redacted

7  states, "A motion was made, seconded, and unanimously

8  approved by those present for reinstatement of the full

9  precautionary suspension of privileges."

10 A.   Right.

11 Q.   What about that is ambiguous to you?

12 A.   Full precautionary suspension of privileges

13 previously had allowed him to see patients, to operate

14 with another operator.  This was all part of the

15 previous credentials committee finding.  Let's find it.

16 All right.  The March 12th letter indicates that his

17 precautionary suspension is to be modified with lesser

18 sanctions:  return to practice, required to have a

19 concurrent consultation, another qualified surgeon scrub

20 in, no longer supervise residents.  Those are the

21 conditions that were associated with the March 10th, I

22 believe it was, committee meeting.

23 Q.   Could I -- could I ask you about that?  Why are you

24 relying on Chad Patrick's letter of March 12th, 2020,

25 when you are so skeptical of his letter of March 25th?

1   A.    Yeah.  Well, yeah, it's a -- it is a good point,

2   and because the minutes are equally uninformative,

3   except that they say, in support of Patrick's letter,

4   concluded that Dr. Hetzel be allowed to continue to see

5   patients, but that for all operative cases, he be

6   scrubbed in with a partner.  So in other words, they've

7   left unredacted that part, which says that he has some

8   limited privileges.  Dr. Patrick's letter says he has

9   some limited privileges, or Mr. Patrick's letter says he

10  has some limited privileges, so it's a corroboration, if

11  you will.

12  Q.    Okay.  So then on March 24th, you -- you have this

13  conclusion/recommendation that says, "Reinstatement of

14  the full precautionary suspension of privileges."  And

15  your view is you do not know what, quote, "the full

16  precautionary suspension of privileges" means?

17  A.    Correct.

18  Q.    What could it --

19  A.    Whether it's full or partially full.

20  Q.    But it says full.

21  A.    Because they -- they -- no, no.  No, no.  They --

22  they previously said full precautionary suspension with

23  the following options, and this time, they -- they just

24  said full precautionary suspension.

25  Q.    Where -- where did they previously say full

1  precautionary suspension with the following

2  modifications?

3  A.    I thought we were just there.

4  Q.    Well, I -- I'll tell you.  I'm looking at it.  They

5  say preliminary suspension, and they don't say full.

6  A.    On the letter of -- of Mr. Patrick of March 12th,

7  it says "these lesser sanctions."  Okay?  And that he's

8  describing 1, 2 and 3I.  "These lesser sanctions shall

9  remain in effect pending the outcome of any hearing."

10  Well, he didn't hear any hearing -- have any hearing,

11  "unless earlier terminated or modified by the

12  credentials committee, the medical executive committee,

13  or the board."  So he has these residual lesser

14  sanctioned privileges in effect, pending the outcome of

15  any hearing.  Part of the problem, of course, is that

16  there was no apparent interest in having a hearing

17  format to listen to his evidence.

18  Q.    Does it affect your view at all that Dr. Hetzel

19  testified that as of March 25th, his privileges were

20  totally suspended?

21  A.    Well, you -- you asked me that earlier, and I think

22  I gave you an answer earlier.  And we've been now going

23  around about many of the same questions.  I'm sorry that

24  I'm giving you the same answer now.

25  Q.    I asked you --

1  A.   But I will give you the same answer.

2  Q.   I asked you earlier about April 23rd.  Now I'm

3  asking you about March 25th.

4       Is it your testimony that Dr. Hetzel does not know

5  whether he had any clinical privileges as of March 25th?

6  A.   No, I -- I have no information, aside from his

7  deposition, about what Dr. Hetzel knew at the time or

8  knows now.  I'm only testifying about the medical staff

9  bylaws, the evidence in the committee minutes, the

10 communications that took place in writing.  In other

11 words, the -- the documentary evidence and -- and what

12 it appears to show.  What it appears to show is that

13 some residual privileges remain until there was a

14 hearing.

15 Q.   And you -- you base that on the statement in Chad

16 Patrick's March 12th letter stating that this

17 precautionary suspension will remain in effect until --

18 pending the outcome of the hearing?

19 A.   Well, and the reason that's important -- I do.  And

20 the reason that's important is under HCQIA, if there's

21 no conscientious attempt to get at information to see

22 whether or not a false report is being filed, there's

23 no -- there's no -- no teeth in the statute there.

24 If -- if there's not a conscientious attempt to get

25 information, if it's not a peer review activity, which

1  has some patient safety aspect to it, HCQIA immunity,

2  jurisdiction, everything else is -- is really

3  irrelevant.  So if, in fact, there is a statement in Mr.

4  Patrick's letter that says, these things are going to

5  stay here until there's a hearing, and there never is a

6  hearing, it's one more element of evidence that there's

7  very little interest in having an exposition of facts in

8  a balanced and even environment.

9  Q.   Okay.  And -- and that's fine, but what I'm asking

10 is your -- is your position that, in fact, this more

11 modified or limited precautionary suspension remained in

12 effect based on Chad Patrick saying, this will remain in

13 effect until there's a hearing?

14 A.   Well, not only that.  There's no evidence that the

15 credentials committee said, and by the way, we didn't

16 mean it, with regard to these conditions that we put on

17 earlier.

18 Q.   Okay.  Other than the restoration of the total

19 suspension of Dr. Hetzel's privileges, what, in your

20 opinion, could reinstatement of the full precautionary

21 suspension possibly refer to?

22           MS. BEIGHTOL:  Objection.  Just to this line.

23 May I have a standing objection to this line --

24           MR. HAWISHER:  Sure.

25           MS. BEIGHTOL:  -- being tread already?

1      But you can answer.

2              THE WITNESS:  Okay.

3              To me, the undoing of the so-called

4    precautionary suspension would be a status quo ante, if

5    you will.  In other words, that Dr. Hetzel would be a

6    member of the medical staff, as Mr. Patrick told him he

7    was, for the coming two years in his letter of February

8    25th, 2020.

9    BY MR. HAWISHER:

10   Q.   Sorry.  To restate my question, what could the

11   reinstatement of the full precautionary suspension refer

12   to, if not to modifying the precautionary suspension

13   again, to make it total as opposed to partial?

14   A.   Well, it's a -- a decent question, but it's a -- a

15   debate that frankly has no evidence that either of us

16   has not already alluded to.  The -- the evidence is that

17   Mr. Patrick's letter says that pending a hearing,

18   there's no action by the credentials committee to undo

19   the three conditions.  Dr. Hetzel presumably was

20   dismissive of privileges with the three conditions on

21   grounds that they were -- they were not realistic, but

22   that doesn't mean that they weren't there.

23   Q.   So I still do not understand how you interpret the

24   phrase "reinstatement of the full precautionary

25   suspension" in any way other than the precautionary

 1 | suspension is again becoming total.
 2 |         MS. BEIGHTOL:  Asked and answered.
 3 | BY MR. HAWISHER:
 4 | Q.   I'm -- and I'm -- I'm not asking why you have a
 5 | different view.  I'm asking what your view is about what
 6 | that means?
 7 |         MS. BEIGHTOL:  Asked and answered.
 8 |         You can answer.
 9 |         THE WITNESS:  The full precautionary
10 | suspension is the sanction or limitation levied on Dr.
11 | Hetzel on March 3rd.
12 | BY MR. HAWISHER:
13 | Q.   Yeah.  So -- so reinstatement of that means he
14 | doesn't have any privileges anymore, right?
15 | A.   Correct.
16 | Q.   Okay.  So when the full precautionary suspension is
17 | reinstated on March 25th, he doesn't have any clinical
18 | privileges anymore?
19 | A.   Oh, no.  They modified that March 3rd business with
20 | a -- with a set of conditions under which they would
21 | allow him to see patients.
22 | Q.   Yes.  On March 10th, the precautionary suspension
23 | is modified.  Then, on March 25th, the full
24 | precautionary suspension is reinstated.
25 |         MS. BEIGHTOL:  Are you testifying, sir?

1          MR. HAWISHER:  I'm -- I'm asking him what he

2   interprets that to mean, if not his -- Dr. Hetzel's

3   privileges are completely suspended again.

4          THE WITNESS:  Okay.

5          MS. BEIGHTOL:  This has been asked and

6   answered, and it's getting to the point of harassing.

7          But you can answer again this last time.

8          THE WITNESS:  Let me give you a quick summary.

9   I don't believe that Dr. Hetzel's privileges were

10  continuously suspended for any 30-day period that we're

11  talking about, between March 3rd and March 10th, or

12  between April -- and March and April 25 and 23.  There's

13  no -- there's no 30-day period there, which would compel

14  reporting to the National Practitioner Data Bank.  Much

15  more importantly, and this is much more important to me

16  at least in terms of my testimony, there is no evidence

17  that the precautionary suspension had any basis

18  whatsoever, which would make it a -- an action

19  reportable or that it even had good faith behind it.

20  BY MR. HAWISHER:

21  Q.   That was your answer to my question of what do you

22  interpret full -- reinstatement of the full

23  precautionary suspension to me?

24          MS. BEIGHTOL:  Objection to the form.

25          That has been asked and answered.

1          THE WITNESS:  It was my answer to the

2    question.  Yes.  What is the full precautionary

3    suspension?  It's an act which had no basis in fact,

4    evidence, or concern for patient safety, which was the

5    March 3rd act, which was modified March 10th, modified

6    further in March 25th, and modified further in April

7    23rd.

8    BY MR. HAWISHER:

9    Q.    What do you understand the word reinstatement to

10   mean in general, not in this particular case?

11   A.    Yeah.  Reinstatement, again, would be the phrase I

12   used previously status quo ante.  It would be the

13   position that Dr. Hetzel was in prior to the sanction

14   and the reporting, and all of the activities that

15   followed.

16   Q.    So is it your position that on March 25th, Dr.

17   Hetzel was reinstated to the status quo ante, which is

18   that he had full privileges?

19   A.    Well, no.  The March 25th to April 23rd segment is

20   not full reinstatement to what he had previously, prior

21   to the March 3rd mention.

22   Q.    Let me -- let me get at it this way.  Let me get at

23   it this way.  To -- I think that to reinstate something,

24   that has to have lapsed or ceased to be in effect, and

25   you are restoring it to effect.  Do you agree or

1   disagree?

2          MS. BEIGHTOL:  Objection to form.

3          THE WITNESS:  In -- in general, that's a good

4   definition.  Sure.

5   BY MR. HAWISHER:

6   Q.   Okay.  So on March 25th, what is it that the

7   committee is restoring to effect that has previously

8   lapsed or ceased to be in effect?

9   A.   Okay.  It's -- it's a question that can be answered

10  in several ways, and I'm sorry to say, the evidence from

11  what I see is not conclusive.  It can be the situation

12  that he was in after the conditions were put on his

13  partial reinstatement, or it could be the condition he

14  was in on March 3rd.  Neither one of those has a lot of

15  evidence behind it.

16  Q.   When did the condition that he was in as a result

17  of having conditions imposed on his privileges, when did

18  that lapse or cease to be in effect?  How could it have

19  been reinstated?

20  A.   It -- it lapsed and ceased to be in effect, I

21  think, in -- was it June or July?  In other words,

22  his -- his reinstatement came at the medical executive

23  committee meeting of June 5.

24  Q.   Maybe that was an -- an unclear question.

25  A.   He said, precautionary suspension lifted subject to

 1  these three conditions, and the three conditions were
 2  far less onerous than had been the recommendation.
 3  So -- so June 5, I think would be the answer to your
 4  question.
 5  Q.   So my question was, when did the period of limited
 6  privileges cease to be in effect?  Because on March
 7  25th, in order for that period of limited privileges to
 8  be reinstated, it has to have previously ceased to be in
 9  effect, right?
10  A.   I'm not sure I understand.
11  Q.   Okay.  Let's -- let's -- let's try a hypothetical
12  here.  Dr. Smith has full clinical privileges, okay?  I
13  go to Dr. Smith and I say, on behalf of the credentials
14  committee, I am reinstating your privileges right now.
15       Does that make any sense?
16            MS. BEIGHTOL:  Objection.
17            THE WITNESS:  As a hypothetical, it wouldn't
18  make any sense at all.  That's --
19  BY MR. HAWISHER:
20  Q.   Right, because he's already got --
21            MS. BEIGHTOL:  Well, let him finish his
22  answer.
23            THE WITNESS:  Dr. Smith already has his
24  privileges, sure, or hers.
25  BY MR. HAWISHER:

1   Q.   Right.  So say -- let's say that changes.  Let's

2   say he's on a precautionary suspension or whatever.

3        Then you can reinstate his privileges, right?

4   A.   Yes.

5   Q.   Okay.  So similar reasoning.  For -- for the period

6   of limited privileges to be reinstated, it has to have

7   stopped being in effect for some period of time, right?

8   A.   The privileges stopped and are reinstated.  Yes.

9   Q.   Okay.  So on March 25th, how could it -- how could

10  the period of limited privileges possibly have been

11  quote, "reinstated," given that that was already in

12  effect?

13  A.   How could the limited privileges have been

14  reinstated on March 25th?

15  Q.   Yeah.

16  A.   Given the fact that he already had limited

17  privileges, is that what you're saying?

18  Q.   Yes.

19  A.   I see.  March 25th -- you're talking about the

20  credentials committee meeting of March 24th.  March 25th

21  begins a new period of modifying his precautionary

22  suspension.

23            MS. BEIGHTOL:  What date did you say?  March

24  25?

25            THE WITNESS:  I'm looking at the letter, Mr.

1   Patrick to Dr. Hetzel, dated March 25.

2            MS. BEIGHTOL:  Okay.  I thought that's what

3   you said.  I was just -- my brain wasn't firing.

4            THE WITNESS:  Okay.  And he writes, "The

5   credentials committee modified the precautionary

6   suspension initially imposed on March 3rd."

7   BY MR. HAWISHER:

8   Q.   Maybe we will come back to that point.  Have you

9   reviewed the declaration of Brenda Shelton that was --

10  A.   Yes, I have.

11  Q.   Okay.  I noticed you don't have it with you.  I've

12  got a copy on my tablet.  Can you pass me the tablet,

13  please?  Thank you.

14       This is Exhibit 14, and I'm going to pass it back

15  to you.  If you could scroll down to Paragraph 4, which

16  is at the bottom of the first page.  Is there anything

17  in Paragraph 4 that you disagree with?

18  A.   Yes.

19            MS. BEIGHTOL:  Object to the form of the

20  question.

21            THE WITNESS:  The -- the -- Shelton says that

22  the precautionary suspension began March 3rd, and of

23  course, we know that's -- that's not true in terms of

24  what the -- the NPDB wanted to see, and continued from

25  that date until June 9th.  That's not true either,

ESQUIRE
DEPOSITION SOLUTIONS

 1   because it was interrupted either between the -- the 3rd

 2   and the 10th, or between the 25th and the 23rd, but

 3   there were two separate periods that were less than 30

 4   days each.  She says, correctly, "His privileges were

 5   always limited in some way during that period."  Then

 6   she says, "when his privileges have been limited for

 7   more than 30 days, i.e., April 3rd," because of course,

 8   she's counting from the false start of March 3rd, "the

 9   precautionary suspension became reportable."  And then

10   she refers to various of the resources we've taken a

11   look at, the NPDB book, and so forth.

12   BY MR. HAWISHER:

13   Q.    Okay.

14   A.    And then she says, "The language in question

15   appears in Section 4.6 of the policy."  Well, it also

16   appears, that's right, in 8.4 of the bylaws.

17   Q.    So let's -- let's stick with Paragraph 4, which

18   is --

19   A.    Paragraph --

20   Q.    4, the -- which you've already answered about, the

21   one that says, "The precautionary suspension began March

22   3rd, 2020."

23   A.    Right.

24   Q.    So we agree that a precautionary suspension began

25   on that date, yes?

1  A.   This is the date on which the hospital sought to

2  suspend Dr. Hetzel's privileges.

3  Q.   Okay.

4  A.   Go ahead.

5  Q.   Now, from that point until June 9th, Dr.

6  Hetzel's -- Dr. Hetzel's privileges were limited.  There

7  were modifications, but his privileges were continuously

8  limited, right?

9           MS. BEIGHTOL:  Objection to form of the

10  question.  Asked and answered, and also --

11          THE WITNESS:  It actually says in the

12  statement here, "The precautionary suspension began

13  March 3rd, and continued from that date until June 9th."

14  BY MR. HAWISHER:

15  Q.   Yes, and --

16          MS. BEIGHTOL:  Let him finish.

17          THE WITNESS:  But it hasn't been a

18  precautionary suspension.

19  BY MR. HAWISHER:

20  Q.   I'm sorry.  Say that last bit again?

21  A.   It hasn't been a precautionary suspension

22  throughout that period of time.

23  Q.   What has it been?

24  A.   It's been a limitation on his privileges, and

25  subject to investigation, examination, and so forth, but

1   the precautionary suspension is a limited activity.

2   It's an interim step to protect patients, and -- and the

3   policy outlines the implementation of the precautionary

4   suspension, but it's not -- precautionary suspension is

5   meant to be an immediate criteria for action.  It says

6   in 4.6.1, a credentials committee meets, convenes,

7   reviews.  13 days, credentials committee decides, and so

8   forth.  So to pretend that the entirety of this period

9   of time is, in fact, a precautionary suspension is at

10  variance with the requirements for when people are

11  supposed to act on such so-called precautionary

12  suspensions.

13  Q.   I'm -- I'm sorry.  What do you mean by that?

14  A.   "The credentials committee," under number D, under

15  4.6.1(d), "can recommend modification," which they did,

16  "continuance," which they did, "termination," which they

17  did, "of the terms, or recommend alternate corrective

18  action."  But I -- I'm surprised that there would be a

19  contention that the entirety of this period is a

20  precautionary suspension.

21  Q.   Okay.

22  A.   Because the whole -- the whole idea of a

23  precautionary suspension is that it's an immediate,

24  urgent, life-threatening limitation on the physician

25  privileges.

1   Q.   So the period in which his privileges were

2   suspended, what do you say that is, if not a

3   precautionary suspension?

4   A.   Well, that's a continued limitation on his

5   privileges.  I just -- I'm -- I'm surprised to find, as

6   I say, a contention that a precautionary suspension

7   continues beyond the immediate threat.  The AMA citation

8   that I offered earlier, it's imposed to prevent imminent

9   danger to the health of one or more individuals.  Of

10  course, you'd have to say that Dr. Hetzel presented an

11  imminent danger from March 3 to June 9th, used to

12  protect people, not to punish members or privilege

13  holders.  So whatever it was they did, and they

14  apparently didn't have any other phrase which they used,

15  precautionary suspension, as I say, just strikes me as

16  odd that one would contend that it was continuation

17  because it's a -- it's got a very limited purpose.  And

18  the limited purposes is sort of an emergency.

19  Q.   I don't -- I think I -- I think I'm not

20  understanding you.  Are you saying that this wasn't a

21  precautionary suspension because it -- I'm sorry.

22  Strike all of that.

23       Is it your position that Mission Hospital did not

24  believe that Dr. Hetzel posed a threat to the safety of

25  patients at any point?

1   A.    I think they never allowed themselves to have an

2   objective examination.  They acted in response to a

3   procedure that had an unfavorable outcome, in which Dr.

4   Buell had at least as large a role as Dr. Hetzel.  They

5   then threw in irrelevant and aged contentions concerning

6   other cases and comments from some of Dr. Hetzel's

7   former partners, and justified it all in the letter from

8   Dr. Frisch on March 3rd, as a precautionary suspension.

9   There is no apparent attempt to make that a legitimate

10  precautionary suspension right from the outset.

11        There's nothing that -- for example, if you look at

12  that HCQIA, the immunity rules don't apply if you're not

13  making a -- a conscientious attempt to determine whether

14  or not there is some protected information, something

15  that should not be publicly disclosed, should not be

16  subject to whatever it is that the HCQIA immunity would

17  protect you from.  So my -- my contention is very

18  simple, which is that the precautionary suspension was

19  done in bad faith.  It was done for reasons that have

20  nothing to do with patient safety.  And as a

21  consequence, it would be hard to imagine that it would

22  qualify for any kind of immunity under HCQIA.  Bad faith

23  continued.

24  Q.    But --

25  A.    Now the fact that -- sorry.  Go ahead.

1    Q.   That's -- that's all right.  So my question was not

2    about immunity.

3         But before I forget, which HCQIA immunity provision

4    are you referring to?

5    A.   I'm referring to those that would deal with bad

6    faith, inaccurate information, or other attributes of

7    information that would be outside the scope of the

8    intention to protect confidential peer-reviewed

9    information.

10   Q.   And specifically, which statute?  Because there are

11   two that could apply.

12   A.   Well, I'm not by any means an expert on HCQIA.  I

13   mean, I am familiar enough with it, as a manager, as an

14   executive in the field, and as a teacher.  But I'm not

15   going to be able to recite chapter and verse on what

16   part of HCQIA is rendered inoperative, if in fact there

17   is a bad faith or inaccurate report of information.

18   Q.   Okay.  Returning to the Shelton declaration.  Where

19   did it go?

20        If you could scroll down to Paragraphs 18 -- 8 --

21   excuse me, 8 and 9, which begin on Page 2.

22   A.   Okay.

23   Q.   The Shelton declaration says, "In determining that

24   the precautionary suspension was reportable, I relied on

25   the records referenced above," which are records of

1  committee actions, "which showed Dr. Hetzel's

2  precautionary suspension had lasted more than 30 days

3  and on the NPDB Guidebook."  I understand that you do

4  not agree that Dr. Hetzel's precautionary suspension

5  lasted more than 30 days.

6      Do you have any reason to dispute that Brenda

7  Shelton did in fact rely on those sources of

8  information?

9          MS. BEIGHTOL:  Objection.

10          THE WITNESS:  No.  I'm sure she did.  It's

11  very much part of what people who are in medical staff

12  offices and the -- the trade group, the NAMS group, and

13  so forth, rely on.  It's an article of faith that they

14  need to comply, to the extent they understand the issues

15  with the NPDB.

16  BY MR. HAWISHER:

17  Q.   Okay.  If you could scroll down to Paragraph 12,

18  which begins at the bottom of Page 3.  And it reads, "I

19  interpret it, and still do interpret this portion of the

20  guidebook is saying a precautionary suspension is not,

21  quote, 'In and of itself reportable.  But it becomes

22  reportable when it meets the reporting criteria

23  identified in the NPDB guidebook.'"

24      Do you agree or disagree with that interpretation

25  of the guidebook?

1           MS. BEIGHTOL:  Objection to the form.

2           THE WITNESS:  Yeah.  I -- I think it's

3   necessary, but insufficient.  The part that is necessary

4   is that a non-reportable precautionary suspension would

5   become reportable, if in fact the institution had a

6   delayed response, and what was supposed to be an

7   immediate, or overnight, or emergency response became in

8   fact greater than 30 days.  It's insufficient in that it

9   pays no particular tribute to the role of the medical

10  staff bylaws or policies that define what a

11  precautionary suspension is.  So if the precautionary

12  suspension is illegitimate in the first place, that is

13  it's not a final review action and it's not reportable,

14  if in fact you don't report something which is not

15  reportable for 30 days, does that become automatically

16  reportable?  I think the answer is no.

17  BY MR. HAWISHER:

18  Q.   I'm sorry.  You said' "if a precautionary

19  suspension is illegitimate in the first place, that is,

20  if it is not a final professional review action."  What

21  do you mean by that?

22  A.   Exactly what Section 8.4 of the bylaws says, that a

23  precautionary suspension is not in and of itself, not by

24  itself, it's not a final professional review action

25  that's reportable.

1   Q.   What is the connection between that and if the

2   precautionary suspension is illegitimate in the first

3   place?

4   A.   I thought I made that clear.  The precautionary

5   suspension appears to have been developed based on Dr.

6   Buell's comments to Mr. -- to Dr. Frisch, and their

7   comments to Dr. Hetzel, which were peremptory, and in

8   the absence of any particular evidence that a patient

9   was being threatened or in imminent danger.  In other

10  words, they reacted to an event in which Dr. Buell had a

11  conflicted interest.  And their reaction was to attempt

12  to punish Dr. Hetzel, in the absence of, you know, any

13  objective examination as to exactly what had happened,

14  or -- or fact gathering.

15  Q.   And in your view, that makes the precautionary

16  suspension illegitimate?

17  A.   It -- it makes it illegitimate.  It's not -- it's

18  not a -- it's not a -- yes, exactly.  Illegitimate.  And

19  by the way, the -- the -- the history here, in which Dr.

20  Hetzel's presentation, finally, when he finally got a

21  chance to talk to the investigative committee, I believe

22  that was very positive in the restoration or partial

23  restoration of his privileges.

24       The fact that all of this precautionary suspension

25  took place in a star chamber, in which there were only

1   vague comments, a couple of patients from your past,

2   that your partners said this, you left the patient

3   there, all of these things are, frankly, in the category

4   of -- of hearsay, and if not biased, at least tilted

5   information concerning with -- you know, in -- in

6   recognition of Dr. Buell's role.  So you have a

7   report -- and I think Dr. Hetzel is cited here by Ms.

8   Shelton.  Let's see.  All right.  So Dr. Hetzel, in

9   Paragraph 10, is merely saying the same thing that --

10  that I'm saying.  It's not a reportable activity.  And

11  therefore, the prolongation of the response period for

12  an activity which was arguably illegitimate initially,

13  doesn't necessarily mean that that activity is now

14  reportable.

15  Q.   Why do you think Mission Hospital is required to

16  offer Dr. Hetzel an FPPE?

17  A.   The FPPE, which I -- as I recall, was one of the

18  final conditions of the medical executive committee

19  consideration in June, was developed and became

20  prominent in the Joint Commission Hospital Accreditation

21  Standards of 2007.  And beginning in the year 2008, they

22  did a -- a peace -- negotiated peace between management

23  and the medical staff.  The Joint Commission, of course,

24  being a creature of the College of Surgeons, the AMA,

25  and the Hospital Association.  That -- that truce,

 1   that -- that arrangement, if you will, essentially said
 2   that there's going to be an organized way of -- of
 3   examining physicians about whom there is some -- some
 4   question.  So I think it's a tool, it's an alternative
 5   tool.  It's always there, along with, by the way, a lot
 6   of terrific tools offered by the North Carolina Board of
 7   Medicine.  And I think the FPPE is something that was
 8   contained in the final action of the medical executive
 9   committee, in any event.
10   Q.   Why do you contend that Mission Hospital is
11   required to offer Dr. Hetzel an FPPE, instead of
12   imposing a precautionary suspension?
13   A.   Well, of course they're a Joint Commission-
14   accredited hospital, and they have to have in place
15   policies for ongoing and focused professional practice
16   evaluation anyway, for all of their physicians.  So why
17   would they be compelled to offer a -- a less dramatic
18   and less -- less -- less dramatic and less stringent set
19   of requirements?  The answer is quite simple.  And that
20   is the FPPE is not a -- a suspension of privileges.  And
21   it can go on for a period of time, which at one and the
22   same time engages the physician and/or any others who
23   were involved, but does not threaten the physician with
24   regulatory sanction, and what amounts to in the field,
25   lifelong program.

1  Q.   I understand why you think an FPPE would be

2  preferable.  My question is why -- what is the source of

3  the obligation on Mission Hospital?

4  A.   I see.  No.  It -- there's -- there's no obligation

5  on Mission Hospital to use any of the particular

6  methods.  The fact that they immediately sanctioned a

7  physician, who had, by the way, a long position in the

8  community and had been part of the hospital for a long

9  period of time, but who no longer was going to produce

10 enough patients for the hospital, is suspect.  The fact

11 that the other surgeon who was involved in the case was,

12 you know, part of the sanctioning, is also suspect.  So

13 the FPPE would have been, frankly, a -- a less

14 controversial activity.  Every member of the medical

15 staff by now knows what an FPPE is.  But this

16 precautionary suspension is a very much harsher and more

17 legally fraught sanction.

18 Q.   Would you agree that the index surgery resulted in

19 very serious complications?

20 A.   Excuse me.  I'm sorry.  Would the --

21 Q.   Would you agree that the index surgery resulted in

22 very serious complications?

23 A.   That's the report that I understand.  I'm not, of

24 course, testifying on clinical matters.  But yes, I

25 understand that to be the case.

1  Q.   So in a -- in a situation where a surgery has

2  resulted in very serious complications and a surgeon who

3  was called in to assist says -- and I'm -- I'm not

4  telling you this is the case.  There's no evidence about

5  what Dr. Buell said.  Says something about that surgery

6  that causes concern.

7       Is it your position that it's illegitimate to

8  impose a precautionary suspension based on that concern?

9            MS. BEIGHTOL:  Objection.

10           THE WITNESS:  It would be my position and it

11 would be my personal choice not to impose a

12 precautionary suspension.  I've spent 60 years in this

13 field.  Ten of them as chief executive of a hospital,

14 running a lot of physician practices, running a surgery

15 center, and so forth, and I've never seen a situation in

16 which the reaction that took place here at Mission

17 Hospital would be appropriate or, frankly, even helpful.

18 That's my personal view.  And I -- I can't say what

19 others would do, but you asked me what my feeling would

20 be, and my feeling is it's a dramatic and punitive

21 overreach.

22 BY MR. HAWISHER:

23 Q.   So here's what I'm trying to get at, and we can

24 make it a hypothetical that's not about Dr. Hetzel, if

25 that helps.  If a surgery goes really, really poorly,

 1  and immediately after that, one of the surgeons involved

 2  is raising concerns that another surgeon made a very bad

 3  decision that led to all of those poor outcomes, and

 4  there is concern that this could be repeated in the

 5  future, what options does the hospital have in the

 6  immediate term to prevent that from being repeated, say,

 7  with tomorrow's surgical case?

 8          MS. BEIGHTOL:  Objection, to the extent you're

 9  applying it to facts here.

10          You can answer.

11          THE WITNESS:  Yeah.  The very first option, of

12  course, is to talk to the other party.  All that the

13  chief executive has heard from is a surgeon who was part

14  of the operation, who may or may not have been part

15  of -- may or may not have been responsible, if you will,

16  for the untoward outcome.  And so at a minimum,

17  information gathering is the hallmark of prudent

18  management in this field.  There's always several sides

19  to these stories.

20      Then the question is, what do you do when you've

21  got the information?  And I think widening the circle

22  immediately, in line with your medical staff bylaws, to

23  show the other doctors that you're playing fair.  That

24  you're not skewing an outcome toward your friends, your

25  enemies, your financial allies, whoever it might be.  So

1   what I would tell my students, it's very simple, and

2   that is get information, widen the circle, pay attention

3   to the rules.

4   BY MR. HAWISHER:

5   Q.   So in -- in the meantime, while you're getting this

6   information and widening the circle, do you just let the

7   surgeon keep doing surgeries?

8   A.   You know, this is the end of the day, and none of

9   the things that I've talked about are going to require

10  very much effort, or at least they're not going to

11  require very much time.  And they're perfectly

12  reasonable, non-bureaucratic things to do.  If, on the

13  other hand, you really don't want to know what Dr.

14  Hetzel's position is, then don't comment and put

15  together a committee that doesn't have anybody in his

16  specialty, have the committee meet in private, and then

17  finally have him have an opportunity to present to the

18  committee, only after they've developed their report.

19  Q.   Can you give me an example of a situation where it

20  would be appropriate to impose a precautionary

21  suspension?

22  A.   I was called once by some nurses in an operating

23  room in Bridgeport Hospital.  I was general counsel of

24  the Hospital Association.  And they had a surgeon who

25  had gone crazy, and was cutting up body parts, and was

1    throwing them around the room.  That's an example.

2    Q.   How long was he suspended?

3    A.   Beg your pardon?

4    Q.   How long was he suspended?

5    A.   Well, I wasn't responsible for whatever it is they

6    did.  But I -- I can tell you that the nurses were very

7    upset.  And as a -- as a consequence, this is

8    fascinating.  They were in Bridgeport.  They called the

9    New Haven police because they didn't trust the

10   Bridgeport police to come and do anything about a

11   doctor, a person of prestige and so forth, but they said

12   he was literally cutting up body parts and tossing them

13   around.

14        So there are not very many situations.  I guess

15   that's the answer to your question.  How many situations

16   have I come across in 60 years that I think would, you

17   know, justify some kind of immediate suspension so that

18   someone doesn't hurt other patients?  I really haven't

19   got any other examples in mind.

20   Q.   So in your view, would a scenario where there are

21   suddenly concerns that the surgeon is not doing a good

22   job anymore, and in the time it would take to

23   investigate, he could be doing more surgeries unsafely,

24   would that qualify?

25             MS. BEIGHTOL:  Objection.

1           THE WITNESS:  Honestly, it -- it is not -- not

2    only not outrageous.  What's outrageous is that for some

3    reason, they gave Dr. Hetzel random privileges for two

4    years, in a letter dated February 25.  And suddenly on

5    March 2nd or March 3rd, they think that he's got to be

6    taken off the -- the OR schedule.  He can't see his

7    patients.  He's really a -- a bad doctor, and so forth.

8    It belies -- it -- it belies the evidence.  It -- it

9    just doesn't make sense to me.

10   BY MR. HAWISHER:

11   Q.   So if they had concerns, is it your view that they

12   should have given him limited privileges in response to

13   his application for renewal?

14   A.   They could have done any number things.  And I -- I

15   don't want to make more out of this than is worthwhile,

16   but I'm very impressed, looking at what the North

17   Carolina Medical Board does with physicians who are the

18   subject of complaints.  They have a program, apparently,

19   for almost everything you could imagine going wrong.

20   Proctoring, oversight, outside specialists coming, and

21   so forth, and it doesn't involve your precautionary

22   suspension from the hospital.  It involves the hospital

23   and the doctor contacting the State Board and saying,

24   we'd like to get Dr. Hetzel involved in this program.

25   Can you do that?

1        In other words, there are functional ways.  If

2   you're - if you're focused on problem solving, there are

3   functional ways to deal with circumscribing some surgeon

4   who may or may not be up to snuff, and they don't

5   involve throwing him under the bus, which is literally

6   what you do with the National Practitioner Data Bank.

7   But why would they throw him under the bus in the first

8   place?  They have a -- a report, which I won't call it

9   biased, because I don't know what the report was.  But

10  it's -- it's structurally suspect from a surgeon who was

11  in the room with him, and whose activity resulted in

12  what Dr. Hetzel disagreed with, in terms of the outcome,

13  and another 4,000 ccs of lost blood, and a very

14  compromised patient.

15       Who put that patient into hospice?  I don't think

16  it's clear from any of these committee meetings or

17  anybody else, that anybody looked at that, and came up

18  and said, you know what?  Dr. Hetzel was responsible,

19  or, you know what?  Dr. Buell is responsible.  Or you

20  know what?  The patient was really very, very sick, with

21  a massive tumor and nothing could be done.  I mean

22  it's -- it's not as if the focus was on patient safety.

23  The focus was on more or less the punitive aspects of

24  keeping Dr. Hetzel out of the operating room.  So it's a

25  suspect report.  It does not have the right aroma to it

1  where somebody said, here's how we're going to protect

2  patients.  And I'm going to talk to Dr. Hetzel on this.

3  And I'm going to get a group of people together, and I'm

4  going to get --

5      Here's -- here's another one, an outside

6  gynecologic oncologist.  That happens all the time.

7  I've done that, even in very small hospitals.  You get a

8  specialist from someplace else, who's not tainted by

9  longstanding associations, and you ask that specialist,

10 what would you do in this kind of situation?  And many

11 of the specialty societies actually make themselves

12 available for that purpose.  So there are different

13 tools.  There's the FPPE, internally.  There's the

14 medical board, externally.  There are professional

15 societies, externally.  There are all sorts of things

16 you can do, only one of which is as damaging to the

17 physician as the precautionary suspension.

18 Q.   Well, so my question was specifically about what to

19 do in connection with his application for privileges.

20 Because I -- I think you described the granting of his

21 application for reappointment as a clean bill of health,

22 or something like that.

23 A.   As a?

24 Q.   A clean bill of health, or maybe you said blank

25 slate, or something --

1    A.   Well, it -- it generally cleans up whatever it is

2    that's sitting around there.  If you've got something

3    that is objectionable, in terms of a physician's

4    conduct, that goes into their credential file.  And

5    somebody says, you know, Dr. Hetzel, you really ought to

6    pay attention to these press conferences, or, you really

7    ought to take a look at patient so-and-so, or, you

8    really ought to mend your fences with this one.  I mean,

9    it's very candid conversations, because they're very

10   important for what it is that has been objected to in a

11   given physician's background.

12        The time comes in which the credentials' committee

13   says, all in favor, say aye.  They say aye, the board

14   says aye, the chief executive sends the letter.  The --

15   the slate is not clean.  It's pretty scrubbed.  In other

16   words, it's -- it's everything in a basic consideration.

17   Do we authorize this man, this human being, this

18   surgeon, to practice for the next two years in our

19   hospital?  That's basically what they said.

20   Q.   But if they don't give him the full and

21   unrestricted privileges that he's applying to have

22   reappointed, then they have to make a data bank report?

23   A.   They --

24        MS. BEIGHTOL:  Objection to the form of the

25   question.  Misstates testimony.

1           THE WITNESS:  They gave him full and

2    unrestricted privileges.

3    BY MR. HAWISHER:

4    Q.   Right.  And what I'm saying is, if instead, they

5    say, you know, we have some concerns about the surgeon.

6    Therefore, we don't want to give him the blank slate,

7    because we've got concerns that haven't been resolved.

8         They have to make a data bank report for those --

9    for those limited privileges they're giving him, don't

10   they?

11   A.   You're --

12          MS. BEIGHTOL:  Objection to the form of the

13   question.  Without other facts and information --

14          THE WITNESS:  Yeah.  There are a lot of facts

15   that we don't have.  But the presupposition to your

16   question is that somehow they had legitimate concerns.

17   BY MR. HAWISHER:

18   Q.   Yes.  That -- that is the presupposition.  And I'm

19   not asking you to agree that that is true in this case.

20        What I'm saying is if they -- if any hospital took

21   the alternative, versus giving a blank slate, new

22   privileges, no restrictions noted, of saying, you know,

23   we do have some concerns here, the limitations -- don't

24   they have to make a data bank report?

25          MS. BEIGHTOL:  Objection.  What time frame?

 1  You're not -- you're not giving a time frame for the --

 2  for the report.  So it's an unclear question for what

 3  you're, I think, trying to elicit.

 4          MR. HAWISHER:  Okay.

 5          MS. BEIGHTOL:  And I object to that.

 6          THE WITNESS:  My answer is that this hospital,

 7  no.  In this hospital, the precautionary suspension is a

 8  defined term, and it's not in and of itself a final

 9  review action that is reportable.  I assume that Ms.

10  Shelton here and all of the physicians who are involved

11  are more or less familiar with the medical staff bylaws

12  and the policies and procedures.  And I'm not sure what

13  they would say to a question that says final

14  professional review action that is reportable, as

15  opposed to being an interim step.

16  BY MR. HAWISHER:

17  Q.   My question was not about a precautionary

18  suspension.  It was about the physician's application

19  for privileges, resulting in either a denial of

20  privileges, or privileges being granted that are more

21  limited than those the physician has requested.

22      Would that not be reportable?

23          MS. BEIGHTOL:  Objection to the form of the

24  question.  Because it doesn't state a time frame.

25          MR. HAWISHER:  Please limit your objection to

 1  the form.

 2          THE WITNESS:  Yeah.  I -- I can't really

 3  answer that.  Not because I don't know, but because I

 4  think there are a lot of missing elements.  If, for

 5  example, a physician's privileges were limited in a way

 6  which was not material to his -- to his practice, or

 7  limited in a way which was -- had to do with educational

 8  activity, you could argue that that was a limitation.

 9  But I think you'll recognize that most hospitals would

10  steer in the opposite direction that they don't want

11  every letter, every complaint to result in a data bank

12  report.  To the contrary, they want as few data bank

13  reports as -- as are necessary.

14  BY MR. HAWISHER:

15  Q.   What I am getting at is a scenario where a

16  physician applies for renewal of his full and

17  unrestricted clinical privileges, and he receives less

18  than that.  The privileges that are in some way limited,

19  due to concerns about prior surgeries that he's done.

20  For example, your privileges are limited in the

21  following respect, you must have a proctor for all

22  operative cases.

23       Would they not have to report that decision to not

24  fully renew his privileges to the data bank?

25          MS. BEIGHTOL:  Objection to the form of the

1   question.

2           THE WITNESS:  Yeah.  I really can't give you

3   any better answer than I've given so far.  Which is that

4   I don't know, because there are a number of unknowns

5   which would have to be filled in.  I -- I try very hard

6   not to do hypotheticals in my life and work, but I

7   sometimes fail.  In any event, that's a little too

8   hypothetical for me.

9   BY MR. HAWISHER:

10  Q.   What are the unknowns that you would need satisfied

11  to give an answer to that?

12  A.   Well, you'd want to know, first of all, whether or

13  not he had medical staff bylaws that talked about what

14  was reportable to the data bank.  And then you'd want to

15  know whether or not the data bank has some sample

16  frequently asked questions, and so forth, and/or

17  requirements in their -- in their texts.  And I,

18  frankly, don't recall right offhand whether or not they

19  have any such requirement.

20          I mean, I could imagine -- here's -- here's a

21  scenario.  A physician is getting ready to retire, and

22  applies for privileges and is in some kind of a retired

23  status, consulting status, not active, and so forth, but

24  he's perfectly comfortable with -- with consulting,

25  which is a change from active.  Is his hospital going to

1   go report him to the practitioner data bank?  No.  Of
2   course not.
3   Q.   No.  In that scenario, he's receiving the
4   privileges he's applied for.  We can --
5   A.   He didn't apply for consulting.  He was awarded
6   consulting.  Perhaps he applied for consulting and
7   active, to see what would happen, or maybe he applied
8   for active and was discouraged along the way.  Even more
9   poignant.
10        MR. HAWISHER:  How long have we been on the
11  record?  Both total and since the last break.
12        THE REPORTER:  Four hours.
13        THE VIDEOGRAPHER:  Let me just call it off the
14  record, so I can grab the battery pack.
15        The time is 2:32 p.m.  We're going off the
16  record.
17        (A recess was taken.)
18        THE VIDEOGRAPHER:  The time is 2:41 p.m.
19  We're going back on the record.
20  BY MR. HAWISHER:
21  Q.   Dr. Hyde, have you reviewed affiliation
22  verification responses that were sent by various people
23  at Mission Hospital to potential credentialing entities?
24  A.   I'm going to have to ask you to repeat that.
25  Q.   Okay.  I'm sorry.

1  A.    Yeah.

2  Q.    Have you reviewed affiliation verification letters

3  that Mission Hospital sent about Dr. Hetzel?

4  A.    About Dr. Hetzel, yes.

5  Q.    Yes.  Okay.  Do you recall which ones you have

6  reviewed?

7  A.    Texas, Arizona, are the two that come to mind.

8  Q.    Okay.  Do you -- do you intend to testify, more

9  likely than not, that any particular employment

10 opportunity was lost as a result of the NPDB report?

11 A.    The NPDB report appeared to have been of some

12 importance to Tenet.  Dr. Hetzel testified that there

13 was an algorithm in Tenet Hospitals that would

14 automatically keep him from being considered.  I'm not,

15 on the other hand, going to testify particularly, unless

16 somebody asks me, concerning -- in response to your

17 question, concerning individual opportunities.  To the

18 contrary, I'm going to testify that the -- the record,

19 in terms of what happens, is that three-quarters of the

20 attempts to overturn unfavorable reports fail.  10

21 percent actually get changed.  And I've given you an

22 article that chronicles that, or at least shows the

23 basis for that calculation.

24       Secondly, that my experience is that what happens

25 with an NPDB report is it's not unlike a report for a

1   major police crime.  It doesn't go away.  Every time

2   somebody inquires about your background, the very first

3   thing that comes up, and I -- I mentioned that this was,

4   sort of, an article of faith with the -- the NAMS group,

5   the medical staff support group, that the very first

6   thing that comes up is, have you checked the National

7   Practitioner Data Bank?  And because the NPDB

8   scrupulously says they're not going to verify -- verify

9   facts from the institution and they're not going to

10  interpret things, they're just going to apply their

11  own -- it's perfectly reasonable if you're a federal

12  official.  It puts that much more onus on the -- on the

13  institution that makes the report.

14       So I'm -- I'm going to testify that I think it's a

15  career-long impediment, that no matter who is asking the

16  Practitioner Data Bank, if the report remains there,

17  even if it's one that has a coherent explanation, and

18  this case is far from having a coherent explanation.

19  Even one that has a coherent explanation would be an

20  impediment and disqualification for many jobs in the

21  field, if not -- if not most of them.

22  Q.   Do you intend to testify, more likely than not,

23  that Dr. Hetzel would have obtained employment at the

24  University of Texas Tech, if not for the NPDB report?

25  A.   I -- I have no basis for testifying.  Although, I

1  do recall I think he had a tentative commitment from one

2  of these institutions.  It is not, however, something

3  that I would plan on testifying about.  And so the

4  answer is that I -- I'm not -- I'm not certain.  But I

5  certainly would not be saying something about a job

6  opportunity about which I knew nothing.  Even if I knew

7  that Dr. Hetzel said that he had a lock on the job but

8  for the NPDB, that's -- that's not evidence of a high --

9  high-grade.

10 Q.    How about whether Dr. -- whether the NPDB report

11 prevented Dr. Hetzel from obtaining privileges at Tenet

12 Hospital?

13 A.    At which hospital?

14 Q.    Tenet.

15 A.    Tenet.  Well, his testimony is they did.  I -- I

16 have no independent way of verifying that.  I mean, I've

17 encountered Tenet hospitals in the past, but I have no

18 means of telling whether or not they actually have the

19 algorithm that he said they had, or that it kept him

20 from that employment.

21 Q.    So his belief that they have the algorithm is not

22 something you, as an expert, would rely upon?

23 A.    Correct.  I mean, it makes perfect sense, and I

24 have no reason to disbelieve him, but it's not something

25 that I would be giving an opinion about.

1  Q.   Why did the NPDB determine that Dr. Hetzel's
2  precautionary suspension was reportable?
3  A.   Well, they thought it had gone on for longer than
4  30 days, apparently.
5  Q.   Okay.  And you disagree with that?
6  A.   I've already indicated that I disagree with that.
7  I think there were different episodes of modification or
8  limitation on privileges, none of which were greater
9  than 30 days, even if the original report had been
10 legitimate.
11 Q.   I believe at one point, you've expressed some
12 uncertainty about whether -- about exactly what the
13 status of Dr. Hetzel's privileges was as a result of a
14 modification to his precautionary suspension?
15         MS. BEIGHTOL:  Objection.  Mischaracterization
16 of the testimony.
17 BY MR. HAWISHER:
18 Q.   Do you recall that?
19 A.   Not -- not -- not really.  I -- I was trying to
20 find the right words to characterize what might have
21 been his contingent privileges, but I don't recall any
22 uncertainty searching for words, yes.
23 Q.   Did you review Dr. Hetzel's dispute statement that
24 he submitted to the NPDB?
25 A.   Yes.  Yes, I did.  Yeah.

1  Q.   Okay.  Can you -- do you recall whether he said in

2  his dispute statement that no precautionary suspension

3  lasted 30 days?

4  A.   I don't recall that.

5  Q.   Okay.  Do you think that is something that he

6  would've said, if in fact, no precautionary suspension

7  lasted 30 days?

8           MS. BEIGHTOL:  Objection to the form of the

9  question.

10          THE WITNESS:  Well, we've talked about the

11 different ways that --

12          I'm sorry.  I didn't mean to interrupt you

13 there.  I talk quickly.  Is that --

14          MS. BEIGHTOL:  You can -- you can answer.

15          THE WITNESS:  I can go ahead?  Okay.

16      There are different ways of -- of -- of

17 characterizing this, is his personal recollection, the

18 correspondence, the committee minutes.  At the bottom

19 of -- at the bottom of the hour here, my testimony is

20 that he did not suffer continuous precautionary

21 suspension for a period longer than 30 days at a time.

22 BY MR. HAWISHER:

23 Q.   Okay.  What about from the period, April 23rd to

24 June 9th?

25 A.   Well, April 23rd, of course, would've followed

1  another executive committee action.  And I don't believe

2  that there was a continuous suspension of his privileges

3  during that period of time, but we can go back and do

4  that again if you'd like.

5  Q.   So may -- maybe in a minute.  Maybe we'll come back

6  to that.

7       What -- if you could just give me, I guess a brief

8  list of the ways in which you contend Dr. Hetzel was

9  deprived of due process during his precautionary

10  suspension and the related investigation?

11  A.   Okay.  There -- there are three things that I would

12  mention.  One, of course, is that the violation of 8.4

13  or 4.6 in the policies, right off the bat.  To the

14  extent that the institution has medical staff bylaws

15  and -- and medical staff policies, which are part of the

16  bylaws, and is faithless with regard to adherence to

17  those -- to those policies, that is a -- the beginning,

18  if you will, of the absence of due process.

19       The second -- the second leg is the delay in

20  resolving this precautionary suspension.  There is every

21  reason to believe, based on experience, and certainly my

22  experience based on the AMA standards for medical staff

23  bylaws generally, and based on the Law Review article,

24  every reason to believe that delayed justice is denied

25  justice, so to speak, that a foot dragging by a hospital

1  to conclude its examination process has the intended or

2  unintended effect of triggering the NPDB's interest in

3  something which has gone on longer than 30 days.

4       And then finally, he testifies and -- and others

5  testify that the -- the evidence gathering procedure,

6  which was underway here, stopped him from being

7  represented by a counsel.  This in itself is very

8  unusual, on grounds that a hearing, which would be a

9  setting in which at least all parties were equally

10 prepared, did not take place.  What took place were

11 apparently episodic, if you will, idiosyncratic, one-of-

12 a-kind that is, activities between a panel with no

13 specialist from Dr. Hetzel's specialty, and parties who

14 were giving them information, and finally, with Dr.

15 Hetzel.

16      So ignoring the guidelines, dragging the feet

17 beyond the limits that would avoid peril to the doctor,

18 at least, and lack of representation, those are the

19 three bases in which I think Dr. Hetzel did not have due

20 process.

21 Q.   Dr. Hetzel did submit materials from his lawyer to

22 the investigating committee, correct?

23 A.   Yes, he did.  And I believe that had a material

24 effect because the investigative committee, frankly had

25 not apparently heard from him directly, indirectly, in

1  person, or on -- in writing, prior to the time they

2  received that material and apparently acted more

3  favorably in his direction, so --

4  Q.   So what -- what do you mean when you say that Dr.

5  Hetzel wasn't provided the right of counsel?

6  A.   He -- he didn't have an attorney with him.  There

7  was no hearing.  A hearing, that is spelled out in the

8  medical staff bylaws, does allow counsel.  And of

9  course, most hospital executives abhor the idea of

10 attorneys bringing their own -- of a physician bringing

11 their own attorney on grounds that they -- they think it

12 might lead to a troubled conflict, a loss for them,

13 at -- at least a lost opportunity to present one-sided

14 information to a decision making body.  So he didn't

15 have counsel.

16 Q.   Are you saying he was deprived of his right to a

17 hearing?

18 A.   To a hearing, and to have counsel at a hearing.

19 Q.   Okay.  Under the bylaws and the policy, unavoidable

20 (inaudible), et cetera, when was he entitled to have a

21 hearing?

22 A.   When?

23 Q.   When?

24 A.   Well, he's entitled to have a hearing -- let's see

25 if I -- I have the -- the section that has to do with

1   the conduct and so forth, three members, hearing

2   officer, personal presence, so on and so forth.  So it

3   looks like all of the pieces and parts of a -- of a fact

4   finding activity, but I don't know the answer to your

5   question right offhand about when he was deprived.  I

6   only have excerpts in front of me.

7   Q.   Okay.  Can you please pass me the tablet?

8        So this will be Exhibit 16, which is the policy on

9   appointment -- with the appointment and credentialing of

10  clinical privileges.  I'm turning to Page 26 of it.

11  Okay.  So the first thing I want to call your attention

12  to is Section 4.6.1(c), which describes a credentials

13  committee being called after a precautionary suspension

14  has been imposed.  And -- and towards the bottom of that

15  paragraph, it describes the affected physician's right

16  to address the credentials committee during the meeting

17  and the presence of counsel and so on.

18       Can you read that to yourself and let me know when

19  you're ready to talk about it?

20  A.   This is the one that begins "unless the

21  recommendation".  Is that what you're looking at, or --

22  Q.   Yes.

23  A.   Okay.

24  Q.   Well --

25  A.   Or the paragraph above that?

1    Q.   No, no, I'm sorry.  Paragraph C.  So two above

2    that.

3    A.   Okay.  Okay.

4    Q.   So you see how the physician is not entitled, under

5    the -- under the policy, to have a -- to have counsel

6    present, and not entitled to a hearing at this stage?

7    A.   The -- they're not entitled at this particular

8    stage.  That's correct.  That's right.

9    Q.   Okay.  So was it a violation of Dr. Hetzel's due

10   process rights for him to not be permitted to have

11   counsel with him when he addressed the credentials

12   committee?

13   A.   I think it was a violation for him not to be able

14   to have counsel in a hearing -- in a formal hearing.

15   It's not a violation of the medical staff bylaws for him

16   not to be able to have an attorney with him during the

17   credentials committee meeting, but that's not referred

18   to as a hearing.  In fact, it specifically says, this is

19   not a hearing.  So just as this is not a -- a final

20   action, this is not a hearing.  And therefore, his

21   prohibition on his bringing counsel to a committee

22   meeting is not in and of itself a violation of the

23   bylaws.  It's a more interesting question of whether or

24   not it's a violation of due process.

25        And just for perhaps your -- your airplane reading

1  pleasure, the article that I gave you a piece of from

2  the Cardozo Law Review, and I'll -- I'll send the -- the

3  full article to Ms. Beightol, so she'd be able to share

4  it, essentially, it asks the question, why do we protect

5  sexual predators and the terrorists, but not doctors?

6  You'll find it to be a -- a -- a -- a very strongly

7  advocated point of view.  And the question of whether

8  Dr. Hetzel had a hearing?  He had no hearing, though

9  this is what he had instead.

10 Q.   Right.  If you could scroll down to Page 28.  It

11 is -- it's PDF Page 32, numbered Page 38.

12 A.   28?

13 Q.   I can scroll there if you'd prefer.  We're looking

14 for Section 5.2, Requests for Hearing.

15 A.   Okay.  I have the hearing and appeal procedures in

16 Page 27 and now, 28.

17 Q.   Okay.  And if you -- if you go down to Page -- to

18 Paragraph C, which is headed, Time and Place for

19 Hearing; do you see that?

20 A.   Yes.

21 Q.   Okay.  I'm going to read the last portion of that

22 paragraph.  "The date of commencement of the hearing

23 shall be no sooner than 30 days, nor later than 120

24 days, from the date of receipt of the request for a

25 hearing, unless specifically agreed to in writing by the

1   parties."

2        Did I read that right?

3   A.   Yes.

4   Q.   Okay.  Did Mission Hospital violate this provision?

5   A.   Not to my knowledge.  In fact, they made -- Dr.

6   Hetzel's counsel, by mail, made a request for a hearing

7   within the requisite period of time.  Now I don't know

8   if they -- well, you asked me if they violated this.

9   I -- I don't think they had a hearing.

10  Q.   Have you reviewed emails from Dr. Hetzel's counsel

11  rescinding or withdrawing the request for a hearing?

12  A.   No.

13  Q.   You -- you have not reviewed those?

14  A.   No.

15  Q.   Okay.  If in fact, Dr. Hetzel's counsel did that,

16  would that affect your position that there was a due

17  process violation?

18        MS. BEIGHTOL:  Objection.

19        THE WITNESS:  Well, I -- I hadn't assumed

20  there was a due process violation because somehow, they

21  had not been faithful to their own bylaws.  Dr. Hetzel

22  had been discouraged from having an attorney at any of

23  these meetings.  I don't know why his counsel, as you --

24  as you say, would have requested a -- would -- would --

25  would have withdrawn that request.  But the point is

1    that he never had a hearing.

2        Are you asking me, did they violate something by

3    not giving him a hearing?  The answer is, to the best of

4    my knowledge, no.  But he did not have one.  And the

5    hospital chief executive indicates that all of these

6    matters involving privileges will be pending a hearing.

7    In other words, he assumed there would be a hearing, and

8    I think most people involved in these kinds of things

9    would assume there's going to be a hearing, but there

10   was not one.  And whether it's because Dr. Hetzel,

11   through his attorney, didn't request it or the hospital

12   didn't attend to it is not part of my testimony.

13       My testimony is that violating the bylaws and

14   essentially -- violating the bylaws and essentially

15   dragging its heels, so to speak, were two of the three

16   areas in which the hospital violated Dr. Hetzel's due

17   process rights.  And if I am correct, and I believe I

18   am, and I'll try to add some citations when I have an

19   errata sheet, I believe he was actively discouraged from

20   bringing an attorney to any of the meetings that he had.

21   BY MR. HAWISHER:

22   Q.   So you said two of -- those were two of the three

23   areas.  The third area is he was discouraged from

24   bringing counsel?

25   A.   I -- I think -- I think that's correct.  And I --

1  I've forgotten whose testimony that was.  It might have

2  been his, it might have been somebody else's, but I

3  don't believe that he had a hearing, and he was

4  discouraged from having an attorney at the meetings that

5  took place.

6  Q.   Well, so you -- you just said, it was not a

7  violation of due process to not have a hearing, right?

8  A.   If I said that, I misspoke.  You indicated that his

9  counsel had withdrawn a request for a hearing.  My

10 testimony is that he was entitled to a hearing and was

11 entitled to have counsel represent him, but was actively

12 discouraged from having counsel at any of the meetings,

13 which were presumably to some extent, substitutes for

14 the hearing, so.

15 Q.   Okay.  So you say he was entitled to have a

16 hearing, even if he withdrew his request for a hearing?

17 A.   The -- there's nothing in conflict here.  I'm not

18 saying that he's -- he's entitled to a hearing if he

19 doesn't want one.  I'm saying that he was discouraged

20 from having counsel present at committee meetings, ad

21 hoc or otherwise.

22 Q.   Do you recall the section of the policy on

23 appointment that we reviewed a moment ago that said the

24 physician does not have the right to be represented by

25 legal counsel at this committee meeting?

 1  A.   Yes, that's right.

 2  Q.   Okay.  So that is consistent with the hospital's

 3  governing documents, right?

 4  A.   Well, it's internally consistent with the governing

 5  documents, but it doesn't mean that it's a -- a

 6  substitute for due process.

 7  Q.   Okay.  So when you say due process, what

 8  obligations or -- or what source of the due process

 9  standard are you referring to?

10  A.   These are all procedural matters.  One is having

11  the preemptive disciplinary action, the precautionary

12  suspension.  Two is foot dragging, denying or delaying,

13  if you will, a resolution.  And three is having as your

14  primary fact-finding activity, a committee meeting at

15  which the key individual here, Dr. Hetzel, is

16  discouraged from having counsel.

17  Q.   So what is the source of the due process

18  obligation, if not Mission Hospital's bylaws and

19  governing documents, that you are relying on when you

20  say --

21  A.   Okay.

22  Q.   -- this is a violation?

23  A.   You -- you are correct in indicating that the

24  bylaws don't provide a basis.  And I don't believe I

25  claim they did.  I only said that he had been

1   discouraged from having an attorney represent him at

2   these committee meetings.  And in my experience, when

3   someone discourages another from having counsel or

4   having representation, they're essentially attempting to

5   preserve whatever uneven playing field they've created.

6   Q.   Okay.  And you have described that as a violation

7   of -- and I believe you've described it as a violation

8   specifically of due process.  And my question for you is

9   what is the source of the obligation to allow Dr. Hetzel

10  to have counsel at -- present at committee meetings, if

11  it's not the bylaws?

12  A.   The bylaws pertain to the first two violations, the

13  precautionary suspension 8.4, 4.6.  Secondly, to the

14  extraordinary delay in any kind of resolution.  There is

15  no source that you could look at in the bylaws that says

16  that he's entitled to have counsel at a committee

17  meeting.  I was pointing out that there is testimony

18  that he was discouraged from having counsel.  That's not

19  to infer the opposite, which is that somehow he has a

20  right to it.

21  Q.   Do you contend that it was a violation of due

22  process to discourage him from having counsel at

23  committee meetings?

24  A.   No.  I indicated that this was an area where he was

25  actively discouraged from having representation.  It is

1  | not, to your question, a violation of any part of the
2  | medical staff bylaws.
3  | Q.    Okay.  With respect to your second criticism, which
4  | is that Mission Hospital unnecessarily prolonged the
5  | precautionary suspension and quote, unquote "dragged its
6  | feet," which provisions of the bylaws do you contend
7  | that Mission Hospital violated?
8  | A.    The violation comes, in this case, not from the
9  | bylaws.  It comes from the NVDB rules, which assuming
10 | that you have a legitimate precautionary suspension, if
11 | that precautionary suspension, even though not a final
12 | professional review action, is dragged out for more than
13 | 30 days, it becomes reportable, irrespective of the fact
14 | that it has not changed in its character during those 30
15 | days.  So I'm not alleging that the bylaws required them
16 | to procrastinate.  I'm only alleging that they did.
17 | Q.    Yeah.  And you have described that what you're
18 | calling procrastination, as a violation.  What does it
19 | violate?
20 | A.    Oh, it violates the requirement for timely action
21 | in response to the precautionary suspension.  Something
22 | should be done in a period of time that is responsible.
23 | I quoted the Massachusetts Medical Society.  I quoted
24 | the AMA.  Everybody in the field would necessarily have
25 | something they could point to and say that if this is

1   delayed, it's going to not just be justice denied.

2   Memories will change.  Alliances will form.  Information

3   will be lost.  In fact, it will have disasters

4   consequences for Dr. Hetzel by triggering the 30-day

5   period.

6   Q.   Do you contend that Mission Hospital violated its

7   bylaws or policies with respect to the timeliness of its

8   actions during the investigation or precautionary

9   suspension?

10  A.   No.  I merely contend that they procrastinated and

11  risked having a reportable event where nonexistent.

12  Q.   Other than Mission Hospital's bylaws and other

13  governing documents, are there any other sources of a

14  due process or timeliness-type obligation that you think

15  applies here?

16  A.   No.

17  Q.   What do you understand the phrase "in and of

18  itself" to mean?

19  A.   That as a -- as -- as a concept without more.  The

20  precautionary suspension is not a final professional

21  review.  It needs, in other words, something else to be

22  completed as a final professional review action.

23  Q.   Okay.  And so for example, a duration that extends

24  beyond 30 days would be something else?

25  A.   Sure.  That would -- that would certainly be a

1   well-known something else.  You'd have to -- you'd have

2   to exceed to the proposition that it was an interim step

3   to present to protect patients in the first place, as

4   opposed to a -- a grudge or some kind of a non-patient

5   safety initiative to begin with.  So it's not in and of

6   itself, a final professional review action.  And

7   dragging out the precautionary suspension is -- it

8   doesn't make it a final professional review action, but

9   it may make it, arguably, depending upon your point of

10  view, now reportable.

11  Q.   You've used the words misrepresentation and fraud

12  in connection with either the precautionary suspension

13  or the NPDB report, or both.  And I would like you to be

14  specific about what you contend was fraudulent about the

15  precautionary suspension?

16  A.   The representations that began with whatever

17  conversations took place, of which we have no record,

18  between Dr. Buell and the medical staff leaders, led to

19  a one-sided action.  That is an action depending on Dr.

20  Buell's perception of -- of what actually had happened,

21  or his and Dr. Ahearne's.  And as a consequence, could

22  not be represented to be an even-handed presentation

23  of -- of information.

24        Secondly, one of the well known exceptions for

25  reporting, whether it's to the NPDB or anybody else, is

1   if the information that you are reporting is not based

2   on information that is intended to protect patients, and

3   is not therefore, accurate.  So a one-sided presentation

4   of information, which is, you know, by definition, not a

5   final professional review action, complicated by

6   procrastination, is the fraudulent part, if you will, of

7   this transaction.  Information not true, not supported,

8   decision making process dragged out, none of it passes

9   what I would regard as a -- a test of ordinary fairness

10  or accuracy.

11  Q.   What was the information that was -- the

12  precautionary suspension was based on that was not true?

13  A.   Dr. Frisch's letter is a good source with which

14  to -- to respond to that.

15          MS. BEIGHTOL:  You looking for the first --

16          THE WITNESS:  No, I have it here.  Thank you,

17  though.

18          Dr. Frisch's email begins by indicating that a

19  precautionary suspension was taking place in accordance

20  with the policy on appointment, reappointment, and

21  clinical privileges.  As I mentioned, that's arguable.

22      Secondly, the second sentence in that second

23  paragraph, "Given that Dr. Hetzel had recently had two

24  intraoperative organ injuries in the past six months,"

25  as we mentioned earlier, that's not true in a minor way,

1  because they're nine months and four or five months, but

2  the so-called intraoperative organ injuries have no

3  basis for report.  There's nothing -- there's no peer-

4  review report.  There's nothing by way of a -- a medical

5  executive committee or credentialist committee.  To the

6  contrary, what we have is on the 25th of February, Dr.

7  Hetzel completely awarded, if you will, two more years

8  of active medical staff membership without any

9  limitations of the type that you would expect if

10  somebody had outstanding two intraoperative organ

11  injuries that had not been further resolved.

12      Then we have the discussion with Dr. Buell.  And I

13  can't imagine that -- no matter how neutral or objective

14  that Dr. Buell would try to be, or anyone else would try

15  to be in his position, it really defies belief that this

16  penalty would be levied on Dr. Hetzel, based on the

17  representation of another surgeon involved in the very

18  same case which is at issue.

19      And then fine -- finally, we have, "We concur that

20  in the interest of patient's safety" -- I'm not sure

21  that's really where they wanted the apostrophe, but one

22  way or another, "patients may be necessary to proceed

23  with a precautionary suspension."  There's no evidence

24  that any patient was going to be harmed by Dr. Hetzel.

25  No evidence certainly that would justify this remarkable

1  sanction.  So those are the areas where I think the

2  representation is inaccurate.

3  BY MR. HAWISHER:

4  Q.   Okay.  So one of these statements was two

5  intraoperative organ injuries in the past six months,

6  which you said is false in a minor way because one of

7  them was nine months ago, right?

8  A.   Correct.

9  Q.   Were there any other statements in that paragraph

10  that are factually untrue?

11  A.   As opposed to biased or arguable, I think that's

12  the only one which I would regard as being factually

13  untrue.  But obviously biased in that it's an attempt to

14  ladle on these two intraoperative organ injuries, which

15  would've been examined as part of the re-credentialing

16  process, and make them give them additional weight to

17  the activity involved in the index patient -- the March

18  2nd patient.

19       So the entire thing is factually only faulted in

20  that timing, but it is dishonest in the entirety.  In

21  terms of the reasoning here, we -- we say we have some

22  past activities about which there is no current

23  information or discussion or controversy.  We've spoken

24  with the conflicted surgeon.  We've ginned up an

25  argument that it's in the interest of patient safety,

1  and therefore we proceed with this precautionary

2  suspension.  So it's a -- it's a -- from my point of

3  view, a dishonest statement.

4  Q.   Okay.  And -- and my question is what evidence are

5  you relying on when you conclude that this is a

6  dishonest statement?  You are pointing to the absence of

7  evidence and saying, therefore, the evidence must not

8  exist.  It is not simply that I do not have it.

9  A.   Yeah.  No, that's not true.  I'm pointing to the

10  business about the two cases having taken place during a

11  period when Dr. Hetzel's privilege renewal would be

12  under consideration.  That's dishonest.  I'm pointing to

13  the conflicted position that Dr. Buell is in, as really

14  astonishing, that an action of this kind would be taken

15  based on -- not any reflection on Dr. Buell, but based

16  upon one point of view, which was necessarily an

17  interested point of view, as another surgeon responsible

18  for this index patient.

19       And finally, the -- the -- what I believe to be in

20  my opinion, dishonesty in saying this is in the interest

21  of patient safety.  I -- I could not see for the life of

22  me that what is regarded as a nuclear option, to take a

23  respected community surgeon out of the hospital, out of

24  the operating room, was in fact, in the interest of

25  patient safety, there being no apparent threat to

1  patient safety, but would rather be categorized as being

2  in some other set of interests conflicted.

3  Q.   Ultimately, it sounds like you're saying, this was

4  such an aggressive step, that it cannot possibly have

5  been legitimate, therefore it's fraudulent.  Therefore,

6  it shouldn't have been reported.

7            MS. BEIGHTOL:  Objection to the form of the

8  question.

9            THE WITNESS:  Well, not quite.  This was such

10 an aggressive step, that it needed justification.  And

11 the justification came in three forms.  One was the

12 canard of the two patients in the past, the second was

13 the conflicted testimony of Dr. Buell, and the third was

14 the protective wrap of patient safety.  So those are the

15 bases that I'm -- I'm pointing to as being not the kinds

16 of basis for the development of information that would

17 justify this, as I mentioned, nuclear option.

18 BY MR. HAWISHER:

19 Q.   With respect to your contention that the two

20 previous organ injuries should not have been considered,

21 if those organ injuries were truly concerning, its

22 February 25th or 24th, or whenever the vote on Dr.

23 Hetzel's privileges is happening, and there -- there is

24 this outstanding concern, what is the vote -- how is the

25 vote supposed to come out?

1  A.   Well, entirely speculative on -- on both of our

2  parts, or any part.  All we know is that these two

3  patients had their histories thrown in, if you will, to

4  the equation as additional justification for taking Dr.

5  Hetzel out of the operating room.  We know that

6  fortuitously, at just about the same time, Mission

7  Hospital had completed, had wrapped up its re-

8  credentialing process for Dr. Hetzel.  I would imagine

9  that if in the course -- not of the final board review

10 or even medical executive committee, but if in the

11 credentials committee or a departmental committee

12 somebody said, you know, Dr. Hetzel really had a couple

13 of problems here, we ought to look at those, that in

14 fact, there would be some track record.  There would be

15 some piece of paper.  There would be some trail that

16 said, actually, we looked at those.  All it is right

17 now, and I don't mean this in a sort of derogatory way,

18 although it's going to sound that way, all it is right

19 now is gossip.  It's gossip from two former partners

20 transmitted to conflicted decision makers wrapped in

21 patient safety.  That's not a legitimate background, I

22 think, for the worst possible sanction, and that is sort

23 of a life sentence in the National Practitioner Data

24 Bank.

25 Q.   Are you familiar with the evidentiary privilege --

1  privileges and discovery privileges that exist for peer

2  review materials?

3  A.   I've looked at the list of discovery materials.  I

4  wouldn't say that I could answer a quiz on them, but

5  yes.

6  Q.   Sure.  What I mean is, I'm sure you have

7  encountered, in your professional career, cases where a

8  hospital says these peer-review materials are

9  privileged.  We're not going to produce them.  You can't

10  look at them, right?

11  A.   Uh-huh.

12  Q.   Okay.  And you understand that --

13  A.   Yes.

14  Q.   -- that has happened in this case?

15  A.   I beg pardon?

16  Q.   And you understand that that has happened --

17  A.   Yes.

18  Q.   -- in this case with respect to some categories of

19  materials?

20  A.   Yes.

21  Q.   Okay.  So are you assuming that if you have not

22  seen a document, that it doesn't exist?

23  A.   No.  I'm not assuming that.  I am assuming that it

24  is more likely than not that the two patients to whom

25  reference was made did not develop into any kind of

1  peer-reviewed case, and therefore were not in front of

2  the credentials committee, and therefore were not

3  anything other than gossip.  So I am assuming that more

4  likely than not.

5  Q.    What is the basis for that assumption?

6  A.    Beg your pardon?

7  Q.    What -- what is the basis for that assumption?

8  A.    Well, they would've been produced, frankly, had --

9  had there been any real information there, aside from

10  hearsay and representation.  Secondly, I'm assuming that

11  Dr. Buell, when he spoke with others involved in this

12  decision, represented his point of view, which was not

13  that he was at fault for the unfavorable outcome for the

14  patient, but that Dr. Hetzel was at fault.  And I think

15  that's more likely than not.  Nothing wrong with that,

16  per se.  It's just as a decision maker, it puts you in a

17  very awkward position.

18        And I'm assuming, more likely than not, because

19  unfortunately, I've -- I've witnessed this too often,

20  that when we have -- how shall we put it.  We disguise

21  bad motives under good ones.  That when we have

22  something we'd like to take -- in which we'd like to

23  take action, but don't necessarily want to be faulted

24  for, we attempt to assume a motive, which is a -- a

25  happier motive, a -- a good motive.  And so patient

1  safety is always a good one in the hospital field.  It's

2  invoked for legitimate reasons, and it's invoked for

3  explanation for why a particular action is being taken,

4  whether or not it involves patient safety.  So yes, I am

5  assuming there is nothing in the credentials committee

6  process that pertains to these two patients.  I am

7  assuming that Dr. Buell's point of view was the point of

8  view communicated concerning the alarm, and I'm assuming

9  that the patient's safety business was cover.

10  Q.   And the basis for your assumption that these two

11  prior injuries were not subject to peer review is just

12  that the materials from that were not produced in this

13  case?

14          MS. BEIGHTOL:  Objection to form.

15          THE WITNESS:  Well, someone might have brought

16  them up, for example, in any of the other proceedings or

17  in depositions or anything else.  All I know is that

18  they were -- they were treated as past -- as -- as

19  representations from -- from two of Dr. Hetzel's

20  partners concerning past patients.  And the fact that

21  they were given legitimacy leads me to believe that

22  there was a reason for that.  What was the reason for

23  that?  If the reason for that was that they were

24  material in terms of Dr. Hetzel's performance, I assume,

25  more likely than not, that would've been taken into

1    account in his re-credentialing.  The fact that they

2    were not -- that his re-credentialing was not made for

3    one year, or one year subject to reeducation on

4    intraoperative organ treatment, or anything of the sort,

5    it becomes more likely than not that nobody brought this

6    up in his credentialing and therefore, it was not a

7    major issue.

8    BY MR. HAWISHER:

9    Q.   Okay.  So a couple things about that.  One, it

10   sounds like you're speculating as to what was considered

11   during Dr. Hetzel's re-credentialing.

12          MS. BEIGHTOL:  Objection to the form of the

13   question.

14          THE WITNESS:  No, no.  All we know is that his

15   re-credentialing took place with no limitations.  That's

16   all we know.  That's what we can demonstrate.

17   BY MR. HAWISHER:

18   Q.   Okay.  The second thing I was going to say is it

19   sounds like you are conflating what was said by Dr.

20   Hetzel's partners to the investigative committee with

21   what was known, and -- and that was around March 20th,

22   with what was known to Doctors Buell and Frisch, and

23   Chad Patrick, when they imposed the precautionary

24   suspension.

25   A.   Yeah.

1   Q.   So I want to turn -- do you have the ad hoc

2   credentials committee report in your materials?  And if

3   not, I can bring it up on the tablet.

4   A.   Yeah.  Why don't -- you -- find it here.

5   Q.   Okay.  And this is Page 15 of Exhibit 11.

6   A.   Okay.

7   Q.   Okay.  So first of all, investigative committee has

8   interviewed the physicians who were -- who assisted Dr.

9   Hetzel during the index surgery, right?

10  A.   Is there a particular paragraph you want me to --

11  Q.   So -- so that would be the second paragraph.

12  A.   Second paragraph.  "The committee was made aware of

13  two additional cases."  Okay.

14  Q.   Yeah, No -- no.  Excuse me.  Second -- second

15  paragraph.  One of the -- one above the one you just

16  looked at.

17  A.   Oh.  "Prior to the subgroup meeting?"  Okay.

18  Q.   Yeah.  So two -- two physicians who helped Dr.

19  Hetzel with the index surgery have given information to

20  the investigative committee about what happened, right?

21  A.   Yes.  I see that.

22  Q.   Okay.  First of all -- I mean, is it your view that

23  it is inappropriate for the investigative committee to

24  ask them about the index surgery?

25  A.   No.  It's my view that it's bogus to cite the two

1   cases, four or five and nine months later, as part of a

2   meeting being held in 2020.  And even before that, for

3   Dr. Frisch in his memo of March 3rd, to have cited as,

4   given that Dr. Hetzel had recently had two

5   intraoperative organ injuries, and so on and so forth.

6   So the fact that these particular cases are brought up

7   here and not in something, you know, which would've been

8   a peer-review activity -- somebody knew about this nine

9   months ago.  Somebody knew about this four or five

10  months ago.  If there's something there, why wait until

11  there's an adventitious move to sideline Dr. Hetzel to

12  bring them up?  It doesn't -- it doesn't appear -- and I

13  realize a matter of opinion, but it doesn't appear

14  legitimate to suddenly surface things that have not

15  previously been examined.

16  Q.   Have you ever heard the -- heard phrases, like, you

17  know, a pattern of bad outcomes that represent you as an

18  outlier, or something like that?

19  A.   Yes.

20  Q.   Okay.  I mean, is it fair to say that a person's

21  track record over the past year or two years can be

22  relevant if there's suddenly a particular concerning

23  case?

24  A.   It -- it's fair to say that, and there's all sorts

25  of hypotheticals we could concoct.  What do we know?  We

1   know that there was no apparent attention to either one

2   of these cases before the index patient on March 2nd and

3   Dr. Buell's report of that, and the suspension.  And now

4   we have the ad hoc committee getting more information

5   about that.  It -- it -- in terms of the -- the timing

6   and the attention and the ordinary process of

7   credentialing, and so forth, it doesn't appear to me --

8   and again, this is my opinion.  It doesn't appear to me

9   to be innocent or innocuous that cases that were long

10  past, that had never been examined previously, are

11  brought forward in this anecdotal fashion.  I spoke to

12  Dr. So-and-so.  Where are the medical records?  Who's

13  examining this?  What actually happened with regard to

14  these two patients?  So it -- it's more likely than not,

15  if you will, my opinion is information about these two

16  cases has been thrown into the rationale or

17  justification for the precautionary suspension.

18  Q.   Okay.  And your basis for the contention that there

19  was, quote, "no apparent attention to these two cases"

20  prior to this investigation is that it has not been

21  produced in this case, as far as you know?

22  A.   No, no.  It's because Dr. Frisch mentions it on the

23  3rd of March, five days after he signed -- five days

24  after the chief executive has signed new privileges for

25  Dr. Hetzel.  If Dr. Frisch, who's the chief of staff of

1  the hospital, who has at least in times of that kind of

2  position, a lot of information, if -- if he suddenly

3  discovers that Dr. Hetzel had two recent intraoperative

4  organ injuries and somehow didn't know about them as Dr.

5  Hetzel was being evaluated for renewal of his

6  privileges, I would be very surprised.  And I think it's

7  more likely than not that the circumstances led to

8  conversations, that Dr. Buell gave his point of view,

9  that Dr. Frisch apparently picked up information on

10  these two cases -- alleged cases that had no impact on

11  Dr. Hetzel's renewal of his privileges, and together,

12  they looked like, as you were putting it, a pattern of a

13  poor outcome or a poor technique.  But it really is a

14  pattern which is illusory, at -- at best.  We can't

15  know, right now, what Dr. Buell actually said.  We only

16  know that he was in a conflicted position.  We know from

17  Dr. Hetzel's deposition he thinks Dr. Buell was at least

18  partly at fault for the poor outcome.  So it's a

19  conflicted report that needs shoring up, and the shoring

20  up takes place with reports on these two cases.

21  Q.   What is the basis for your belief that Dr. Frisch

22  had just learned of these two prior injuries as of March

23  3rd?

24  A.   Well, he -- he mentions them in this memo, which

25  is -- which is of course, long before this discussion by

 1   this ad hoc committee.  And it's not clear to me that he

 2   would've had any source of information except people who

 3   were involved in the index patient.  In other words,

 4   he's not undertaking a peer review of Dr. Hetzel here.

 5   He's responding to the suspension of Dr. Hetzel's

 6   privileges.  And so he has access to information that

 7   there were two cases, but what we know is that neither

 8   one of these cases apparently became any matter of

 9   controversy except in the minds of those who felt that

10   they should inform Dr. Frisch of additional information

11   that he might want to mention.  Again, more likely than

12   not, not information which independently would've led to

13   anything or did lead to anything.

14   Q.   So what is the basis for your belief that there was

15   no controversy about these procedures, other than in the

16   minds of the people who told Dr. Frisch about them?

17   Which, again, I would like to know why you believe other

18   people told Dr. Frisch about them?

19   A.   Yeah, the -- the basis for my belief that there was

20   no controversy was that Dr. Hetzel's privileges were

21   renewed without limitation.  Nobody said you have to go

22   get a consult.  Nobody said you have to do an FPPE.

23   Nobody said anything.  They said, here are your

24   privileges for the next two years.  That leads me to

25   think that whatever is being talked about from four or

1  five or nine months ago was not sufficiently

2  controversial to have triggered some other kind of

3  response.

4  Q.   Okay.  So that brings us back to my question from

5  earlier, which was, accepting for the sake of argument

6  that those two surgeries were not controversial enough

7  or problematic enough by themselves to lead to action,

8  why is it illegitimate to consider them as context for

9  this particular organ injury?

10           MS. BEIGHTOL:  Objection.

11           THE WITNESS:  Well, you know, your

12  hypothetical really has a lot of different

13  possibilities.  If you were saying on a scale of 1 to

14  10, that the patients were treated in a disastrous,

15  unprofessional, ill-considered, negligent manner, and

16  that's a 10, and that the patients on the other hand

17  were well-treated, well-cared for, and had good

18  outcomes, that's a 1.  What do we know?  We know that

19  whatever it was, it didn't rise to the level of becoming

20  part of anything which would stimulate the credentials

21  committee to limit Dr. Hetzel's privileges.  Does that

22  mean that it's a -- a 1 or a 2 or a 3?  We don't know.

23  All we know is that the -- suddenly they appear in this

24  March 3rd memo from Dr. Frisch.  And of course, a

25  reasonable supposition would be -- I think it's

 1  reasonable, why do they appear?  They appear because

 2  it's necessary to give some additional weight, aside

 3  from Dr. Buell's conflicted testimony, to the

 4  precautionary suspension.

 5  BY MR. HAWISHER:

 6  Q.   Tell me about the methodology you're applying in

 7  drawing that conclusion.

 8  A.   Well, in the credentials business, it's a fairly

 9  straightforward process and there's -- the methodology

10  would essentially be memorialized in what are called the

11  Ideal Credentialing and Privileging Standards of the

12  National Association for Medical Staff Support.  That

13  would include assessment and analysis of patient

14  complaints, of complaints by other physicians, of

15  National Practitioner Data Bank reports, and so forth.

16  All of that is assembled by the people who are the so-

17  called medical staff support people, such as our Ms.

18  Shelton here, and it's presented to a credentials

19  committee.  The credentials committee generally will

20  consult an authority in the same specialty, possibly

21  from the same department, possibly from outside, and

22  will decide whether or not anything which has been

23  raised in complaint about the physician rises to a level

24  which should involve some discussion, some action, some

25  remediation, and there will be some record of that.

1        So the methodology is to take a look at the Ideal

2    Credentialing and Privileging Standards and attempt to

3    intuit, if we don't have direct evidence exactly what

4    happened.  What we know is that nothing happened that

5    would have prevented the renewal of Dr. Hetzel's

6    privileges and that these particular cases, which might

7    have been 1s or might have been 10s, show up in Dr.

8    Frisch's memorandum to, amongst others, Dr. Hetzel

9    concerning his precautionary suspension.

10   Q.   Were you aware that Dr. Hetzel had been directed to

11   submit his breast surgical cases to -- to the breast

12   conference on a regular basis?

13   A.   Yes.

14   Q.   Okay.  This also was not reflected in his -- in the

15   renewal of his privileges, right?

16   A.   Dr. Hetzel testified that he actually was attending

17   another breast conference and that unfortunately, there

18   was no organized sign-in process at that breast

19   conference.  I took the complaint about his not showing

20   up at breast conferences to be more a -- a management

21   than a medical staff issue.  And that is that the

22   management was very eager to show, notwithstanding their

23   devastating destruction of the oncology service, that

24   they still had an active cancer unit, an active breast

25   cancer service, and that Dr. Hetzel was there as part of

1   the -- part of that group.  I'm hypothesizing, if you

2   will, as to why they were so concerned that he went to

3   one and not the other breast cancer conference.  But

4   yes, I'm aware of that.  That certainly would not have

5   risen to the level of medical staff attention.  It was

6   the subject of the civil performance improvement

7   project.  And when I -- when I hear those kind of words,

8   I think management, not medical staff.

9   Q.   So first of all, did you know that the direction to

10  attend and present at those conferences had come from

11  the peer-review committee?

12  A.   I -- I did see the peer-review committee cited, but

13  I didn't see anything that looked like communication of

14  the peer-review committee or a meeting of the peer-

15  review committee, or anything that said that actual

16  committee members were -- were involved, as opposed to a

17  staff, for example, following up.  But as I say, my --

18  my opinion, and it's only my opinion, is that going to

19  one and not the other conference might have been seen as

20  irritating on grounds that Mission was busily losing its

21  oncology service.  And I can see that the performance

22  improvement project is not a -- is not a -- it's not a

23  phrase that I see very often in medical staff

24  operations.

25  Q.   So -- so my question was -- my question was not

 1  about whether he followed the instructions.  My question

 2  was, he's been directed to adhere to this performance

 3  improvement plan.

 4  A.    Yes, yes.

 5  Q.    And that also is not reflected in the renewal of

 6  his privileges, right?

 7  A.    Yes, that's correct.  That's right.

 8  Q.    But it -- so that -- that doesn't mean that there

 9  were no concerns about his breast surgery cases, does

10  it?

11  A.    Well, it -- it doesn't mean that there were no

12  concerns.  It means that the leadership of the medical

13  staff wasn't concerned.  And as I say, I think it's

14  highly likely that when you see an acronym like

15  performance improvement project, that's a management

16  initiative.  I try to get my students not to use

17  corporate speak, but they do it all the time.  But I can

18  assure you that I've never seen a medical staff which

19  spontaneously comes up with simple performance

20  improvement project initiatives.  Having said that,

21  what's the point?  The point is that nothing was as

22  serious in this as to bring it to the attention of the

23  credentials committee and motivate them to put some kind

24  of limitation on Dr. Hetzel's privileges.

25  Q.    Okay.  And therefore, because neither of those

1  cases was independently sufficient to limit his

2  privileges, it is therefore illegitimate to consider

3  them in the context of another surgery that has caused

4  concern?

5          MS. BEIGHTOL:  Objection.

6          THE WITNESS:  It's -- it's not illegitimate.

7  It's suspicious.  If in fact -- quite aside from the

8  privileges case, if in fact these two cases were serious

9  cases, I would expect that somebody would have looked at

10  them from the point of view of medical staff, the

11  department of surgery, the other surgeons who were

12  involved.  I would expect somebody would've looked at

13  it.  There would be a paper trail.  I would further

14  expect that if these cases had become of interest and

15  they were more on the 10 side and less on the 1 side in

16  the medical staff, that they would be put forward, even

17  in terms of limited, you know, redacted form as evidence

18  that, in fact, Dr. Hetzel was on a -- a pattern of

19  behavior which culminated in the index patient, as

20  opposed to Dr. Hetzel had a bad outcome with the index

21  patient, which he shared with Dr. Buell, and evidence to

22  indicate the importance of the precautionary suspension

23  was at hand.

24  BY MR. HAWISHER:

25  Q.   When you say, quote, "there would be a paper

1  trail," what is the basis for your belief that there is

2  not a paper trail?

3  A.   Well, as I say, I've -- I've looked at everything

4  that I've been given.

5  Q.   Okay.

6  A.   Put it that way.

7  Q.   So what is the basis for your belief that there is

8  not a paper trail that you have not been given?

9  A.   Well, I look at the index of redacted items.  I

10  didn't see anything about any patients who had

11  intraoperative organ injury.  But it may be there and I

12  just overlooked it.

13  Q.   Okay.  Do you have any reason to believe that that

14  is not the case?

15  A.   I -- I don't have reason to believe that it is or

16  is not.

17  Q.   So you are assuming that these cases were not

18  subject to peer review?

19  A.   Beg your pardon?

20  Q.   So you are assuming that these cases were not

21  subjected to peer review, but you do not know that?

22  A.   I'm assuming that the cases were not controversial.

23  They may have been subjected to peer review.  They may

24  have been any number of things, but that they were not

25  controversial.  Why do I assume that?  Because Dr.

1   Hetzel was awarded two years of active privileges

2   without any kind of limitation or comment, and neither

3   he nor anyone else has testified that he had any

4   limitations as a result of those cases.  As a

5   consequence, those cases play an important role, but not

6   the role that I believe would be your interpretation.

7   They play an important role as being handy bricks to

8   throw at Dr. Hetzel.  They're leftover pieces of

9   information, presumably from someone knowledgeable, his

10  partners, someone who talked to Dr. Buell.  I can

11  imagine the conversations.  And that's the reason we

12  have medical staff bylaws and policies in place, is to

13  protect individual physicians from hearsay and

14  convenient attacks, to say nothing of the Practitioner

15  Data Bank.

16  Q.    When you say that Dr. Hetzel's partners told Dr.

17  Buell about these cases, what are you basing that on?

18  A.    I -- I didn't say that.  I said I can imagine the

19  circumstances under which Dr. Buell may have

20  mentioned -- may have -- may have learned from Dr.

21  Hetzel's partners.  I think Dr. Hetzel testified that

22  two of his partners had talked about something along

23  those lines.  It's not material to know where the gossip

24  came from.  It's only material to know that it was

25  immediately at hand for Dr. Frisch when he wrote a note

1    on the 3rd of March.  Keep in mind, this is now the 3rd
2    of March.  It was conveniently at hand, but had not
3    triggered any particular serious inquiry, at least
4    serious enough to be remembered by any of the deponents
5    so far, and not serious enough to have resulted in
6    limitations on Dr. Hetzel's privileges.
7    Q.    Which deponents are you talking about?
8    A.    Dr. Hetzel.  He's the one I'm focusing on.
9    Q.    You -- you think he didn't remember those cases?
10   A.    No, no.  I think he -- I think he remembered them.
11   He did not regard them as somehow being the kinds of
12   cases that would be talked about in the same sense as
13   the index patient.  He thought they were history.  He
14   corrected the timing on them.  I don't believe he
15   thought they were unimportant.  I think he just noted
16   that they were in the past, and nothing had to come of
17   them.
18   Q.    You've mentioned on at least a dozen occasions that
19   Dr. Buell had a conflict of interest with respect to
20   what he is assumed to have said about the index surgery.
21   Does it not occur to you that Dr. Hetzel has a conflict
22   of interest with respect to what he says in this case?
23            MS. BEIGHTOL:  Objection to the form.
24            THE WITNESS:  Well, of course he does.  All
25   of -- all of the participants in these matters have

1   their own points of view.  And if Dr. Hetzel had

2   appeared in Dr. Frisch's office and said Dr. Buell

3   should be subject -- that Buell should be subject to

4   precautionary suspension, I would feel the same about --

5   about that uneven playing field.  The point is not that

6   Dr. Buell or Dr. Hetzel is either at fault or not at

7   fault.  I'm not testifying about that.  The point is

8   that when you have a set of bylaws that are meant to be

9   guardrails for the conduct of highly intelligent people,

10  all of whom have resources, all of whom have great

11  stakes, if you will, in the business of having

12  privileges in a prestigious hospital, when you're in

13  that kind of setting, you have to respect a level

14  playing field.  And a level playing field is not where

15  one of the protagonists gets to give his point of view

16  to the detriment and the -- the cost of the other

17  protagonist.

18  BY MR. HAWISHER:

19  Q.   Could you pass me the tablet, please?  So I'm going

20  to turn to Page 52 of the same exhibit.  Here you are.

21  And this is from the medical executive committee minutes

22  of June 5th.

23       And -- and I remember you describing this as an

24  exoneration of Dr. Hetzel, but they expressed concern

25  about his surgical performance, didn't they?

1  A.   I --
2           MS. BEIGHTOL:  Objection to the form of the
3  question.
4           THE WITNESS:  I did something here.
5  BY MR. HAWISHER:
6  Q.   That's all right.  If you want to pass it back, I
7  can --
8  A.   Ah, got it now.
9  Q.   Okay.
10  A.   Your -- and your question was they expressed
11  concern?
12  Q.   About his surgical performance, yes.
13  A.   Well, they expressed concern in their actions.
14  They want him to be subject to a -- an FPPE, to have
15  proctoring, and to have some letter of guidance or
16  counsel, whatever that means, as part of the
17  precautionary suspension.  So yes, they have -- they
18  have enough concerns.  This is what they did.
19  Q.   Okay.  So this is not really an exoneration of Dr.
20  Hetzel, is it?
21           MS. BEIGHTOL:  Objection to the form of the
22  question.
23           THE WITNESS:  No.  No, it's not.  And in
24  the -- in the sense that it puts him back exactly in the
25  position he would've been in prior to the precautionary

1   suspension.

2   BY MR. HAWISHER:

3   Q.   Did you say you had reviewed the fitness-for-duty

4   evaluations that were -- the actual reports from the

5   evaluators?

6   A.   No, I didn't.

7   Q.   Okay.  Were you provided those to review and chose

8   not to?

9   A.   I think so.  Yes.

10  Q.   Okay.  Any reason for that?

11  A.   Respect to privacy of another individual.  It's not

12  material to my question, primarily because I saw it as

13  yet one more brick to throw in Dr. Hetzel's direction

14  on -- on the way out the door.  If these folks had been

15  seriously interested in fitness-to-practice, they

16  would've done something separately.  The Joint

17  Commission standard under the medical staff is to keep

18  mental and physical health separate from disciplinary

19  activity, and they would not have conflated the two.

20  And so I have to regard the fitness to serve inquiry as

21  being in part mischief.  Then the second part of my

22  opinion is that fitness-to-serve need not be your

23  medical staff.  The North Carolina Medical Board has an

24  entire fitness-to-serve service in which they make

25  individuals available for physicians.  Keep in mind

1   their -- their constituency is the physician, so they --

2   they have an entire program set up that avoids conflict

3   of interest, unnecessary embarrassment, invasion of

4   privacy, the usual things that follow when a cloud is

5   cast over the fitness of a practitioner.

6   Q.   Okay.  With respect to the separation of the

7   fitness-for-duty evaluations and the precautionary

8   suspension, I'm not sure I understand that.  Because

9   it -- it seems to me, like, if you have concerns that a

10  physician may not be medically capable of performing a

11  safe surgery, you would want to impose a precautionary

12  suspension until you find out whether that's the case,

13  right?

14  A.   No.  Here's -- here's the theory in the background,

15  because it's an interesting area, and I'm -- I'm glad

16  you have an interest in that.  The -- the whole business

17  of the compromised physician is relatively new.  It's --

18  I would say at the beginning of the turn of the century,

19  we saw an awful lot of information about physicians who

20  were burnt out, who were victims of alcohol, drug abuse,

21  and mental illness.  Had physical handicaps.  We're all

22  living longer than perhaps evolution intended us to, and

23  so we have physical disabilities and so forth.  All of

24  this has been incorporated by organized medicine into

25  physician assistant programs.  And physician assistant

1  programs exist for the very purpose we're talking about

2  here, that is that neither you nor I want our colleagues

3  and our workmates, if you will, to be knowledgeable

4  about anything that's happening with our physical or

5  mental disabilities.  And that's why the -- I mentioned

6  the Federation of State Medical Boards.  North Carolina

7  has a very robust program.  There's a place to send

8  people if you have doubts about their mental or physical

9  capacity.  That's different from discipline.  Discipline

10 is, you did something wrong, and we have to take

11 something away from you.

12     So the idea of, on -- one, on the same hand, not

13 throwing physicians away, because goodness knows they --

14 they cost a lot to produce, and trying to preserve what

15 they have to offer versus discipline that says,

16 basically, this is a bad doctor.  I wouldn't trust him

17 or her.  We have to do something to limit what they're

18 doing.  You see what I'm saying?  So there are really

19 two different -- two different tracks here.  And I'm

20 sure leaders of this medical staff know better than what

21 they did, which was the -- the fitness for duty, so to

22 speak, brick thrown after Dr. Hetzel.

23 Q.  Well, so I -- I -- I think I see what you're

24 saying.  But it seems to me like the tracks are one,

25 ensuring safe care, and then two, is disciplinary code

1  of conduct type stuff, right?

2  A.    Yeah.  No, it turns out that's not -- that's not

3  quite the way it works.  The medical staff implements a

4  process to identify and manage matters of individual

5  health for licensed independent practitioners which is

6  separate from actions taken for disciplinary purposes.

7  And the reason they're doing this, this is not the

8  American Patients Association.  This is the American

9  Medical Association, and the American College of

10  Surgeons, and the American Hospital Association, and

11  this is what they think they want to do with regard to

12  the physician who may be compromised by physical or

13  mental health.  They want to keep it out of the

14  disciplinary tact.

15      Now, you're asking on behalf of patients.  Well,

16  wouldn't it make sense to have all of these things

17  grouped over here?  And the answer is, apparently,

18  nobody really thinks that's the right thing to do

19  because there are so many different skills involved.

20  For example, if you've got -- I -- I found myself once

21  sharing a statewide gubernatorial confab on alcohol and

22  drug abuse.  If you've got alcohol and drug abuse

23  problems in your -- in your attorneys, in your -- in

24  your doctors, the -- the -- the skills that you need,

25  frankly, are not the skills that ordinarily come from

1    the credentials committee examining evidence and

2    consulting practitioners, and coming up with a

3    conclusion.  They're rather the skills you need in

4    treatment.  And if you see these things as being

5    treatment, rehabilitative, addiction, occupational

6    therapy, that's -- that's the bucket that goes in the

7    direction of preserving physician manpower, woman power.

8    Q.   So what -- what I'm -- I -- I -- I appreciate all

9    of that.  But what I'm trying to get at is, it seems --

10   disciplinary, to me, sounds like code of conduct and not

11   like anything that could affect a physician's

12   privileges.

13        It sounds like you disagree?

14             MS. BEIGHTOL:  Objection to the form of the

15   question.

16             THE WITNESS:  You could have limitations,

17   which will be incorporated in privileges.  Not, however,

18   because they are part of a punitive regimen.  You could

19   imagine a -- a substance abuse, for example, regimen run

20   by, for example, a -- a medical board or a -- a state

21   professional society.  And all of that takes place off

22   campus, so to speak.  It's not really part of what

23   happens day in and day out in the hospital.  Is that

24   person safe for patient care?  That's really something

25   which the professionals in the treatment area can -- can

1  figure out.  Does that person need to be punished for

2  something that he or she has done?  That's a different

3  question.

4  BY MR. HAWISHER:

5  Q.   Okay.  So it's -- when you say punishment or

6  punished, it sounds to me like a quote, "interim step to

7  protect patients would not be punishment," but something

8  else?

9  A.   Well, it's definitely punishment.  I mean, that's

10  the -- the -- the threat of the National Practitioner

11  Data Bank for every practicing physician is that it

12  would be a continuing source of punishment as your --

13  the findings, whatever those findings are, are brought

14  up over, and over, and over again, as different

15  prospective employers look at your -- your track record.

16  So it -- it is punishment.  I mean, that's the -- that's

17  the right word.  It's not therapy.  It's not going to

18  make Dr. Hetzel a -- a better surgeon.  It's going to

19  keep him limited in terms of what he can do.

20  Q.   So is it your testimony then that if, for example,

21  a surgeon shows up intoxicated to perform a surgery, it

22  would be a violation of standard MS 11.1.1 to consider

23  that as part of a precautionary suspension, or something

24  like that?

25  A.   Well, it's -- it's a fine question.  I've had

1  surgeons show up intoxicated.  I remember having a call
2  one night about a surgeon who had passed out on the lawn
3  of the hospital I was running.  Nothing happened to him
4  by way of either realization or punishment, and he died
5  not very long thereafter from his disease.  But having
6  said that -- that was a digression, I'm sorry.  Having
7  said that, you could imagine any number of crossover
8  questions.  And people are -- people are fulfilling
9  different responsibilities along those two tracks.  The
10 treatment people are fulfilling treatment
11 responsibilities.  The supervision, regulatory, medical
12 staff people are fulfilling their responsibilities.
13 Both are -- are necessary if we are not to be throwing
14 physicians willy-nilly out the window and at the same
15 time protecting patients.
16 Q.   Okay.  So in -- in the scenario where somebody is
17 alleged to have performed a surgery while intoxicated or
18 attempted to, is the -- is it okay for the credentials
19 committee to request some sort of evaluation of whether
20 he has a substance use disorder as part of deciding
21 whether to allow him to continue to exercise his
22 privileges?
23         MS. BEIGHTOL:  Objection to form of the
24 question.
25         THE WITNESS:  Yeah.  No, it's a -- it's a

1  complex area, and I don't believe there are simple,

2  straightforward answers.  If there were, I would -- I

3  would offer one.  You're correct in noting that what is

4  a professional problem can become a patient problem.

5  BY MR. HAWISHER:

6  Q.  On -- let's see.

7       MR. HAWISHER:  How long have we been on the

8  record this time?  Most recently, I mean?

9       THE VIDEOGRAPHER:  This -- this one has been

10  one hour, 20 minutes.

11       MR. HAWISHER:  Okay.  So do we need to take a

12  quick pause?

13       THE VIDEOGRAPHER:  We can.

14       MR. HAWISHER:  Okay.  Let's do that.

15       MS. BEIGHTOL:  Yeah, I have some --

16       THE VIDEOGRAPHER:  The time is 4:01 p.m.

17  We're going off the record.

18     (A recess was taken.)

19       THE VIDEOGRAPHER:  The time is 4:09 p.m.

20  We're going back on the record.

21  BY MR. HAWISHER:

22  Q.  All right.  Dr. Hyde, as of October 27th, 2021,

23  Mission Hospital submitted a correction report, correct?

24  A.  Yes.

25  Q.  Okay.  When Mission Hospital submitted a correction

1  report, what happened to the previous report, the May

2  4th, 2020, report?

3  A.   I -- I believe it -- it stayed there and was

4  accompanied by the corrected report, but it might have

5  taken the place.  I've frankly forgotten exactly what

6  happened.

7  Q.   Okay.  If the guidebook says that the previous

8  report is removed and querying entities that have

9  received it are directed to destroy it, do you have any

10  reason to disagree with that?

11          MS. BEIGHTOL:  Objection to the form.

12          THE WITNESS:  The guidebook -- hold on a

13  second.  I -- I was just looking at that a couple of

14  minutes ago.  I am looking at my excerpted pages from

15  the guidebook and it says, "correction report is used to

16  correct an error, whereas a revision to action report is

17  used to submit an action."  And it says, "The correction

18  report negates and replaces the current version of the

19  report."  So the answer to your question would be if

20  they submitted a correction report, it would negate and

21  replace the copy that was on file.

22  BY MR. HAWISHER:

23  Q.   Okay.  So as of October 27th, 2021, the NPDB

24  stopped sending out the May 20 -- the -- the May 4th,

25  2020, report, and they sent out the correction report

1    instead?

2              MS. BEIGHTOL:  Objection.

3              THE WITNESS:  I don't recall offhand.

4    BY MR. HAWISHER:

5    Q.   What aspect of that do you not recall offhand?

6    A.   I don't recall their indicating what report they

7    sent out.  I assume if they had the correction report,

8    that's what they would send out, but I just don't recall

9    as a fact.

10   Q.   Do you have any reason to believe that that is not

11   how they handled the panel proceeding?

12   A.   No.

13   Q.   Okay.  How many NPDB reports have you submitted or

14   been in -- been involved in submitting?

15   A.   I've never submitted one.  I've never been

16   associated with a hospital where we had a physician who

17   was so far off the standard that I thought we should

18   submit an NPDB report.  Moreover, and this is not

19   unrelated, I've tried to make a habit in the management

20   jobs I've had, of staying out of the medical staff's

21   arena.  And so the answer is none.  And for a reason

22   that I regard as good reasons, namely, I've been

23   fortunate not to have physicians who I thought warranted

24   that.  But more importantly, I've essentially left the

25   medical staff to do the medical staff disciplinary

 1  matters, which would include reporting to the NPDB.

 2  Q.   So are you saying that during your time overseeing

 3  hospitals, they may have reported physicians to the

 4  NPDB, but if so, you were not involved in it?

 5  A.   No, I'm not --

 6          MS. BEIGHTOL:  Objection.

 7          THE WITNESS:  -- aware of any who were -- were

 8  involved.  I'm saying there's a -- there's a twofold

 9  reason why I have no direct reporting record.  One is

10  that I've been fortunate enough not to have physicians

11  who I thought were NPDB material and, two, as I've

12  stayed out of it anyway, leaving it to the medical

13  staff.

14  BY MR. HAWISHER:

15  Q.   What sources of -- what is the nature of your

16  experience with the NPDB then?

17  A.   Well, when I was first running a hospital in 1987,

18  the HCQIA, which created the NPDB, had just been

19  created, had just been passed.  And both the hospital I

20  was running and the network of hospitals, the 17

21  hospitals in an outfit called the Northeast Hospital

22  Network, tried to keep an eye on changing legislative

23  requirements.  And we would do what you would expect of

24  trade associations.  We'd have discussions.  We'd share

25  information.  Sometimes put on programs, but not on this

1  subject.  And in the business of running a hospital at
2  the time, it was my job to make sure that we had
3  policies and procedures.  The medical staff was alerted.
4  They had their bylaws up for amendment.  We had the
5  medical staff office involved.  So in other words, it
6  was the inauguration and initiation of new federal
7  requirements and legislation.  I haven't been in the
8  same position since -- that was 1994.  And then in 2000
9  to 2002, I had to recreate a hospital policy completely
10 from scratch that would have included medical staff
11 bylaws.  So that would've been my -- my interaction with
12 matters NPDB is as the chief executive, having some
13 responsibility for the incorporation and inclusion of
14 reporting methods into hospital documents.
15 Q.   So when you say, for example, that the HCQIA was
16 not intended to override hospital bylaws, what is the --
17 what experience do you have related to that question?
18 A.   Well, of course, in the intervening 39 years, had a
19 lot of exposure to NPDB matters.  Some of which I've
20 shared with you today.  The NPDB is it -- is it worth
21 fighting for your record?  Some of which are new to me
22 and the result of this -- this endeavor.  Sham peer
23 review, that's a -- a familiar concept.  Not that peer
24 article, but that concept.  And it's one of significant
25 interest to organized medicine.  So my job as a hospital

1   executive would be to make sure that my hospitals were

2   incorporating what they needed to in terms of their

3   medical staff governance and their medical staff

4   management to implement the NPDB.

5        Now, in my classes, which I've been teaching now

6   since 2003 continuously, and I teach a course in

7   hospital operations at a graduate school for young

8   executives in this field, these are all relevant subject

9   matters.  The -- the NPDB, the business of

10  accreditation, the standards, the rules and regulations

11  of the states, the role of organized medicine, all of

12  this is material which we review and go over, because

13  otherwise, my students are going to go unarmed into

14  the -- into the future.  So it's a combination of

15  managing the incorporation of NPDB into a hospital

16  activity and parenthetically teaching, although it's not

17  a major subject in my course.

18  Q.   Do you have any course materials or syllabus,

19  anything like that, that identifies what you teach your

20  students?

21  A.   Sure.  Yeah.  No, I can -- I can provide that.

22  Q.   What, if anything, do you tell your students about

23  precautionary suspensions?

24  A.   About?

25  Q.   Precautionary suspensions?

1  A.   Oh, we -- I don't deal with that subject,

2  specifically.  We talk with the NPDB and it's sanctions

3  and so forth, but I don't recall ever encountering that

4  in my -- in my classroom.  I do tell my students, in

5  case you're looking for an aphorism that characterizes

6  my -- my theories, that there is no patient safety

7  problem, none, which is not, at its bottom, a problem of

8  money.

9  Q.   What do you mean by that?

10 A.   Well, in this case, it has to do with the loss of

11 Dr. Hetzel's services at the Mission Hospital changing

12 feelings, which he detected about him, and shots that

13 were taken in his direction as a result.  Then there's

14 the question of who's going to be responsible for the

15 index patient?  That may be also a matter of money.  And

16 finally, why did 300 doctors leave this hospital?

17 That's definitely a matter of money, as Professor Hall

18 studied it, it's essentially the serial and dramatic

19 erosion of appropriate staffing, which alienated

20 physicians who were looking for the staff to take care

21 of their patients and seemed to be powerless to

22 influence the executive decision.  So money is -- is

23 here, everywhere in a patient safety matter, even though

24 it's not obvious or even the most important issue, but

25 it's always there.

1  Q.   Do you intend to offer in this case any opinions
2  related to, for example, HCA failing to adequately staff
3  Mission Hospital?
4  A.   Well, I'm not interested in HCA because I -- I
5  think I'm interested in Mission Hospital.  If I'm asked
6  why 300 doctors left Mission Hospital, my answer would
7  be their disappointment in the dramatically changing
8  staffing patterns, and therefore, the services offered
9  to patients.  Why would someone ask me that?  It's
10 pertinent to the context of trust between physicians
11 and -- and managers, especially when they don't work for
12 the same employer when the physician is independent or
13 relatively independent.  But I don't anticipate offering
14 any testimony that is along those lines, but I would
15 respond more or less as I -- as I just did.
16 Q.   And what would be the basis for your assertion
17 that -- your assertions about the reasons physicians
18 left Mission Hospital?
19 A.   Mission is fortunate, or unfortunate, enough to
20 have attracted the attention of a leading national
21 researcher and Professor Mark Hall, at the Wake Forest
22 University.  He spent quite a bit of time between 2019
23 and 2025, studying the Mission acquisition or sale, and
24 appears to have -- from what I see, he is a member of
25 the National Academy of Medicine.  Appears to have

1  enough horsepower to have done responsible the job in
2  studying the very issue we were talking about.  He
3  chronicles between roughly 2017 and 2024, a dramatic
4  decline in the staffing ratios, which he shows, and a
5  dramatic increase in the profitability.  And if you
6  don't -- if you're not immune to or blind to these
7  issues, you'd recognize, and many of the doctors do,
8  that those two are related.  That the way that you make
9  money in the hospital field today is by understaffing.
10  And when you have understaffing, you have patient needs
11  that are not being met and you have patient needs not
12  being met, you have unhappy doctors.  If the doctors are
13  good, and historically, the Mission Hospital doctors
14  have been very good, then you have opportunities to go
15  to other hospitals.  If you go to other hospitals, you
16  will attract the enmity of those who are responsible for
17  Mission and possibly obstacles thrown your way.  That's
18  just hypothetical.
19      But the basis is the 178-page report, which was
20  final, from Professor Hall, final in January of this
21  year.  And, not parenthetically, the contentions of the
22  former and current attorneys general who have sued to
23  attempt to stop what they see as the erosion of
24  emergency, oncology, and other services at Mission
25  Hospital.

 1  Q.   Okay.  What does your report in this case say about

 2  those subjects?

 3  A.   Very little.  It -- it basically alludes to them

 4  because I -- I -- I don't -- you know, you can make a

 5  circus out of these things by going off in subjects that

 6  are not easily demonstrated.  And what I say about it

 7  comes up in the -- my comments about the motivation, if

 8  you will.  I've -- I've made some comments about --

 9  about motivation.  The motivation Dr. Hetzel's due

10  process protection guaranteed by the bylaws were

11  violated.  Why is that?  And moving to a new

12  jurisdiction, maintenance continues to damage him.

13       That's not what I'm looking for.  I'm looking

14  for -- well, I note on Page 3 that, my opinion, there's

15  no legitimate that is patient safety basis for

16  maintaining the report on Dr. Hetzel with the NPDB, but

17  I don't directly join the -- the financial issue.

18           MS. BEIGHTOL:  If I may.  I'm happy to help

19  if --

20           MR. HAWISHER:  Yeah, sure.

21           MS. BEIGHTOL:  Dr. Hyde, look at the bottom of

22  Page 6.  I know it's been a long day.  I just did a find

23  search.

24           THE WITNESS:  Oh, yes.

25           MS. BEIGHTOL:  Yeah.

1          THE WITNESS:  Motivated by financial.

2          MS. BEIGHTOL:  I just didn't want to waste

3    time.

4          THE WITNESS:  Yes.  Or other considerations

5    unrelated to legitimate patient safety concerns.  And

6    then I footnote Dr. Hetzel in his deposition noting the

7    targeting of his practice for economic reason.  So it's

8    a -- as I say, it's a -- it's an important issue in

9    terms of context.  It's very important in terms of what

10   I do as a -- as a teacher or as a consultant.  Whether

11   it's important in your case would have to be up to both

12   of you of what you want to do with that information.

13   But.

14   BY MR. HAWISHER:

15   Q.   I -- I'm sorry, what are you saying is the

16   connection between what's on Page 6 of your report and

17   this Hall -- this Mark Hall analysis?

18   A.   The -- the comment at the bottom, footnote 17, that

19   essentially indicates that there's a financial

20   motivation.

21   Q.   Okay.  So Dr. Hetzel notes the possibility of

22   targeting of his practice for economic reasons in his

23   letter of April 17?

24   A.   Yes.

25   Q.   Okay.  Are you saying that his practice was

1  targeted for economic reasons?

2  A.   No.

3  Q.   Okay.

4  A.   I'm saying that his practice was targeted for

5  whatever reasons, but that the -- no, I'm not saying

6  that his practice was targeted for economic reasons.

7  It's the motivation of the punitive sanction in the form

8  of this precautionary suspension that he thinks, and I

9  think, would be reasonably related to issues that are

10  not patient safety issues, whatever they were.

11  Q.   Okay.  And -- and so the Hall report is connected

12  because the Hall report describes issues that are not

13  patient safety issues, and you think there are issues

14  that are not patient safety issues involved in this

15  case, and that's the connection?

16  A.   The Hall report indicates the exodus of some 300

17  physicians and explains why they've left.  That's the

18  only relevance.

19  Q.   Okay.  Is the exodus of 300 physicians mentioned

20  anywhere in your report?

21  A.   No.

22         MS. BEIGHTOL:  Objection.

23  BY MR. HAWISHER:

24  Q.   And I -- I am not trying to sound like I'm berating

25  you, Doctor, but this is the first time I've had any

1   indication that the Hall report was going to have

2   anything to do with your testimony in this case.

3   A.    Right.

4   Q.    So my question for you is, is this something you

5   intend to rely on at trial?

6   A.    If I'm asked a question about why the doctors were

7   disillusioned with Mission Hospital, that would be my

8   answer.

9   Q.    Okay.  Is the proposition that -- that physicians

10  have been disillusioned with Mission Hospital going to

11  be something you rely on at trial?

12          MS. BEIGHTOL:  Objection to the form of the

13  question.

14          THE WITNESS:  I don't think I've been opaque

15  about my views concerning the position of Mission

16  Hospital, the controversy involving the state, the role

17  of the medical staff, or the remaining medical staff.  I

18  think that all of these are part of the context that the

19  average jurist or juror might understand.  Why is there

20  such a -- such an animus or disconnect between the

21  management and the medical staff?  There is never --

22  it's never -- it's never without some kind of

23  explanation.  My explanation is a very simple one, and

24  that is that everybody's been looking at, and Professor

25  Hall has especially been looking at, what drove the

1  doctors away.

2  BY MR. HAWISHER:

3  Q.   Okay.  So why is this not mentioned in your report

4  somewhere?

5          MS. BEIGHTOL:  Objection.  Misstatement of his

6  testimony.

7          THE WITNESS:  Yeah.  It's -- it's not -- it

8  was not part of my report.  Now it's part of my

9  testimony, apparently.

10         MR. HAWISHER:  Okay.  So Kristen, I think

11  we're going to need to hold his deposition open to

12  explore this further because this is completely new.

13         MS. BEIGHTOL:  This is a matter that we're

14  going to have to discuss.  I'm not going to agree to

15  that, but we'll have to discuss parameters of that,

16  whether we're going to agree to it, and also, whether we

17  need court intervention to determine that.

18         MR. HAWISHER:  Okay.  That's fine with me.

19         MS. BEIGHTOL:  But we are not -- just to be

20  clear for the record, we are not agreeing to you holding

21  it open.  We are objecting at this time until such time

22  as we have further conferral on this matter, and

23  understand your full position as well as any parameters

24  recommended in making any agreement, if one can be made.

25  But again, as it stands at this moment, we object to

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

```
 1   that.
 2            MR. HAWISHER:  Okay.
 3            MS. BEIGHTOL:  But we'll confer further and
 4   determine whether that's an insurmountable issue or not.
 5   BY MR. HAWISHER:
 6   Q.   All right.  Dr. Hyde, I'm going to pass you Exhibit
 7   2, again.  We're towards the end of that exhibit.  Well,
 8   not that far down.  Yeah.  We're -- we're around Page
 9   19.
10        Do you recognize this letter?
11   A.   Yes.
12   Q.   Okay.  This is something you reviewed to -- as --
13   as part of your review of this case?
14   A.   I did.  I'd forgotten the signatory's name, but
15   I -- I do remember it.
16   Q.   Okay.  So if you will scroll down to Page 20, if
17   you're not already there, there's a numbered list of the
18   points that Dr. Hetzel raised with the NPDB in -- in
19   disputing the report; do you see that?
20   A.   Page 20?
21   Q.   Yes.
22   A.   I've only got seven pages here.
23   Q.   Okay.  So if you're looking at the header, it's
24   Page 2 of 7.  Of the PDF, it's Page 20.
25   A.   Okay.
```

1              MS. BEIGHTOL:  Isn't that in his paper draft?

2              MR. HAWISHER:  It may be.  I've not seen it.

3              MS. BEIGHTOL:  Yeah, it is.  It's in your --

4    give me a second.  I'll hand it to him because it --

5    it -- it's very hard to read in general, the way the

6    report is, and it's even harder to read if you're

7    looking at it on a screen.

8              MR. HAWISHER:  Yeah, that's fine.

9              MS. BEIGHTOL:  At least it would be for me.

10             MR. HAWISHER:  This -- this -- this is not the

11   NPDB report.  This is the letter.

12             MS. BEIGHTOL:  Oh, you're talking about his

13   letter?

14             MR. HAWISHER:  From Carolyn -- I'm not going

15   to try the last name.

16             MS. BEIGHTOL:  But you mean the letter from

17   his counsel?

18             MR. HAWISHER:  No, no, no.  The letter dated

19   December 22nd, 2021.

20             MS. BEIGHTOL:  Oh, yeah.  Here you go.

21             Is this what you're talking about?

22             MR. HAWISHER:  Yes.  Thank you.

23             THE WITNESS:  Okay.

24   BY MR. HAWISHER:

25   Q.   So on the second page of that letter, there is a

1  list of dispute points that Dr. Hetzel raised; do you

2  see that?

3  A.   Yes.

4  Q.   Okay.  And -- and point 2 was "the initial

5  precautionary suspension was not reportable according to

6  the hospital's bylaws."  Right?

7  A.   Correct.

8  Q.   So if you want to turn to Page 4 of that letter.

9  Let's see.  In the final paragraph on that page --

10  excuse me, the -- yes.  The -- well, first, let's look

11  at the second to last paragraph on that page.  The --

12  the one that begins, in your first dispute point."  Do

13  you see that one?

14  A.   Yes.

15  Q.   Okay.  It's a -- it concludes, "Precautionary

16  suspensions are reportable if they last more than 30

17  days.  They do not have to be the result of the final"

18  suspension -- "final decision."  Do you see that?

19  A.   I do.

20  Q.   Do you agree with that?

21  A.   It's not the bylaws of the -- of the hospital.

22  It's certainly the interpretation of the agency.

23  Q.   Okay.  Do you agree or disagree with the

24  interpretation of the agency?

25  A.   Well, the -- the interpreter basically presumes

1   that she knows what a precautionary suspension is, that

2   is that it's not a final action.  She also presumes that

3   there is some information behind the precautionary

4   suspension, and I believe that's not correct.  So I

5   disagree with her conclusion, primarily because I

6   disagree with the premises.

7   Q.   Okay.  Do you also disagree with her premise that

8   Dr. Hetzel's precautionary suspension lasted from March

9   25th, 2020, to June 9th, 2020?

10  A.   Do I also disagree with her -- I'm sorry, I missed

11  part of it.

12  Q.   Do you also disagree with her premise that Dr.

13  Hetzel's precautionary suspension that lasted from March

14  25th, 2020, to June 9th, 2020?

15  A.   Oh, ye., absolutely.

16  Q.   Okay.  And we've already talked about your reasons

17  for disagreeing with her on that, right?

18  A.   Correct.  Right.

19  Q.   Okay.  Does it give you pause that the NPDB dispute

20  resolution manager disagrees with your opinion on this?

21  A.   Not really.  And I -- I mean no disrespect to

22  federal officials generally, but I have students who

23  become federal officials and students who become

24  hospital managers, and they don't always agree on what

25  it is they're -- they're looking at.  I don't expect the

1  NPDB, as I testified earlier, to work this out for the
2  hospital.  I don't expect them to say that, as they --
3  as she says here, "the" DPDB (sic) "does not examine our
4  reporting.  It uses bylaws, how practitioners are
5  disciplined, or how they're afforded due process.  All
6  such concerns must be resolved between the subject of
7  report and the reporting entity."  She's essentially
8  saying, irrespective of HCQIA, and the NPDB, and my
9  office, and everything else you've been through, we
10  don't do this.  It's up to the reporting entity to
11  figure out how to use its bylaws, how practitioners are
12  disciplined, and how they're afforded due process.  And
13  I think that's exactly my understanding of the NPDB, and
14  I think it's what Mr. Illich, in his own way, was trying
15  to get at, which is we don't figure these things out for
16  you.  You have to figure them out at the institutional
17  that is reporting, level.
18  Q.  Okay.  So in the preceding paragraph, the long one
19  that starts, "The hospital documents state."  Do you see
20  the paragraph I'm talking about?
21  A.  Yes.  Yes.
22  Q.  Do you see the sentence towards the end that says,
23  "Based on the record and per the regulations, the
24  hospital was legally required to submit the report"?
25  A.  That's her understanding, yes.

1   Q.   Okay.  And so do you also disagree with that
2   conclusion?
3   A.   I don't think there was a 30-day period.  I don't
4   think it was properly submitted in the first place, and
5   so I disagree with her representation in this paragraph.
6   And I think the fact that she is stating this is in
7   diametric opposition to what she says footnoted to her
8   own guidebook below, that they don't examine how the
9   reporting entity uses bylaws, how a practitioner will be
10  disciplined, or how they're afforded due process.
11  That's exactly what she's doing in this paragraph is
12  figuring out code of conduct, concerns raised about
13  this, concern about that, following initial review,
14  blah, blah, blah.  She's attempting to do the job that
15  would be done in the ordinary course of events by the
16  medical staff executive committee, and credentials
17  committee, and the medical staff liaison to the
18  management.  So I don't -- I don't accept what she says
19  in this paragraph and parenthetically, apparently
20  neither does she.
21  Q.   So it -- it is your position that the role of the
22  Dispute Resolution Branch is not to determine whether
23  the action was required to be reported?
24  A.   It's -- it's my opinion that she has exactly
25  outlined what it is that they do.  They don't examine

1   how the entity uses its bylaws.  That's number one.

2   They don't examine how practitioners are disciplined.

3   That's number two.  And they don't examine due process.

4   What they do is essentially take in information and hold

5   it, and then disclose it on request.

6   Q.   The Dispute Resolution Branch does determine

7   whether an action was properly reported and whether the

8   report was correct, don't they?

9           MS. BEIGHTOL:  Objection.

10          THE WITNESS:  She doesn't -- she says that

11  they don't.

12  BY MR. HAWISHER:

13  Q.   Where does she say that?

14  A.   She says that they don't examine how a reporting

15  entity uses bylaws, how practitioners are disciplined,

16  or how they're afforded due process.

17  Q.   What does any of those things have to do with

18  whether the report was properly submitted and whether it

19  was factually correct?

20  A.   Oh, you're asking a different question.  I'm sorry.

21  You're asking has she determined that in fact the entity

22  has followed what they believe to be the guidance, which

23  is their own book, their --

24  Q.   Yes.

25  A.   -- their 2018 book.  And she says, yes, I -- I

1  think the hospital followed our book.

2  Q.   Yes.

3  A.   Now what?

4  Q.   Do you disagree with that conclusion first?

5  A.   I don't -- I don't disagree with the conclusion

6  that the hospital followed the book.  The question is,

7  did the hospital apply its own criteria for making a

8  report in an even-handed or informed manner?  And the

9  answer is no, and she won't figure that out.  They won't

10  figure that out.

11  Q.   That -- that's fine.  I wasn't trying to get at

12  that.

13  A.   Okay.

14  Q.   I don't care about that.  If you will go to Page 5,

15  the second to last paragraph, the one that begins, "In

16  your seventh dispute," I think this addresses some of

17  the things we were talking about earlier with respect to

18  the difference between final and non-final actions.  Can

19  you read through that paragraph and let me know when

20  you're done?

21  A.   I did, yes.

22  Q.   Okay.  So to me, it looks like the data bank is

23  expressing the view that they do not care if an action

24  is final or not, but it must be reported if it lasts

25  more than 30 days.

1  A.    Right.

2  Q.    Do you agree or disagree with that interpretation?

3            MS. BEIGHTOL:  Objection.

4            THE WITNESS:  I -- I disagree with the fact

5  that they think it's been longer than 30 days.  There

6  were multiple modifications of the suspension along the

7  way, no one of which took more than 30 days.  But having

8  said that, she's doing exactly in this paragraph what

9  she said she would not do.  She's interpreting a

10  precautionary suspension.  That's a term out of the

11  bylaws, amongst other places, of Mission Hospital.  "Is

12  reported before a final result of professional action."

13  She is not reporting that, in fact, it's not even a

14  final -- what's the phrase here -- a -- a final

15  professional review action that is reportable.  She's

16  not dealing with that at all.  She's dealing with, in

17  the seventh -- precautionary -- let's see -- reported

18  because a serious question has been raised.  What --

19  what the heck is that?  A serious question has been

20  raised?  Is that out of the HCQIA statute?

21  BY MR. HAWISHER:

22  Q.    That's the question I've --

23  A.    Is that out of the bylaws?  And so she concludes

24  about when a precautionary suspension must be reported,

25  having done the very thing that she said she's not going

1   to do, which is to interpret how the institution is

2   using its own bylaws in the development of reports, how

3   they are providing some kind of due process, and whether

4   or not the -- whether or not the -- how the -- how the

5   practitioners are disciplined.  So --

6   Q.   Okay.  So I'm going to offer you an alternative

7   interpretation here, and I want to just get your take on

8   it because right now, it -- it seems to be your view

9   that everybody in the world but you is just wrong on

10  this issue.

11          MS. BEIGHTOL:  Objection to the form of the

12  question, and the mischaracterization, and the

13  harassment of this witness and the -- at this hour, it's

14  not appropriate on any -- on any page.

15       But you can answer whatever question he's going to

16  pose.

17  BY MR. HAWISHER:

18  Q.   The interpretation I'm going to offer you is that

19  the data -- is that the data bank believes that bylaws

20  are just irrelevant to whether something should be

21  reported or not.  They do not care what the bylaws say.

22  They care what the HCQIA and their guidebook says.

23  Under that interpretation, it seems to me it makes sense

24  to say, I -- I'm not going to review your bylaws.  I'm

25  going to tell you this is a precautionary suspension,

1   and therefore it must be reported.  It seems to me that

2   that is the interpretation they are adopting.

3       Do you disagree?

4   A.   I think what they're -- what they're saying is a

5   little bit different with an emphasis on what happens at

6   the institutional level.  They're not going to tell you

7   that you're entirely wrong in making this report.

8   They're not going to tell you that you're entirely wrong

9   in having no evidence behind this report.  They're only

10  going to say, if this is your report, you've determined

11  this is your report, and if it involves a period more

12  than 30 days, then we're going to regard that as a

13  reportable event.

14  Q.   What makes you think that that is the approach

15  they're adopting?

16  A.   Well, as you've said, and I think you're correct,

17  and as her letter indicates, they're not interpreting

18  what the definition of the initial event is.  They're

19  not interpreting -- let me find it again.  She says on

20  the bottom of -- of Page 4, "You claim the initial

21  precautionary suspicion was not reportable according to

22  the hospital's bylaws.  This dispute point is beyond the

23  scope of review."  In other words, it's not just that

24  they -- it's not just that they are ignoring the

25  hospital bylaws, they're indicating that it's something

1   they couldn't even consider.  So they don't know if the

2   hospital bylaws have been properly applied in the

3   determination of what a final professional review action

4   might be.

5   Q.   Yes.  I -- I -- I completely agree with that, and

6   that's, I think, the interpretation I offered to you,

7   which is they don't care what the bylaws say.

8         MS. BEIGHTOL:  Objection to the form of the

9   question.  Mischaracterization.

10        THE WITNESS:  They don't care -- okay.  If you

11  have a generous interpretation of they don't care, they

12  don't care if you have sent something which is

13  inaccurate without basis or foundation and, of course,

14  in violation of your bylaws.

15  BY MR. HAWISHER:

16  Q.   So let's talk about inaccurate.  Are you saying

17  they did not review the report for accuracy?

18        MS. BEIGHTOL:  Objection to the form.

19        THE WITNESS:  I'm saying that their

20  representation of a continuous period of suspension was

21  not accurate.  There was not a continuous period of

22  suspension without modification.  There were two periods

23  that were short of 30 days.

24  BY MR. HAWISHER:

25  Q.   What do you do for a living?

```
 1   A.   Well, I teach and have taught for 22 years in
 2   graduate programs with students who are going into
 3   careers in healthcare management, in healthcare finance,
 4   and in nursing as holders of a Doctor of Nursing
 5   Practice program.  I do consulting.  I have consulting
 6   clients who ask me to help them solve problems.  I have,
 7   as I mentioned in terms of physicians, right now, two
 8   clients that involve physicians and their questions.
 9   One is the American Federation of Teachers, which
10   notwithstanding its name, has a quarter million nurses
11   and hospitalists in its membership.  And I have
12   questions from them.  I -- I occupy a position they call
13   their national healthcare advisor.  And then I also have
14   an affiliate of the American Federation of Teachers, the
15   State University of New York's Union, called United
16   University Professions, which represents the faculty
17   members in all four of the SUNY Medical Schools.  I have
18   other consulting clients.  I have a union of 4,000
19   nurses in western New York.  In the last two years, I've
20   had attorneys general in the state of New York,
21   Washington, and New Jersey as clients.  In addition to
22   teaching and consulting, I do this kind of work as an
23   expert witness, and I've done it since 2004.
24   Q.   What proportion of your time is spent on expert
25   work versus consulting and teaching?
```

 1   A.   It will vary from year to year, but it's about

 2   half.  It also varies from semester to semester because,

 3   of course, when I'm -- when I'm teaching, that's a very

 4   time intensive activity.

 5   Q.   What proportion of your income is derived from

 6   expert work as opposed to consulting and teaching?

 7   A.   On average, over the years, about 50 percent of my

 8   income comes from expert witness work.

 9   Q.   Do you advertise your expert witness services at

10   all?

11   A.   No, I don't.

12   Q.   How -- how do people mostly find you for expert

13   work?

14   A.   Well, I assume it's word of mouth.  I don't do any

15   public speaking.  I have no website.  I -- I don't have

16   any brochures.  And as you brought out, I don't

17   advertise.  So I have to assume it's word of mouth.

18   Q.   Are the majority of the cases on which you work in

19   Connecticut, or are they Mission only?

20   A.   None of them are in Connecticut.  The cases on

21   which I work are everywhere.  I have one other North

22   Carolina case.  I have a number of Georgia, Florida,

23   Pennsylvania, Nevada, New Mexico, Oregon, Washington,

24   Hawaii cases.

25   Q.   As of the date you completed your report, I believe

1   you had invoiced $7,500, and you've been paid $7,500 for

2   your work on this case.  Do you know where the number is

3   now?

4   A.   That actually is not accurate.  I had been paid, or

5   have been paid, perhaps not by the report date, but I

6   have been paid 14,000 so far.  I have another 6,500 that

7   has not been billed, in terms of the number of hours

8   that I've put in to date.  So 14,000 already paid, 6,500

9   not yet billed.

10  Q.   And are the -- is either of those numbers including

11  the 5,000 we have paid for the deposition?

12  A.   No, sir.

13  Q.   Okay.  As we sit here today, is there anything that

14  you anticipate doing to further develop your opinions in

15  this case or to prepare for trial in any way?

16  A.   No, aside from reviewing my deposition.

17  Q.   Okay.  What prompted you to pull up the Hall

18  report, and the constitutionality of the NPDB article,

19  and -- and the things like that in preparation for

20  today?

21  A.   The defense expert in this area raised the question

22  of whether an NPDB black mark is fatal, continually

23  fatal, or a passing enterprise.  As a consequence, I --

24  I went looking for resources that I could -- that I

25  could cite that basically would say what the

1  consequences are.  I found this Law Review article,

2  which is very fascinating, very interesting.  And I had,

3  of course, been aware of -- of Mark Hall's project over

4  the years because it's been in -- in my field, a very

5  famous and notorious one.

6            MR. HAWISHER:  Could you pass me the tablet

7  please?

8  BY MR. HAWISHER:

9  Q.   As it relates to the consequences of an NPDB

10  report.

11  A.   Well, the -- the literature that I found is, first,

12  from Professor Van Tassel, with regard to the

13  constitutionality.  She's very eloquent.  She said it's

14  the first time the federal government has engaged in

15  blacklisting since the McCarthy era.  "Physicians are

16  blacklisted after being found to have provided poor

17  quality of care through a highly subjective and oft

18  times summary peer-review process conducted by private

19  hospitals."  I found myself nodding.  Then, I found this

20  article, quite aside from the Wake Forest stuff I found,

21  an article which helped answer the question of what's

22  the outcome?  And this is the Medscape article, which

23  I've given you a copy.  It basically says that a certain

24  percent of -- 14 percent of physician disputes resulted

25  in corrections, 10 percent resulted in reports being

1  removed.  But that leaves 76 percent, if you will, as

2  the likelihood that your report in, some form or

3  another, will stay there.  And then I found this editor

4  of this American Physicians -- Journal of American

5  Physicians and Surgeons talking about sham review and

6  the role of HCQIA in providing cover.  General

7  accounting office report that found that one-third of

8  the adverse action reports in the NPDB were inaccurate.

9  That's a -- sort of a thought-provoking number.  One-

10  third of the adverse action reports in the NPDB were

11  inaccurate.

12      So that's why I went looking for them, was to try

13  to find some substantiation for the proposition that

14  it's a -- it's a stain that is hard to remove, and that

15  has continuing consequences, and is subject to errors.

16  Not only hospital errors, but obviously, if the GAO says

17  a third of your -- of your information is inaccurate,

18  the reports have inaccurate information, that's a -- a

19  fairly important factor as well.  So it's bad

20  information that stays like ink in the well, hard to get

21  out, and may not be accurate.

22  Q.  How do you differentiate between the impact of the

23  NPDB report and the impact of the underlying facts?

24  A.  Impact of the underlying --

25  Q.  Facts.  So --

1  A.    Facts.

2  Q.    -- to give you -- to make it more concrete, in this

3  case, say that there was not a -- a report in the NPDB,

4  but Dr. Hetzel carried around a little card that said

5  everything that report number 1, the May 4th, 2020,

6  report said on it, and gave that to any prospective

7  credentialing entity --

8  A.    Uh-huh.

9  Q.    -- how do you differentiate that case from what

10 happened in reality?

11 A.    The NPDB report itself is such a black mark that I

12 rarely find it in hospitals that value their physicians.

13 Let me give you an example.  A good number of the cases

14 that I've encountered over 20 years involve

15 neurosurgeons.  Neurosurgeons have the highest incidence

16 and prevalence of malpractice actions, and frequently

17 are the subject of negligent credentialing and other

18 kind of institutional issue oversight.  That doesn't

19 mean they're bad.  It means that they are sued often.

20 And because the patients who have not done well with

21 them are going to live for some long time with

22 disability, that it's going to be expensive.  Why do we

23 not find neurosurgeons in the NPDB?  There is a peer-

24 reviewed article, one of the very few that you'll ever

25 find in -- along these ways, not about how much

800.211.DEPO (3376)
EsquireSolutions.com

1   neurosurgeons make as individuals, but how much money

2   they produce for hospitals.  And a neurosurgeon, aside

3   from being a high six, seven-figure person, produces

4   north of $5 million in revenue for a hospital of which

5   he or she is a part.  That's not somebody you're going

6   to lightly throw under the bus.

7        So I think the short answer to your question is, if

8   I find an NPDB mark submitted by a hospital, that's

9   probably a very -- very disastrous comment on that

10  physician.  If I find a physician that's had a lot of

11  malpractice suits, not necessarily so.

12  Q.   So back to -- back to my question, which is, how do

13  you differentiate between disclosure of the actual facts

14  of what happened being harmful to a physician's

15  profession versus the fact that there is an NPDB report

16  being what's harmful?

17  A.   The disclosure of actual facts can have, of course,

18  a variable impact depending upon what those facts are.

19  It will not approach the damage that an NPDB report will

20  wreak on a physician's career.

21  Q.   What do you base that on?

22  A.   I've -- I've been involved for now two decades in

23  what amount to 300, 350 cases, and in the scheme of

24  things, have tried to distill some of what I've learned,

25  frankly, for my students.  I don't really find a lot of

1   use for this information otherwise.  But in general,

2   you're asking me what my opinion is.  I will tell you

3   that I doubt very much you will ever find a peer-

4   reviewed journal article on this, but it's my opinion

5   that the disclosure of unfavorable information about a

6   physician's actual practices, up to and including

7   criminal activity, is nowhere near as damaging as an

8   NPDB report.

9   Q.   Now, why -- why would that be the case?  What is it

10  about an NPDB report that would cause a credentials

11  committee, for example, to go, oh no, we don't want this

12  guy, when just hearing the same facts related in a

13  letter --

14  A.   Right.

15  Q.   -- would not cause that reaction?

16  A.   Right.  It's -- it's an interesting, I guess,

17  question of -- of psychology of why it's so damaging.

18  Most physicians practicing today have grown up with the

19  practitioner data bank and are well aware of it, and

20  they conversely tend to blame medical malpractice suits,

21  not necessarily on themselves, but on perhaps others who

22  are involved.  So the NPDB says, you, doctor, you are a

23  bad doctor.  You're on this list.  A malpractice suit

24  says, we all did something.  There's going to be some

25  kind of recovery.  It may not be disastrous.  It's the

 1  individual target, and based on a kind of reasoning that

 2  I was using just a moment ago with regard to

 3  neurosurgery, it essentially says that even though this

 4  physician brings in a lot of money for the hospital,

 5  he/she is not worth it.  We're going to throw them under

 6  the bus.  That's different from a malpractice action

 7  where people may gather around and say, it's not your

 8  fault, Doctor.  You know, we -- what -- that's what we

 9  have insurance for and so on and so forth.  The --

10  the -- the NPDB mark is, in my experience, a -- a

11  devastating blow to a physician's future.

12  Q.   You remember reviewing the affiliation verification

13  responses in this case, right?

14  A.   The --

15  Q.   Affiliation verification letters?

16  A.   Yes.

17  Q.   Yeah.

18  A.   I -- I mentioned that I had reviewed and remembered

19  Texas and the Arizona licensing people.  That's really

20  all I really remember from that.

21  Q.   Would it be fair to describe those as a devastating

22  blow to Dr. Hetzel's career?

23          MS. BEIGHTOL:  Objection.

24          THE WITNESS:  Well, I -- I think everything

25  that Dr. Hetzel has said, I mean, there's a reason the

1   man is living in reduced circumstances, dramatically

2   reduced circumstances, and that is because he does not

3   have a job.  Why doesn't he have a job?  His testimony,

4   and I have no reason not to believe him, is that he's

5   been blocked every time he's had a likely prospect.  My

6   own view, for what it's worth, is my opinion, is that

7   the NPDB would be a fatal block to anybody.  It's not a

8   matter of relative to this or relative to that.  It is

9   the black mark from the federal government that

10  essentially says you're a bad doctor.

11  BY MR. HAWISHER:

12  Q.   So let's take the example of Arizona.  You know Dr.

13  Hetzel did obtain employment in Arizona, right?

14  A.   Well, he got a -- a limited license and he got

15  employment, but because I believe his testimony was that

16  getting a limited license would have compelled him to

17  have yet one more piece of paper in the NPDB bank, he

18  decided not to do that.

19  Q.   So -- so my -- my question was actually going to be

20  about his -- his actual employment that he had obtained.

21  He -- he had obtained employment pending his licensure

22  in Arizona?

23  A.   Yes.

24  Q.   Did you know that?

25  A.   Yes.,Yes.

1  Q.   And then ultimately because his licensure was still

2  pending in Arizona, his employment was terminated.

3  A.   Yeah.  You see, it -- it isn't only one element.

4  If you have, say, a compromised license, that has to be

5  reported again.  If you don't have a license, you can't

6  maintain your board certification or so-called

7  maintenance of certification.  If you're not maintaining

8  your board certification because you're not actively

9  practicing or maintaining your maintenance of

10 certification, then you have no prospect whatsoever.  So

11 it's not as if the NPDB mark is a mark of Cain, which is

12 self-actualizing, it actually has impacts all the way

13 down.  Licensure, board certification, actual practice

14 that are -- that are cumulative, but it begins with the

15 black mark.

16 Q.   So -- so my question was going to be, the Arizona

17 licensure was delayed because they were investigating

18 the facts of the precautionary suspension, right?

19 A.   Yes.

20 Q.   Okay.  And he had disclosed the precautionary

21 suspension?

22 A.   Correct.

23 Q.   So that's not something the NPDB report caused, is

24 it?

25 A.   Well, it wasn't -- it wasn't the disclosure.  It

1   was the consequence in terms of a limited license.

2   Q.   So you're -- I think you're getting the timeline a

3   bit mixed up.  They offered him a limited license after

4   they had investigated the precautionary suspension.

5   A.   Right.

6   Q.   He lost his job in Arizona because it was taking

7   Arizona so long to investigate --

8   A.   Uh-huh.  Okay.

9   Q.   -- the underlying incident.  So the delay in -- in

10  making a decision about whether to offer him a license,

11  that's the thing I'm saying the NPDB report did not

12  cause.

13  A.   Well, see, you pointed yet another -- to another --

14  yet another aspect, and that is to the extent you get in

15  the way of the -- the gears of making decisions with

16  regard to employment, you -- you run the risk of

17  stopping that employment.  You pointed out, and I

18  believe you're accurate, sort of what I recall is that a

19  delay became a factor.  Why was delay there in the first

20  place?  Because someone had to negotiate this National

21  Practitioner Data Bank thing, and the someone in all

22  likelihood would not feel confident saying, oh, I see

23  this thing here, but it actually was this.  They would

24  take literally what was there and would use that.  So

25  delay is yet another aspect of the long shadow cast by

1   the National Practitioner Data Bank.

2   Q.   So what I was asking in connection with that is

3   they were -- they were investigating the precautionary

4   suspension itself, right?

5   A.   I believe that's what they were investigating,

6   yeah.

7   Q.   And they were investigating it because he disclosed

8   it to them.

9   A.   Right.

10  Q.   So where does the NPDB report fit into that?

11  A.   The fact that there is a report.

12  Q.   Okay.  What connection does that have to their

13  decision to investigate the precautionary suspension

14  that he disclosed to them?

15  A.   The -- the fact that there is a report is going to

16  overshadow any attempt to get any kind of healthcare

17  privileges in any kind of inpatient institution.  A

18  mandatory check is for the NPDB.  If --

19  Q.   I -- I --

20  A.   -- if you are a medical staff credentialing and

21  privileging person and don't check the NPDB, it's

22  essentially malpractice in your field.

23  Q.   I asking about his licensure in Arizona, not -- not

24  his privileges at any institution, and I'm asking about

25  a delay that was caused with they -- while they

1  investigated a suspension that he disclosed as part of

2  his application.

3  A.    Mm-hmm.

4  Q.    What does the NPDB have to do with that?

5  A.    Why did he disclose it?

6  Q.    Because it was the truth.

7  A.    Well --

8          MS. BEIGHTOL:  Objection.

9          THE WITNESS:  He -- there are a lot of things

10 that are the truth that we never disclose.  He disclosed

11 it because he knew that a routine inquiry to the NPDB

12 would disclose it, and he thought, perhaps I'll get out

13 in front of this and explain what actually happened.  We

14 don't really know, but the fact of delay is not

15 irrelevant.  What's relevant is the report, the delay in

16 resolving the report, the NPDB, the existence of this

17 report, all of those things cascade into other aspects

18 of a physician's practice.

19 BY MR. HAWISHER:

20 Q.    Is your opinion that Mission Hospital should have

21 avoided or withdrawn the report based on your opinion

22 that the report should not have been submitted in the

23 first place?

24 A.    Yes.

25 Q.    Is there any other basis for your opinion that they

 1  should have withdrawn or voided the report?

 2  A.   Well --

 3          MS. BEIGHTOL:  Objection.  This is outside of

 4  what he's testified.

 5          THE WITNESS:  I -- I would think that it was

 6  submitted either in error or inappropriately would be

 7  enough.

 8  BY MR. HAWISHER:

 9  Q.   Can we agree that on May 4th, Mission Hospital does

10  not know what the medical executive committee is going

11  to do on June 5th?

12          MS. BEIGHTOL:  Objection to the form of the

13  question.

14          THE WITNESS:  By definition, that is correct.

15  BY MR. HAWISHER:

16  Q.   Are you aware of any guidance anywhere by any

17  federal anything that says a hospital can decline to

18  report a -- a precautionary suspension based on its

19  bylaws?

20  A.   No.

21          MS. BEIGHTOL:  Objection to the form of the

22  question.

23  BY MR. HAWISHER:

24  Q.   Have you ever encountered a case saying that a

25  hospital can decline to report based on what's in its

1  bylaws?

2  A.   No.

3  Q.   In other areas of your professional experience, can

4  a hospital ignore federal guidance based on what's in

5  its bylaws?

6        MS. BEIGHTOL:  Objection to the form of the

7  question.

8        THE WITNESS:  Well, that's a pretty broad --

9  pretty broad question, and I would have to demur and

10  say, I -- I really couldn't fill in the blank there for

11  you.  If you're saying that the hospital is free to

12  ignore its own bylaws in its interpretation of a federal

13  statute as it might apply to the organization, I would

14  say, well, at least they should get some legal guidance

15  as to whether or not that's true.

16  BY MR. HAWISHER:

17  Q.   You've mentioned the topic of legal guidance a few

18  times now.  Fair to say that any legal guidance that

19  Mission Hospital would've gotten on this issue would be

20  subject to the attorney-client privilege?

21        MS. BEIGHTOL:  Objection to the form of the

22  question.  Without full information.

23        THE WITNESS:  I'm -- I'm sure that the

24  privilege could be asserted, but it can be waived, of

25  course, by the client.  So if Mission Hospital were

 1  eager to demonstrate its fidelity to its own values and
 2  to its medical staff bylaws, presumably it could do so.
 3  But we're -- we're out in speculation here, and I'm not
 4  sure it's productive.  Anyway --
 5  BY MR. HAWISHER:
 6  Q.   Are -- are you inferring from the fact that Mission
 7  Hospital has not waived the privilege in that respect,
 8  that either this advice did not occur or it would not
 9  support Mission Hospital in this lawsuit?
10  A.   No.
11           MS. BEIGHTOL:  Objection.
12  BY MR. HAWISHER:
13  Q.   Okay.  Then -- so why -- why do you bring up the
14  possibility that Mission Hospital could serve this?
15  A.   Well, I bring up the possibilities because in the
16  years in which I spent as an executive, I always looked
17  for legal advice.  And if I got legal advice which was
18  at variance with, for example, my own medical staff
19  bylaws, I would bring that to the attention of the
20  medical staff leaders and discuss with them how we were
21  going to change that.  I don't see any evidence that
22  anybody had any qualms here about the medical staff
23  bylaws.  They just didn't follow them.
24  Q.   Why do you believe that Brenda Shelton's
25  declaration is not accurately stating how she interprets

1  the bylaws?

2          MS. BEIGHTOL:  Objection to the form of the

3  question.

4          THE WITNESS:  I'm sure it's to the best of her

5  ability because it's a sworn declaration and she has a

6  responsible position.  I have every reason to think that

7  she thinks she's accurate in interpreting the medical

8  staff bylaws.

9  BY MR. HAWISHER:

10  Q.   And what I'm getting at is, you seem to be framing

11  it as the hospital ignored their bylaws and knew they

12  were ignoring their bylaws.  And what I'm suggesting to

13  you is, is it possible the hospital believed that what

14  they were doing was consistent with their bylaws?

15          MS. BEIGHTOL:  Objection to the form of the

16  question.

17          THE WITNESS:  It -- it -- it seems highly

18  implausible, and I base that on the clock, if you will.

19  An operation takes place on March 2nd.  On March 3rd,

20  the medical staff leaders already have a memo ready to

21  Dr. Hetzel that alleges that he's been sufficiently --

22  sufficiently negligent, or whatever it might be, in his

23  care of patients, that he should have a -- a summary

24  suspension, a presumptive suspension.  And what they

25  offered -- precautionary suspension.  What they offered

 1  by a way of evidence presumably is an allusion to the

 2  index patient and the representation of two other

 3  patients.  So the hospital is all set to, essentially,

 4  fault Dr. Hetzel on March 3rd.  They base that on the

 5  information they have, which is from an interested

 6  party -- an influential and interested party, and not on

 7  any kind of disinterested examination by the medical

 8  staff through the credentials committee or anyone else.

 9      The solution that is selected by the hospital is --

10  to use the phrase -- probably overuse the phrase that I

11  used earlier, the nuclear solution.  They don't say, we

12  think that, Dr. Hetzel, you'd benefit from a program of

13  proctorship.  They don't say, we think you would do well

14  to engage with the North Carolina Board of Medicine on

15  this program, and we've -- we've arranged for you to do

16  that.  We'd like you to do that.  They don't say any of

17  these things that are within the realm of nonthreatening

18  punitive damage.  What they say is, we've -- we've

19  precautionarily suspended your privileges and would like

20  you to stop seeing patients here and no -- not do rounds

21  on your patients and so forth.  Really quite astonishing

22  that they would go to such a solution.

23  BY MR. HAWISHER:

24  Q.   So specifically with respect to the question of

25  whether at Mission Hospital a precautionary suspension

1 | can become reportable, is it possible that Mission
2 | Hospital just interpret it -- interprets its bylaws
3 | differently than you do?
4 |         MS. BEIGHTOL:  Objection to the form of the
5 | question.
6 |         THE WITNESS:  Yeah.  No, it's -- it's
7 | possible.  Anything is possible in terms of in
8 | interpretation.  The plain language, I think, is fairly
9 | straightforward.  What's not straightforward is how the
10 | back-and-forth here and the failure to listen to Dr.
11 | Hetzel until the middle of April with correspondence,
12 | and failure to engage with him until, you know, the end
13 | of April -- and which, by the way, parenthetically, all
14 | of these supposed problems with his practice seem to
15 | have disappeared in his -- in the conclusion of the
16 | credentials committee.  But in the scheme of things,
17 | they don't appear to be doing something with Dr. Hetzel,
18 | which is going to preserve his capacity and at the same
19 | time, protect patients.  They do something, which has to
20 | date, at least, destroyed his capacity.
21 | BY MR. HAWISHER:
22 | Q.  When you say his -- "the problems with his practice
23 | seem to have disappeared in the eyes of the credentials
24 | committee,:  what do you mean by that?
25 | A.  The -- I had noted that the -- the decision of the

1   credentials committee in April 23rd -- he meets with the
2   investigative committee on April 10th.  He gets the
3   committee's report on April 17th.  Keep in mind, this is
4   now six weeks after the event.  On April 23rd, the
5   committee votes to recommend the precautionary
6   suspension be lifted.  In other words, all of those
7   alleged code of conduct, wrong breast clinic, two
8   patients' issues, seem to have disappeared.  And the
9   committee, now having had some contact with Dr. Hetzel,
10  is ready to lift his precautionary suspension.
11      This is consistent with my experience, and is
12  consistent with an answer I gave you earlier.  And that
13  is, what would you do if faced with a report, such as
14  that which came from Dr. Buell, or which we believe came
15  from Dr. Buell, after the operation with Dr. Hetzel?
16  The very first thing would be, of course, to consult
17  others who involved.  The second thing would be to
18  enlarge the circle in terms of exchange of information.
19  The idea that somehow, this investigative committee
20  would investigate things without talking to Dr. Hetzel,
21  is -- it -- it's just beyond reasonable to assume that
22  that's a -- a fair way of going about collecting
23  information.
24  Q.   Well, they did talk to Dr. Hetzel, right?
25  A.   They -- they did, eventually, yes.

1    Q.    So what's the issue?

2    A.    The issue is --

3              MS. BEIGHTOL:  Objection to the form.

4              THE WITNESS:  You -- you asked me what I would

5    do if -- if I had this report on March 3rd.  They didn't

6    talk to Dr. Hetzel until six weeks had gone by.

7    BY MR. HAWISHER:

8    Q.    So the investigative committee didn't meet until

9    March 20th, right?

10   A.    It's all part of the delay involved here.  We've

11   talked about the fact that delay becomes an issue

12   because it looks like the hospital is compelled, in

13   their interpretation, to report Dr. Hetzel, based on

14   the -- the foot dragging and delay.  You cannot help but

15   think that at least one alternative explanation is that

16   the delay was purposeful.  And the delay in getting a

17   committee together, the fact the committee has nobody in

18   Dr. Hetzel's specialty, the fact that it takes them

19   until the 10th for him to meet with the investigative

20   committee compared to the March 3rd precautionary

21   suspension, all of this delay makes it more likely that,

22   in fact, the hospital's interpretation of the hospital's

23   responsibility would be triggered.  And for better or

24   worse, what happened is that he didn't have 30

25   consecutive days of the same suspension.  He was in and

1  out with modifications along the way, but as I say, you

2  can't help but think as an alternative to the ordinary

3  delay associated with getting groups of people together

4  and having an investigation and coming to a consensus

5  that, in addition, one factor was someone had their eye

6  on the calendar and basically thought, well, if we can

7  delay this for 30 days, we'll report the fellow, and

8  then we'll explain we had to report him.

9  Q.   If the report had been intended to harm Dr. Hetzel,

10  wouldn't it have been worded differently?

11  A.   I'm not sure how it could be more damaging.  I'm

12  not sure what you mean.

13  Q.   Well -- so let me give you one example.  There is

14  no mention in the report of the nature of the serious

15  complications that occurred after the index surgery, is

16  there?

17  A.   Well, that's -- that's not the part of the

18  report -- the format.  There's nothing in there because

19  it's not reportable.  I know in your brief, you took

20  credit for not including various different derogatory

21  aspects of Dr. Hetzel's background, but my -- my

22  reaction when I read it was, well, they're not

23  reportable.

24  Q.   Okay.  I am going to pass you Exhibit 3 in just a

25  second.  Would you agree with me that, "A narrative

1   description of an NPDB report should include sufficient

2   detail to ensure that future queriers have a clear

3   understanding of what the subject of the report is

4   alleged to have done, and the nature of and reasons for

5   the event upon which the report is based"?

6          MS. BEIGHTOL:  Objection to the form of the

7   question.

8          THE WITNESS:  I think my answer is, yes.  I'm

9   not looking at what you're looking at, but yes.

10  BY MR. HAWISHER:

11  Q.   Okay.  So I -- I will -- good answer, because

12  that's what the guidebook says.  What the subject is

13  alleged to have done, in this case, was perform a

14  surgery that led to serious complications, right?

15  A.   You're looking at, "sufficient detail to ensure

16  that future queriers have a clear understanding of what

17  the subject of the report is alleged to have done, and

18  the nature and reasons for the event upon which the

19  report is based."  And your question is, how detailed

20  should that be, or how clinical, or --

21  Q.   My question is whether you are saying it would be

22  inappropriate to include that the subject of a report

23  performed a surgery that resulted in serious

24  complications?

25  A.   No.  I don't think that's inappropriate.

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1   Q.   So when you said a moment ago that the derogatory

2   details that Mission Hospital chose not to include in

3   its report could not have been put in the report, what

4   did you mean by that?

5   A.   The -- let me find your -- your -- your brief here.

6   I don't have it in front of me, but I -- I believe I'm

7   referring to the outrider, the two patients, the code of

8   conduct, the --

9   Q.   We -- we can drop --

10  A.    -- breast clinic.

11  Q.   We can forget about all of that because my question

12  is specifically about the serious complications that

13  occurred during the index surgery.  Isn't that something

14  they could have included if they had wanted to?

15        MS. BEIGHTOL:  Objection to the form of the

16  question.

17        THE WITNESS:  You -- you actually asked a

18  different question, which is, could you have included

19  other information, such as that which you've cited in

20  your brief in support of the motion of summary judgment?

21  And my answer is, a lot of that's not reportable.

22  You're asking whether or not some further description of

23  the event, which is the subject of the index report

24  here, would be appropriate and within the limits of this

25  narrative description thing?  The answer is, yes.

```
 1   BY MR. HAWISHER:
 2   Q.   Yeah.  So it would've -- it would've been
 3   appropriate and within the limits of the narrative
 4   description then qto include, the subject of this report
 5   is alleged to have performed a surgery that led to
 6   serious complications with subsequent hospice referral?
 7           MS. BEIGHTOL:  Objection to the form of the
 8   question.
 9           THE WITNESS:  And what's wrong with that?
10   BY MR. HAWISHER:
11   Q.   My -- my question is, is that something that could
12   have been included in this report?
13   A.   I don't have access to -- let's try that again, if
14   you would.  Let me give you that back.  And let's see.
15   Do you have this brief in support of a motion for
16   summary judgment?
17   Q.   I'm not asking you about my brief.
18   A.   Well, I'm -- I'm testifying about your brief, so --
19   let's see.  I don't have it here.
20           MS. BEIGHTOL:  I can pull it up if you need
21   it.
22           THE WITNESS:  The -- the answer is, a
23   description that's adequate to alert future users of the
24   data bank is appropriate.
25   BY MR. HAWISHER:
```

1  Q.   Okay.  So --

2  A.   Material, which is --

3          MS. BEIGHTOL:  Let him finish.

4          THE WITNESS:  -- material, which is

5  irrelevant, unrelated, or even in consequence of their

6  relative importance, trivial is not -- is not

7  appropriate.

8  BY MR. HAWISHER:

9  Q.   Dr. Hetzel performed a surgery that resulted in

10  serious complications with subsequent hospice referral.

11  Is that something Mission Hospital could have included?

12          MS. BEIGHTOL:  Objection to the form of the

13  question.

14          THE WITNESS:  Dr. Hetzel performed --

15  BY MR. HAWISHER:

16  Q.   A surgery that resulted in serious complications

17  with subsequent hospice referral.

18  A.   What would be appropriate would be to indicate that

19  Dr. Hetzel performed a surgery together with Dr. Buell

20  and Dr. Ahaerne that resulted in serious complications

21  with the patient.

22  Q.   Can't do that because you can't include proper

23  names of any individuals other than the subject of the

24  report.

25          MS. BEIGHTOL:  Objection to the form.

 1   Testimony.
 2          THE WITNESS:  I was including them in my
 3   answer to your question.  And you were -- you were
 4   asking me whether a statement that Dr. Hetzel had
 5   performed an operation that resulted in serious
 6   consequences for the patient, and I was merely pointing
 7   out that Dr. Hetzel was not alone --
 8   BY MR. HAWISHER:
 9   Q.   Okay.  So --
10   A.   -- in the serious complications for the patient.
11   Q.   Dr. Hetzel, together with other surgeons, performed
12   a surgery that resulted in serious complications with
13   subsequent hospice referral.  Is that something that
14   could have been included in the report?
15   A.   Whether it could have been or should have been, it
16   certainly would be consistent with what they want to
17   see, in terms of some kind of explication, which would
18   alert future potential employers.
19   Q.   Does that not strike you as something you would
20   include in the report if your goal was to harm Dr.
21   Hetzel's reputation?
22   A.   Oh, I see what your question is here.  No.  I think
23   having the report itself, quite aside from any graphic
24   detail, is the most damaging thing that could be done by
25   the hospital.  And had they wanted to minimize the

1  damage, but at the same time, do something to preserve

2  Dr. Hetzel's capabilities, there are many alternative

3  paths they could have chosen.

4  Q.   You do not think that it would be worse for Dr.

5  Hetzel's reputation if people who received the report

6  also knew that the patient had been referred to hospice?

7  A.   No.  I -- I'm not sure that adds a lot.  In some

8  ways, less is more.  If you -- if you're trying to

9  damage someone, giving them -- we're seeing a good

10  example of this politically these days -- the less you

11  say about specifics and the more you say about

12  generalities, the more damaging your judgment might be.

13  I see your point, which is that if someone was thinking

14  in a linear manner, and they wanted to say as many

15  devastating and derogatory things that they could about

16  Dr. Hetzel, would they, in fact, have included more

17  verbiage?  And clearly, they would have, but I'm saying

18  the verbiage is secondary to the actual existence of an

19  NPDB report.

20  Q.   So is Brenda Shelton a, sort of, Machiavellian

21  genius who is crafting this deliberately to be as

22  harmful as possible?

23        MS. BEIGHTOL:  Objection to the form of the

24  question.

25        THE WITNESS:  No.  I think as between

1   ignorance and guile, I always prefer the former as an

2   explanation for human behavior.  I think it's a

3   combination of some bad motives, some quick reaction,

4   some desire to shuffle Dr. Hetzel off to the side,

5   and -- and some good motivation.  I mean, everything --

6   it's a -- it's a group of human beings, and they're

7   going to have mixed motives.  And I -- I really don't

8   think that the motives here are central.  I've said, to

9   the contrary, on the other hand, that I don't think that

10  adverse patient safety or patient safety protection is

11  the only, or even the primary issue involved here.  I

12  think something happened that energized Dr. B., and Dr.

13  A., and Dr. F. to report this nuclear option of the

14  suspension, and then it may or may not have been actual

15  intention to delay consideration or deliberations so

16  thoroughly that the 30-day limit would be hit, if only

17  by accident.  Or it may be that those who were involved

18  knew about the 30-day limit and sought to modify the

19  suspension so as to avoid the 30-day limit.  I mean,

20  we're speculating about human motivations here, but

21  it's -- it's not, from my point of view, an adverse

22  patient safety limitation.  It's a reaction that

23  includes the longer standing relationship of Dr. Hetzel

24  to this institution, which was about to be his former

25  hospital.

1   BY MR. HAWISHER:

2   Q.   With respect to your opinion that Dr. Hetzel's

3   precautionary suspension was not reportable because each

4   segment of that suspension lasted 30 days or less --

5   A.   Yes.

6   Q.   -- would that not, if that were how it worked,

7   allow a hospital to, in every case, decline to make an

8   NPDB report by subtly modifying the limitations the

9   practitioner is under on day 30?

10  A.   Exactly.  Exactly, it would.  And I -- I would not

11  be surprised to find that as a strategy because

12  hospitals, if they seek to preserve the, not just human

13  relations, but the economic benefit of a physician, are

14  going to be very reluctant to report in a cavalier

15  manner things, which might be dealt with in a -- in

16  alternative ways.  So I'm -- I'm -- I've -- I've

17  witnessed hospitals that purposely don't report.  I've

18  witnessed hospitals that have a paid physician

19  malpractice settlement, so it's not on the physician's

20  books, so the physician doesn't get reported.  There are

21  all sorts of ways of -- of attempting to evade this

22  black mark, and if a physician is valued by a hospital,

23  I believe that would be a rational choice for them to

24  make to see what might be done to minimize the damage.

25  They might well have been on one side of that argument,

1   as I just said, attempting to avoid the 30 days of

2   continuous suspension.

3              MR. HAWISHER:  Okay.  Subject to our position

4   that this deposition should be held open, I'm finished

5   with my questions.

6              MS. BEIGHTOL:  All right.  I have just a few

7   questions.  And obviously, we already stated on the

8   record our respective positions.  We object to that but

9   are willing to have a conversation to determine if the

10  parties can come to terms on it.

11                         EXAMINATION

12  BY MS. BEIGHTOL:

13  Q.   Doctor, I have just a few questions for you that

14  should not be controversial -- controversial, but just

15  to make sure I understand some of the things.  Then --

16  A.   If -- if you could speak a little louder --

17  Q.   Okay.

18  A.   -- Kristen, thank you very much.

19  Q.   Sorry.  I forgot that that --

20  A.   Yeah.

21  Q.   -- heater is starting again.

22  A.   Okay.

23  Q.   Was Mission federally required to report, if it

24  reported, the truth of the path of its actions as it

25  related to Dr. Hetzel?

1  A.   Could you try that again?

2  Q.   Yes.  Was Mission Hospital --

3  A.   Right.

4  Q.   -- federally required to report the truth, if it

5  reported anything, as to the path of the actions with

6  regard to Dr. Hetzel?

7  A.   Yes.

8        MR. HAWISHER:  Object to the form.

9  BY MS. BEIGHTOL:

10  Q.   Am I correct that you --

11  A.   Yes.

12  Q.   I'm asking a new question.

13  A.   Okay.

14  Q.   Am I correct that throughout the day today, you

15  have testified that there was never a more than 30-day

16  reportable event?  In other words, that none of these

17  suspensions, as it relates to Dr. Hetzel, ever raised to

18  a reportable level?

19  A.   Yes.

20        MR. HAWISHER:  Object to the form.

21  BY MS. BEIGHTOL:

22  Q.   The facts that form that -- or that testimony that

23  you gave, you've mentioned today memorandums, minutes,

24  letters, bylaws.  Were all of those things in Mission

25  Hospital's possession at or before the May 4, 2020,

```
 1   report?
 2           MR. HAWISHER:  Object to the form.
 3           THE WITNESS:  The medical staff bylaws, yes.
 4   Memorandum memorializing the March 2nd, 3rd, yes.
 5   Minutes of meetings that took place in March and April,
 6   yes.  Anything, of course, after May would be no, but
 7   the answer to your question, I believe, is yes.
 8   BY MS. BEIGHTOL:
 9   Q.   And we're not talking about anything after May 4 as
10   it relates to the report because the report was done on
11   May 4, correct?
12   A.   Right.
13   Q.   As it relates to those documents, they were not
14   only in Mission's possession, but they were Mission
15   created; is that right?
16           MR. HAWISHER:  Object to the form.
17           THE WITNESS:  Yes.
18   BY MS. BEIGHTOL:
19   Q.   And you discussed some inaccuracies today at the
20   beginning of your testimony.  I believe you talked about
21   the word indefinite, the characterization of -- I forget
22   the terminology -- the concerns about preoperative
23   planning and interpretation, some of the dates in the
24   report itself.
25       Those items, those things that we discussed, the
```

 1  basis for those opinions, were they in the same

 2  documents we just went over that were in Mission's

 3  possession by May 4?

 4  A.   Yes.

 5           MR. HAWISHER:  Object to the form.

 6  BY MS. BEIGHTOL:

 7  Q.   As it relates to the way they corrected the report,

 8  in other words, that they did a corrected report versus

 9  a voided report, does even the corrected report, in and

10  of itself, in that it corrects something that was filed

11  and not voided, have the impact that you have mentioned

12  today -- the nuclear impact as it relates to the first

13  report we've been talking about?

14           MR. HAWISHER:  Object to the form.

15           THE WITNESS:  Yes.  I believe so.

16  BY MS. BEIGHTOL:

17  Q.   We've talked about the bylaws.  Your testimony

18  about the bylaws in the sentence you read over and over

19  today about precautionary suspensions not being

20  reportable, is that the plain language of the policy, or

21  were you using other words that you were adding in

22  there?

23  A.   No.  I was --

24           MR. HAWISHER:  Object to the form.

25           THE WITNESS:  -- quoting that excerpt from the

1   bylaws, which is identical to the excerpt from the
2   policy.
3   BY MS. BEIGHTOL:
4   Q.   Does your report contain -- well, strike that.
5        If we read your report, do all the words that you
6   say in there and the weight you give them, are they your
7   opinion still today?
8   A.   Yes.
9   Q.   Okay.  And all the things we've talked about today,
10  are they, in your mind, having drafted report -- the
11  report, consistent with the report?
12  A.   Yes.
13            MR. HAWISHER:  Object to the form.
14  BY MS. BEIGHTOL:
15  Q.   Is there anything that you discussed today that you
16  feel like is completely out of that realm or not
17  included or not, in some way, indicated or tipped off?
18  A.   No.
19            MR. HAWISHER:  Object to the form.
20  BY MS. BEIGHTOL:
21  Q.   You talked a lot today about redacted information.
22  Would that additional information, those redacted
23  minutes, those redacted portions of other documents that
24  have been produced in this case, help you to see the --
25  the complete picture in this case?

1   A.   I don't know, because I don't know what's in the

2   redacted material.  It -- it certainly would remove the

3   mystery.  Whether or not it helped me understand what

4   was going on would be up to the material or up to me.

5   Q.   But certainly, it would give you the full picture?

6   A.   Well, yes.

7          MR. HAWISHER:  Object to the form.

8          THE WITNESS:  Certainly, by definition, it's a

9   fuller picture, and I just -- it's always a mistake to

10  assume that you know what's behind the redacted

11  language, I think.

12  BY MS. BEIGHTOL:

13  Q.   And Mission Hospital, today and all along in this

14  case, has had that full picture, right?

15  A.   Correct.

16         MR. HAWISHER:  Object to the form.

17  BY MS. BEIGHTOL:

18  Q.   But you've had to operate without it in your review

19  of this case, correct?

20  A.   Yes.  Yes.

21         MR. HAWISHER:  Object to the form.

22  BY MS. BEIGHTOL:

23  Q.   We have a pending motion to compel redacted and not

24  provided information.  If we gather that additional

25  information, would you review it and give us opinions on

1  that information?

2  A.   Yes.

3  Q.   And those may be opinions you'll offer at trial?

4  A.   They -- they may be, depending on what they are.

5  Q.   And certainly, if we have other information that we

6  get in this case that we don't have to date because we

7  haven't taken the deposition of Ms. Shelton, we haven't

8  taken the deposition of other individuals involved in

9  this process, would you also, likewise, agree to review

10  that and share any additional opinions, if needed, based

11  on that information?

12  A.   Yes.  Absolutely.

13  Q.   Okay.

14       MR. HAWISHER:  Objection to the form.  And I

15  would also like to state for the record that I do not

16  regard that as an adequate supplementation of this

17  report with respect to opinions he may form in the -- in

18  the future.

19       MS. BEIGHTOL:  Well, I think, you know, you

20  know that we have a pending motion.

21       MR. HAWISHER:  Oh, I know.  I know.

22       MS. BEIGHTOL:  And that pending motion,

23  obviously, supposes that there will be subsequent

24  information produced, and you've chosen to take this

25  expert's deposition before that was produced and before

 1  he had that information.  So I think that the case
 2  record will speak for itself, and any subsequent orders
 3  from the court will inform us of what our next steps can
 4  be, and we can seek the court's guidance if necessary.
 5            MR. HAWISHER:  Okay.
 6  BY MS. BEIGHTOL:
 7  Q.   You've mentioned that some opinions, rebutted
 8  opinions by Defense experts?
 9  A.   Yes.
10  Q.   But are they still part and parcel of what your
11  initial opinions were?  You just have brought them in
12  specific today, given the words of the defense reports?
13  A.   Well, they're --
14            MR. HAWISHER:  Object to the form.
15            THE WITNESS:  -- they're part of my opinions.
16  They're part of my testimony today.
17  BY MS. BEIGHTOL:
18  Q.   And were they part of your initial opinions in that
19  they are consistent with them?
20  A.   I think we spent some time --
21            MR. HAWISHER:  Object to the form.
22            THE WITNESS:  -- looking at that question, and
23  there were some issues that I didn't join as fully as
24  I've joined them today.  The general idea that my
25  opinions are unchanged, that they are -- are not

1   accompanied by any new opinions, and that what we talked

2   about today is elaboration on my opinions is one with

3   which I could agree.

4           MS. BEIGHTOL:  Got it.  Let me check my notes.

5   I think that's all I have unless David has some

6   questions that create other questions.

7           MR. HAWISHER:  No, it's -- the only thing I

8   have, actually, is can we mark the Hall report as

9   Exhibit 29 or the first page, just so it's clear what

10  we're talking about in the future?

11          MS. BEIGHTOL:  I think that's advisable.

12          MR. HAWISHER:  I think it would be 29.

13          THE REPORTER:  Okay.

14          MR. HAWISHER:  I've got nothing.

15          THE REPORTER:  Okay.  I'm going to get the

16  transcript orders on the record first.

17          MR. HAWISHER:  Yeah.

18          THE REPORTER:  We'll start with you, Mr.

19  Hawisher?

20          MR. HAWISHER:  E-Trans with exhibits, please.

21          THE REPORTER:  E-Trans with exhibits.

22      For you, Ms. -- Ms. Beightol?

23          MS. BEIGHTOL:  Kristen.  Same.

24          THE REPORTER:  Same.  Okay.  And am I taking

25  the exhibits with me?  Because that's the only way

 1  they're going to be in there.

 2          MS. BEIGHTOL:  Yes.

 3          THE REPORTER:  Okay.  Those probably won't be

 4  mailed out because, obviously, I can't mail them out

 5  today and tomorrow, I might be stuck somewhere all day,

 6  so I'm not sure.  Just -- just so you're aware, but

 7  okay.

 8          MR. HAWISHER:  What -- what is your email

 9  address because --

10          THE VIDEOGRAPHER:  Hold on a second.  We -- we

11  can get that off the record.  Before we go off the

12  record, I also need to take the video orders.  I

13  apologize.  I should have given you a heads-up.  If you

14  could just -- if you know, at this time, if you're

15  ordering a video and if -- if so, if you wish for it to

16  be synced to the transcript, please let me know.

17          MR. HAWISHER:  Yes, and yes, please.

18          MS. BEIGHTOL:  I would like your card, so that

19  I have your information to know how to order it --

20          THE VIDEOGRAPHER:  I -- I will --

21          MS. BEIGHTOL:  -- but I, right now, am not

22  going to order one, but I may at a later day.

23          THE VIDEOGRAPHER:  Okay.  The time is 5:38

24  p.m.  This concludes today's deposition.  We are going

25  off the record.

```
 1    (Deposition concluded at 5:38 p.m.)

 2

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

1                    CERTIFICATE OF REPORTER

2

3              I, CATHERINE PASTOR, a Digital Reporter and

4    Notary Public in and for the State of Connecticut do

5    hereby certify:

6

7              That the foregoing witness whose examination

8    is hereinbefore set forth was duly sworn and that said

9    testimony was accurately captured with annotations by me

10   during the proceeding.

11

12             I further certify that I am not related to any

13   of the parties to this action by blood or marriage and

14   that I am not interested in the outcome of this matter,

15   financial or otherwise.

16

17             IN WITNESS THEREOF, I have hereunto set my

18   hand this 11th day of November 2025.

19

20   _____ _C. Pastor_____

21   CATHERINE PASTOR

22             Notary Commission Connecticut No. 0194130

23   Notary Expires:  March 31, 2030

24

25

1                     CERTIFICATE OF TRANSCRIPTIONIST

2

3             I, AMBER KOWALSKI, Legal Transcriptionist do

4      hereby certify:

5             That the foregoing is a complete and true

6      transcription of the original digital audio recording of

7      the testimony and proceedings captured in the above-

8      entitled matter.  As the transcriptionist, I have

9      reviewed and transcribed the entirety of the original

10     digital audio recording of the proceeding to ensure a

11     verbatim record to the best of my ability.

12            I further certify that I am neither attorney

13     for nor a relative or employee of any of the parties to

14     the action; further, that I am not a relative or

15     employee of any attorney employed by the parties hereto,

16     nor financially or otherwise interested in the outcome

17     of this matter.

18            IN WITNESS THEREOF, I have hereunto set my

19     hand this 11th day of November 2025.

20

21

22            *Amber Kowalski*

23            AMBER KOWALSKI

24

25

1                    DEPOSITION ERRATA SHEET

2

3   Esquire Job No. J13653933

4   Case Caption:  DAVID JOHN HETZEL, M.D. v. MH MISSION

5   HOSPITAL, LLLP

6

7          DECLARATION UNDER PENALTY OF PERJURY

8

9          I declare under penalty of perjury that I have

10  read the entire transcript of my deposition taken in the

11  above-captioned matter or the same has been read to me,

12  and the same is true and accurate, save and except for

13  changes and/or corrections, if any, as indicated by me

14  on the DEPOSITION ERRATA SHEET hereof, with the

15  understanding that I offer these changes as if still

16  under oath.

17

18    Signed on the _____ day of _____, _____.

19

20

21             _____

22             FREDERICK HERBERT HYDE, M.D.

23

24

25

```
 1                 DEPOSITION ERRATA SHEET

 2   Page No._____Line No._____Change to:_____

 3   _____

 4   Reason for change:_____

 5   Page No._____Line No._____Change to:_____

 6   _____

 7   Reason for change:_____

 8   Page No._____Line No._____Change to:_____

 9   _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25           FREDERICK HERBERT HYDE, M.D.
```

```
1                    DEPOSITION ERRATA SHEET

2    Page No._____Line No._____Change to:_____

3    _____

4    Reason for change:_____

5    Page No._____Line No._____Change to:_____

6    _____

7    Reason for change:_____

8    Page No._____Line No._____Change to:_____

9    _____

10   Reason for change:_____

11   Page No._____Line No._____Change to:_____

12   _____

13   Reason for change:_____

14   Page No._____Line No._____Change to:_____

15   _____

16   Reason for change:_____

17   Page No._____Line No._____Change to:_____

18   _____

19   Reason for change:_____

20   Page No._____Line No._____Change to:_____

21   _____

22   Reason for change:_____

23

24   SIGNATURE:_____DATE:_____

25           FREDERICK HERBERT HYDE, M.D.
```

1       LEGAL TRANSCRIPTIONIST'S CERTIFICATE OF REVISION

2     TO THE DEPOSITION OF FREDERICK HERBERT HYDE, M.D.

3              TAKEN ON NOVEMBER 6, 2025

4

5   CASE:  DAVID JOHN HETZEL, M.D. vs. MH MISSION
            HOSPITAL,LLP
6

7          I declare that I, Denise Moore, Legal

8   Transcriptionist, have reviewed the original digital

9   audio recording of the above-stated audio file and

10  made the following changes:

11          On Appearance Page, corrected contact

12          information for Attorney Kristen L. Beightol.

13          Updated index for pre-marked Exhibits 1-24.

14          Added Exhibit 30.

15          Having advised all attending parties in this

16  proceeding and hearing no objection, I hereby certify

17  that the revised transcript has been delivered to the

18  ordering parties:

19              Kristen L. Beightol, Esq.

20              David C. Hawisher, Esq.

21          Dated this 17th day of November 2025.

22

                    _Denise Moore_
23          _____
            Denise Moore
24          Legal Transcriptionist

25

```
1                    DEPOSITION ERRATA SHEET

2

3   Esquire Job No. J13653933

4   Case Caption:  DAVID JOHN HETZEL, M.D. v. MH MISSION

5   HOSPITAL, LLLP

6

7           DECLARATION UNDER PENALTY OF PERJURY

8

9        I declare under penalty of perjury that I have

10  read the entire transcript of my deposition taken in the

11  above-captioned matter or the same has been read to me,

12  and the same is true and accurate, save and except for

13  changes and/or corrections, if any, as indicated by me

14  on the DEPOSITION ERRATA SHEET hereof, with the

15  understanding that I offer these changes as if still

16  under oath.
```

Signed on the ___19ᵗʰ___ day of ___November___, ___2025___.


_____

FREDERICK HERBERT HYDE, M.D.

1                          DEPOSITION ERRATA SHEET

2     Page No._____ Line No._____ Change to:_____

3     _____

4     Reason for change:_____

5     Page No._____ Line No._____ Change to:_____

6     _____

7     Reason for change:_____

8     Page No._____ Line No._____ Change to:_____

9     _____

10    Reason for change:_____

11    Page No._____ Line No._____ Change to:_____

12    _____

13    Reason for change:_____

14    Page No._____ Line No._____ Change to:_____

15    _____

16    Reason for change:_____

17    Page No._____ Line No._____ Change to:_____

18    _____

19    Reason for change:_____

20    Page No._____ Line No._____ Change to:_____

21    _____

22    Reason for change:_____

23

24    SIGNATURE:_____ DATE: 11/19/25

25            FREDERICK HERBERT HYDE, M.D.

*See attached pages*



ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

**Errata Sheet, Deposition of Fred Hyde, MD, JD, MBA**
**Hetzel v MH Mission Hospital**
**November 6, 2025**

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|--------------------|
| Cover, 1, 5, etc. | | Frederick Herbert Hyde, M.D. | Fred Hyde, M.D. | Accuracy; change wherever name appears. |
| 9 | 11 | You | You've | clarity |
| 12 | 19 | corrections noted | corrections to mistakes noted | clarity |
| 12 | 22 | Yep | Yes | slang (whether of witness or recorder), should be corrected |
| 17 | 9 | take | see | clarity |
| 17 | 20 | Yes. No, I mean . . | Yes, I mean | clarity, intent |
| 18 | 11 | from | for | clarity |
| 19 | 9 | you got | you've got | correction |
| 28 | 21 | Yeah | Yes | slang |

1

Errata Sheet, Deposition of Fred Hyde, MD, JD, MBA
Hetzel v MH Mission Hospital
November 6, 2025

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|-------------------|
| 30 | 22 | that it will | that such a view will | meaning |
| 36 | 2 | Yeah | Yes | slang |
| 43 | 19 | Yeah | Yes | slang |
| 51 | 22 | medical staff decided | medical staff bylaws decided | reference |
| 61 | 2 | Yep | Yes | slang |
| 74 | 23 | NPND (sic) | NPDB | correction |
| 78 | 17 | Yep | Yes | slang |
| 79 | 14 | Yeah | Yes | slang |

2

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|-------------------|
| 84 | 3 | professions | profession | correction |
| 86 | 14 | Yeah | Yes | slang |
| 87 | 23 | repost | *riposte* | correction |
| 111 | 14, 17 | Yeah | Yes | slang |
| 114 | 10 | this continuous | this was continuous | meaning |
| 114 | 11 | April 23 | March 25 | correction |
| 114 | 12 | March 23 | April 23 | correction |
| 115 | 17 | Yeah | Yes | slang |
| 117 | 2 | Yeah | Yes | slang |

3

Errata Sheet, Deposition of Fred Hyde, MD, JD, MBA
Hetzel v MH Mission Hospital
November 6, 2025

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|-------------------|
| 118 | 23 | partner," blah, blah, blah. | partner," etc. | slang |
| 119 | 15 | Yeah | Yes | slang |
| 136 | 21 | Shelton says | Ms. Shelton says | accuracy |
| 140 | 18 | purposes is sort of | purpose is | accuracy |
| 143 | 12 | NAMS | NAMSS | accuracy, formal group name/acronym |
| 144 | 2 | Yeah | Yes | slang |
| 147 | 15-16 | ongoing and focused professional practice evaluation | Ongoing and Focused Professional Practice Evaluation | formal names |
| 147 | 25 | lifelong program | a lifelong record | clarity |
| 150 | 18 | There's always | There are always | clarity |

4

Errata Sheet, Deposition of Fred Hyde, MD, JD, MBA
Hetzel v MH Mission Hospital
November 6, 2025

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|--------------------|
| 153 | 3 | random | unrestricted | accuracy |
| 156 | 6 | press | breast | accuracy |
| 156 | 15 | is not clean | is clean | meaning |
| 160 | 2 | Yeah | Yes | slang |
| 163 | 4 | NAMS | NAMSS | accuracy, formal group name/acronym |
| 168 | 7 | a counsel | counsel | accuracy |
| 178 | 9 | NVDB | NPDB | correction |
| 179 | 3 | disasters | disastrous | correction |
| 179 | 11 | where nonexistent | where it was non-existent | accuracy |

5

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|-------------------|
| 180 | 2 | exceed | accede | correction |
| 184 | 9 | Yeah | Yes | slang |
| 190 | 25 | Yeah | Yes | slang |
| 195 | 19 | Yeah | Yes | slang |
| 199 | 6 | the civil performance | the performance | correction |
| 203 | 12 | is to | to | clarity |
| 207 | 22 | not be your | not be on your | accuracy |
| 208 | 25 | assistant (twice) | assistance | accuracy |
| 210 | 21 | sharing | chairing | accuracy |

6

**Errata Sheet, Deposition of Fred Hyde, MD, JD, MBA**
**Hetzel v MH Mission Hospital**
**November 6, 2025**

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|------------------------------|--------------------|
| 210 | 21 | confab | commission | accuracy |
| 213 | 4 | realization | rehabilitation | accuracy |
| 218 | 18 | years, had | years, I had | accuracy |
| 221 | 12 | same employer when | same employer, or when | clarity |
| 221 | 21 | researcher and Professor | researcher, Professor | clarity |
| 222 | 1 | to have done responsible the job | to have done a responsible job | clarity |
| 222 | 17 | possibly obstacles | possibly have obstacles | accuracy |
| 223 | 15-16 | no legitimate that is patient safety basis for maintaining | no legitimate evidence that patient safety is the basis for maintaining | accuracy, clarity |
| 232 | 3 | DPDB | NPDB | accuracy |

7

Errata Sheet, Deposition of Fred Hyde, MD, JD, MBA
Hetzel v MH Mission Hospital
November 6, 2025

| Page | Line(s) | Correction, change from . . . | Correction, change to . . . | Reason for change |
|------|---------|-------------------------------|-----------------------------|-------------------|
| 233 | 14 | blah, blah, blah. | etc. | slang |
| 242 | 6-11 | 14,000, 6,500, 14,000, 6,500, 5,000 | $14,000, $6,500, $14,000, $6,500, $5,000 | clarity |
| 244 | 6-7 | General accounting office | A General Accounting Office | proper name |
| 251 | 18 | accurate, sort of what | accurate, what | clarity |
| 252 | 6 | yeah | yes | slang |
| 262 | 1 | way but as I say, you | way. You | clarity |
| 269 | 23 | longer | long | accuracy |
| 270 | 18 | have a paid physician | have paid a physician | accuracy |

8



**Key Points:**

- Initial 5/4/20 report should never have been filed. Due Process, AMA, NC (Licensees are not required to report any suspension or revocation of privileges until a **"final action"** by the hospital and not until **"all internal appeals within the institution or facility are complete."**)

- Hospital **chose** not to use many resources available to avoid suspension (at *every* step).

- NPDB reports were misleading, incomplete and inaccurate.

- There was no reason they could not void their report (instead they waited until 7/9 and submitted a revision).

- Any legitimate fitness for duty concerns should be addressed separately, to protect his rights to privacy and dignity.

**Inaccuracies in Mission NPDB Documents:**

5/4/20 NPDB Filing:

Lists date of action as 3/3/20 (Illich tells them in his 7/27/21 letter to correct this to 3/25)

Length of Action: "Indefinite"

No mention of 3/10/20 modification

No mention of 4/23/20 recommendation to restore privileges

Lists "Concerns about preoperative planning and intraoperative care" which had already been resolved

**Subsequent NPDB Communication Flaws:**

(1) Corrected 3/3 to 3/25, *but*:

(2) Length of Action still "Indefinite"

(3) No mention of recommendation to restore privileges on 4/23

(4) They wait until July 9th to submit the revision report, even though on JUNE 5th the MEC voted to lift the suspension and not impose the conditions suggested by the Credentials Committee

**The chronology of events illustrates that:**

- Hetzel was excluded from the initial investigation

  > The "Ad Hoc Investigative Committee" activities btwn March 19 – 23 allegedly revealed multiple serious concerns regarding Dr. Hetzel which "indicated a concerning practice pattern"

- However, once he *was* included his privileges were promptly restored

  > April 10th Hetzel meets with Investigative Committee, receives copy of the Committee's report and responds in writing April 17th.

  > April 23rd: "After Dr. Hetzel responded to the investigative committee, another Credentials Committee meeting was called [and] voted to recommend that the precautionary suspension be 'lifted contingent on…the fitness for duty evaluation…" (MSJ).

- There are redactions in documents (committee minutes) and missing letters & verbal communications which prevent a full assessment of actions

  **Bad Faith:**

- Only v. late do fitness for duty concerns appear, and are then comingled with administrative sanctions.

- Serious allegations raised by the Ad Hoc Investigative Committee: unnoticed and/or unaddressed by the hospital, resolved within days of Hetzel's first opportunity (April 10–17) to present his case?

- Failing to offer him recognized avenues to address legitimate concerns (FPPE, etc., NCMB programs)

- Excluding him from the investigatory process

- Refusing to void the report, despite full lifting of all restrictions

- Not honoring his right to privacy and dignity (and TJC standard) in addressing any legitimate health concerns