David John Hetzel, MD,

               Plaintiff,

      vs.

MH Mission Hospital, LLLP,

              Defendant.

**Reply to Dr. Hetzel's
Supplemental Submission**

Mission Hospital hereby responds to Dr. Hetzel's supplemental submission (Doc. 92).

## STANDARD OF REVIEW

A defendant's motion for summary judgment asks "whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986). So the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to prevent summary judgment. *Id. Accord Escobar-Salmeron v. Moyer*, 150 F.4th 360, 372 (4th Cir. 2025) (nonmovant cannot defeat summary judgment by relying on a "few stray (and contradictory) statements in the record"); *Scott v. Harris*, 550 U.S. 372, 380 (2007) (court should disregard a version of events that "is blatantly contradicted by the record").

## ARGUMENT

Dr. Hetzel's supplemental submission relies on arguments that are blatantly contradicted by the record, and it fails to create a genuine dispute of fact about HCQIA immunity, the statute of limitations, the invited-publication defense, or key elements of Dr. Hetzel's tortious-interference claim. This Court

should grant summary judgment for Mission Hospital for the reasons stated below and in our prior briefing.

**1.    Dr. Hetzel's supplemental submission is misleading and fails to create a factual dispute.**

Ms. Shelton testified by declaration that she submitted Report 1, that Report 1 was required, that she believed it was required when she submitted it, that Report 1 was accurate, and that she believed it was accurate when she submitted it. (Doc. 65-8.) Ms. Shelton's deposition testimony did not contradict her declaration.

Dr. Hetzel's supplemental submission badly misrepresents Ms. Shelton's testimony. He relies on things she didn't say and omits or mischaracterizes what she did say. His supplemental submission fails to present even a "scintilla of evidence" for his position, let alone evidence from which "reasonable jurors could find by a preponderance of evidence that the plaintiff is entitled to a verdict." *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

**A.    Ms. Shelton testified that there was a single suspension that was modified but not interrupted.**

Ms. Shelton testified repeatedly that the precautionary suspension was continuous from March 3 to June. Here are some examples:

- "[As of the March 10 modification] He was still under precautionary suspension at that time. … [The March 10 action] was just a modification of that." (Doc. 92-1 at 122.)

- "March 3rd was the original precautionary suspension. It was not interrupted." (Doc. 92-1 at 219.)

- "[The March 10 action] was just a modification. It was not an

interruption of the suspension." (Doc. 92-1 at 220.)

- "Q. … Yes or no, do you disagree that the March 10, 2020 decision was an interruption? [objection] A. I don't agree that it was an interruption." (Doc. 92-1 at 222.)

(*See also* Doc. 65-4 [Hetzel Dep.] at 43 (period of limited privileges was "still a continuation of" the precautionary suspension).)

Dr. Hetzel claims that Ms. Shelton "admitted that there were actually two periods of less than thirty days." (Doc. 92 at 6.) He cites nothing for this claim because it is not true, and he knows it is not true.

## B. Ms. Shelton testified that NPDB rules required Mission Hospital to report Dr. Hetzel's suspension.

Ms. Shelton testified without contradiction that NPDB rules required her to report Dr. Hetzel's suspension. She submitted the report because:

- She was "aware of the rules that required [her] to submit a report." There was no "question in [her] mind as to whether submitting a report was required." (Doc. 92-1 at 283.)

- She was "following the directions in the [NPDB] guidebook and the parameters that are—are listed there." (*Id.* at 212.)

- She "knew the time limit required by the data bank." (*Id.* at 206.)

- She "knew … the rules, and he had been under suspension beyond the 30 days. So [she] knew that was a reporting … ." (*Id.* at 231.)

Dr. Hetzel claims that there is a disputed fact about whether the NPDB required the reporting of Dr. Hetzel's suspension. He relies (at 6) on a single line of testimony that he paraphrases as "Defendant Mission Hospital could have chosen not to report Dr. Hetzel to the NPDB." That testimony was about

Mission Hospital's factual ability to fail to report, not about the NPDB's rules. Ms. Shelton repeatedly testified that Report 1 was required.

### C. Ms. Shelton testified that the April 23 action by the credentials committee did not lift Dr. Hetzel's suspension.

In response to questions about the April 23 modification, Ms. Shelton testified as follows:

A. … [The precautionary suspension] would've been lifted, but it was contingent on the fitness for duty assessments. So *it was not lifted at that time [April 23]. It—it would've taken another action once those were provided and acted on.*

Q. Well, you disputed my language of "lifted" with regard to March 10. So we can agree that you even used the word "lifted" with regard to April 23rd, right?

A. Yes, it's there [in the minutes].

Q. And, in fact, the lifting was to add the ability to provide clinical care, which was similar to what happened on March 10, where the ability to provide clinical care was reinstated, right? [objection]

A. *It did not happen on April 23rd,* but that was the determination that it may be lifted as soon as those fitness for duty evaluations were back and could be reviewed—[interruption from Ms. Beightol].

(Doc. 92-1 at 223–24. *See also id.* at 273–74 (precautionary suspension "had not been lifted [by May 4]").)

Dr. Hetzel claims that there is a dispute about whether the April 23 action by the credentials committee "took Dr. Hetzel from the reinstated full suspension of privileges to, pending the assessments, having privileges

again." For this claim he relies on an ambiguous exchange that conflated the March 10 modification with the April 23 modification. He ignores not only the unambiguous testimony of Ms. Shelton but also the testimony of every other fact witness—including him.[1]

### D.      Ms. Shelton testified that the suspension was indefinite.

According to Dr. Hetzel, "Ms. Shelton unequivocally testified, while looking at Report 1, [that] the suspension 'was not indefinite.'" (Doc. 92 at 9–10.) But in that exchange, Dr. Hetzel's counsel equated "not indefinite" with being "ultimately lifted." (Doc. 92-1 at 210.) The question was not about what Ms. Shelton knew when she submitted Report 1. Ms. Shelton testified that when she submitted Report 1, the precautionary suspension had not ended:

> A.   … I mean, I don't know at the time … that it was not indefinite. …
>
> Q.   May 4th, 2020, you knew it was not indefinite. You knew it had been lifted with condition[s], right?
>
> A.   It had—[objection]—it had not been finalized at that—at that time. … It was modified, but [the modification] was not final until the completion of fitness for duty evaluations had been evaluated.

(Doc. 92-1 at 227–29.) When Dr. Hetzel's counsel later asked if Ms. Shelton

---

[1] The exchange on which Dr. Hetzel relies mentioned only one date, March 10. It discussed being able to "see[] patients" and "operate," which were features of the March 10 modification and not the April 23 modification. (*See* Doc. 92-1 at 160–61.) When asked unambiguous questions, every fact witness has testified that the April 23 action did not lift the precautionary suspension. (Doc. 92-1 at 223–24; Doc. 80-6 [Joslin Dep.] at 291–292 (precautionary suspension "wasn't lifted on [April 23]"); *id.* at 333–334 (same); Doc. 65-4 [Hetzel Dep.] at 62–63 (privileges were "fully suspended from March 25 to June 9").)

wanted to clarify anything, she explained that distinction:

> Q. Oh yes, please correct if you … have something to correct.
>
> A. You asked me about the [NPDB] entries and whether they were indefinite or definite. *They were indefinite when they were—in the beginning, because I didn't know when they would end.* And—and the precautionary suspension did not end until June. I think I got that confused in my—when you asked me the first time. …
>
> Q. It wasn't indefinite. Sitting here today, the truth is it wasn't indefinite, correct?
>
> A. Correct, *as of June of 2020.*
>
> Q. And it's correct that as of May 4, 2020, when you did the initial report, it had been lifted on conditions, true?
>
> A. *At that point, it was still indefinite. It had not been lifted at that point yet.*

(Doc. 92-1 at 273–74. *See also* Doc. 80-6 [Joslin Dep.] at 343 ("indefinite" was accurate at time of report).)

### E.    Ms. Shelton testified that Mission Hospital sought to make Report 1 "basic" to avoid being "overly negative."

Ms. Shelton testified that Report 1 was "not intended to be overly nega-tive."[2] (Doc. 92-1 at 210.) Dr. Hetzel did not ask follow-up questions about

---

[2] This testimony was given in response to a question about why Report 1 did not describe the March 10 modification of the precautionary suspension. Ms. Shelton explained that if that modification had been described, "the limitation to his surgical privileges would've been included," making the narrative more negative. (Doc. 92-1 at 210.) By being vague, Report 1 leaves open the possibility that the limitation on Dr. Hetzel's privileges was mi-nor, whereas Report 3 shows that he had no privileges whatsoever for most of the suspen-sion and effectively no privileges for the remainder. (*See* Doc. 80-6 [Joslin Dep.] at 337–38 (goal for Report 1 was to report minimum required information); Doc. 65-4 [Hetzel Dep.]

the motives for Report 1. Instead he argues that Ms. Shelton's testimony indirectly shows that Report 1 was malicious because Ms. Shelton did not know why certain requested information was not provided to credentialing entities immediately. But that testimony is not about Report 1, and it doesn't help him anyway. (*See also* Doc. 80-6 [Joslin Dep.] at 277 (delay caused by Dr. Hetzel).)

## 2. Dr. Hetzel's supplemental submission still fails to present evidence to defeat Mission Hospital's HCQIA immunity.

To overcome Mission Hospital's HCQIA immunity, Dr. Hetzel has the burden of showing that Report 1 was false and that Mission Hospital knew it was false at the time of submission. To withstand summary judgment, he must present competent evidence of both elements.

[1] Dr. Hetzel has tried to show falsity in five ways. His supplemental submission says that Report 1 should not have been submitted at all (at 6); that it should not have used a March 3 date of action (at 8); that it should not have listed "concerns about preoperative planning and intraoperative care" as the basis for action (at 9); that the narrative was misleading because it omitted the March 10 modification of the precautionary suspension (at 9); and that it should not have listed a date of action of "indefinite" (at 9–10). However, he has not presented evidence supporting any of these arguments.

Dr. Hetzel has not presented evidence that his precautionary suspension should not have been reported. Dr. Hetzel contends that his precautionary suspension ended on April 23. But even if that were true, Dr. Hetzel's privileges

---

at 140 (more detailed narrative of Report 3 was no better for Dr. Hetzel).)

were limited for more than 30 consecutive days, so Report 1 was required. And Dr. Hetzel has presented no competent evidence that his precautionary suspension ended on April 23. He himself testified that his privileges remained suspended after April 23. (Doc. 65-4 at 62–63.)

Dr. Hetzel also has presented no evidence that the contents of Report 1 were false. Dr. Hetzel testified that Report 1 was accurate. (Doc. 65-4 at 126.) So did Dr. Joslin. (Doc. 80-6 at 342–45.) And so did Ms. Shelton.[3]

**[2]** Dr. Hetzel has not presented evidence of knowing falsity. As discussed above, Brenda Shelton testified that she believed that: Report 1 was required, the March 3 date was accurate, the "concerns about planning and care" statement was accurate, "indefinite" was accurate, and the narrative was accurate. Dr. Joslin agreed with all of these points. Even if Report 1 were false, Dr. Hetzel's failure to show knowing falsity would require summary judgment. *Murphy v. Goss*, 103 F. Supp. 3d 1234, 1239 (D. Or. 2015)

**3. Dr. Hetzel's supplemental submission still fails to create a factual dispute as to the limitations and invited-publication defenses to his defamation claim.**

To withstand summary judgment on defamation per se and per quod, Dr. Hetzel must present evidence that creates a factual dispute on both the statute of limitations and the invited-publication doctrine. His supplemental submis-

---

[3] So did Dr. Hetzel's expert. (Doc. 72-2 at 49–50 (endorsing "indefinite"), 26–27 (agreeing that there were concerns about preoperative planning and intraoperative care), 61–62 (agreeing that March 3 was "legitimate" date to report), 64–65 (agreeing that Report 1 narrative was not misleading).)

sion does neither.

**[1]** All but two publications of an NPDB report (both of Report 3) were outside the one-year limitations period for defamation. As we explained, Dr. Hetzel has not pleaded a claim based on Report 3, and a statement made to the government at the government's direction cannot support defamation liability. *Pierson v. Orlando Health*, 2010 WL 4341354 (M.D. Fla. 2010); *Becker v. Philco Corp.*, 372 F.2d 771, 775 (4th Cir. 1967). Dr. Hetzel's supplemental submission confirms that "Mr. Illich of [DHHS] directed" Mission Hospital to submit Report 3 and dictated its contents. (Doc. 92 at 8.)

**[2]** Dr. Hetzel's last word on the invited-publication doctrine was that "sign[ing] an authorization directing the release of [NPDB] Reports to a hiring entity" would be an "overt, intentional and affirmative act[] directing publication." (Doc. 81 at 21.) He said this to distinguish *Harrell v. City of Gastonia*, 392 F. App'x 197, 207 (4th Cir. 2010), which held that a defamation claim failed under the invited-publication doctrine. We responded by showing that Dr. Hetzel had signed authorizations directing the release of his NPDB reports to the only two potential employers who received them. (Doc. 82 at 4; Doc. 82-2.) He has no further response.

4. **Dr. Hetzel's supplemental submission still fails to present evidence of key elements of Dr. Hetzel's tortious-interference claim.**

To withstand summary judgment on his tortious-interference claim, Dr. Hetzel needed to present evidence that Mission Hospital acted with legal malice, that it actively induced potential employers not to hire Dr. Hetzel, and

that a specific contract would have been entered into if not for Report 1. Dr. Hetzel's supplemental submission fails to do so.

[1] Dr. Hetzel must show that Mission Hospital's sole motive in making Report 1 was to harm him. *E.g.*, *Wells Fargo v. Link*, 372 N.C. 260, 284 (2019). Dr. Hetzel argues that one motive was a desire to harm him; however, he does not dispute the testimony that Mission Hospital believed Report 1 was required, which was a legitimate motive for making the report. (Doc. 92-1 at 206, 212, 231, 283.)

[2] Dr. Hetzel must show that Mission Hospital "actually sought" to prevent his hiring through "active persuasion, request, or petition." *Esposito v. Talbert & Bright*, 181 N.C. App. 742, 745 (2007); *Charah, LLC v. Sequoia Services*, 2019 NCBC 17, ¶ 40. Although he contends (at 13) that Ms. Shelton knew that Report 1 would be "considered" by credentialing entities, he does not contend that she sought that result or that the submission of Report 1 was "active persuasion, request, or petition." The undisputed evidence is that Mission Hospital did not want Report 1 to be "overly negative" and did not communicate with prospective credentialing entities except in response to requests. (Doc. 92-1 at 209.)

[3] Dr. Hetzel must show that a specific contract would have been made if not for Report 1. *MarketPlace v. Vaughn*, 2023 NCBC 17, ¶ 84. His supplemental submission seeks to show that Report 1 was, in general, harmful to his reputation and employment prospects. But Dr. Hetzel still does not present evidence that if not for Report 1 he would have been successfully

credentialed at Texas Tech and its affiliated hospitals. The only testimony on the subject is still that he does not know. (Doc. 65-4 at 184–85.)

## CONCLUSION

Dr. Hetzel's supplemental submission has failed to create a dispute of material fact that would prevent the entry of summary judgment on HCQIA immunity, on the defamation claims, or on the tortious-interference claim. This Court should enter judgment for Mission Hospital.

Submitted June 23, 2026.

ROBERTS & STEVENS, PA

/s/David Hawisher

Phillip Jackson (#21134)
   pjackson@roberts-stevens.com
David Hawisher(#55502)
   dhawisher@roberts-stevens.com
PO Box 7647
Asheville, NC 28802
(828) 252-6600
*Counsel for Defendants*

## CERTIFICATES

**Service.** I have served this document by ECF.

**AI Use.** The foregoing document complies with this Court's standing order at 3:24-mc-104 because its preparation did not involve the use of prohibited artificial intelligence tools and because an attorney has personally verified its accuracy as required by the standing order.

Certified June 23, 2026.

ROBERTS & STEVENS, PA

/s/David Hawisher
David Hawisher